# Exhibit A

| | |
|---|---|
| **From:** | Tu, Michael C. |
| **Sent:** | Tuesday, February 21, 2023 9:31 AM |
| **To:** | Fatale, Alfred L. |
| **Cc:** | Cotilletta, Joseph; Rowley, Robert; Rina Restaino; brian@schallfirm.com; Schwartz, David J.; Gardner, Jonathan; Sweeney, Benjamin Brink; Fukumura, Koji; Liu, Ryan; Daniel Laguardia; Daniel.Lewis@Shearman.com; 'elizabeth.stewart@shearman.com' |
| **Subject:** | RE: Honest - Lead Plaintiff Deposition |

Dear Al:

This follows our call yesterday as well as your email below.  We appreciate that Ms. Ng resides in San Francisco and is busy with work obligations.  We note, however, that it was her decision to become involved in this litigation in the Central District of California and to put herself forward as both lead plaintiff and proposed class representative.  The timing of the class certification briefing has also been known for many months, and we would have expected Ms. Ng to set aside time to fulfill her obligations in connection therewith, including the time to travel to the locus of the litigation and to sit for deposition after putting herself forward as the proposed class representative.

Nevertheless, as a professional courtesy, we will agree to hold the deposition remotely on Sunday rather than in-person on a business day, as you have requested.  We will re-notice the deposition for **9:30am PST this Sunday, February 26, 2023**, with the understanding and agreement from you that you will extend similar courtesies, when requested, with respect to the timing and location of depositions of defendants and/or their witnesses going forward.  (We assume and do not imply that this would not otherwise be the case.)

If this reflects our understanding, let us know and we will send an amended notice and details regarding access to the zoom session.

Best regards,
Mike

**Michael C. Tu**
Cooley LLP
355 South Grand Avenue, Suite 900
Los Angeles, CA 90071
+1 310 883 6550 direct
+1 213 561 3205 direct
+1 213 561 3250 main
mctu@cooley.com
www.cooley.com/michael-tu

**From:** Fatale, Alfred L. <AFatale@labaton.com>
**Sent:** Monday, February 20, 2023 3:42 PM
**To:** Tu, Michael C. <mctu@cooley.com>; Fukumura, Koji <kfukumura@cooley.com>; Liu, Ryan <RLiu@cooley.com>; Daniel Laguardia <Daniel.Laguardia@Shearman.com>; Daniel.Lewis@Shearman.com; 'elizabeth.stewart@shearman.com' <Elizabeth.Stewart@Shearman.com>
**Cc:** Cotilletta, Joseph <JCotilletta@labaton.com>; Rowley, Robert <RRowley@labaton.com>; Rina Restaino <rina@schallfirm.com>; brian@schallfirm.com; Schwartz, David J. <DSchwartz@labaton.com>; Gardner, Jonathan <JGardner@labaton.com>
**Subject:** Honest - Lead Plaintiff Deposition

**[External]**

Michael,

Thanks for speaking earlier today and taking our proposal under consideration.  As I mentioned, in balancing some urgent work related matters our client is facing at the moment and the upcoming deadline for your opposition to her motion for class certification (March 6, 2023), we are able to make Lead Plaintiff available for a deposition on Sunday, February 26, 2023.

Also, we request that the deposition be conducted remotely.  As noted, Lead Plaintiff lives in San Francisco and Joe or I will also need to participate.  Not only are we both on the East Coast but we are both currently schedule to be traveling with family that day (Joe is coming back from Florida with his family and I'm traveling to Florida that day with my family).  Nevertheless, to facilitate this deposition occurring in a workable time period, Joe and I are willing to flip a coin and modify our travel plans to facilitate a remote deposition on that day.

Thanks again for consideration.

Al



**Alfred L. Fatale III | Partner**
140 Broadway, New York, New York 10005
T: (212) 907-0884 |  F: (212) 883-7084
E: afatale@labaton.com  |  W: www.labaton.com



***Privilege and Confidentiality Notice*** This electronic message contains information that is (a) LEGALLY PRIVILEGED, PROPRIETARY IN NATURE, OR OTHERWISE PROTECTED BY LAW FROM DISCLOSURE, and (b) intended only for the use of the Addressee(s) named herein. If you are not the Addressee(s), or the person responsible for delivering this to the Addressee(s), you are hereby notified that reading, copying, or distributing this message is prohibited. If you have received this electronic mail message in error, please contact us immediately at 212-907-0700 and take the steps necessary to delete the message completely from your computer system. Thank you.

# Exhibit B

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

IN RE THE HONEST COMPANY,     ) Case No.

INC. SECURITIES LITIGATION.   ) 2:21-cv-7405-MCS-PLA

                                          )

                                          )

                                          )

_____  )

VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED DEPOSITION OF

KATHIE NG

Sunday, February 26, 2023

Remotely Testifying from San Francisco, California

Stenographically Reported By:

Hanna Kim, CLR, CSR No. 13083

Job No. 5780519

Page 1

off the record.

Does that sound okay?

A. Yes.

Q. As you heard before we came on the record, this deposition will also be a little trickier in that we're doing it remotely, and so we'll be introducing exhibits via Exhibit Share.

We'll -- we'll just sort of take it slowly. And if you have any questions, including as we begin to introduce exhibits or you have any trouble viewing exhibits, please just let us know.

Okay?

A. Okay.

Q. Do you have any questions about the ground rules I've just gone over?

A. No.

Q. Okay. I'm going to mark and introduce as Exhibit 1 a document entitled "DEFENDANT THE HONEST COMPANY, INC.'S AMENDED NOTICE OF DEPOSITION OF LEAD PLAINTIFF AND PROPOSED CLASS REPRESENTATIVE KATHIE NG."

Can you let me know when you have that document in front of you, Ms. Ng.

A. Okay.

(Kathie Ng Deposition Exhibit 1 was marked electronically.)

Page 14

THE WITNESS: I have it in front of me.

BY MR. SWEENEY:

Q. Have you ever seen this document before?

A. I have.

Q. Do you understand what this document is?

A. Yes.

Q. What do you understand it to be?

A. This is a motion to -- oh, I'm so sorry. I was moving to -- move this as a class action case.

Q. Okay. I'll represent to you, Ms. Ng, that this is a document to take your deposition today.

A. Okay.

Q. When did you learn that you would need to testify at a deposition in this -- in connection with this litigation?

A. I believe the beginning of this week.

Q. And who told you?

A. Rina.

Q. Prior to this week, did you have any understanding as to whether or not you would need to testify at a deposition in this case?

A. No.

Q. So you didn't have any understanding one

Page 15

way or another?

A. I wasn't aware, no.

Q. Okay. Did you prepare in any way for your testimony today?

A. Yes.

Q. What steps did you take to prepare?

A. I just met with the attorneys to discuss --

Q. Which --

A. -- with -- I'm sorry?

Q. No, I'm sorry. Please continue.

A. I met with the attorneys over phone to discuss what I can expect today.

Q. And which attorneys did you speak with?

A. Joseph, Rina, and Al.

Q. Was there just -- just one call or multiple calls?

A. Initially it was just one call with Rina. And it was a brief call the second time with Rina and Brian. And a Zoom meeting with Rina, Al, and Joe the third time.

Q. About approximately how much time altogether would you estimate you met with your attorneys regarding this deposition?

A. Oh, I'd say maybe two to three hours.

Page 16

Q. Did you review any documents in preparation for today's deposition?

A. Yes.

Q. Did those documents refresh your recollection as to any issues or matters in connection with this litigation?

A. It did.

Q. Which documents did you review?

A. The Complaint, the -- the Complaint, the Certification Motion.

Q. When you say the "Certification Motion," are you referring to the Lead Plaintiff's motion for class certification?

A. Correct.

Q. Do you recall which Complaint you reviewed? Was it the original Complaint or the Consolidated and Amended Complaint --

A. I believe it was the Consolidated.

Q. Okay.

Have you seen --

THE COURT REPORTER: I'm going to ask -- I'm sorry. I'm going to ask you both to slow down because we're catching each other's toes.

Thank you.

THE WITNESS: Okay.

Page 17

5 (Pages 14 - 17)

Q. Did you attend college?

A. I did.

Q. Where?

A. San Francisco State University.

Q. And did -- did you graduate?                    09:58:08

A. I did.

Q. What year?

A. 1991 -- oh, no, I'm so sorry. Let me...
1991.

Q. And did you have a -- a major or an area   09:58:21 of focus?

A. I did. I earned a BS degree in business management.

Q. Did you attend any postgraduate schooling?

A. I did not.                    09:58:43

Q. Are you aware that the Defendants in this case have requested a copy of your curriculum vitae or resume?

A. Yes.

Q. Do you have a resume?                    09:59:03

A. I do not.

Q. Have you ever had a resume?

A. Many years ago, yes.

Q. Have you provided that to your attorneys?

A. No, it -- it -- no.                    09:59:29

Page 22

Q. Are you currently employed?

A. I am.

Q. Who is your employer?

A. Doma Title of California.

Q. Can you tell me what kind of company that   09:59:54 is?

A. It's a title escrow company.

Q. And how long have you been employed there?

A. A little over two years.

Q. And what is your current title?                    10:00:12

A. Escrow officer.

Q. Can you please briefly explain in your own word -- excuse me, your own words what that role encompasses.

A. I handle real estate and refinance          10:00:25 transactions from beginning to end. We're a neutral third party. We're the intermediary between banks, buyers, and lenders.

Q. Do you interact often with attorneys in connection with your job?                    10:00:42

A. Not often.

Q. What is your current salary?

**Redacted for PII**

Page 23

Q. -- a year?

A. -- correct.

Q. Thank you.
Have you been in escrow -- I'm sorry. Let me back up.                    10:01:18
Did you say escrow officer or escrow agent?

A. Escrow officer.

Q. And have you been an escrow officer the whole time you've been at Doma?                    10:01:27

A. Yes.

Q. Were you implied -- or excuse me.
Were you employed somewhere else prior to Doma?

A. Yes.                    10:01:43

Q. And where was the last place you were employed before Doma?

A. Chicago Title Company.

Q. And were you also an escrow officer there?

A. I was.                    10:01:53

Q. And for how long were you employed at Chicago Title Company?

A. A little over ten years.

Q. And for all that time, were you employed as an escrow officer?                    10:02:10

Page 24

A. Correct.

Q. Were you employed somewhere else prior to Chicago Title?

A. I was.

Q. And where was that?                    10:02:27

A. Old Republic Title.

THE COURT REPORTER: I'm sorry, what Republic Title?

THE WITNESS: Old Republic Title.

BY MR. SWEENEY:                    10:02:39

Q. And were you also an escrow officer there?

A. I was.

Q. And for how long were you employed at Old Republic Title?

A. I don't recall exactly, but I want to say   10:02:47 about a year.

Q. Since college, have you held any employment other than as an escrow officer?

A. I worked in retail.

Q. And do you recall approximately when that   10:03:00 was?

A. 1995-ish.

Q. And what kind of retail?

A. I worked for Toys "R" Us.

Q. And what exactly was your position at        10:03:28

Page 25

7 (Pages 22 - 25)

electronically.)

BY MR. SWEENEY:

Q. So, Ms. Ng, please let me know when you have this up.

For purposes of the record, I'm introducing as Exhibit Number 2, a document Bates stamped HONEST_NG_000000001.

A. I have it up.

Q. Do you recognize this document, Ms. Ng?

A. It looks vaguely familiar.

Q. Do you have an understanding as to what this document is?

A. This looks like a printout of the information I inputted.

Q. And that's the information that you were just describing to me having submitted?

A. Correct.

Q. And if you look on the first page, there's a section that says "How did you hear about this case?"

Do you see that?

A. Yes, I do.

Q. And below that, it says "Internet Search."

Do you see that?

A. Yes.

Page 30

Q. And you understand that this -- stri- -- strike that.

Do you recall performing an internet search that led you to fill out and submit this form?

A. I'm not quite sure what your question is.

Q. Sure.

You mentioned that you clicked on a link in a press release about an investigation of The Honest Company; is that correct?

A. That's correct.

Q. And how did you come across that press release?

A. Okay. The internet. I was on the internet.

Q. And did you -- strike the question.

And did you come across it in the course of a particular search using the internet?

A. I believe I was searching articles under Honest Company [verbatim].

Q. And do you recall why you were searching articles under The Honest Company?

A. At this point, you know, the stock price had dropped, so I was monitoring it every day just to see where it was at, and I would see articles pop

Page 31

up.

Q. So at the time you first came across the press release with the link to the Schall firm's web page, you were monitoring Honest share prices; is that correct?

A. Correct.

Q. Were you actively looking for press releases concerning investigations or lawsuits against The Honest Company?

A. I wasn't --

MR. COTILLETTA: Objection to form.

MR. SWEENEY: Hanna, did we get a clean answer on that?

THE COURT REPORTER: No, we did not.

BY MR. SWEENEY:

Q. Can you please answer the question again, Ms. Ng.

A. I was not.

Q. Do you recall what, if anything, happened after you submitted this form on the Schall firm's website?

A. I received a call from someone at the law firm.

Q. And do you recall approximately when that call was?

Page 32

A. I believe it was that day.

Q. And if you could just scroll to the second page of the document I've marked Exhibit 2. It's fairly faint, but you can see in the last box under the -- under the line that says "Admin Notification," it says in slightly light font, "September 20, 2021."

Do you see that?

A. I do.

Q. And does that sound correct that you submitted this form on September 20, 2021?

A. I don't recall the exact date.

Q. But you have no reason to believe it was not September 20, 2021?

A. Correct.

Q. You mentioned you got a call from someone at the Schall firm.

Did you -- did they become your attorneys on that call, do you recall?

MR. COTILLETTA: I'm going to object to form and just instruct, Kathie, just -- just be careful about your response because obviously, you don't want to touch on attorney-client privilege.

So, Ben, if you can repeat the question, I'd appreciate it.

Page 33

9 (Pages 30 - 33)

MR. SWEENEY:  Yeah, sure.

BY MR. SWEENEY:

Q.  Did -- did you retain the Schall firm to serve as your attorneys on that call that you referenced on September 20th, 2021?                    10:15:56

A.  I don't believe I did.

Q.  Do you know at what point you retained them to serve as your attorneys?

A.  I don't.

Q.  Did you ever perform any sort of research    10:16:11 regarding the Schall firm?

A.  I may have.  I don't recall exactly.

Q.  Do you not recall, one way or another, whether you performed any research or just not recall what research you performed?               10:16:56

A.  The latter.

Q.  Do you recall when you first heard the name "Labaton Sucharow"?

A.  It was shortly after I started working with the Schall firm.                          10:17:24

Q.  Do you recall whether it was after you had already retained the Schall firm to serve as your attorneys?

A.  I believe it was.

Q.  Had you ever interacted or had any manner    10:17:37

Page 34

or dealings with either the Schall firm or Labaton Sucharow prior to this case?

A.  No.

Q.  Had you ever heard about either firm prior to this case?                                 10:18:00

A.  No.

Q.  Have you ever contacted any attorneys other than those employed by the Schall firm in Labaton Sucharow in connection with Honest or its stock?                                      10:18:26

A.  I did not.

Q.  You understand that at some point in 2021, a lawsuit was filed on your behalf; correct?

A.  Correct.

Q.  Whose decision was it to file that        10:19:00 lawsuit?

A.  My decision.

Q.  And you understand that that lawsuit was filed as a class action?

MR. COTILLETTA:  Objection to form.      10:19:17

I -- I just want to clarify.  Are you talking about, Ben, when you say "lawsuit," can -- can you -- can you clarify that for the witness.  She is a layperson.  Just want to make sure we're talking about the same thing in terms of dates.    10:19:31

Page 35

MR. SWEENEY:  Yeah.  Let's see.

Yeah.  I'm sorry, Joe.  So which did -- which part of the question do you want me to clarify?  I'm looking back.

MR. COTILLETTA:  The year.  You said filed   10:20:36 a lawsuit.  Her filing a lawsuit in 2021.

MR. SWEENEY:  Okay.  Sure.

BY MR. SWEENEY:

Q.  You understand that in 2021, you had applied -- I want to strike the question.           10:20:52

Well, I think we can just leave that line of questioning.

You understand that at some point, a lawsuit was filed on your behalf; correct?

A.  That's correct.                        10:21:45

Q.  And what -- what, if anything, did you hope to accomplish by the filing of that lawsuit?

MR. COTILLETTA:  Objection.  Form.

BY MR. SWEENEY:

Q.  You can answer.                        10:22:02

A.  Oh.  To recover some of the losses that I suffered.

Q.  And when you say losses that you suffered, are you referring to losses related to a decrease in the stock price of Honest?                       10:22:20

Page 36

MR. COTILLETTA:  Objection.  Form.

BY MR. SWEENEY:

Q.  You can answer.

A.  Correct.

Q.  And I asked you earlier whether you'd       10:22:29 reviewed the consolidated and amended complaint prior to filing, and I think you said that you believed you had.

Is that right?

A.  Correct.                              10:22:46

Q.  Did you take any steps personally to investigate or otherwise verify the information in the consolidated and amended complaint?

A.  I did not.

Q.  Do you have an understanding regarding the  10:23:04 nature of the allegations against the defendants in this case?

A.  I do.

Q.  Can you please tell me what your understanding is?                                  10:23:21

A.  My understanding is that The Honest Company potentially violated the Securities Act.

Q.  And do you contend that the The Honest Company violated the Securities Act in connection with particular SEC filings or other documents?    10:23:42

Page 37

10 (Pages 34 - 37)

MR. COTILLETTA: Objection. Form.

BY MR. SWEENEY:

Q. You can answer.

A. I believe so, yes.

Q. And sitting here right now, do you know what those documents are?

MR. COTILLETTA: Objection to form.

BY MR. SWEENEY:

Q. You can answer.

A. Not off the top of my head.

Q. Do you have any arrangement concerning payment of fees and costs with your attorneys in connection with this litigation?

A. I do.

Q. And what is your understanding of that arrangement?

A. Well, I don't have the retention agreement memorized, but it's spelled out on there.

Q. Sure.

But setting aside what's spelled out -- strike that.

Understanding that you don't have the retention agreement in front of you --

A. Mm-hmm.

Q. -- do you have a general understanding,

Page 38

sitting here, of whether or not you are responsible for paying their fees or costs?

A. I do.

Q. And what is your general understanding?

A. I'm not responsible.

Q. What, if anything, do you expect to recover in the event that one of more of the defendants is found to be liable?

A. Can you repeat that question?

Q. Sure.

What, if anything, do you expect to recover if one or more of the defendants is found liable?

A. Money compensation.

Q. And do you have any understanding as to the size or amount of money compensation that you are seeking?

MR. COTILLETTA: Objection. Form.

THE WITNESS: No. I believe there will be --

BY MR. SWEENEY:

Q. You -- I'm sorry.

A. It's okay.

I believe there will be experts who can determine the value of the case. And I'll leave it

Page 39

up to the attorneys.

Q. You understand that you're the Lead Plaintiff in this case; correct?

A. I do.

Q. Do you recall when you became Lead Plaintiff?

A. I believe it was towards the end of 2021.

Q. Do you have any understanding regarding the role and responsibilities of a Lead Plaintiff?

MR. COTILLETTA: Objection to form.

BY MR. SWEENEY:

Q. You can answer. And just sort of generally going forward, unless he instructs you not to answer, please just go ahead and -- and -- and answer once he's finished his objection.

A. Okay.

I do.

Q. And what is your understanding?

A. Well, as Lead Plaintiff, I suffered the highest loss out of all the members. And my role is to oversee the case from beginning to end, to work alongside with the attorneys, and to seek a favorable recovery for the class members.

Q. And have you been overseeing the litigation since you were appointed Lead Plaintiff?

Page 40

A. I have.

Q. What actions have you taken to oversee the litigation since becoming Lead Plaintiff?

A. I've reviewed documents that were prepared and before they were filed. I kept in touch with the attorneys.

And -- excuse me -- my phone's ringing -- let me turn it off.

And -- and they kept me up to date with the case thus far.

Q. Approximately how often would you estimate you communicate with your attorneys regarding this case?

A. I would say my best guesstimate would be about, you know, once -- once every quarter or -- or so. Maybe three to four months.

Q. And what form did those communications usually take? To be clear, I don't want the -- the content of your communications, but is it a phone call, e-mail? What's the predominant means of communication?

A. The predominant means is by e-mail.

Q. Have you made any decisions regarding the prosecution of this litigation since you became Lead Plaintiff?

Page 41

11 (Pages 38 - 41)

of the way and be able to make a decision with the settlement.

Q. Did you speak with anyone other than your attorneys regarding a decision to apply to serve as class rep?    10:34:50

A. No.

Q. Do you have any sort of understanding regarding what a class action is?

A. Yes.

Q. Can you tell me what your understanding    10:35:07 is?

A. There's a group of us who suffered the same loss.

Q. And do you have any understanding regarding the -- the -- excuse me.    10:35:20

Do you have any understanding regarding the responsibilities of a class representative?

A. Yes.

Q. And what is your understanding?

A. Well, I have to look out -- I have a    10:35:30 fiduciary responsibility to the class members, and I have to look out for the -- their best interest.

Q. Anything else that you can think of?

A. Just to work closely with the attorneys and just to oversee and supervise and monitor the    10:35:49

Page 46

attorneys.

Q. And can you please describe the class that you are seeking to represent.

A. The shareholders. Is that your question?

Q. Sure. So just if you could give me --    10:36:04

A. Okay.

Q. -- to the best of your knowledge a description of the class that you're seeking to be the representative of in this litigation.

A. The shareholders who invested and suffered    10:36:15 a loss.

Q. Do you have any understanding as to whether or not your claims individually are typical of the proposed class?

A. I'm not --    10:36:49

MR. COTILLETTA: Objection to form.

THE WITNESS: Can you rephrase that, please.

BY MR. SWEENEY:

Q. I don't think I'm going to rephrase it,    10:36:59 but I'll -- I'll -- I can repeat it.

A. Okay.

Q. And if you -- if you don't have an understanding, you know, that's fine. You can just say that.    10:37:06

Page 47

But do you have any understanding as to whether or not your individual claims are typical of the proposed class?

MR. COTILLETTA: Objection to form.

THE WITNESS: Yeah, I'm not -- I'm not    10:37:21 quite sure what that question -- what you're asking.

BY MR. SWEENEY:

Q. Do you think you would be an adequate class representative?

A. I believe so.    10:37:51

Q. And why is that?

A. Because I understand the case and I understand what needs to happen. And I'm just looking out for the best interest for the entire class because we have the same goal.    10:38:06

Q. And what is that goal?

A. The goal is to be compensated monetarily for the -- the losses that we suffered.

Q. Do you believe that other Plaintiffs would be inadequate class representatives?    10:38:33

A. No.

Q. Do you intend to make yourself available to prosecute this litigation?

A. I do.

Q. How often do you plan to speak with your    10:38:51

Page 48

attorneys about this case?

A. On a regular basis.

Q. And would a regular basis be the every couple-months' intervals that you described to me a little bit ago?    10:39:15

A. That or whatever --

MR. COTILLETTA: Objection to form.

THE WITNESS: That or whatever -- whatever is necessary.

BY MR. SWEENEY:    10:39:24

Q. Do you consider your job as an escrow officer to be particularly demanding?

A. I do.

Q. Is it particular- -- particularly demanding in -- during certain times of the year?    10:40:18

A. It can be.

Q. Is one of those times right now?

A. Not so much right now because of the market.

Q. So I'll represent to you that your    10:40:35 attorneys told us that you would be unable to attend a deposition on a weekday because your work schedule was too busy.

Is that true?

A. It's busy, yes.    10:41:02

Page 49

13 (Pages 46 - 49)

Q.  They also told us you were unable to travel to Los Angeles because of your work schedule.

Is -- is that true?

A.  That's true.

Q.  If there were ever another reason why you needed to -- to travel to Los Angeles, for instance to attend trial, would you be able to do that?

A.  If I had ample notice, I can try to make arrangement to do so.  But with this deposition, it was so such short notice, I wasn't able to.

Q.  Do you anticipate that your work schedule will interfere with your participation in this litigation going forward?

A.  No.

Q.  Are you taking any steps to ensure that it does not interfere?

A.  Well, again, if I just have ample notice, I'll be able to participate no problem and be -- make myself available.

Q.  And just to confirm and make sure I'm remembering correctly, you mentioned that the first time you learned that you might need to testify at a deposition in this case was earlier this week; is that right?

MR. COTILLETTA:  Ob- -- ob- -- objection

Page 50

to form.

THE WITNESS:  That's correct.

BY MR. SWEENEY:

Q.  Do you have any understanding regarding how much time you might need to devote to this litigation?

A.  I do have.

Q.  I'm sorry, can you please repeat --

A.  I said I do.

Q.  And what is your understanding?

A.  My understanding is time-wise I just need to make myself available in terms of, as you mentioned, if I had to attend for the trial, I understand I need to make myself avail- -- available for however long it takes.  And I'm prepared to do that.

Q.  And do you think you can do that even given the demanding nature of your job?

A.  Yes, with ample notice.

THE COURT REPORTER:  Counsel, this is the court reporter.  Whenever you get to a good breaking point, I'm going request a break, please.

MR. SWEENEY:  Yeah, just a -- a couple more -- I think, you know, just another two minutes and we can be at a good breaking point.

Page 51

BY MR. SWEENEY:

Q.  Ms. Ng, do you consider yourself to be someone with good judgment generally?

A.  I think so.

Q.  And do you have any medical conditions that might impair your judgment?

A.  No.

MR. SWEENEY:  Okay.  I'm -- I -- I think a break's fine now.  I'm prepared to go off the record.

THE VIDEOGRAPHER:  We're going off the record at 10:44 a.m.

(Short recess taken.)

THE VIDEOGRAPHER:  We're on the record at 11:05 a.m., and this is the beginning of Media 2 in the deposition of Kath- -- Kathie Ng.

BY MR. SWEENEY:

Q.  Welcome bass [verbatim] -- back, Ms. Ng.  You understand you're still under oath; right?

A.  I do.

Q.  Great.

Before we went off the record, I was asking you some questions about decisions you'd made in this litigation.  And there was some back and forth with me and your attorney, Mr. Cotilletta,

Page 52

regarding the attorney-client privilege.

So I'm going to do my best to ask similar questions while steering clear of privilege issues.  And, again, I want to be very clear, I -- I'm not asking for you to give me the substance of any of the communications between you and your attorneys.

Did you review the Motion for Appointment as Lead Plaintiff filed in the fall of last year?  Or, excuse me, back up.  Excuse me.

Did you review, prior to filing, the Motion for Appointment as Lead Plaintiff filed in fall of 2021?

A.  I did.

Q.  Did you review the Motion for Appointment as Class Representative and Certification of the Class filed in February of this year?

A.  I did.

Q.  And did you review the Consolidated and Amended Complaint filed in February of 2022?

A.  I did.

Q.  Can you think of any other court filings in this case that you have reviewed?

A.  The Complaint.  There were several other documents that I did review and --

Q.  And were -- I'm sorry.

Page 53

14 (Pages 50 - 53)

A. No, that's fine.

Q. And were those --

A. There were some other documents I reviewed.

Q. Were those other documents to your    11:07:41 knowledge filed in connection with either the Lead Plaintiff motion or the class certification motion?

A. I believe so.

Q. Do you also recall responding to questions from Defendants called interrogatories in this case?    11:08:09

A. I do.

Q. Okay. So I'm going to introduce another exhibit now. I think this will be Exhibit 3.

(Kathie Ng Deposition Exhibit 3 was marked electronically.)    11:08:22

MR. SWEENEY: You should all have it shortly.

So for purposes of the record, I'm marking as Exhibit 3 "LEAD PLAINTIFF'S RESPONSES AND OBJECTIONS TO THE HONEST COMPANY, INCORPORATED'S    11:08:35 FIRST SET OF INTERROGATORIES TO LEAD PLAINTIFF AND PROPOSED CLASS REPRESENTATIVE KATHIE NG." [As read]

BY MR. SWEENEY:

Q. Can you let me know when you that up, Ms. Ng?    11:08:47

Page 54

A. I will.

Okay. Exhibit 3?

Q. Yes.

A. Okay. I -- I have it up now.

Q. And do you recognize this document,    11:09:15 Ms. Ng?

A. I do.

Q. And do you recognize it to be the interrogatory responses that we were just discussing?    11:09:25

A. Correct.

Q. And did you participate in putting these responses together?

A. I did.

Q. And you reviewed the document before it    11:09:40 was finalized and sent to Defendants?

A. I did.

Q. Do you recall whether you made any edits?

A. I probably did, but I can't recall.

Q. And each of the answers included in these    11:10:05 responses is true and complete to the best of your knowledge; correct?

A. That's correct.

Q. Okay. If you please turn to page 17 of this document where it says "Interrogatory Number    11:10:27

Page 55

11."

And let me know when you're there.

A. I'm there.

Q. Could you please read aloud the text of the interrogatory beginning at line 6 on this page.    11:10:44

A. Line 6 through 9 or just 6?

Q. 6 through 9, please.

A. Okay. "IDENTIFY, INCLUDING by providing the case name, jurisdiction, case number and subject matter, any civil, regulatory, administrative,    11:11:04 and/or criminal lawsuit or proceeding in which YOU are or have been a party, class member, or witness."

Q. And then if you would please direct your attention to line 25 and 26 and read the response there for me aloud, please.    11:11:27

A. "Subject to and without waiving the foregoing objections, Lead Plaintiff states that she is unaware of any such lawsuits or proceedings."

Q. Do you recall providing that answer?

A. I recall.    11:11:46

Q. And that answer is true?

A. That's true.

Q. Do you recall having been sued in small claims court by Diaz and Partners Property Management?    11:12:09

Page 56

A. I vaguely remember that. That was, from my memory, against my property manager. My name may have been on it, but I -- I didn't go to court or anything like that.

MR. SWEENEY: I'm going to mark another    11:12:37 exhibit.

Okay. This is going to be Exhibit 4.

(Kathie Ng Deposition Exhibit 4 was marked electronically.)

BY MR. SWEENEY:    11:12:56

Q. If you can let me know when you have it up, Ms. Ng.

A. I have it up.

Q. I was just asking you about an action filed in small claims court by Diaz and Partners    11:13:31 Property Management.

A. Mm-hmm.

Q. Do you remember that, the conversation we were just having?

A. I do remember that.    11:13:39

Q. And you said you thought it was against your property manager; is that correct?

A. I did say that.

Q. Do you see your property manager listed on this printout?    11:13:53

Page 57

15 (Pages 54 - 57)

A.  I do not.

Q.  And the address listed here is your home address, correct --

A.  Correct.

**Redacted for PII**

A.  Yes, that's correct.

Q.  And having looked at this document, is it still your testimony that the small claims claim was made not against you, but against your property   11:14:38 manager?

A.  That -- that's my recollection.

Q.  And you never went into court regarding this matter?

A.  I don't believe so.   11:14:51

Q.  Do you recall if anyone ever served you papers regarding this matter?

A.  I don't recall.

Q.  Do you know someone named Howard Dong?

A.  Yes.   11:15:28

Q.  And who is that?

A.  That's my ex.

Q.  Do you recall anything else regarding this case?

A.  Well, I know who the parties are.   11:15:52

Page 58

Q.  Sure.

And who are the parties --

A.  The case -- I don't understand the case.

Diaz and Partners was our property manager for a property that we had in Idaho.   11:16:06

Q.  You and Mr. Dong?

A.  That's correct.

Q.  Was Diaz and Partners Property Management your property manager?

A.  They were a -- they -- they were the   11:16:35 initial property manager.

Q.  Is Diaz and Partners the property manager that you had understood the claim to be against?

A.  No.

Q.  Is that a different property manager?   11:16:55

A.  It is.  It was the one after Diaz and --

Q.  And do you recall --

A.  -- Partners.

Q.  Sorry.

Do you recall the name of that other   11:17:05 property manager?

A.  Offhand, I -- I don't.  It's been a while.

Q.  Did you ever pay the hundred and $16 referenced in this document to Diaz and Partners Property Management?   11:17:36

Page 59

A.  I don't recall.

Q.  Do you recall whether Mr. Dong did?

A.  I don't think he did.

Q.  Is there a reason this case was not included in your response to Interrogatory Number   11:18:03 11?

A.  Quite honestly, I don't even recall this at all.

Q.  Do you presently have any liens against your assets that you're aware of?   11:18:30

A.  No.

Q.  Do you recall having ever been named as a defendant in a lawsuit filed by Toorak Capital Partners?

A.  No, I do not.   11:18:59

MR. SWEENEY:  I'm going to introduce another exhibit.  This will be Exhibit Number 5, I think.

(Kathie Ng Deposition Exhibit 5 was marked electronically.)   11:19:33

BY MR. SWEENEY:

Q.  If you could let me know when you have this up, Ms. Ng.

A.  I have it up.

Q.  And if you could scroll down to the third   11:19:52

Page 60

page of the PDF, which is page 2 of the pleading, there's a paragraph number 9.

Do you see that?

A.  Page 2.  Let's see.

Okay.   11:20:17

Q.  And you see where it says "Defendant Kathie Ng is an individual believed to reside in San Francisco California" -- or excuse me -- "San Francisco County, California, who may claim an interest in the Subject Property." [As read]   11:20:29

A.  Mm-hmm.

Q.  Do you see that?

A.  Yes.

Q.  Do you have any understanding regarding whether this document is referring to you?   11:20:35

A.  Well, I do see a name on here that I recognize.  So -- and I -- I do remember recording a deed of trust roughly around that time, me being the lender.

Q.  As a lender, are you occasionally named in   11:21:25 quiet title actions?

A.  Not that I am aware of.

Q.  Do you see the reference also in paragraph 9 of this document to "Instrument Number 2019-K775282-00"?   11:21:41

Page 61

16 (Pages 58 - 61)

possible.

Q. I'm a little confused.

I thought you just told me that you only would have reviewed Yahoo Finance articles relating to Honest.   12:17:43

A. Right. So whatever articles that pops up on there, that's what I'd click on. And so wherever it takes me, it takes me there. But I don't go to that specific website. Everything starts with Yahoo Finance.   12:17:54

Q. Okay. So you would have -- you might reviewed articles on the Honest website if they were linked to from Yahoo Finance; is that right?

A. Right.

Q. Okay. Have you ever read a securities   12:18:06 analyst report concerning Honest?

A. I don't believe I have.

Q. Do you recall having ever read a securities analyst's report ever relating to any company?   12:18:28

A. No.

Q. Have you read Honest's S-1 registration statement?

MR. COTILLETTA: Object to form.

THE WITNESS: I vaguely remember that I   12:18:42

Page 94

did.

BY MR. SWEENEY:

Q. I'm sorry. Could you repeat your answer, please.

A. I believe I did.   12:18:48

Q. And do you recall when you might have read it?

A. I don't recall.

Q. Do you recall whether it was before or after you purchased your shares in Honest?   12:18:57

A. Oh, it would have been before.

Q. Similar to what we just discussed, is it your testimony that you would have only reviewed that if it was linked to from Yahoo Finance?

A. Correct.   12:19:25

MR. COTILLETTA: I'm sorry. Madam Reporter, can you please read back the question and answer for me.

(Record read back by the reporter.)

BY MR. SWEENEY:   12:20:12

Q. And do you recall any of the material included in Honest's S-1 registration statement?

A. I don't recall.

Q. Do you recall whether the information in the registration statement was important, one way or   12:20:31

Page 95

another, to your decision to invest in Honest?

MR. COTILLETTA: Objection to form.

THE WITNESS: I would say yes.

BY MR. SWEENEY:

Q. But you don't recall what information was   12:20:47 included in the regista- -- reg- -- excuse me.

But you don't recall what information was in- -- included in the registration statement; correct?

A. That's correct.   12:20:56

Q. So you can't recall sitting here what about Honest's registration statement would have been important to your decision to invest; correct?

A. That's correct.

Q. Do you recall having ever read Honest's   12:21:12 prospectus prepared and submitted to the SEC in connection with the IPO?

MR. COTILLETTA: Object to form.

THE WITNESS: I'm not sure if I read them.

BY MR. SWEENEY:   12:21:44

Q. And similar to the registration statement, you would have only read it if it had been linked from Yahoo Finance; correct?

A. Correct.

Q. Can you recall any of the information   12:21:56

Page 96

included in the prospectus?

A. Well, I --

MR. COTILLETTA: Objection. Form.

THE WITNESS: Well, I can't recall the title of the document. You know, I can't recall. I   12:22:25 just know that it would have probably been favorable for me to -- to actually take the next step to purchase the stocks.

BY MR. SWEENEY:

Q. So your recollection is that if -- if you   12:22:49 reviewed the Hon- -- excuse me.

Your recollection is that if you reviewed Honest's prospectus, then the information likely would have been favorable to your decision to purchase Honest stock; is that right?   12:23:03

A. Correct.

Q. But you don't recall specifically what that information might have been; correct?

A. Well, the information would have been related to the products and the sales.   12:23:16

Q. Can you recall any other details of the information that was included in the prospectus?

A. I -- I don't recall.

Q. Have you ever read, setting aside the prospectus and the registration statement, any other   12:23:44

Page 97

25 (Pages 94 - 97)

know -- where we're headed with COVID. So my understanding that -- was that there was still, like, a fear of COVID 19 of catching, contracting COVID 19. And, you know, people were buying supplies. And I -- I thought that it would be something that would continue for a while.   12:52:34

BY MR. SWEENEY:

Q. Right.

And would you say that -- I think you used the word "unclear." Would you -- would it be fair to generally characterize -- no. Well, strike the question.   12:52:49

Was it your feeling as of June 2021, that the future course of the COVID 19 pandemic was unclear?   12:53:10

MR. COTILLETTA: Objection to form.

THE WITNESS: June two- -- 2021. I wouldn't say it was unclear. I -- I -- I thought that we were headed in the right direction, but it was going to take a while to get there.   12:53:29

BY MR. SWEENEY:

Q. Do you recall the delta variant?

A. I do.

Q. Do you recall when the delta variant surfaced and began making headlines?   12:53:50

Page 106

A. I don't recall when.

Q. Are you familiar -- have you heard of the Omicron var- -- variant?

A. I do.

Q. Do you recall approximately when you first heard about that?   12:54:15

A. I don't.

Q. Would fall or winter sound about right to you, of 2021 -- or excuse me. That's a poor question.   12:54:35

Would fall of '21 or winter of 2021/2022 sound about right?

A. For Omicron?

Q. Correct.

A. Twenty --   12:54:49

MR. COTILLETTA: Objection to form.

THE WITNESS: You know, I can't recall exactly, but thereabouts.

BY MR. SWEENEY:

Q. But you would agree that as of May 2021, the nature and the outlook of the COVID 19 pandemic was still evolving; correct?   12:54:58

A. Yes.

MR. COTILLETTA: Objection to form.

BY MR. SWEENEY:   12:55:16

Page 107

Q. Prior to investing in Honest in June of 2021, had you ever heard of a product called the "Clean Conscious Diaper"?

A. No.

Q. Had you ever heard the term "costovation"?   12:55:30

A. No.

Q. Prior to investing in Honest in June of 2021, had you ever heard that Honest diapers were a strategic acquisition tool?

A. I heard of that, but I can't remember exactly when.   12:55:55

Q. All right.

If you could look back at -- one second here -- Exhibit 7, which I believe is the June 20, 2021, brokerage statement.   12:56:32

Let me know when you have it up.

A. I have it up.

Q. And you testified earlier that the 20,000 Honest shares reflected in this statement are the only Honest shares that you have ever owned; correct?   12:56:50

A. That's correct.

Q. Have you ever held or possessed any hard-copy stock certificates for any of these shares?   12:57:16

Page 108

A. No.

Q. Do you have any way of knowing who owned any of the 20,000 shares before you purchased them?

MR. COTILLETTA: Objection to form.

THE WITNESS: No.   12:57:33

BY MR. SWEENEY:

Q. Is it your contention in this litigation that the price that you paid for your Honest shares was artificially inflated?

A. Yes.   12:57:54

Q. Do you know by how much?

MR. COTILLETTA: Objection to form.

THE WITNESS: I do not.

BY MR. SWEENEY:

Q. Why do you believe the price you paid for your Honest shares was inflated?   12:58:13

A. Well, because shortly after I purchased the stock, the price started decreasing.

Q. Is there anything beyond the decrease in share price that you've just described that led you or has led you to believe that the share -- strike the question.   12:58:55

Is there anything other than the price decrease after you purchased the shares that has led you to believe that the price you paid to acquire   12:59:10

Page 109

28 (Pages 106 - 109)

them was inflated?

A. Well, the subsequent negative articles that came out just didn't paint the company in -- in a good picture -- in a good light, so it was kind of like the negative publicity.   12:59:36

Q. Are there any articles in particular that you recall reviewing that led you to this conclusion?

A. No, but I do remember seeing a few. But I didn't read it in detail. I just like read the --   12:59:54 the heading.

Q. And would all of these articles have been on Yahoo Finance?

A. Yes.

Q. So your view regarding the artificially   01:00:08 inflated share prices is based on two things: one, the decrease in price after you purchased; and, two, the negative media coverage.

Is that correct?

MR. COTILLETTA: Objection to form.   01:00:43

THE WITNESS: And also the products, the information that came out.

BY MR. SWEENEY:

Q. Is there any information in particular that you're referencing?   01:00:56

Page 110

A. Well, specifically like the diapers. That was supposed to be, you know, a diaper that had new technology, and -- and that wasn't the case. So there was a lot of consumer dissatisfaction with that.   01:01:15

And just the sales that they claimed to have just wasn't there, so...

Q. Is it your understanding that Honest misrepresented its sales numbers?

A. I believe so.   01:01:34

Q. Do you have any understanding as to what -- as -- as to for what period -- well, strike the question.

Do you have any understanding as to the period for which Honest misrepresented its sale   01:01:54 numbers?

A. The period I believe right before the IPO or around that time.

Q. Is it your understanding that Honest reported sales numbers that were higher than what it   01:02:16 had, in fact, experienced?

A. Well, I'm not too sure about that, but the claim of the sales for COVID-related products being really good, when it actually wasn't, was a factor.

Q. And do you have any understanding as to   01:02:45

Page 111

where Honest made the claim that its sales of COVID-related products were really good?

A. You know, it was some- -- something that I had read, so I don't know exactly where.

Q. At some point you sold your shares in   01:03:04 Honest; correct?

A. That's correct.

Q. Do you recall approximately when that was?

A. I believe it was December of 2021.

Q. And you sold all of your shares at the   01:03:31 same time?

A. I did.

Q. Why did you sell?

A. I think at that point I realized -- well, I was hoping for it to come back up, but at that   01:03:43 point I realized it wasn't going to, so I just figured let me just cut my losses.

Q. Did you discuss your decision to sell with anyone?

A. No.   01:03:57

Q. Is there any information other than what we've already discussed that you considered as part of your decision to sell?

A. I don't know. Just, you know, like I said, watching the stock price take a nosedive was   01:04:18

Page 112

pretty much it. And also -- and, of course -- I'm sorry, of course the earnings reports, too. That -- that didn't help.

Q. Did you review one or more Honest earning reports?   01:04:43

A. Not the reports of -- again, it would have been an article that I saw in Yahoo Finance.

Q. And do you recall for which time periods you might have heard about the earnings reports?

A. It would have been a report after I   01:04:58 purchased the shares.

Q. So the earnings reports that you're referring to would have been reports issued between your purchase of the shares in June 2021 and your sale of the shares in December 2021; is that right?   01:05:19

A. Correct.

Q. And you have not owned any Honest shares since selling the 20,000 in December of 2021; correct?

A. I'm sorry, can you repeat that?   01:05:35

Q. Sure.

Since selling the 20,000 shares in December of 2021, you have not owned any other Honest shares; correct?

A. Correct.   01:05:46

Page 113

29 (Pages 110 - 113)

any sense of for how long Honest stock was doing pretty good?

A. Yeah. When it came out IPO to when I purchased it.

Q. So about a month?    01:12:08

A. Yes.

Q. Between the time you purchased your shares in June of 2021 and the time you sold your shares in December of 2021, about how often did you check Honest's stock price?    01:12:30

A. Daily.

(Interruption in audio/video.)

THE COURT REPORTER: I'm sorry, say that again, please.

THE WITNESS: Daily.    01:12:37

BY MR. SWEENEY:

Q. Are you aware that the stock market generally has declined in market capitalization since May 2021?

MR. COTILLETTA: Objection to form.    01:13:07

THE WITNESS: Yes.

BY MR. SWEENEY:

Q. Do you have any understanding as to the reasons why the market overall has gone down?

A. A little bit.    01:13:33

Page 118

Q. Could you tell me what your understanding is?

A. Well, based on the economy is -- is what I would say attributes to that and just the volatility of the market. You know, people are a little bit    01:13:52 afraid to invest at the time -- at -- at this time and starting 2002 -- 2021. So I think, you know, that adds to it as well.

Q. Any other factors you can think of?

A. Decline in business and decline in sales.    01:14:15

Q. Do you believe it's possible that a particular company's stock could decrease because the stock market in general is going down?

MR. COTILLETTA: Objection to form.

THE WITNESS: Yes.    01:14:34

BY MR. SWEENEY:

Q. Do you believe any part of the decline in Honest's stock price since the May 2021 IPO is attributable to market-wide general decline in stocks since then?    01:15:11

MR. COTILLETTA: Objection to form.

THE WITNESS: Maybe a little bit.

BY MR. SWEENEY:

Q. Are you familiar with the names of the named Defendants in this case?    01:15:41

Page 119

A. Yes.

Q. Could you tell me which of the named defendants you can recall?

A. The Honest Company, the -- the directors, the executives, and the underwriters.    01:16:06

Q. And do you have any understanding as to the names of any of the individual directors or executives named as defendants?

A. Well, aside from Jessica Alba, not off the top of my head.    01:16:31

Q. And do you recall any of the particular banks named as underwriter defendants?

A. I believe it's Chase, but I'm going by memory.

Q. Is it your contention in this litigation    01:16:55 that Honest misrepresented the effects of COVID-19 on its business?

A. Yes.

Q. How so?

A. Well, they presented the products that    01:17:20 were COVID related to be selling -- there were high sales of those particular products.

But come to find out, it turns out that the -- the -- those products, the sales were actually declining because, you know, we were    01:17:44

Page 120

getting the -- the COVID shots were available, things of that sort. So people were less inclined to purchase the COVID-related products.

Q. And do you contend that those alleged misrepresentation [verbatim] influenced your    01:18:11 decision to purchase Honest shares?

A. Repeat that --

MR. COTILLETTA: Object to form.

I'm sorry, can I get a read back of the question?    01:18:28

(Record read back by the reporter.)

MR. COTILLETTA: Objection to form.

BY MR. SWEENEY:

Q. You can answer the question, if you understand it.    01:18:52

A. You know what, I'm sorry, something's buzzing on my end. Can you repeat that one more time?

Q. Sure.

So the question -- we were just discussing    01:19:07 your contention in this litigation regarding alleged misrepresentations connected to the effects of COVID on Honest business.

And my question was whether you contend that those alleged misrepresentations influenced    01:19:18

Page 121

31 (Pages 118 - 121)

saw.

Q. And, again, just to be clear, you're referring to the negative reviews that were -- that appeared in the consolidated and amended Complaint; right?                    01:26:04

A. Correct.

Q. You haven't performed any sort of independent review of customer comments or feedback for Honest products, have you?

A. I have not.                    01:26:24

Q. So you couldn't say, for instance, whether there were more positive comments than negative ones, could you?

A. I couldn't say.

Q. Is it your contention in this litigation    01:26:42 that Honest misrepresented the safety and efficacy of its products?

A. I think so.

Q. Which products, in particular?

A. The diapers.                    01:27:09

Q. And are you referring to the Clean Conscious Diaper in particular?

A. I am.

Q. Is it your contention that Honest's misrepresentation concerned the same issues we were    01:27:35

Page 126

just discussing, for instance, blow-outs, rashes, and leaks?

A. Repeat that, please.

Q. Sure.

Is it your contention that what Honest    01:27:45 misrepresented about the safety of its Clean Conscious Diaper has to do with the incidents of blow-outs, rashes, and leaks, as we were just discussing?

A. Yes.                    01:28:05

Q. Are you aware of any other alleged misrepresentations concerning Honest diapers?

MR. COTILLETTA: Objection to form.

THE WITNESS: No.

BY MR. SWEENEY:                    01:28:26

Q. I think I may have asked you this earlier, but I just want to confirm.

Had you heard of the Clean Conscious Diaper at the time you purchased your shares in June of 2021?                    01:29:06

MR. COTILLETTA: Objection to form.

THE WITNESS: I don't recall.

BY MR. SWEENEY:

Q. Can you think of any other misrepresentations other than the ones we've just    01:29:29

Page 127

discussed, that you are alleging were made by The Honest Company?

MR. COTILLETTA: Objection. Form.

THE WITNESS: No. No.

BY MR. SWEENEY:                    01:29:45

Q. And is it your contention that those misrepresentations that we just discussed influenced your decision to purchase Honest shares?

MR. COTILLETTA: Objection to form.

THE WITNESS: That, and the omission of    01:30:28 information.

BY MR. SWEENEY:

Q. What information do you think should have been disclosed that was not?

A. Oh, are you partic- -- pertaining to the    01:30:39 diapers or just information in general.

Q. Sure.

Let's start with the diapers and then you can tell me anything else after.

A. Okay. Well, with the diapers, no. But    01:30:50 with the destocking of the COVID products, yes.

Q. So in your view, Honest should have disclosed additional information concerning the destocking of COVID products?

A. Correct. The actual -- yeah, sales and    01:31:08

Page 128

the inventory levels.

Q. And you are not aware of any of the allegedly omitted or withheld information at the time you purchased the shares in June of 2021?

MR. COTILLETTA: Objection to form.    01:31:40

THE WITNESS: That's correct.

MR. COTILLETTA: I'm sorry, can I get a readback on the question. Sorry, Ben.

(Record read back by the reporter.)

MR. COTILLETTA: Thank you.    01:32:10

BY MR. SWEENEY:

Q. We talked earlier about Honest's registration statement and prospectus. And I believe you testified that you might have reviewed them if they were linked to on Yahoo Finance; is    01:32:30 that right?

A. That's correct.

Q. But sitting here today, you can't recall, one way or another, whether you, in fact, reviewed those documents; correct?                    01:32:44

A. Correct.

Q. How much time, in total, would you estimate that you've spent reviewing the consolidated and amended Complaint?

A. I would say an hour or two.    01:33:13

Page 129

33 (Pages 126 - 129)

Q. And that includes all the time going back to when it was filed last year?

MR. COTILLETTA: Objection to form.

THE WITNESS: Yes.

BY MR. SWEENEY:                               01:33:43

Q. Do you feel you have a good understanding of the claims and allegations in this litigation?

A. I believe so.

Q. Do you believe it is important for a class representative to have a good understanding of the   01:34:06 claims and allegations in the case?

A. I think so.

Q. Can you think of any reasons in particular why it might be important for the class representative to have a good understanding of the   01:34:24 allegations?

A. Well, once it's [verbatim] going to represent a class, he or she should understand what the allegations are.

Q. Have you ever spoken to somebody named   01:34:46 Cody Dixon?

A. I have not.

Q. Have you ever spoken with any of the other named Plaintiffs in this litigation?

A. I have not.                               01:35:01

Page 130

Q. Have you ever spoken with anyone who presently works or formerly worked at Honest?

A. I have not.

Q. Between June of 2021 and August of 2021 -- or excuse me.                               01:35:32

Between June of 2021 and December of 2021, while you held Honest shares, did you ever vote your shares?

A. Did I ever what? I'm sorry.

Q. Did you ever vote your shares, you   01:35:45 actually ever exercised any voting rights related to your shares?

A. I did not.

Q. I'm sorry. You -- you said you've never spoken to a current or former Honest employee;   01:36:18 correct?

A. Correct.

Q. Have your attorneys spoken to any current or former Honest employees?

A. I believe they have.                               01:36:32

Q. Do you know which current or former Honest employees they've spoken to?

A. Well, it's listed on -- on one of the documents.

Q. Are you referring to Lead Plaintiff's   01:36:53

Page 131

initial disclosures?

MR. COTILLETTA: I could stipulate that's -- that's what she's talking about and -- just to speed things up.

BY MR. SWEENEY:                               01:37:09

Q. And do you have any understanding as to whether your attorneys have spoken to each of the individuals listed on the initial disclosures?

A. I'm not -- I'm not sure about that.

Q. Have you personally engaged any private   01:37:23 investigators in connection with this litigation?

A. I have not.

Q. Have your attorneys engaged any private investigators?

A. I don't know.                               01:37:48

MR. SWEENEY: I think I'm getting pretty close to wrapping up. Can we maybe go off the record just briefly.

THE VIDEOGRAPHER: We're going off the record at 1:38 p.m.                               01:38:17

(Short recess taken.)

THE VIDEOGRAPHER: We're on the record at 1:54 p.m., and this is the beginning of Media 4 in the deposition of Kathie Ng.

MR. SWEENEY: Welcome back, Ms. Ng.   01:54:41

Page 132

I don't have any more questions for you at this time. I'll reserve my rights based on any further questioning by your own attorneys. But I wanted to thank you for your time and -- yeah, thank you for your efforts. All right.                               01:54:57

And, Joe, do you have any dir- -- any redirect?

MR. COTILLETTA: I'm so sorry to delay people further. I -- we -- I saw the -- the -- we were getting forced out of the breakout room, which   01:55:08 is fine.

I need just a little more time before I make that decision. So I would like to go back to a breakout room for a couple more minutes. And, you know, if -- if he has a 5 to 10 more minutes. I --   01:55:19 I -- I don't think it will take that long, but I just need a little more time and then we can come right back in.

THE CONCIERGE: Sure. I'll go ahead and open --                               01:55:30

MR. COTILLETTA: All right.

Okay. Thank you.

THE COURT REPORTER: One second. We need to go off the record, though. One second.

MR. COTILLETTA: Sure.                               01:55:34

Page 133

34 (Pages 130 - 133)

# Exhibit C

EX-1.1 2 d27841dex11.htm EX-1.1

**Exhibit 1.1**

*Execution Version*

**[●] Shares**

**THE HONEST COMPANY, INC.**

**COMMON STOCK, PAR VALUE $0.0001**

**UNDERWRITING AGREEMENT**

[●], 2021

[●], 2021

Morgan Stanley & Co. LLC
J.P. Morgan Securities LLC
Jefferies LLC

As Representatives of the Underwriters named in Schedule II hereto

c/o Morgan Stanley & Co. LLC
    1585 Broadway
    New York, NY 10036

c/o J.P. Morgan Securities LLC
    383 Madison Avenue
    New York, NY 10179

c/o Jefferies LLC
    520 Madison Avenue
    New York, NY 10022

Ladies and Gentlemen:

The Honest Company, Inc., a Delaware corporation (the "**Company**"), proposes to issue and sell to the several Underwriters named in Schedule II hereto (the "**Underwriters**"), and certain shareholders of the Company (the "**Selling Shareholders**") named in Schedule I hereto severally propose to sell to the several Underwriters, an aggregate of [●] shares of the common stock, par value $0.0001 of the Company (the "**Firm Shares**"), of which [●] shares are to be issued and sold by the Company and [●] shares are to be sold by the Selling Shareholders, each Selling Shareholder selling the amount set forth opposite such Selling Shareholder's name in Schedule I hereto.

The Company also proposes to issue and sell to the several Underwriters not more than an additional [●] shares of its common stock, par value $0.0001 (the "**Additional Shares**") if and to the extent that Morgan Stanley & Co. LLC ("**Morgan Stanley**"), J.P. Morgan Securities LLC ("**JPMorgan**") and Jefferies LLC, as representatives of the several Underwriters (the "**Representatives**"), shall have determined to exercise, on behalf of the Underwriters, the right to purchase such shares of common stock granted to the Underwriters in Section 3 hereof. The Firm Shares and the Additional Shares are hereinafter collectively referred to as the "**Shares**." The shares of common stock, par value $0.0001 of the Company to be outstanding after giving effect to the sales contemplated hereby are hereinafter referred to as the "**Common Stock**." The Company and the Selling Shareholders are hereinafter sometimes collectively referred to as the "**Sellers**."

The Company has filed with the Securities and Exchange Commission (the "**Commission**") a registration statement on Form S-1 (File No. 333-255150), including a preliminary prospectus, relating to the Shares. The registration statement as amended at the time it becomes effective, including the information (if any) deemed to be part of the registration statement at the time of effectiveness pursuant to Rule 430A under the Securities Act of 1933, as amended (the "**Securities Act**"), is hereinafter referred to as the "**Registration Statement**"; the prospectus in the form first used to confirm sales of Shares (or in the form first made available to the Underwriters by the Company to meet requests of purchasers pursuant to Rule 173 under the Securities Act) is hereinafter referred to as the "**Prospectus**." If the Company has filed an abbreviated registration statement to register additional shares of Common Stock pursuant to Rule 462(b) under the Securities Act (a "**Rule 462 Registration Statement**"), then any reference herein to the term "**Registration Statement**" shall be deemed to include such Rule 462 Registration Statement.

For purposes of this Agreement, "**free writing prospectus**" has the meaning set forth in Rule 405 under the Securities Act, "**preliminary prospectus**" shall mean each prospectus used prior to the effectiveness of the Registration Statement, and each prospectus that omitted information pursuant to Rule 430A under the Securities Act that was used after such effectiveness and prior to the execution and delivery of this Agreement, "**Time of Sale Prospectus**" means the preliminary prospectus contained in the Registration Statement at the time of its effectiveness together with the documents and pricing information set forth in Schedule III hereto, and "**broadly available road show**" means a "bona fide electronic road show" as defined in Rule 433(h)(5) under the Securities Act that has been made available without restriction to any person. As used herein, the terms "Registration Statement," "preliminary prospectus," "Time of Sale Prospectus" and "Prospectus" shall include the documents, if any, incorporated by reference therein as of the date hereof.

Morgan Stanley has agreed to reserve a portion of the Shares to be purchased by it under this Agreement for sale to the Company's directors, officers, employees and business associates and other parties related to the Company (collectively, "**Participants**"), as set forth in each of the Time of Sale Prospectus and the Prospectus under the heading "Underwriters" (the "**Directed Share Program**"). The Shares to be sold by Morgan Stanley pursuant to the Directed Share Program, at the direction of the Company, are referred to hereinafter as the "**Directed Shares**".

1. *Representations and Warranties of the Company*. The Company represents and warrants to and agrees with each of the Underwriters that:

(a) The Registration Statement has become effective; no stop order suspending the effectiveness of the Registration Statement is in effect, and no proceedings for such purpose or pursuant to Section 8A under the Securities Act are pending before or, to the Company's knowledge, threatened by the Commission.

2

(b) (i) The Registration Statement, when it became effective, did not contain and, as amended or supplemented, if applicable, will not contain, as of the date of such amendment or supplement, any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading, (ii) the Registration Statement and the Prospectus comply and, as amended or supplemented, if applicable, will, as of the date of such amendment or supplement, comply in all material respects with the Securities Act and the applicable rules and regulations of the Commission thereunder, (iii) the Time of Sale Prospectus does not, and at the time of each sale of the Shares in connection with the offering when the Prospectus is not yet available to prospective purchasers and at the Closing Date (as defined in Section 5), the Time of Sale Prospectus, as then amended or supplemented by the Company, if applicable, will not, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, (iv) each broadly available road show, if any, when considered together with the Time of Sale Prospectus, does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading and (v) the Prospectus, as of this date, does not contain and, as amended or supplemented, if applicable, as of the date of such amendment or supplement and as of the Closing Date and any Option Closing Date (as defined below), will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, except that the representations and warranties set forth in this paragraph do not apply to statements or omissions in the Registration Statement, the Time of Sale Prospectus or the Prospectus based upon information relating to any Underwriter furnished to the Company in writing by such Underwriter through the Representatives expressly for use therein.

(c) The Company is not an "ineligible issuer" in connection with the offering pursuant to Rules 164, 405 and 433 under the Securities Act. Any free writing prospectus that the Company is required to file pursuant to Rule 433(d) under the Securities Act has been, or will be, filed with the Commission in accordance with the requirements of the Securities Act and the applicable rules and regulations of the Commission thereunder. Each free writing prospectus that the Company has filed, or is required to file, pursuant to Rule 433(d) under the Securities Act or that was prepared by or on behalf of or used or referred to by the Company complies or will comply in all material respects with the requirements of the Securities Act and the applicable rules and regulations of the Commission thereunder. Except for the free writing prospectuses, if any, identified in Schedule III hereto, and electronic road shows, if any, each furnished to the Representatives before first use, the Company has not prepared, used or referred to, and will not, without the Representatives' prior consent, prepare, use or refer to, any free writing prospectus.

3

(d) The Company has been duly incorporated, is validly existing as a corporation in good standing under the laws of the jurisdiction of its incorporation, has the corporate power and authority to own or lease its property and to conduct its business as described in each of the Registration Statement, the Time of Sale Prospectus and the Prospectus and is duly qualified to transact business and is in good standing in each jurisdiction in which the conduct of its business or its ownership or leasing of property requires such qualification, except to the extent that the failure to be so qualified or be in good standing would not reasonably be expected to, singly or in the aggregate, have a material adverse effect on the Company and its subsidiaries, taken as a whole.

(e) Each subsidiary of the Company has been duly incorporated, organized or formed, is validly existing as a corporation or other business entity in good standing under the laws of the jurisdiction of its incorporation, organization or formation, has the corporate or other business entity power and authority to own or lease its property and to conduct its business as described in each of the Registration Statement, the Time of Sale Prospectus and the Prospectus and is duly qualified to transact business and is in good standing in each jurisdiction in which the conduct of its business or its ownership or leasing of property requires such qualification, except to the extent that the failure to be so qualified or be in good standing would not reasonably be expected to, singly or in the aggregate, have a material adverse effect on the Company and its subsidiaries, taken as a whole; all of the issued shares of capital stock or other equity interests of each subsidiary of the Company have been duly and validly authorized and issued, are fully paid and non-assessable and are owned directly or indirectly by the Company, free and clear of all liens, encumbrances, equities or claims.

(f) This Agreement has been duly authorized, executed and delivered by the Company.

(g) As of the Closing Date, the authorized capital stock of the Company will conform as to legal matters in all material respects to the description thereof contained in each of the Registration Statement, the Time of Sale Prospectus and the Prospectus.

(h) The shares of Common Stock (including the Shares to be sold by the Selling Shareholders) outstanding prior to the issuance of the Shares to be sold by the Company have been duly authorized and are validly issued, fully paid and non-assessable.

(i) The Shares to be sold by the Company have been duly authorized and, when issued, delivered and paid for in accordance with the terms of this Agreement, will be validly issued, fully paid and non-assessable, and the issuance of the Shares will not be subject to any preemptive or similar rights that have not been validly waived.

4

(j) The execution and delivery by the Company of, and the performance by the Company of its obligations under, this Agreement will not contravene (i) any provision of applicable law, (ii) the certificate of incorporation or by-laws of the Company, (iii) any agreement or other instrument binding upon the Company or any of its subsidiaries that is material to the Company and its subsidiaries, taken as a whole, or (iv) any judgment, order or decree of any governmental body, agency or court having jurisdiction over the Company or any subsidiary, except in the case of clauses (i), (iii) and (iv), where such contravention would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Company and its subsidiaries, taken as a whole, and no consent, approval, authorization or order of, or qualification with, any governmental body, agency or court is required for the performance by the Company of its obligations under this Agreement, except such as have been obtained or validly waived or as may be required by the securities or Blue Sky laws of the various states in connection with the offer and sale of the Shares.

(k) There has not occurred any material adverse change, or any development involving a prospective material adverse change, in the condition, financial or otherwise, or in the earnings, business or operations of the Company and its subsidiaries, taken as a whole, from that set forth in the Time of Sale Prospectus.

(l) There are no legal or governmental proceedings pending or, to the Company's knowledge, threatened to which the Company or any of its subsidiaries is a party or to which any of the properties of the Company or any of its subsidiaries is subject (i) other than proceedings accurately described in all material respects in each of the Registration Statement, the Time of Sale Prospectus and the Prospectus and proceedings that would not, singly or in the aggregate, have a material adverse effect on the Company and its subsidiaries, taken as a whole, or on the power or ability of the Company to perform its obligations under this Agreement or to consummate the transactions contemplated by each of the Registration Statement, the Time of Sale Prospectus and the Prospectus or (ii) that are required to be described in the Registration Statement, the Time of Sale Prospectus or the Prospectus and are not so described; and there are no statutes, regulations, contracts or other documents to which the Company or any of its subsidiaries is subject or by which the Company or any of its subsidiaries is bound that are required to be described in the Registration Statement, the Time of Sale Prospectus or the Prospectus or to be filed as exhibits to the Registration Statement that are not described in all material respects or filed as required.

(m) Each preliminary prospectus filed as part of the Registration Statement as originally filed or as part of any amendment thereto, or filed pursuant to Rule 424 under the Securities Act, complied when so filed in all material respects with the Securities Act and the applicable rules and regulations of the Commission thereunder.

5

(n) The Company is not, and immediately after giving effect to the offering and sale of the Shares and the application of the proceeds thereof as described in the Prospectus will not be, required to register as an "investment company" as such term is defined in the Investment Company Act of 1940, as amended.

(o) The Company and its subsidiaries, taken as a whole, (i) are in compliance with any and all applicable foreign, federal, state and local laws and regulations, rules, ordinances, codes, policies or rules of common law, including without limitation any judicial or administrative orders, consents, decrees or judgments relating to the protection of human health and safety, the environment or hazardous or toxic substances or wastes, pollutants or contaminants ("**Environmental Laws**"), (ii) have received all permits, licenses or other approvals required of them under applicable Environmental Laws to conduct their respective businesses and (iii) are in compliance with all terms and conditions of any such permit, license or approval, except where such noncompliance with Environmental Laws, failure to receive required permits, licenses or other approvals or failure to comply with the terms and conditions of such permits, licenses or approvals would not reasonably be expected to, singly or in the aggregate, have a material adverse effect on the Company and its subsidiaries, taken as a whole.

(p) There are no costs or liabilities associated with Environmental Laws (including, without limitation, any capital or operating expenditures required for clean-up, closure of properties or compliance with Environmental Laws or any permit, license or approval, any related constraints on operating activities and any potential liabilities to third parties) which would, singly or in the aggregate, have a material adverse effect on the Company and its subsidiaries, taken as a whole.

(q) There are no contracts, agreements or understandings between the Company and any person granting such person the right to require the Company to file a registration statement under the Securities Act with respect to any securities of the Company or to require the Company to include such securities with the Shares registered pursuant to the Registration Statement, except as have been validly waived or complied with in connection with the issuance and sale of the Shares contemplated hereby and as have been described in the Registration Statement, Time of Sale Prospectus and Prospectus.

(r) (i) None of the Company or any of its subsidiaries or affiliates, or any director, officer, or, to the Company's knowledge, any employee thereof, or any agent or representative of the Company or of any of its subsidiaries or affiliates, has taken or will take any action in furtherance of an offer, payment, promise to pay, or authorization or approval of the payment, giving or receipt of money, property, gifts or anything else of value, directly or indirectly, to any government official (including any officer or employee of a government or

6

government-owned or controlled entity or of a public international organization, or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for political office) ("**Government Official**") in order to influence official action, or to any person in violation of any applicable anti-corruption laws; (ii) the Company and each of its subsidiaries and affiliates have conducted their businesses in compliance with applicable anti-corruption laws and have instituted and maintained and will continue to maintain policies and procedures reasonably designed to promote and achieve compliance with such laws and with the representations and warranties contained herein; and (iii) neither the Company nor any of its subsidiaries will use, directly or indirectly, the proceeds of the offering in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any person in violation of any applicable anti-corruption laws.

(s) The operations of the Company and each of its subsidiaries are and have been conducted at all times in material compliance with all applicable financial recordkeeping and reporting requirements, including those of the Bank Secrecy Act, as amended by Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA PATRIOT Act), and the applicable anti-money laundering statutes of jurisdictions where the Company and each of its subsidiaries conduct business, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency (collectively, the "**Anti-Money Laundering Laws**"), and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Company or any of its subsidiaries with respect to the Anti-Money Laundering Laws is pending or, to the knowledge of the Company, threatened.

(t) (i) None of the Company, any of its subsidiaries, or any director, officer, or employee thereof, or, to the Company's knowledge, any agent, affiliate or representative of the Company or any of its subsidiaries, is an individual or entity ("**Person**") that is, or is owned or otherwise controlled by one or more Persons that are:

(A) the subject of any sanctions administered or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control, the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant sanctions authority (collectively, "**Sanctions**"), or

(B) located, organized or resident in a country or territory that is the subject of comprehensive Sanctions (including, without limitation, Crimea, Cuba, Iran, North Korea and Syria) (collectively, "**Sanctioned Countries**").

7

(ii) The Company will not, directly or indirectly, use the proceeds of the offering, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person:

(A) to fund or facilitate any activities or business of or with any Person or in any country or territory that, at the time of such funding or facilitation, is the subject of Sanctions or a Sanctioned Country, respectively; or

(B) in any other manner that will result in a violation of Sanctions by any Person (including any Person participating in the offering, whether as underwriter, advisor, investor or otherwise).

(iii) The Company and each of its subsidiaries have not in the last five years knowingly engaged in, are not now knowingly engaged in, and will not engage in, any dealings or transactions with any Person, or in any country or territory, that at the time of the dealing or transaction is or was the subject of Sanctions or a Sanctioned Country, respectively.

(u) Subsequent to the respective dates as of which information is given in each of the Registration Statement, the Time of Sale Prospectus and the Prospectus, except in each case as described in the Registration Statement, the Time of Sale Prospectus and the Prospectus, (i) the Company and its subsidiaries, taken as a whole, have not incurred any material liability or obligation, direct or contingent, nor entered into any material transaction; (ii) the Company has not purchased any of its outstanding capital stock (except for acquisitions of capital stock by the Company pursuant to agreements that permit the Company to repurchase such shares upon the applicable party's termination of service to the Company, nor declared, paid or otherwise made any dividend or distribution of any kind on its capital stock other than ordinary and customary dividends; and (iii) there has not been any material change in the capital stock, short-term debt or long-term debt of the Company and its subsidiaries, taken as a whole.

(v) The Company and its subsidiaries do not own any real property. The Company and each of its subsidiaries have good and marketable title to all personal property owned by them which is material to the business of the Company and its subsidiaries, in each case free and clear of all liens, encumbrances and defects except such as do not materially affect the value of such property and do not interfere with the use made and proposed to be made of such property by the Company and its subsidiaries; and any real property and buildings held under lease by the Company and its subsidiaries are held by them under valid, subsisting and, to the Company's knowledge, enforceable leases with such exceptions as are not material and do not materially interfere with the use made and proposed to be made of such property and buildings by the Company and its subsidiaries.

8

(w) (i) The Company and its subsidiaries own or have a valid and enforceable license to all patents, inventions, copyrights, know how (including trade secrets and other unpatented and/or unpatentable proprietary or confidential information, systems or procedures), software, domain names, trademarks, service marks, trade names and other intellectual property (including all registrations and applications for registration of and all goodwill associated with, any of the foregoing) (collectively, "**Intellectual Property Rights**") used or held for use in or reasonably necessary to the conduct of their businesses, except where the failure to do so would not reasonably be expected to have a material adverse effect; (ii) the Company and its subsidiaries solely and exclusively own all Intellectual Property Rights owned or purported to be owned by any of them and hold all of their respective rights under all Intellectual Property Rights owned by, or licensed to, any of them free and clear of all liens, encumbrances and defects, except as described in the Registration Statement, the Time of Sale Prospectus or the Prospectus, (iii) the Intellectual Property Rights owned by the Company and its subsidiaries and, to the Company's knowledge, the Intellectual Property Rights licensed to the Company and its subsidiaries, are valid, subsisting and enforceable, and there is no pending or, to the Company's knowledge, threatened action, suit, proceeding or claim by others challenging the validity, scope or enforceability of any such Intellectual Property Rights; (iv) to the Company's knowledge, no third party is infringing, misappropriating or otherwise violating, any Intellectual Property Rights owned by the Company, except as would not reasonably be expected to have a material adverse effect; (v) neither the Company nor any of its subsidiaries infringes, misappropriates or otherwise violates, or has infringed, misappropriated or otherwise violated, any Intellectual Property Rights and neither the Company nor any of its subsidiaries has received any notice alleging any such infringement, misappropriation or other violation of Intellectual Property Rights which, singly or in the aggregate, if the subject of an unfavorable decision, ruling or finding, would have a material adverse effect on the Company and its subsidiaries, taken as a whole; (vi) all employees or contractors engaged in the development of Intellectual Property Rights on behalf of the Company or any subsidiary of the Company have executed an invention assignment agreement whereby such employees or contractors presently assign all of their right, title and interest in and to such Intellectual Property Rights to the Company or the applicable subsidiary, and to the Company's knowledge no such agreement has been breached or violated, except where the failure to do so would not reasonably be expected to have a material adverse effect; and (vii) the Company and its subsidiaries use, and have used, commercially reasonable efforts to appropriately maintain all information intended to be maintained as a trade secret, except where the failure to do so would not reasonably be expected to have a material adverse effect.

9

(x) Except as would not reasonably be expected to have a material adverse effect on the Company and its subsidiaries, taken as a whole, (i) The Company and its subsidiaries use and have used any and all software and other materials distributed under a "free," "open source," or similar licensing model (including but not limited to the MIT License, Apache License, GNU General Public License, GNU Lesser General Public License and GNU Affero General Public License) ("**Open Source Software**") in compliance with all license terms applicable to such Open Source Software; and (ii) neither the Company nor any of its subsidiaries uses or distributes or has used or distributed any Open Source Software in any manner that requires or has required (A) the Company or any of its subsidiaries to permit reverse engineering of any software code or other technology owned by the Company or any of its subsidiaries or (B) any software code or other technology owned by the Company or any of its subsidiaries to be (1) disclosed or distributed in source code form, (2) licensed for the purpose of making derivative works or (3) redistributed at no charge.

(y) (i) The Company and each of its subsidiaries have complied in all material respects and are presently in compliance in all material respects with all published privacy policies, contractual obligations by which the Company is legally bound, and applicable laws, statutes, judgments, orders, rules and regulations of any court or arbitrator or other governmental or regulatory authority and any other legal obligations, that, in each case, govern the collection, use, transfer, import, export, storage, protection, disposal and disclosure by the Company or any of its subsidiaries of sensitive, confidential or regulated data (including "personal data," "personal information," or other similar terms as defined in the Data Security Obligations) maintained by or for the Company and its subsidiaries (collectively the "**Data Security Obligations**", and such sensitive, confidential or regulated data maintained by or for the Company and its subsidiaries collectively referred to as "**Sensitive Data**"); (ii) the Company has not received any written notification of or material complaint regarding and is unaware of any other facts that, individually or in the aggregate, would reasonably constitute material non-compliance with any Data Security Obligation; and (iii) there is no action, suit or proceeding by or before any court or governmental agency, authority or body pending or threatened alleging non-compliance by the Company or its subsidiaries with any Data Security Obligation.

(z) The Company and each of its subsidiaries have implemented commercially reasonable technical and organizational measures designed to protect the information technology systems and Sensitive Data used in connection with the operation of the Company's and its subsidiaries' businesses as currently conducted and such information technology systems are substantially adequate for, and operate and perform as required in connection with, the operation of such businesses as currently conducted. Without limiting the foregoing, the Company and its subsidiaries have used commercially reasonable efforts to establish and maintain, and have established, maintained, implemented and materially complied with, reasonable information security, cyber security and data protection controls, policies and procedures, including, as appropriate, oversight, access controls, encryption, technological and physical safeguards and business continuity/disaster recovery and security plans that are designed to protect against breach, unauthorized destruction, loss, distribution, use, access, disablement,

10

misappropriation or modification, or other compromise or misuse of Sensitive Data or material information technology systems used in connection with the operation of the Company's and its subsidiaries' businesses as currently conducted ("**Breach**"). Except as would not reasonably be expected to have a material adverse effect and to the knowledge of the Company, there has been no Breach, and the Company and its subsidiaries have not been notified of and have no knowledge of any event or condition that would reasonably be expected to result in, any such Breach.

(aa) No material labor dispute with the employees of the Company or any of its subsidiaries exists, or, to the knowledge of the Company, is imminent; and the Company is not aware of any existing, threatened or imminent labor disturbance by the employees of any of its principal suppliers, manufacturers or contractors that could, singly or in the aggregate, have a material adverse effect on the Company and its subsidiaries, taken as a whole.

(bb) The Company and each of its subsidiaries are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as the Company reasonably believes as are prudent and customary in the businesses in which they are engaged; neither the Company nor any of its subsidiaries has been refused any insurance coverage sought or applied for; and neither the Company nor any of its subsidiaries has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business at a cost that would not, singly or in the aggregate, have a material adverse effect on the Company and its subsidiaries, taken as a whole.

(cc) The Company and each of its subsidiaries possess all certificates, authorizations and permits issued by the appropriate federal, state or foreign regulatory authorities necessary to conduct their respective businesses, except where the failure to obtain such certificates, authorizations or permits would not reasonably be expected to, singly or in the aggregate, have a material adverse effect on the Company and its subsidiaries, taken as a whole, and neither the Company nor any of its subsidiaries has received any notice of proceedings relating to the revocation or modification of any such certificate, authorization or permit which, singly or in the aggregate, if the subject of an unfavorable decision, ruling or finding, would have a material adverse effect on the Company and its subsidiaries, taken as a whole.

(dd) The financial statements included in each of the Registration Statement, the Time of Sale Prospectus and the Prospectus, together with the related schedules and notes thereto, comply as to form in all material respects with the applicable accounting requirements of the Securities Act and present fairly in all material respects the consolidated financial position of the Company and its subsidiaries as of the dates shown and its results of operations and cash

11

flows for the periods shown, and such financial statements have been prepared in conformity with generally accepted accounting principles in the United States ("**U.S. GAAP**") applied on a consistent basis throughout the periods covered thereby except for any normal year-end adjustments in the Company's quarterly financial statements. The other financial information included in each of the Registration Statement, the Time of Sale Prospectus and the Prospectus has been derived from the accounting records of the Company and its consolidated subsidiaries and presents fairly in all material respects the information shown thereby. The statistical, industry-related and market-related data included in each of the Registration Statement, the Time of Sale Prospectus and the Prospectus are based on or derived from sources which the Company reasonably and in good faith believes are reliable and accurate and such data is consistent with the sources from which they are derived, in each case in all material respects.

(ee) PricewaterhouseCoopers LLP, who have certified certain financial statements of the Company and its subsidiaries and delivered its report with respect to the audited consolidated financial statements and schedules filed with the Commission as part of the Registration Statement and included in each of the Registration Statement, the Time of Sale Prospectus and the Prospectus, is an independent registered public accounting firm with respect to the Company within the meaning of the Securities Act and the applicable rules and regulations thereunder adopted by the Commission and the Public Company Accounting Oversight Board (United States).

(ff) The Company and its subsidiaries, as a whole, maintain a system of internal accounting controls designed to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations; (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with U.S. GAAP and to maintain asset accountability; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences. Since the end of the Company's most recent audited fiscal year, there has been (i) no material weakness in the Company's internal control over financial reporting (whether or not remediated) and (ii) no change in the Company's internal control over financial reporting that has materially and adversely affected, or is reasonably likely to materially and adversely affect, the Company's internal control over financial reporting.

(gg) Except as described in the Registration Statement, the Time of Sale Prospectus or the Prospectus the Company has not sold, issued or distributed any shares of Common Stock during the six-month period preceding the date hereof, including any sales pursuant to Rule 144A under, or Regulation D or S of, the Securities Act, other than shares issued pursuant to employee benefit plans, qualified stock option plans or other employee compensation plans or pursuant to outstanding options, rights or warrants.

12

(hh) The Registration Statement, the Prospectus, the Time of Sale Prospectus and any preliminary prospectus comply, and any amendments or supplements thereto will comply, with any applicable laws or regulations of foreign jurisdictions in which the Prospectus, the Time of Sale Prospectus or any preliminary prospectus, as amended or supplemented, if applicable, are distributed in connection with the Directed Share Program.

(ii) No consent, approval, authorization or order of, or qualification with, any governmental body or agency, other than those obtained, is required in connection with the offering of the Directed Shares in any jurisdiction where the Directed Shares are being offered.

(jj) The Company has not offered, or caused Morgan Stanley or any Morgan Stanley Entity as defined in Section 12 to offer, Shares to any person pursuant to the Directed Share Program with the specific intent to unlawfully influence (i) a customer or supplier of the Company to alter the customer's or supplier's level or type of business with the Company, or (ii) a trade journalist or publication to write or publish favorable information about the Company or its products.

(kk) The Company and each of its subsidiaries have filed all federal, state, local and foreign tax returns required to be filed through the date of this Agreement or have requested extensions thereof (except where the failure to file would not reasonably be expected to, singly or in the aggregate, have a material adverse effect on the Company and its subsidiaries, taken as a whole) and have paid all taxes required to be paid thereon (except for cases in which the failure to file or pay would not reasonably be expected to, singly or in the aggregate, have a material adverse effect on the Company and its subsidiaries, taken as a whole, or, except as currently being contested in good faith and for which reserves required by U.S. GAAP have been created in the financial statements of the Company), and no tax deficiency has been determined adversely to the Company or any of its subsidiaries which, singly or in the aggregate, has had (nor does the Company nor any of its subsidiaries have any notice or knowledge of any tax deficiency which could reasonably be expected to be determined adversely to the Company or its subsidiaries and which could reasonably be expected to have) a material adverse effect on the Company and its subsidiaries, taken as a whole.

(ll) From the time of initial confidential submission of the Registration Statement to the Commission through the date hereof, the Company has been and is an "emerging growth company," as defined in Section 2(a) of the Securities Act (an "**Emerging Growth Company**").

13

(mm) The Company (i) has not alone engaged in any Testing-the-Waters Communication with any person other than the Testing-the-Waters Communications with the consent of the Representatives with entities that are reasonably believed to be qualified institutional buyers within the meaning of Rule 144A under the Securities Act or institutions that are reasonably believed to be accredited investors within the meaning of Rule 501 under the Securities Act and (ii) has not authorized anyone other than the Representatives to engage in Testing-the-Waters Communications. The Company reconfirms that the Representatives have been authorized to act on its behalf in undertaking Testing-the-Waters Communications. The Company has not distributed any Testing-the-Waters Communication that is a written communication within the meaning of Rule 405 under the Securities Act. "**Testing-the-Waters Communication**" means any communication with potential investors undertaken in reliance on Section 5(d) or Rule 163B of the Securities Act.

(nn) As of the time of each sale of the Shares in connection with the offering when the Prospectus is not yet available to prospective purchasers, none of (A) the Time of Sale Prospectus, (B) any free writing prospectus, when considered together with the Time of Sale Prospectus, and (C) any individual Testing-the-Waters Communication, when considered together with the Time of Sale Prospectus, included, includes or will include an untrue statement of a material fact or omitted, omits or will omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(oo) Neither the Company nor any of its subsidiaries has any securities rated by any "nationally recognized statistical rating organization," as such term is defined in Section 3(a)(62) of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**").

2. *Representations and Warranties of the Selling Shareholders*. Each Selling Shareholder, severally and not jointly, represents and warrants to and agrees with each of the Underwriters that:

(a) This Agreement has been duly authorized, executed and delivered by or on behalf of such Selling Shareholder.

(b) The execution and delivery by or on behalf of such Selling Shareholder of, and the performance by such Selling Shareholder of its obligations under, this Agreement, the Custody Agreement signed by or on behalf of such Selling Shareholder and Computershare Inc., as Custodian, relating to the deposit of the Shares to be sold by such Selling Shareholder (the "**Custody Agreement**") and the Power of Attorney appointing certain individuals as such Selling Shareholder's attorneys-in-fact to the extent set forth therein, relating to the transactions contemplated hereby and by the Registration Statement (the "**Power of Attorney**") will not contravene (i) any provision of applicable law, (ii) the certificate of incorporation or by-laws of such Selling Shareholder (if such Selling Shareholder is a corporation), (iii) any agreement or other instrument binding upon such Selling Shareholder or (iv) any judgment, order or decree of

14

any governmental body, agency or court having jurisdiction over such Selling Shareholder except in the case of clauses (i), (iii) or (iv) as would not, individually or in the aggregate, have a material adverse effect on the ability of the Selling Shareholder to consummate the transactions contemplated by this Agreement, the Custody Agreement and the Power of Attorney, and no consent, approval, authorization or order of, or qualification with, any governmental body, agency or court is required for the performance by such Selling Shareholder of its obligations under this Agreement or the Custody Agreement or Power of Attorney of such Selling Shareholder, except such as have been obtained and made under the Securities Act and such as may be required under the Exchange Act or the rules and regulations thereunder, under FINRA or such as may be required by the securities or Blue Sky laws of the various states or foreign jurisdictions in connection with the offer and sale of the Shares.

(c) Such Selling Shareholder has, and on the Closing Date will have, valid title to, or a valid "security entitlement" within the meaning of Section 8-501 of the New York Uniform Commercial Code in respect of, the Shares to be sold by such Selling Shareholder free and clear of all security interests, claims, liens, equities or other encumbrances and the legal right and power, and all authorization and approval required by law, to enter into this Agreement, the Custody Agreement and the Power of Attorney and to sell, transfer and deliver the Shares to be sold by such Selling Shareholder or a security entitlement in respect of such Shares.

(d) The Custody Agreement and the Power of Attorney have been duly authorized, executed and delivered by such Selling Shareholder and are valid and binding agreements of such Selling Shareholder subject to the effects of bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

(e) Upon payment for the Shares to be sold by such Selling Shareholder pursuant to this Agreement, delivery of such Shares, as directed by the Underwriters, to Cede & Co. ("**Cede**") or such other nominee as may be designated by the Depository Trust Company ("**DTC**"), registration of such Shares in the name of Cede or such other nominee and the crediting of such Shares on the books of DTC to securities accounts of the Underwriters (assuming that neither DTC nor any such Underwriter has notice of any adverse claim (within the meaning of Section 8-105 of the New York Uniform Commercial Code (the "**UCC**")) to such Shares), (A) DTC shall be a "protected purchaser" of such Shares within the meaning of Section 8-303 of the UCC, (B) under Section 8-501 of the UCC, the Underwriters will acquire a valid security entitlement in respect of such Shares and (C) no action based on any "adverse claim", within the meaning of Section 8-102 of the UCC, to such Shares may be successfully asserted against the Underwriters with respect to such security entitlement; for purposes of this representation, such Selling Shareholder may

15

https://www.sec.gov/Archives/edgar/data/1530979/000119312521130292/d27841dex11.htm

assume that when such payment, delivery and crediting occur, (x) such Shares will have been registered in the name of Cede or another nominee designated by DTC, in each case on the Company's share registry in accordance with its certificate of incorporation, bylaws and applicable law, (y) DTC will be registered as a "clearing corporation" within the meaning of Section 8-102 of the UCC and (z) appropriate entries to the accounts of the several Underwriters on the records of DTC will have been made pursuant to the UCC.

(f) Such Selling Shareholder has delivered to the Representatives an executed lock-up agreement in substantially the form attached hereto as Exhibit A (the "**Lock-up Agreement**").

(g) Such Selling Shareholder is not prompted by any material non-public information concerning the Company or its subsidiaries which is not set forth in the Registration Statement, the Time of Sale Prospectus or the Prospectus to sell its Shares pursuant to this Agreement.

(h) (i) The Registration Statement, when it became effective, did not contain and, as amended or supplemented, if applicable, as of the date of such amendment or supplement, will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading, (ii) the Time of Sale Prospectus does not, and at the time of each sale of the Shares in connection with the offering when the Prospectus is not yet available to prospective purchasers and at the Closing Date (as defined in Section 5), the Time of Sale Prospectus, as then amended or supplemented by the Company, if applicable, will not, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, (iii) each broadly available road show, if any, when considered together with the Time of Sale Prospectus, does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading and (iv) the Prospectus, as of its date, does not contain and, as amended or supplemented, if applicable, as of the date of such amendment or supplement and as of the Closing Date and any Option Closing Date (as defined in Section 3) will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided, that the representations and warranties set forth in this paragraph are limited solely to statements or omissions made in reliance upon information relating to such Selling Shareholder furnished in writing to the Company or the Representatives by or on behalf of such Selling Shareholder expressly for use in the Registration Statement, the Time of Sale Prospectus or the Prospectus or any amendments or supplements thereto, it being understood and agreed that the only information furnished in writing by such Selling Shareholder consists of the name of such Selling Shareholder, the number of offered shares and the address and other

16

information with respect to such Selling Shareholder (excluding percentages) which appear in the Registration Statement or any Prospectus in the table (and corresponding footnotes) under the caption "Principal and Selling Shareholders" (with respect to each Selling Shareholder, the "**Selling Shareholder Information**") and provided further that the representations and warranties set forth in this paragraph do not apply to statements or omissions in the Registration Statement, the Time of Sale Prospectus or the Prospectus based upon information relating to any Underwriter furnished to the Company in writing by such Underwriter through the Representatives expressly for use therein.

(i) (i) None of such Selling Shareholder or any of its subsidiaries, or, to the knowledge of such Selling Shareholder, any director, officer, employee, agent, representative, or affiliate thereof, is a Person that is, or is owned or otherwise controlled by one or more Persons that are:

(A) the subject of any Sanctions, or

(B) located, organized or resident in a Sanctioned Country.

(ii) Such Selling Shareholder will not, directly or indirectly, use the proceeds of the offering, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person:

(A) to fund or facilitate any activities or business of or with any Person or in any country or territory that, at the time of such funding or facilitation, is the subject of Sanctions or a Sanctioned Country, respectively; or

(B) in any other manner that will result in a violation of Sanctions by any Person (including any Person participating in the offering, whether as underwriter, advisor, investor or otherwise).

(iii) Such Selling Shareholder has not in the last five years knowingly engaged in, is not now knowingly engaged in, and will not engage in, any dealings or transactions with any Person, or in any country or territory, that at the time of the dealing or transaction is or was the subject of Sanctions or a Sanctioned Country, respectively.

(iv) (a) None of such Selling Shareholder or any of its subsidiaries, or, to the knowledge of such Selling Shareholder, any director, officer, employee, agent, representative, or affiliate thereof, has taken or will take any action in furtherance of an offer, payment, promise to pay, or authorization or approval of the payment, giving or receipt of money, property, gifts or anything else of value, directly or indirectly, to

17

any Government Official in order to influence official action, or to any person in violation of any applicable anti-corruption laws; (b) such Selling Shareholder and each of its subsidiaries have conducted their businesses in compliance with applicable anti-corruption laws [and have instituted and maintained and will continue to maintain policies and procedures reasonably designed to promote and achieve compliance with such laws and with the representations and warranties contained herein;[1]] and (c) neither the Selling Shareholder nor any of its subsidiaries will use, directly or indirectly, the proceeds of the offering in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any person in violation of any applicable anti-corruption laws.

(v) [The operations of such Selling Shareholder and each of its subsidiaries are and have been conducted at all times in material compliance with all applicable Anti-Money Laundering Laws, and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving such Selling Shareholder or any of its subsidiaries with respect to the Anti-Money Laundering Laws is pending or, to the best knowledge of the Selling Shareholder, threatened.][2]

3. *Agreements to Sell and Purchase.* Each Seller, severally and not jointly, hereby agrees to sell to the several Underwriters the respective number of Firm Shares set forth in Schedule I hereto opposite its name, and each Underwriter, upon the basis of the representations and warranties herein contained, but subject to the terms and conditions hereinafter stated, agrees, severally and not jointly, to purchase from such Seller at $[●] a share (the "**Purchase Price**") the number of Firm Shares (subject to such adjustments to eliminate fractional shares as the Representatives may determine) that bears the same proportion to the number of Firm Shares to be sold by such Seller as the number of Firm Shares set forth in Schedule II hereto opposite the name of such Underwriter bears to the total number of Firm Shares.

On the basis of the representations and warranties contained in this Agreement, and subject to its terms and conditions, the Company agrees to sell to the Underwriters the Additional Shares, and the Underwriters shall have the right to purchase, severally and not jointly, up to [●] Additional Shares at the Purchase Price, provided, however, that the amount paid by the Underwriters for any Additional Shares shall be reduced by an amount per share equal to any dividends declared by the Company and payable on the Firm Shares but not payable on such Additional Shares. The Representatives may exercise this right on behalf of the Underwriters in whole or from time to time in part by giving written notice not later than 30 days after the date of this Agreement. Any

---

[1]   To be included if any Selling Shareholder is a company.
[2]   To be included if any Selling Shareholder is a company.

18

exercise notice shall specify the number of Additional Shares to be purchased by the Underwriters and the date on which such shares are to be purchased. Each purchase date must be at least one business day after the written notice is given and may not be earlier than the closing date for the Firm Shares or later than ten business days after the date of such notice. Additional Shares may be purchased as provided in Section 5 hereof solely for the purpose of covering over-allotments made in connection with the offering of the Firm Shares. On each day, if any, that Additional Shares are to be purchased (an "**Option Closing Date**"), each Underwriter agrees, severally and not jointly, to purchase the number of Additional Shares (subject to such adjustments to eliminate fractional shares as the Representatives may determine) that bears the same proportion to the total number of Additional Shares to be purchased on such Option Closing Date as the number of Firm Shares set forth in Schedule II hereto opposite the name of such Underwriter bears to the total number of Firm Shares.

4. *Terms of Public Offering*. The Sellers are advised by the Representatives that the Underwriters propose to make a public offering of their respective portions of the Shares as soon after the Registration Statement and this Agreement have become effective as in the Representatives' judgment is advisable. The Sellers are further advised by the Representatives that the Shares are to be offered to the public initially at $[●] a share (the "**Public Offering Price**") and to certain dealers selected by the Representatives at a price that represents a concession not in excess of $[●] a share under the Public Offering Price, and that any Underwriter may allow, and such dealers may reallow, a concession, not in excess of $[●] a share, to any Underwriter or to certain other dealers.

5. *Payment and Delivery*. Payment for the Firm Shares to be sold by each Seller shall be made to such Seller in Federal or other funds immediately available in New York City against delivery of such Firm Shares for the respective accounts of the several Underwriters at 10:00 a.m., New York City time, on [●], 2021, or at such other time on the same or such other date, not later than [●], 2021, as shall be designated in writing by the Representatives. The time and date of such payment are hereinafter referred to as the "**Closing Date**."

Payment for any Additional Shares shall be made to the Company in Federal or other funds immediately available in New York City against delivery of such Additional Shares for the respective accounts of the several Underwriters at 10:00 a.m., New York City time, on the date specified in the corresponding notice described in Section 3 or at such other time on the same or on such other date, in any event not later than [●], 2021, as shall be designated in writing by the Representatives.

The Firm Shares and Additional Shares shall be registered in such names and in such denominations as the Representatives shall request not later than one full business day prior to the Closing Date or the applicable Option Closing Date, as the case may be. The Firm Shares and Additional Shares shall be delivered to the Representatives on the Closing Date or an Option Closing Date, as the case may be, for the respective accounts of the several Underwriters. The Purchase Price payable by the Underwriters shall be reduced by (i) any transfer taxes paid by, or on behalf of, the Underwriters in connection with the transfer of the Shares to the Underwriters duly paid and (ii) any withholding required by law.

19

6. *Conditions to the Underwriters' Obligations.* The obligations of the Sellers to sell the Shares to the Underwriters and the several obligations of the Underwriters to purchase and pay for the Shares on the Closing Date are subject to the condition that the Registration Statement shall have become effective not later than [●] (New York City time) on the date hereof.

The several obligations of the Underwriters are subject to the following further conditions:

(a) Subsequent to the execution and delivery of this Agreement and prior to the Closing Date:

(i) no order suspending the effectiveness of the Registration Statement shall be in effect, and no proceeding for such purpose or pursuant to Section 8A under the Securities Act shall be pending before or threatened by the Commission; and

(ii) there shall not have occurred any change, or any development involving a prospective change, in the condition, financial or otherwise, or in the earnings, business or operations of the Company and its subsidiaries, taken as a whole, from that set forth in the Time of Sale Prospectus that, in the Representatives' judgment, is material and adverse and that makes it, in the Representatives' judgment, impracticable to market the Shares on the terms and in the manner contemplated in the Time of Sale Prospectus.

(b) The Underwriters shall have received on the Closing Date a certificate, dated the Closing Date and signed by an executive officer of the Company, to the effect set forth in Sections 6(a)(i) and 6(a)(ii) above and to the effect that the representations and warranties of the Company contained in this Agreement are true and correct as of the Closing Date and that the Company has complied with all of the agreements and satisfied all of the conditions on its part to be performed or satisfied hereunder on or before the Closing Date.

The officer signing and delivering such certificate may rely upon the best of his or her knowledge as to proceedings threatened.

(c) The Underwriters shall have received on the Closing Date an opinion and negative assurance letter of Cooley LLP, outside counsel for the Company, dated the Closing Date, each in form and substance reasonably satisfactory to the Representatives.

20

(d) The Underwriters shall have received on the Closing Date an opinion of Whalen LLP, counsel for the Selling Shareholders, dated the Closing Date, in form and substance reasonably satisfactory to the Representatives.

(e) The Underwriters shall have received on the Closing Date an opinion and negative assurance letter of Davis Polk & Wardwell LLP, counsel for the Underwriters, dated the Closing Date, in form and substance reasonably satisfactory to the Representatives.

With respect to Section 6(c) and 6(e) above, Cooley LLP and Davis Polk & Wardwell LLP and with respect to Section 6(d) above, Whalen LLP, may state that their opinions and beliefs are based upon their participation in the preparation of the Registration Statement, the Time of Sale Prospectus and the Prospectus and any amendments or supplements thereto and review and discussion of the contents thereof, but are without independent check or verification, except as specified.

The opinions of Cooley LLP and Whalen LLP described in Sections 6(c) and 6(d) above shall be rendered to the Underwriters at the request of the Company or one or more of the Selling Shareholders, as the case may be, and shall so state therein.

(f) The Underwriters shall have received, on each of the date hereof and the Closing Date, a letter dated the date hereof or the Closing Date, as the case may be, in form and substance reasonably satisfactory to the Representatives, from PricewaterhouseCoopers LLP, independent registered public accounting firm, containing statements and information of the type ordinarily included in accountants' "comfort letters" to underwriters with respect to the financial statements and certain financial information contained in the Registration Statement, the Time of Sale Prospectus and the Prospectus; *provided* that the letter delivered on the Closing Date shall use a "cut-off date" not earlier than the date hereof.

(g) The Lock-up Agreements between the Representatives and certain shareholders, officers and directors of the Company shall be in full force and effect on the Closing Date.

(h) The several obligations of the Underwriters to purchase Additional Shares hereunder are subject to the delivery to the Representatives on the applicable Option Closing Date of the following:

(i) a certificate, dated the Option Closing Date and signed by an executive officer of the Company, confirming that the certificate delivered on the Closing Date pursuant to Section 6(b) hereof remains true and correct as of such Option Closing Date;

(ii) an opinion and negative assurance letter of Cooley LLP, outside counsel for the Company, dated the Option Closing Date, relating to the Additional Shares to be purchased on such Option Closing Date and otherwise to the same effect as the opinion required by Section 6(c) hereof;

21

(iii) an opinion of Whalen LLP, outside counsel for the Selling Shareholders, dated the Option Closing Date, relating to the Additional Shares to be purchased on such Option Closing Date and otherwise to the same effect as the opinion required by Section 6(d) hereof;

(iv) an opinion and negative assurance letter of Davis Polk & Wardwell LLP, counsel for the Underwriters, dated the Option Closing Date, relating to the Additional Shares to be purchased on such Option Closing Date and otherwise to the same effect as the opinion required by Section 6(e) hereof;

(v) a letter dated the Option Closing Date, in form and substance reasonably satisfactory to the Underwriters, from PricewaterhouseCoopers LLP, independent public accountants, substantially in the same form and substance as the letter furnished to the Underwriters pursuant to Section 6(f) hereof; *provided* that the letter delivered on the Option Closing Date shall use a "cut-off date" not earlier than two business days prior to such Option Closing Date; and

(vi) such other documents as the Representatives may reasonably request with respect to the good standing of the Company, the due authorization and issuance of the Additional Shares to be sold on such Option Closing Date and other matters related to the issuance of such Additional Shares.

7. *Covenants of the Company*. The Company covenants with each Underwriter as follows:

(a) To furnish to the Representatives, without charge, [●] signed copies of the Registration Statement (including exhibits thereto) and for delivery to each other Underwriter a conformed copy of the Registration Statement (without exhibits thereto) and to furnish to the Representatives in New York City, without charge, prior to 10:00 a.m. New York City time on the business day next succeeding the date of this Agreement and during the period mentioned in Section 7(e) or 7(f) below, as many copies of the Time of Sale Prospectus, the Prospectus and any supplements and amendments thereto or to the Registration Statement as the Representatives may reasonably request.

(b) Before amending or supplementing the Registration Statement, the Time of Sale Prospectus or the Prospectus, to furnish to the Representatives a copy of each such proposed amendment or supplement and not to file any such proposed amendment or supplement to which the Representatives reasonably object, and to file with the Commission within the applicable period specified in Rule 424(b) under the Securities Act any prospectus required to be filed pursuant to such Rule.

22

(c) To furnish to the Representatives a copy of each proposed free writing prospectus to be prepared by or on behalf of, used by, or referred to by the Company and not to use or refer to any proposed free writing prospectus to which the Representatives reasonably object.

(d) Not to take any action that would result in an Underwriter or the Company being required to file with the Commission pursuant to Rule 433(d) under the Securities Act a free writing prospectus prepared by or on behalf of the Underwriter that the Underwriter otherwise would not have been required to file thereunder.

(e) If the Time of Sale Prospectus is being used to solicit offers to buy the Shares at a time when the Prospectus is not yet available to prospective purchasers and any event shall occur or condition exist as a result of which it is necessary to amend or supplement the Time of Sale Prospectus in order to make the statements therein, in the light of the circumstances, not misleading, or if any event shall occur or condition exist as a result of which the Time of Sale Prospectus conflicts with the information contained in the Registration Statement then on file, or if, in the opinion of counsel for the Underwriters, it is necessary to amend or supplement the Time of Sale Prospectus to comply with applicable law, forthwith to prepare, file with the Commission and furnish, at its own expense, to the Underwriters and to any dealer upon request, either amendments or supplements to the Time of Sale Prospectus so that the statements in the Time of Sale Prospectus as so amended or supplemented will not, in the light of the circumstances when the Time of Sale Prospectus is delivered to a prospective purchaser, be misleading or so that the Time of Sale Prospectus, as amended or supplemented, will no longer conflict with the Registration Statement, or so that the Time of Sale Prospectus, as amended or supplemented, will comply with applicable law.

(f) If, during such period after the first date of the public offering of the Shares as in the opinion of counsel for the Underwriters the Prospectus (or in lieu thereof the notice referred to in Rule 173(a) of the Securities Act) is required by law to be delivered in connection with sales by an Underwriter or dealer, any event shall occur or condition exist as a result of which it is necessary to amend or supplement the Prospectus in order to make the statements therein, in the light of the circumstances when the Prospectus (or in lieu thereof the notice referred to in Rule 173(a) of the Securities Act) is delivered to a purchaser, not misleading, or if, in the opinion of counsel for the Underwriters, it is necessary to amend or supplement the Prospectus to comply with applicable law, forthwith to prepare, file with the Commission and furnish, at its own expense, to the Underwriters and to the dealers (whose names and addresses the Representatives will furnish to the Company) to which Shares may have been sold by the Representatives on behalf

23

of the Underwriters and to any other dealers upon request, either amendments or supplements to the Prospectus so that the statements in the Prospectus as so amended or supplemented will not, in the light of the circumstances when the Prospectus (or in lieu thereof the notice referred to in Rule 173(a) of the Securities Act) is delivered to a purchaser, be misleading or so that the Prospectus, as amended or supplemented, will comply with applicable law.

(g) To endeavor to qualify the Shares for offer and sale under the securities or Blue Sky laws of such jurisdictions as the Representatives shall reasonably request.

(h) To make generally available to the Company's security holders and to the Representatives as soon as practicable an earnings statement covering a period of at least twelve months beginning with the first fiscal quarter of the Company occurring after the date of this Agreement which shall satisfy the provisions of Section 11(a) of the Securities Act and the rules and regulations of the Commission thereunder.

(i) To comply with all applicable securities and other laws, rules and regulations in each jurisdiction in which the Directed Shares are offered in connection with the Directed Share Program.

(j) If any Seller is not a U.S. person for U.S. federal income tax purposes, the Company will deliver to each Underwriter (or its agent), on or before the Closing Date, (i) a certificate with respect to the Company's status as a "United States real property holding corporation," dated not more than thirty (30) days prior to the Closing Date, as described in Treasury Regulations Sections 1.897-2(h) and 1.1445-2(c)(3), and (ii) proof of delivery to the IRS of the required notice, as described in Treasury Regulations 1.897-2(h)(2).

(k) The Company will promptly notify the Representatives if the Company ceases to be an Emerging Growth Company at any time prior to the later of (i) completion of the distribution of the Shares within the meaning of the Securities Act and (ii) completion of the Restricted Period referred to in Section 3.

(l) If at any time following the distribution of any Testing-the-Waters Communication that is a written communication within the meaning of Rule 405 under the Securities Act there occurred or occurs an event or development as a result of which such Testing-the-Waters Communication included or would include an untrue statement of a material fact or omitted or would omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances existing at that subsequent time, not misleading, the Company will promptly notify the Representatives and will promptly amend or supplement, at its own expense, such Testing-the-Waters Communication to eliminate or correct such untrue statement or omission.

24

The Company also covenants with each Underwriter that, without the prior written consent of Morgan Stanley and JPMorgan on behalf of the Underwriters, it will not, and will not publicly disclose an intention to, during the period ending 180 days after the date of the Prospectus (the "**Restricted Period**"), (1) offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any shares of Common Stock or any securities convertible into or exercisable or exchangeable for Common Stock or (2) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Common Stock, whether any such transaction described in clause (1) or (2) above is to be settled by delivery of Common Stock or such other securities, in cash or otherwise or (3) file any registration statement with the Commission relating to the offering of any shares of Common Stock or any securities convertible into or exercisable or exchangeable for Common Stock.

The restrictions contained in the preceding paragraph shall not apply to (a) the Shares to be sold hereunder, (b) grants of stock options, stock awards, restricted stock, restricted stock units or other equity awards and the issuance of Common Stock or securities convertible into or exercisable for Common Stock (whether upon the exercise of stock options or otherwise) to employees, officers, directors, advisors, or consultants of the Company pursuant to the terms of an equity compensation plan in effect as of the Closing Date and described in the Time of Sale Prospectus and Prospectus, provided that all recipients of any such grants, stock awards, restricted stock, restricted stock units or other equity awards shall execute and deliver to the Representatives a lock-up letter substantially in the form of Exhibit A hereto covering the remainder of the Restricted Period, subject to any earlier release as provided in such lock-up letter, (c) the sale or issuance of or entry into an agreement providing for the sale or issuance of Common Stock or securities convertible into, exercisable for or which are otherwise exchangeable for or represent the right to receive Common Stock in connection with (x) the acquisition by the Company or any of its subsidiaries of the securities, business, technology, property or other assets of another person or entity or pursuant to an employee benefit plan assumed by the Company in connection with such acquisition, and the issuance of any Common Stock or securities convertible into, exercisable for or which are otherwise exchangeable for or represent the right to receive Common Stock pursuant to any such agreement or (y) the Company's joint ventures, commercial relationships and other strategic transactions, provided that the aggregate number of shares of Common Stock securities convertible into, exercisable for or which are otherwise exchangeable for or represent the right to receive Common Stock that the Company may sell or issue or agree to sell or issue pursuant to this clause (c) shall not exceed 10% of the total number of shares of Common Stock outstanding as of the Closing Date immediately following the completion of the transactions contemplated by this Agreement to be completed as of that date and all recipients of any such securities shall execute and deliver to the Representatives a lock-up letter substantially in the form of Exhibit A covering the remainder of the Restricted Period, subject to any earlier release as provided in such lock-up letter, (d) the establishment or amendment of a trading plan pursuant to Rule 10b5-1 under the Exchange Act for the transfer of shares of Common Stock, provided that

25

(i) such plan or amendment does not provide for the transfer of shares of Common Stock during the Restricted Period and (ii) to the extent a public announcement or filing under the Exchange Act, if any, is required of or voluntarily made by the Company regarding the establishment or amendment of such plan, such announcement or filing shall include a statement to the effect that no transfer of Common Stock may be made under such plan during the Restricted Period, or (e) the filing of any registration statement on Form S-8 relating to securities granted or to be granted pursuant to any plan in effect on the date hereof and described in the Time of Sale Prospectus or any assumed benefit plan contemplated by clause (c).

If Morgan Stanley and JPMorgan, in their sole discretion, agree to release or waive the restrictions on the transfer of Shares set forth in a Lock-up Agreement for an officer or director of the Company and provides the Company with notice of the impending release or waiver at least three business days before the effective date of the release or waiver, the Company agrees to announce the impending release or waiver by a press release substantially in the form of Exhibit B hereto through a major news service at least two business days before the effective date of the release or waiver.

8. *Covenants of the Sellers*. Each Seller, severally and not jointly, covenants with each Underwriter as follows:

(a) Each Seller will deliver to each Underwriter (or its agent), prior to or at the Closing Date, a properly completed and executed Internal Revenue Service ("**IRS**") Form W-9 or an IRS Form W-8, as appropriate, together with all required attachments to such form.

(b) Each Seller will deliver to each Underwriter (or its agent), on the date of execution of this Agreement, a properly completed and executed Certification Regarding Beneficial Owners of Legal Entity Customers, together with copies of identifying documentation, and each Seller undertakes to provide such additional supporting documentation as each Underwriter may reasonably request in connection with the verification of the foregoing Certification.

9. *Expenses*. Whether or not the transactions contemplated in this Agreement are consummated or this Agreement is terminated, the Company agrees to pay or cause to be paid all expenses incident to the performance of its obligations under this Agreement, including: (i) the fees, disbursements and expenses of the Company's counsel, the Company's accountants and one counsel for the Selling Shareholders (to the extent not agreed by the Selling Shareholders to be paid by them) in connection with the registration and delivery of the Shares under the Securities Act and all other fees or expenses in connection with the preparation and filing of the Registration Statement, any preliminary prospectus, the Time of Sale Prospectus, the Prospectus, any free writing prospectus prepared by or on behalf of, used by, or referred to by the Company and amendments and supplements to any of the foregoing, including all printing costs associated therewith, and

26

the mailing and delivering of copies thereof to the Underwriters and dealers, in the quantities hereinabove specified, (ii) all costs and expenses related to the transfer and delivery of the Shares to the Underwriters, including any transfer or other taxes payable thereon, (iii) the reasonable and documented cost of printing or producing any Blue Sky or Legal Investment memorandum in connection with the offer and sale of the Shares under state securities laws and all expenses in connection with the qualification of the Shares for offer and sale under state securities laws as provided in Section 7(g) hereof, including filing fees and the reasonable and documented fees and disbursements of counsel for the Underwriters in connection with such qualification and in connection with the Blue Sky or Legal Investment memorandum, (iv) all filing fees and the reasonable and documented fees and disbursements of counsel to the Underwriters incurred in connection with the review and qualification of the offering of the Shares by the Financial Industry Regulatory Authority (provided, that the amount payable by the Company with respect to fees and disbursements of counsel for the Underwriters pursuant to subsections (iii) and (iv) shall not exceed $40,000), (v) all fees and expenses in connection with the preparation and filing of the registration statement on Form 8-A relating to the Common Stock and all costs and expenses incident to listing the Shares on the Nasdaq Global Select Market, (vi) the cost of printing certificates representing the Shares, (vii) the costs and charges of any transfer agent, registrar or depositary, (viii) the costs and expenses of the Company relating to investor presentations on any "road show" undertaken in connection with the marketing of the offering of the Shares, including, without limitation, expenses associated with the preparation or dissemination of any electronic road show, expenses associated with the production of road show slides and graphics, fees and expenses of any consultants engaged in connection with the road show presentations with the prior approval of the Company, travel and lodging expenses of the representatives and officers of the Company and any such consultants, and up to 50% of the cost of any aircraft chartered in connection with the road show, (ix) the document production charges and expenses associated with printing this Agreement , (x) all fees and disbursements of counsel incurred by the Underwriters in connection with the Directed Share Program and stamp duties, similar taxes or duties or other taxes, if any, incurred by the Underwriters in connection with the Directed Share Program and (xi) all other costs and expenses incident to the performance of the obligations of the Company hereunder for which provision is not otherwise made in this Section. It is understood, however, that except as provided in this Section, Section 11 entitled "Indemnity and Contribution" , Section 12 entitled "Directed Share Program Indemnification" and the last paragraph of Section 14 below, the Underwriters will pay all of their costs and expenses, including fees and disbursements of their counsel, stock transfer taxes payable on resale of any of the Shares by them and any advertising expenses connected with any offers they may make.

The provisions of this Section shall not supersede or otherwise affect any agreement that the Sellers may otherwise have for the allocation of such expenses among themselves.

27

10. *Covenants of the Underwriters*. Each Underwriter, severally and not jointly, covenants with the Company not to take any action that would result in the Company being required to file with the Commission under Rule 433(d) a free writing prospectus prepared by or on behalf of such Underwriter that otherwise would not be required to be filed by the Company thereunder, but for the action of the Underwriter.

11. *Indemnity and Contribution*. (a) The Company agrees to indemnify and hold harmless each Underwriter, each person, if any, who controls any Underwriter within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act, and each affiliate of any Underwriter within the meaning of Rule 405 under the Securities Act from and against any and all losses, claims, damages and liabilities (including, without limitation, any legal or other expenses reasonably incurred in connection with defending or investigating any such action or claim) that arise out of, or are based upon any untrue statement or alleged untrue statement of a material fact contained in the Registration Statement or any amendment thereof, any preliminary prospectus, the Time of Sale Prospectus or any amendment or supplement thereto, any issuer free writing prospectus as defined in Rule 433(h) under the Securities Act, any Company information that the Company has filed, or is required to file, pursuant to Rule 433(d) under the Securities Act, any "road show" as defined in Rule 433(h) under the Securities Act (a "road show"), the Prospectus or any amendment or supplement thereto, or any Testing-the-Waters Communication or that arise out of, or are based upon any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as such losses, claims, damages or liabilities arise out of, or are based upon, any such untrue statement or omission or alleged untrue statement or omission made in reliance upon and in conformity with any information relating to any Underwriter furnished to the Company in writing by such Underwriter through the Representatives expressly for use therein, it being understood and agreed that the only such information furnished by the Underwriters through the Representatives consists of the information described as such in paragraph (c) below. Each Selling Shareholder agrees, severally and not jointly, to indemnify and hold harmless each Underwriter, the directors, officers and employees of each Underwriter, each person, if any, who controls any Underwriter within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act, and each affiliate of any Underwriter within the meaning of Rule 405 under the Securities Act from and against any and all losses, claims, damages and liabilities (including, without limitation, any legal or other expenses reasonably incurred in connection with defending or investigating any action or claim) that arise out of, or are based upon, any untrue statement or alleged untrue statement of a material fact contained in the Registration Statement or any amendment thereof, any preliminary prospectus, the Time of Sale Prospectus or any amendment or supplement thereto, any issuer free writing prospectus as defined in Rule 433(h) under the Securities Act, any Company information that the Company has filed, or is required to file, pursuant to Rule 433(d) under the Securities Act, any road show, the Prospectus or any amendment or supplement thereto, or any Testing-the-Waters Communication, or that arise out of, or are based upon, any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not

28

misleading, but in each case only with respect to statements or omissions made in reliance upon, and in conformity with, the Selling Shareholder Information. The aggregate liability of any Selling Shareholder pursuant to Sections 11(a) and 11(e) shall be limited to an amount equal to the net proceeds (net of underwriting discounts and commissions but without deducting expenses) received by such Selling Shareholder for the Shares sold by such Selling Shareholder under this Agreement (with respect to each Selling Shareholder, the "**Selling Shareholder Proceeds**").

(b) Each Underwriter agrees, severally and not jointly, to indemnify and hold harmless the Company, the Selling Shareholders, the directors of the Company, the officers of the Company who sign the Registration Statement and each person, if any, who controls the Company or any Selling Shareholder within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act from and against any and all losses, claims, damages and liabilities (including, without limitation, any legal or other expenses reasonably incurred in connection with defending or investigating any such action or claim) that arise out of, or are based upon, any untrue statement or alleged untrue statement of a material fact contained in the Registration Statement or any amendment thereof, any preliminary prospectus, the Time of Sale Prospectus or any amendment or supplement thereto, any issuer free writing prospectus as defined in Rule 433(h) under the Securities Act, any Company information that the Company has filed, or is required to file, pursuant to Rule 433(d) under the Securities Act, any road show or the Prospectus or any amendment or supplement thereto, or arise out of, or are based upon, any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, but only with reference to information relating to such Underwriter furnished to the Company in writing by such Underwriter through the Representatives expressly for use in the Registration Statement, any preliminary prospectus, the Time of Sale Prospectus, any issuer free writing prospectus, road show, or the Prospectus or any amendment or supplement thereto, it being understood and agreed that the only information furnished by any such Underwriter consists of the following information in the Prospectus furnished on behalf of each Underwriter: the selling concession amount appearing in the [●] paragraph under the caption "Underwriting," the information concerning stabilization and the option to purchase additional shares in the fourth paragraph under the caption "Underwriting" and the information concerning sales to discretionary accounts appearing in the seventh paragraph under the caption "Underwriting" (the "**Underwriter Information**").

(c) In case any proceeding (including any governmental investigation) shall be instituted involving any person in respect of which indemnity may be sought pursuant to Section 11(a), 11(b) or 11(c), such person (the "**indemnified party**") shall promptly notify the person against whom such indemnity may be sought (the "**indemnifying party**") in writing and the indemnifying party, upon request of the indemnified party, shall retain counsel reasonably satisfactory to the indemnified party to represent the indemnified party and any others the

29

indemnifying party may designate in such proceeding and shall pay the reasonably incurred, documented fees and disbursements of such counsel related to such proceeding. In any such proceeding, any indemnified party shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at the expense of such indemnified party unless (i) the indemnifying party and the indemnified party shall have mutually agreed in writing to the retention of such counsel or (ii) the named parties to any such proceeding (including any impleaded parties) include both the indemnifying party and the indemnified party and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them. It is understood that the indemnifying party shall not, in respect of the legal expenses of any indemnified party in connection with any proceeding or related proceedings in the same jurisdiction, be liable for (i) the fees and expenses of more than one separate firm (in addition to any local counsel) for all Underwriters and all persons, if any, who control any Underwriter within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act or who are affiliates of any Underwriter within the meaning of Rule 405 under the Securities Act, (ii) the fees and expenses of more than one separate firm (in addition to any local counsel) for the Company, its directors, its officers who sign the Registration Statement and each person, if any, who controls the Company within the meaning of either such Section and (iii) the fees and expenses of more than one separate firm (in addition to any local counsel) for all Selling Shareholders and all persons, if any, who control any Selling Shareholder within the meaning of either such Section, and that all such fees and expenses shall be reimbursed as they are incurred. In the case of any such separate firm for the Underwriters and such control persons and affiliates of any Underwriters, such firm shall be designated in writing by the Representatives. In the case of any such separate firm for the Company, and such directors, officers and control persons of the Company, such firm shall be designated in writing by the Company. In the case of any such separate firm for the Selling Shareholders and such control persons of any Selling Shareholders, such firm shall be designated in writing by the persons named as attorneys-in-fact for the Selling Shareholders under the Powers of Attorney. The indemnifying party shall not be liable for any settlement of any proceeding effected without its written consent, but if settled with such consent or if there be a final judgment for the plaintiff, the indemnifying party agrees to indemnify the indemnified party from and against any loss or liability by reason of such settlement or judgment. Notwithstanding the foregoing sentence, if at any time an indemnified party shall have requested an indemnifying party to reimburse the indemnified party for fees and expenses of counsel as contemplated by the second and third sentences of this paragraph, the indemnifying party agrees that it shall be liable for any settlement of any proceeding effected without its written consent if (i) such settlement is entered into more than 30 days after receipt by such indemnifying party of the aforesaid request and (ii) such indemnifying party shall not have reimbursed the indemnified party in accordance with such request prior to the date of such settlement. No indemnifying party shall, without the prior written consent of the indemnified party, effect any settlement of any pending or threatened proceeding

30

in respect of which any indemnified party is or could have been a party and indemnity could have been sought hereunder by such indemnified party, unless such settlement includes (x) an unconditional release of such indemnified party from all liability on claims that are the subject matter of such proceeding and (y) does not include a statement as to or an admission of fault, culpability or a failure to act by or on behalf of any indemnified party.

(d) To the extent the indemnification provided for in Section 11(a), 11(b) or 11(c) is unavailable to an indemnified party or insufficient in respect of any losses, claims, damages or liabilities referred to therein, then each indemnifying party under such paragraph, in lieu of indemnifying such indemnified party thereunder, shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages or liabilities (i) in such proportion as is appropriate to reflect the relative benefits received by the indemnifying party or parties on the one hand and the indemnified party or parties on the other hand from the offering of the Shares or (ii) if the allocation provided by clause 11(d)(i) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause 11(d)(i) above but also the relative fault of the indemnifying party or parties on the one hand and of the indemnified party or parties on the other hand in connection with the statements or omissions that resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations. The relative benefits received by the Sellers on the one hand and the Underwriters on the other hand in connection with the offering of the Shares shall be deemed to be in the same respective proportions as the net proceeds from the offering of the Shares (after deducting underwriting discounts and commissions but before deducting expenses) received by the each Seller and the total underwriting discounts and commissions received by the Underwriters, in each case as set forth in the table on the cover of the Prospectus, bear to the aggregate Public Offering Price of the Shares. The relative fault of the Sellers on the one hand and the Underwriters on the other hand shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Sellers or by the Underwriters and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The Underwriters' respective obligations to contribute pursuant to this Section 11 are several in proportion to the respective number of Shares they have purchased hereunder, and not joint. Each Selling Shareholder's obligation to contribute pursuant to this Section 11 is several in proportion to the respective number of Shares such Selling Shareholder has sold hereunder, and not joint. The liability of each Selling Shareholder under the contribution agreement contained in this paragraph shall be limited to an amount equal to the Selling Shareholder Proceeds less any amounts such Selling Shareholder is obligated to pay under Section 11(a) above.

31

(e) The Sellers and the Underwriters agree that it would not be just or equitable if contribution pursuant to this Section 11 were determined by *pro rata* allocation (even if the Underwriters were treated as one entity for such purpose) or by any other method of allocation that does not take account of the equitable considerations referred to in Section 11(d). The amount paid or payable by an indemnified party as a result of the losses, claims, damages and liabilities referred to in Section 11(d) shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim. Notwithstanding the provisions of this Section 11, no Underwriter shall be required to contribute any amount in excess of the amount by which the total price at which the Shares underwritten by it and distributed to the public were offered to the public exceeds the amount of any damages that such Underwriter has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. The remedies provided for in this Section 11 are not exclusive and shall not limit any rights or remedies which may otherwise be available to any indemnified party at law or in equity.

(f) The indemnity and contribution provisions contained in this Section 11 and the representations, warranties and other statements of the Company and the Selling Shareholders contained in this Agreement shall remain operative and in full force and effect regardless of (i) any termination of this Agreement, (ii) any investigation made by or on behalf of any Underwriter, any person controlling any Underwriter or any affiliate of any Underwriter, by or on behalf of any Selling Shareholder or any person controlling any Selling Shareholder, or by or on behalf of the Company, its officers or directors or any person controlling the Company and (iii) acceptance of and payment for any of the Shares.

12. *Directed Share Program Indemnification.* (a) The Company agrees to indemnify and hold harmless Morgan Stanley, each person, if any, who controls Morgan Stanley within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act and each affiliate of Morgan Stanley within the meaning of Rule 405 of the Securities Act ("**Morgan Stanley Entities**") from and against any and all losses, claims, damages and liabilities (including, without limitation, any legal or other expenses reasonably incurred in connection with defending or investigating any such action or claim) (i) that arise out of, or are based upon any untrue statement or alleged untrue statement of a material fact contained in any material prepared by or with the consent of the Company for distribution to Participants in connection with the Directed Share Program or arise out of or are based upon any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading; (ii) that arise out of, or are based upon the failure of any Participant to pay for and accept delivery of Directed Shares that the Participant agreed to purchase; or (iii) related to, arising out of, or are based upon, or in connection with the Directed Share Program, other than losses, claims, damages or liabilities (or expenses relating thereto) that are finally judicially determined to have resulted from the bad faith or gross negligence of Morgan Stanley.

32

(b) In case any proceeding (including any governmental investigation) shall be instituted involving any Morgan Stanley Entity in respect of which indemnity may be sought pursuant to Section 12(a), the Morgan Stanley Entity seeking indemnity, shall promptly notify the Company in writing and the Company, upon request of the Morgan Stanley Entity, shall retain counsel reasonably satisfactory to the Morgan Stanley Entity to represent the Morgan Stanley Entity and any others the Company may designate in such proceeding and shall pay the fees and disbursements of such counsel related to such proceeding. In any such proceeding, any Morgan Stanley Entity shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at the expense of such Morgan Stanley Entity unless (i) the Company shall have agreed to the retention of such counsel or (ii) the named parties to any such proceeding (including any impleaded parties) include both the Company and the Morgan Stanley Entity and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them. The Company shall not, in respect of the legal expenses of the Morgan Stanley Entities in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the fees and expenses of more than one separate firm (in addition to any local counsel) for all Morgan Stanley Entities. Any such separate firm for the Morgan Stanley Entities shall be designated in writing by Morgan Stanley. The Company shall not be liable for any settlement of any proceeding effected without its written consent, but if settled with such consent or if there be a final judgment for the plaintiff, the Company agrees to indemnify the Morgan Stanley Entities from and against any loss or liability by reason of such settlement or judgment. Notwithstanding the foregoing sentence, if at any time a Morgan Stanley Entity shall have requested the Company to reimburse it for fees and expenses of counsel as contemplated by the second and third sentences of this paragraph, the Company agrees that it shall be liable for any settlement of any proceeding effected without its written consent if (i) such settlement is entered into more than 30 days after receipt by the Company of the aforesaid request and (ii) the Company shall not have reimbursed the Morgan Stanley Entity in accordance with such request prior to the date of such settlement. The Company shall not, without the prior written consent of Morgan Stanley, effect any settlement of any pending or threatened proceeding in respect of which any Morgan Stanley Entity is or could have been a party and indemnity could have been sought hereunder by such Morgan Stanley Entity, unless such settlement includes an unconditional release of the Morgan Stanley Entities from all liability on claims that are the subject matter of such proceeding.

33

(c) To the extent the indemnification provided for in Section 12(a) is unavailable to a Morgan Stanley Entity or insufficient in respect of any losses, claims, damages or liabilities referred to therein, then the Company in lieu of indemnifying the Morgan Stanley Entity thereunder, shall contribute to the amount paid or payable by the Morgan Stanley Entity as a result of such losses, claims, damages or liabilities (i) in such proportion as is appropriate to reflect the relative benefits received by the Company on the one hand and the Morgan Stanley Entities on the other hand from the offering of the Directed Shares or (ii) if the allocation provided by clause 12(c)(i) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause 12(c)(i) above but also the relative fault of the Company on the one hand and of the Morgan Stanley Entities on the other hand in connection with any statements or omissions that resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations. The relative benefits received by the Company on the one hand and the Morgan Stanley Entities on the other hand in connection with the offering of the Directed Shares shall be deemed to be in the same respective proportions as the net proceeds from the offering of the Directed Shares (before deducting expenses) and the total underwriting discounts and commissions received by the Morgan Stanley Entities for the Directed Shares, bear to the aggregate Public Offering Price of the Directed Shares. If the loss, claim, damage or liability is caused by an untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact, the relative fault of the Company on the one hand and the Morgan Stanley Entities on the other hand shall be determined by reference to, among other things, whether the untrue or alleged untrue statement or the omission or alleged omission relates to information supplied by the Company or by the Morgan Stanley Entities and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

(d) The Company and the Morgan Stanley Entities agree that it would not be just or equitable if contribution pursuant to this Section 12 were determined by *pro rata* allocation (even if the Morgan Stanley Entities were treated as one entity for such purpose) or by any other method of allocation that does not take account of the equitable considerations referred to in Section 12(c). The amount paid or payable by the Morgan Stanley Entities as a result of the losses, claims, damages and liabilities referred to in the immediately preceding paragraph shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by the Morgan Stanley Entities in connection with investigating or defending any such action or claim. Notwithstanding the provisions of this Section 12, no Morgan Stanley Entity shall be required to contribute any amount in excess of the amount by which the total price at which the Directed Shares distributed to the public were offered to the public exceeds the amount of any damages that such Morgan Stanley Entity has otherwise been required to pay. The remedies provided for in this Section 12 are not exclusive and shall not limit any rights or remedies which may otherwise be available to any indemnified party at law or in equity.

34

(e) The indemnity and contribution provisions contained in this Section 12 shall remain operative and in full force and effect regardless of (i) any termination of this Agreement, (ii) any investigation made by or on behalf of any Morgan Stanley Entity or the Company, its officers or directors or any person controlling the Company and (iii) acceptance of and payment for any of the Directed Shares.

13. *Termination*. The Underwriters may terminate this Agreement by notice given by the Representatives to the Company, if after the execution and delivery of this Agreement and prior to or on the Closing Date or any Option Closing Date, as the case may be, (i) trading generally shall have been suspended or materially limited on, or by, as the case may be, any of the New York Stock Exchange, the NYSE American, the Nasdaq Global Select Market, the Chicago Board of Options Exchange, the Chicago Mercantile Exchange or the Chicago Board of Trade, (ii) trading of any securities of the Company shall have been suspended on any exchange or in any over-the-counter market, (iii) a material disruption in securities settlement, payment or clearance services in the United States shall have occurred, (iv) any moratorium on commercial banking activities shall have been declared by Federal or New York State authorities or (v) there shall have occurred any outbreak or escalation of hostilities, or any change in financial markets or any calamity or crisis that, in the Representatives' judgment, is material and adverse and which, singly or together with any other event specified in this clause (v), makes it, in the Representatives' judgment, impracticable or inadvisable to proceed with the offer, sale or delivery of the Shares on the terms and in the manner contemplated in the Time of Sale Prospectus or the Prospectus.

14. *Effectiveness; Defaulting Underwriters*. This Agreement shall become effective upon the execution and delivery hereof by the parties hereto.

If, on the Closing Date or an Option Closing Date, as the case may be, any one or more of the Underwriters shall fail or refuse to purchase Shares that it has or they have agreed to purchase hereunder on such date, and the aggregate number of Shares which such defaulting Underwriter or Underwriters agreed but failed or refused to purchase is not more than one-tenth of the aggregate number of the Shares to be purchased on such date, the other Underwriters shall be obligated severally in the proportions that the number of Firm Shares set forth opposite their respective names in Schedule II bears to the aggregate number of Firm Shares set forth opposite the names of all such non-defaulting Underwriters, or in such other proportions as the Representatives may specify, to purchase the Shares which such defaulting Underwriter or Underwriters agreed but failed or refused to purchase on such date; *provided* that in no event shall the number of Shares that any Underwriter has agreed to purchase pursuant to this Agreement be increased pursuant to this Section 14 by an amount in excess of one-ninth of such number of Shares without the written consent of such Underwriter. If, on the Closing Date, any Underwriter or Underwriters shall fail or refuse to purchase Firm Shares and the aggregate number of Firm Shares with respect to which such default occurs is more than one-tenth of the aggregate number of Firm Shares to be purchased on such date, and arrangements satisfactory to the Representatives, the Company and the

35

Selling Shareholders for the purchase of such Firm Shares are not made within 36 hours after such default, this Agreement shall terminate without liability on the part of any non-defaulting Underwriter, the Company or the Selling Shareholders. In any such case either the Representatives or the relevant Sellers shall have the right to postpone the Closing Date, but in no event for longer than seven days, in order that the required changes, if any, in the Registration Statement, in the Time of Sale Prospectus, in the Prospectus or in any other documents or arrangements may be effected. If, on an Option Closing Date, any Underwriter or Underwriters shall fail or refuse to purchase Additional Shares and the aggregate number of Additional Shares with respect to which such default occurs is more than one-tenth of the aggregate number of Additional Shares to be purchased on such Option Closing Date, the non-defaulting Underwriters shall have the option to (i) terminate their obligation hereunder to purchase the Additional Shares to be sold on such Option Closing Date or (ii) purchase not less than the number of Additional Shares that such non-defaulting Underwriters would have been obligated to purchase in the absence of such default. Any action taken under this paragraph shall not relieve any defaulting Underwriter from liability in respect of any default of such Underwriter under this Agreement.

If this Agreement shall be terminated by the Underwriters, or any of them, because of any failure or refusal on the part of any Seller to comply with the terms or to fulfill any of the conditions of this Agreement, or if for any reason any Seller shall be unable to perform its obligations under this Agreement, the Company (other than by reason of a default by the Underwriters or the occurrence of any of the events described in clauses (i) (solely to the extent that such event is not caused by conduct of the Company), (iii), (iv) or (v) of Section 13) will reimburse the Underwriters or such Underwriters as have so terminated this Agreement with respect to themselves, severally, for all out-of-pocket expenses (including the fees and disbursements of their counsel) reasonably incurred by such Underwriters in connection with this Agreement or the offering contemplated hereunder.

15. *Entire Agreement*. (a) This Agreement, together with any contemporaneous written agreements and any prior written agreements (to the extent not superseded by this Agreement) that relate to the offering of the Shares, represents the entire agreement between the Company and the Selling Shareholders, on the one hand, and the Underwriters, on the other, with respect to the preparation of any preliminary prospectus, the Time of Sale Prospectus, the Prospectus, the conduct of the offering, and the purchase and sale of the Shares.

(b) The Company and each Selling Shareholder acknowledge that in connection with the offering of the Shares: (i) the Underwriters have acted at arm's length, are not agents of, and owe no fiduciary duties to, the Company, any of the Selling Shareholders or any other person, (ii) the Underwriters owe the Company and each Selling Shareholder only those duties and obligations set forth in this Agreement, any contemporaneous written agreements and prior written agreements (to the extent not superseded by this Agreement), if any, (iii) the Underwriters may have interests that differ from those of the Company and each

36

Selling Shareholder, and (iv) none of the activities of the Underwriters in connection with the transactions contemplated herein constitutes a recommendation, investment advice, or solicitation of any action by the Underwriters with respect to any entity or natural person. The Company and each Selling Shareholder waive to the full extent permitted by applicable law any claims it may have against the Underwriters arising from an alleged breach of fiduciary duty in connection with the offering of the Shares.

(c) Each Selling Shareholder further acknowledges and agrees that, although the Underwriters may provide certain Selling Shareholders with certain Regulation Best Interest and Form CRS disclosures or other related documentation in connection with the offering, the Underwriters are not making a recommendation to any Selling Shareholder to participate in the offering or sell any Shares at the Purchase Price, and nothing set forth in such disclosures or documentation is intended to suggest that any Underwriter is making such a recommendation.

16. *Recognition of the U.S. Special Resolution Regimes*. (a) In the event that any Underwriter that is a Covered Entity becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer from such Underwriter of this Agreement, and any interest and obligation in or under this Agreement, will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if this Agreement, and any such interest and obligation, were governed by the laws of the United States or a state of the United States.

(b) In the event that any Underwriter that is a Covered Entity or a BHC Act Affiliate of such Underwriter becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under this Agreement that may be exercised against such Underwriter are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if this Agreement were governed by the laws of the United States or a state of the United States.

For purposes of this Section a "**BHC Act Affiliate**" has the meaning assigned to the term "affiliate" in, and shall be interpreted in accordance with, 12 U.S.C. § 1841(k). "**Covered Entity**" means any of the following: (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b). "**Default Right**" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable. "**U.S. Special Resolution Regime**" means each of (i) the Federal Deposit Insurance Act and the regulations promulgated thereunder and (ii) Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act and the regulations promulgated thereunder.

37

17. *Counterparts*. This Agreement may be signed in two or more counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. Counterparts may be delivered via facsimile, electronic mail (including any electronic signature complying with the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act or other applicable law, e.g., www. Docusign.com) or other transmission method any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

18. *Applicable Law*. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York.

19. *Headings*. The headings of the sections of this Agreement have been inserted for convenience of reference only and shall not be deemed a part of this Agreement.

20. *Notices.* All communications hereunder shall be in writing and effective only upon receipt and if to the Underwriters shall be delivered, mailed or sent to the Representatives in care of Morgan Stanley & Co. LLC, 1585 Broadway, New York, New York 10036, Attention: Equity Syndicate Desk, with a copy to the Legal Department; Goldman Sachs & Co. LLC, 200 West Street, New York, New York 10282-2198, Attention: Equity Syndicate Desk, with a copy to the Legal Department; and Jefferies LLC, 520 Madison Avenue, New York, New York 10022, Attention: General Counsel; if to the Company shall be delivered, mailed or sent to The Honest Company, Inc., 12130 Millennium Drive, #500, Los Angeles, CA 90094, Attention: General Counseland if to the Selling Shareholders shall be delivered, mailed or sent to each of the Attorneys-in-Fact named in the Power of Attorney, c/o the Company at the address set forth on the cover of the Registration Statement, Attention: General Counsel with a copy, which shall not constitute notice, to Whalen LLP, 1601 Dove Street, Suite 270, Newport Beach, California 92660.

Very truly yours,

The Honest Company, Inc.

By: _____
　　　Name:
　　　Title:

38

Exhibit 1

The Selling Shareholders named in Schedule
   I hereto, acting severally

By:    _____

     Name:
     Title: Attorney-in Fact

Accepted as of the date hereof

Morgan Stanley & Co. LLC
J.P. Morgan Securities LLC
Jefferies LLC

Acting severally on behalf of themselves and the
   several Underwriters named in Schedule II hereto

By:  Morgan Stanley & Co. LLC

By:   _____

     Name:
     Title:

By:  J.P. Morgan Securities LLC

By:   _____

     Name:
     Title:

By:  Jefferies LLC

By:   _____

     Name:
     Title:

39

**SCHEDULE I**

| **Selling Shareholder** | **Number of Firm Shares To Be Sold** |
|---|---|
| [●] | |
| Total: | |

I-1

**SCHEDULE II**

| **Underwriter** | **Number of Firm Shares To Be Purchased** |
| --- | --- |
| Morgan Stanley & Co. LLC | |
| J.P. Morgan Securities LLC | |
| Jefferies LLC | |
| [●] | |
| Total: | |

II-1

**SCHEDULE III**

**Time of Sale Prospectus**

1.    Preliminary Prospectus issued [●]

2.    [identify all free writing prospectuses filed by the Company under Rule 433(d) of the Securities Act]

3.    [free writing prospectus containing a description of terms that does not reflect final terms, if the Time of Sale Prospectus does not include a final term sheet]

4.    [orally communicated pricing information such as price per share and size of offering if a Rule 134 pricing term sheet is used at the time of sale instead of a pricing term sheet filed by the Company under Rule 433(d) as a free writing prospectus]

III-1

**EXHIBIT A**

**FORM OF LOCK-UP AGREEMENT**

1

**LOCK-UP AGREEMENT**

_____, 2021

Morgan Stanley & Co. LLC
J.P. Morgan Securities LLC
Jefferies LLC

c/o Morgan Stanley & Co. LLC
  1585 Broadway
  New York, NY 10036

c/o J.P. Morgan Securities LLC
  383 Madison Avenue
  New York, NY 10179

c/o Jefferies LLC
  520 Madison Avenue
  New York, NY 10022

Ladies and Gentlemen:

The undersigned understands that Morgan Stanley & Co. LLC, J.P. Morgan Securities LLC and Jefferies LLC (the "**Representatives**") propose to enter into an Underwriting Agreement (the "**Underwriting Agreement**") with The Honest Company, Inc., a Delaware corporation (the "**Company**"), providing for the public offering (the "**Public Offering**") by the several Underwriters, including the Representatives (the "**Underwriters**"), of shares (the "**Shares**") of the common stock, par value $0.0001 per share of the Company (the "**Common Stock**").

To induce the Underwriters that may participate in the Public Offering to continue their efforts in connection with the Public Offering, the undersigned hereby agrees that, without the prior written consent of Morgan Stanley & Co. LLC and J.P. Morgan Securities LLC on behalf of the Underwriters, it will not, and will not publicly disclose an intention to, during the period commencing on the date hereof and ending 180 days after the date of the final prospectus (the "**Public Offering Date**") (such period, the "**Restricted Period**") relating to the Public Offering (the "**Prospectus**"), (1) offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any shares of Common Stock beneficially owned (as such term is used in Rule 13d-3 of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**")), by the undersigned or any other securities so owned convertible into or exercisable or exchangeable for Common Stock or (2) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Common Stock, whether any such transaction described in clause (1) or (2) above is to be settled by delivery of Common

Stock or such other securities, in cash or otherwise. The undersigned acknowledges and agrees that the foregoing precludes the undersigned from engaging in any hedging or other transactions designed or intended, or which could reasonably be expected to lead to or result in, a sale or disposition of any shares of Common Stock, or securities convertible into or exercisable or exchangeable for Common Stock, even if any such sale or disposition transaction or transactions would be made or executed by or on behalf of someone other than the undersigned.

The foregoing shall not apply to:

(a) transactions relating to shares of Common Stock or other securities acquired in the Public Offering or in open market transactions after the completion of the Public Offering, *provided* that no filing under Section 16(a) of the Exchange Act shall be required or shall be voluntarily made during the Restricted Period in connection with subsequent sales of Common Stock or other securities acquired in such Public Offering or open market transactions;

(b) transfers of shares of Common Stock or any security convertible into or exercisable or exchangeable for Common Stock (i) as a bona fide gift or gifts, or for bona fide estate planning purposes, (ii) to any trust for the direct or indirect benefit of the undersigned or the immediate family of the undersigned, (iii) upon death or by will, testamentary document or intestate succession, (iv) to an immediate family member of the undersigned or to any trust for the direct or indirect benefit of the undersigned or one or more immediate family members of the undersigned (for purposes of this agreement, "immediate family" shall mean any spouse or domestic partner and relationship by blood, current or former marriage or adoption, not more remote than first cousin) or (v) if the undersigned is a trust, to any trustor, trustee or beneficiary of the undersigned or the estate of any such trustee or beneficiary;

(c) distributions, transfers or dispositions of shares of Common Stock or any security convertible into or exercisable or exchangeable for Common Stock (i) to another corporation, partnership, limited liability company, trust or other business entity that is an affiliate (as defined in Rule 405 promulgated under the Securities Act of 1933, as amended) of the undersigned, or to any investment fund or other entity controlling, controlled by, managing or managed by the undersigned or affiliates of the undersigned, or (ii) as part of a distribution, transfer or disposition without consideration by the undersigned to its stockholders, current or former partners (general or limited), members, beneficiaries or other equity holders, or to the estates of any such stockholders, partners, members, beneficiaries or other equity holders;

(d) (i) the receipt by the undersigned from the Company of shares of Common Stock upon the exercise of options, settlement of restricted stock units or other equity awards granted under a stock incentive plan or other equity award plan, which plan is described in the registration statement related to the Public Offering (the "**Registration Statement**") and the Prospectus, or the exercise of warrants outstanding and which are described in the Registration Statement and the Prospectus, or (ii) the sale or other transfer of shares of Common Stock or any securities convertible into Common Stock to

2

the Company upon the vesting, exercise or settlement of restricted stock units, options, warrants or other Company securities (including, in each case, by way of a "cashless" or "net" exercise basis and any transfer to the Company necessary in respect of such amount needed for the payment of taxes, including estimated taxes, and remittance payments due as a result of such vesting, settlement or exercise including by means of a "net settlement," "sell to cover" or otherwise); provided the shares received upon the vesting, exercise or settlement are subject to the terms of this agreement;

(e) the establishment of a trading plan pursuant to Rule 10b5-1 under the Exchange Act for the transfer of shares of Common Stock or any securities convertible into or exercisable or exchangeable for Common Stock, *provided* that (i) such plan does not provide for the transfer of Common Stock during the Restricted Period and (ii) to the extent a public announcement or filing under the Exchange Act, if any, is required of or voluntarily made by or on behalf of the undersigned or the Company regarding the establishment of such plan, such announcement or filing shall include a statement to the effect that no transfer of Common Stock may be made under such plan during the Restricted Period;

(f) the transfer of Common Stock or any security convertible into or exercisable or exchangeable for Common Stock that occurs by operation of law, such as pursuant to a qualified domestic order, divorce settlement, divorce decree, settlement agreement or other court order;

(g) any transfer of Common Stock to the Company pursuant to arrangements under which the Company has the option to repurchase such shares or a right of first refusal with respect to transfers of such shares or in connection with the death, disability or termination of employment or service;

(h) the conversion of the outstanding preferred stock of the Company into shares of Common Stock prior to or in connection with the consummation of the Public Offering, provided that such conversion is described in the Registration Statement and any such shares of Common Stock received upon such conversion shall be subject to the terms of this agreement;

(i) sales of shares of Common Stock to the Underwriters pursuant to the terms of the Underwriting Agreement;

(j) the transfer of shares of Common Stock or any security convertible into or exercisable or exchangeable for Common Stock in connection with a bona fide third-party tender offer, merger, consolidation or other similar transaction, that is approved by the Board of Directors of the Company, made to all holders of Common Stock involving a Change of Control (as defined below), provided that in the event that the tender offer, merger, consolidation or other such transaction is not completed, the Common Stock owned by the undersigned shall remain subject to the restrictions contained in this agreement. For the purposes of this clause (j), "**Change of Control**" shall mean the transfer (whether by tender offer, merger, consolidation or other similar transaction), in one transaction or a series of related transactions, to a person or group of affiliated

3

persons (other than the Underwriters pursuant to the Public Offering), of shares of Common Stock or any securities convertible into or exercisable or exchangeable for Common Stock if, after such transfer, such person or group of affiliated persons would hold more than fifty percent (50%) of the outstanding voting securities of the Company (or the surviving entity);

(k) the sale by the Company (on behalf of the undersigned) of up to such number of shares of Common Stock solely necessary to raise funds to satisfy the Company's income and payroll tax withholding obligations in connection with the vesting, exercise or settlement of restricted stock units, options, warrants or other Company securities held by the undersigned that are outstanding as of the date hereof; *provided* that if the undersigned is required to file a report under Section 16(a) of the Exchange Act during the Restricted Period, the undersigned shall include a statement in any such report to the effect that such transfer was solely pursuant to the circumstances described in this clause (k), no other shares of Common Stock were sold and that the Undersigned's securities are subject to a lock-up agreement with the Underwriters; *provided further* that no other public announcement shall be required or shall be voluntarily made in connection with such transfer; or

(l) the transfer of shares of Common Stock or any security convertible into or exercisable or exchangeable for Common Stock to a partnership, limited liability company or other entity of which the undersigned and/or the immediate family of the undersigned are the legal and beneficial ownership of all of the outstanding securities or similar interests;

*provided* that in the case of any transfer, distribution or disposition pursuant to clause (b), (c) or (f), each transferee, donee or distributee shall sign and deliver a lock-up agreement substantially in the form of this agreement;

*provided further* that in the case of any transfer, distribution or disposition pursuant to clause (a), (b)(i), (b)(ii), (b)(iv), (b)(v) or (c), no public announcement or filing under Section 16(a) of the Exchange Act, or any other public filing or disclosure shall be required or shall be voluntarily made during the Restricted Period;

*provided further* that in the case of any transfer, distribution or disposition pursuant to clause (b), (c), (f) or (l) such transfer, distribution or disposition shall not involve a disposition for value; and

*provided further* that in the case of any transfer pursuant to clause (b)(iii), (d), (f) (g) or (k), no public announcement or filing under Section 16(a) of the Exchange Act, or any other public filing or disclosure shall be voluntarily made during the Restricted Period, and if any filing under Section 16(a) of the Exchange Act, or other public filing or disclosure, is legally required, such filing or disclosure shall clearly indicate in the footnotes thereto the nature and conditions of such transfer.

Notwithstanding the foregoing, if the undersigned is a current employee of the Company or any subsidiary of the Company, and the undersigned is not an executive

4

officer, director or founder of the Company nor a party to that certain Amended and Restated Investors' Rights Agreement dated June 11, 2018 by and among the Company and the investors listed thereto (the "**Rights Agreement**"), then:

(A) the undersigned may sell or otherwise transfer up to 15% of the aggregate number of shares of Common Stock and shares of Common Stock underlying securities convertible into or exercisable or exchangeable for Common Stock held by the undersigned as of the date of the Underwriting Agreement for which all vesting conditions were satisfied as of the date of the second post-IPO earnings announcement (as defined below) (the "**Employee Early Release Shares**") beginning at the opening of trading on the third Trading Day (as defined below) immediately following the Company's regular disclosure, either on Form 8-K or in a periodic report filed with the Securities and Exchange Commission (the "**SEC**"), of the Company's financial results for the second quarter following the most recent period for which financial statements are included in the Prospectus (which for this purpose shall not include "flash" numbers or preliminary, partial earnings) (the "**second post-IPO earnings announcement**"); and

(B) in addition to the Employee Early Release Shares, if the last reported closing price of the Common Stock on the New York Stock Exchange or The Nasdaq Stock Market, as the case may be, is at least 33% greater than the initial public offering price per share set forth on the cover page of the Prospectus for at least ten (10) Trading Days out of any fifteen (15) consecutive Trading Day period ending on or after the Trading Day that is 90 days after the Public Offering Date, the undersigned may sell or otherwise transfer up to 25% of the aggregate number of shares of Common Stock and shares of Common Stock underlying securities convertible into or exercisable or exchangeable for Common Stock held by the undersigned as of the date of the Underwriting Agreement for which all vesting conditions were satisfied as of the date of the second post-IPO earnings announcement beginning at the opening of trading on the third Trading Day immediately following the second post-IPO earnings announcement.

[If the Representatives release any officer, director or beneficial owner of 1% or more of the outstanding shares of Common Stock of the Company as of the date of the Underwriting Agreement (calculated assuming conversion of all outstanding shares of the Company's preferred stock), other than the undersigned, from the restrictions described herein during the Restricted Period, then the undersigned shall also be granted an early release from its obligations hereunder, on a pro rata basis with all other beneficial owners of similarly restricted securities of the Company based on the maximum percentage of shares held by any such beneficial owner being released from such holder's lock-up agreement (the "**Pro-rata Release**"); provided, however, that no Pro-rata Release of the undersigned's Shares will occur unless the Representatives have waived such prohibitions with respect to Common Stock, or any securities convertible into or exercisable for Common Stock, valued at $5,000,000 or more in the aggregate, in one or a series of similar transactions (based on the closing or last reported sale price of the Common Stock on the date such waiver becomes effective). The Pro-rata Release shall not be applied in the case of (1) an early release from the restrictions described herein due to circumstances of an emergency or hardship, as determined by the Representatives in their sole judgment, (2) a release effective solely to permit a transfer not involving a disposition for value if the transferee agrees in writing to be

5

bound by the same terms described in this agreement or (3) an early release from the restrictions described herein during the Restricted Period in connection with an underwritten public offering that is wholly or partially a secondary offering of Shares. The undersigned acknowledges that the Representatives are under no obligation to inquire whether, or to ensure that, the Company notifies the undersigned of the delivery by the Representatives of any such notice.]

A "**Trading Day**" is a day on which the New York Stock Exchange and The Nasdaq Stock Market are open for the buying and selling of securities.

In addition, the undersigned agrees that, without the prior written consent of Morgan Stanley & Co. LLC and J.P. Morgan Securities LLC on behalf of the Underwriters, it will not, during the Restricted Period, make any demand for or exercise any right with respect to, the registration of any shares of Common Stock or any security convertible into or exercisable or exchangeable for Common Stock. The undersigned also agrees and consents to the entry of stop transfer instructions with the Company and the Company's transfer agent and registrar against the transfer of the undersigned's shares of Common Stock except in compliance with the foregoing restrictions.

If the undersigned is an officer or director of the Company, the undersigned further agrees that the foregoing provisions shall be equally applicable to any issuer-directed Shares the undersigned may purchase in the Public Offering.

If the undersigned is an officer or director of the Company, (i) Morgan Stanley & Co. LLC and J.P. Morgan Securities LLC agree that, at least three business days before the effective date of any release or waiver of the foregoing restrictions in connection with a transfer of shares of Common Stock, Morgan Stanley & Co. LLC and J.P. Morgan Securities LLC will notify the Company of the impending release or waiver, and (ii) the Company has agreed in the Underwriting Agreement to announce the impending release or waiver by press release through a major news service at least two business days before the effective date of the release or waiver. Any release or waiver granted by Morgan Stanley & Co. LLC and J.P. Morgan Securities LLC hereunder to any such officer or director shall only be effective two business days after the publication date of such press release. The provisions of this paragraph will not apply if (a) the release or waiver is effected solely to permit a transfer not for consideration and (b) the transferee has agreed in writing to be bound by the same terms described in this agreement to the extent and for the duration that such terms remain in effect at the time of the transfer.

The undersigned understands that the Company and the Underwriters are relying upon this agreement in proceeding toward consummation of the Public Offering. The undersigned further understands that this agreement is irrevocable and shall be binding upon the undersigned's heirs, legal representatives, successors and assigns.

The undersigned acknowledges and agrees that the Underwriters have not provided any recommendation or investment advice nor have the Underwriters solicited any action from the undersigned with respect to the Public Offering of the Shares and the undersigned has consulted their own legal, accounting, financial, regulatory and tax

https://www.sec.gov/Archives/edgar/data/1530979/000119312521130292/d27841dex11.htm

advisors to the extent deemed appropriate. The undersigned further acknowledges and agrees that, although the Underwriters may provide certain Regulation Best Interest and Form CRS disclosures or other related documentation to you in connection with the Public Offering, the Underwriters are not making a recommendation to you to participate in the Public Offering or sell any Shares at the price determined in the Public Offering, and nothing set forth in such disclosures or documentation is intended to suggest that any Underwriter is making such a recommendation.

Whether or not the Public Offering actually occurs depends on a number of factors, including market conditions. Any Public Offering will only be made pursuant to an Underwriting Agreement, the terms of which are subject to negotiation between the Company and the Underwriters.

The undersigned hereby represents and warrants that the undersigned has full power and authority to enter into this agreement. All authority herein conferred or agreed to be conferred and any obligations of the undersigned shall be binding upon the successors, assigns, heirs or personal representatives of the undersigned.

The undersigned understands that, if (a) the Underwriting Agreement does not become effective by October 1, 2021 (provided, however, that the undersigned agrees that this agreement shall be automatically extended by three months if the Company provides written notice to the undersigned that the Company is still pursuing the Public Offering contemplated by the Underwriting Agreement), (b) the Underwriting Agreement (other than the provisions thereof which survive termination) shall terminate or be terminated prior to payment for and delivery of the Common Stock to be sold thereunder, or (c) the registration statement filed with the SEC in connection with the Public Offering is withdrawn, the undersigned shall be released from all obligations under this agreement.

This agreement may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com or www.echosign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

This agreement shall be governed by and construed in accordance with the laws of the State of New York.

[*Signature page follows*]

7

EXHIBIT

Very truly yours,

_____
*(please print complete name of entity)*

By:_____
     *(duly authorized signature)*

Name:_____
     *(please print full name)*

Title:_____
     *(please print full title)*

Address:

_____

_____

E-mail:

*[Signature Page – Lock-up Agreement]*

**EXHIBIT B**

## FORM OF WAIVER OF LOCK-UP

_____, 20__

[Name and Address of
Officer or Director
Requesting Waiver]

Dear Mr./Ms. [Name]:

This letter is being delivered to [●] in connection with the offering by The Honest Company, Inc. (the "**Company**") of [●] shares of common stock, $0.0001 par value (the "**Common Stock**"), of the Company and the lock-up agreement dated [●], 2021 (the "**Lock-up Agreement**"), executed by you in connection with such offering, and your request for a [waiver] [release] dated _____, 20__, with respect to _____ shares of Common Stock (the "**Shares**").

[●] hereby agrees to [waive] [release] the transfer restrictions set forth in the Lock-up Agreement, but only with respect to the Shares, effective _____, 20__; provided, however, that such [waiver] [release] is conditioned on the Company announcing the impending [waiver] [release] by press release through a major news service at least two business days before effectiveness of such [waiver] [release]. This letter will serve as notice to the Company of the impending [waiver] [release].

Except as expressly [waived] [released] hereby, the Lock-up Agreement shall remain in full force and effect.

Very truly yours,

**[●]**

2

Acting severally on behalf of themselves and the several
Underwriters named in Schedule I hereto

By: _____

    Name:
    Title:

cc: Company

3

**FORM OF PRESS RELEASE**

The Honest Company, Inc.
[Date]

The Honest Company, Inc. (the "**Company**") announced today that [●], the lead book-running managers in the Company's recent public sale of [●] shares of its common stock is [waiving][releasing] a lock-up restriction with respect to _____ shares of the Company's common stock held by [certain officers or directors] [an officer or director] of the Company. The [waiver][release] will take effect on _____, 20__ , and the shares may be sold on or after such date.

**This press release is not an offer for sale of the securities in the United States or in any other jurisdiction where such offer is prohibited, and such securities may not be offered or sold in the United States absent registration or an exemption from registration under the United States Securities Act of 1933, as amended.**

4

**Exhibit D**

S-8 1 d415482ds8.htm S-8

**As filed with the Securities and Exchange Commission on May 6, 2021**

**Registration No. 333-**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## Form S-8
## REGISTRATION STATEMENT

*UNDER*
*THE SECURITIES ACT OF 1933*

# The Honest Company, Inc.
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **90-0750205** |
| (State or other jurisdiction of incorporation or organization) | (IRS employer identification number) |
| | |
| **12130 Millennium Drive, #500 Los Angeles, California** | **90094** |
| (Address of Principal Executive Offices) | (Zip Code) |

**2011 Stock Incentive Plan**
**2021 Equity Incentive Plan**
**2021 Employee Stock Purchase Plan**
**(Full titles of the plans)**

**Nikolaos Vlahos**
**Chief Executive Officer**
**12130 Millennium Drive, #500**
**Los Angeles, California 90094**
**(888) 862-8818**
**(Name, address, including zip code and telephone number, including area code, of agent for service)**

*Copies to:*

**C. Thomas Hopkins**
**Nicole Brookshire**
**Siana Lowrey**
**Sara Semnani**
**Cooley LLP**
**1333 2nd Street, Suite 400**
**Santa Monica, California 90401**
**(310) 883-6400**

---

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Smaller reporting company | ☐ |
| Non-accelerated filer | ☒ | Accelerated filer | ☐ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

## CALCULATION OF REGISTRATION FEE

| Title of Securities To Be Registered | Amount To Be Registered(1) | Proposed Maximum Offering Price Per Share | Proposed Maximum Aggregate Offering Price | Amount of Registration Fee |
|---|---|---|---|---|
| 2011 Stock Incentive Plan (options) (Common stock, $0.0001 par value per share) | 17,768,458(2) | $5.19 (7) | $ 92,134,764.04 (7) | $10,051.90 |
| 2021 Equity Incentive Plan (Common stock, $0.0001 par value per share) | 7,250,000(3)(4)(5) | $ 22.22 (8) | $161,095,000.00(8) | $17,575.46 |
| 2021 Employee Stock Purchase Plan (Common stock, $0.0001 par value per share) | 1,175,000 (6) | $18.89 (9) | $22,195,750.00(9) | $2,421.56 |
| TOTAL | 26,193,458 | — | $275,425,514.04 | $30,048.92 |

(1)     Pursuant to Rule 416(a) under the Securities Act of 1933, as amended (the "**Securities Act**"), this Registration Statement shall also cover any additional shares of common stock that become issuable under the above-named plans by reason of any stock dividend, stock split, recapitalization or any other similar transaction effected without receipt of consideration which results in an increase in the number of The Honest Company, Inc.'s (the "**Registrant**") outstanding shares of common stock, par value $0.0001 per share (the "**Common Stock**").

(2)     Represents shares of Common Stock reserved for issuance upon the exercise of outstanding options granted under the Registrant's 2011 Stock Incentive Plan, as amended (the "**2011 Plan**"). The 2011 Plan has been terminated and no further option grants will be made under the 2011 Plan, and any shares underlying outstanding options that terminate by expiration, forfeiture, cancellation or otherwise without the issuance of such shares, have been allocated to the Registrant's 2021 Equity Incentive Plan (the "**2021 Plan**").

(3)     Includes 200,000 shares of Common Stock reserved for issuance pursuant to outstanding restricted stock unit awards granted under the 2011 Plan. The 2011 Plan has been terminated and no further restricted stock unit awards or option grants will be made under the 2011 Plan, but any shares underlying outstanding restricted stock unit awards that terminate by expiration, forfeiture, cancellation, or otherwise, will be available for grant under the 2021 Plan.

(4)     Includes 110,267 shares of Common Stock reserved for issuance pursuant to outstanding restricted stock unit awards granted under the 2021 Plan.

(5)     Includes 6,939,733 shares of Common Stock currently reserved for future grant under the 2021 Plan. To the extent outstanding awards under the 2011 Plan, consisting of those referenced in footnotes (2) and (3) above, terminate by expiration, forfeiture, cancellation or otherwise without the issuance of such shares, the shares of Common Stock subject to such awards instead will be available for future issuance under the 2021 Plan. The 2021 Plan also provides that an additional number of shares will automatically be added annually to the shares authorized for issuance under the 2021 Plan on January 1st of each year, for a period of not more than 10 years, commencing on January 1, 2022 and ending on (and including) January 1, 2031, in an amount equal to 4% of the total number of shares of Common Stock outstanding on December 31st of the preceding year; provided, however, that the Registrant's board of directors may act prior to January 1st of a given year to provide that the increase for such year will be a lesser number of shares of Common Stock.

(6)     Represents shares of Common Stock reserved for issuance under the Registrant's 2021 Employee Stock Purchase Plan (the "**ESPP**"). The ESPP provides that an additional number of shares will automatically be added annually to the shares authorized for issuance under the ESPP on January 1st of each year for a period of up to 10 years, commencing on January 1, 2022 and ending on (and including) January 1, 2031, in an amount equal to the lesser of (i) 1% of the total number of shares of Common Stock outstanding on December 31st of the preceding calendar year, and (ii) 3,525,000 shares of Common Stock. Notwithstanding the foregoing, the Registrant's board of directors may act prior to the first day of any calendar year to provide that there will be no January 1st increase in the share reserve for such calendar year or that the increase in the share reserve for such calendar year will be a lesser number of shares of Common Stock than would otherwise occur pursuant to the preceding sentence.

(7)     Estimated pursuant to Rule 457(h) solely for the purpose of calculating the registration fee. The proposed maximum offering price per share and proposed maximum aggregate offering price are calculated using a weighted-average exercise price for such shares.

(8)    Estimated pursuant to Rule 457(h) solely for the purpose of calculating the registration fee. The proposed maximum offering price per share and proposed maximum aggregate offering price are calculated using the average of the high and low prices of the Common Stock as reported on The Nasdaq Global Select Market on May 5, 2021.

(9)    Estimated pursuant to Rule 457(h) solely for the purpose of calculating the registration fee. The proposed maximum offering price per share and proposed maximum aggregate offering price are calculated using the average of the high and low prices of the Common Stock as reported on The Nasdaq Global Select Market on May 5, 2021, multiplied by 85%, which is the percentage of the price per share applicable to purchases under the ESPP.

**PART I**

**INFORMATION REQUIRED IN THE SECTION 10(A) PROSPECTUS**

The information called for by Part I of Form S-8 is omitted from this Registration Statement in accordance with Rule 428 of the Securities Act and the instructions to Form S-8. In accordance with the rules and regulations of the Commission and the instructions to Form S-8, such documents are not being filed with the Commission either as part of this Registration Statement or as prospectuses or prospectus supplements pursuant to Rule 424.

**PART II**

**INFORMATION REQUIRED IN THE REGISTRATION STATEMENT**

Item 3.        **Incorporation of Documents by Reference.**

The Honest Company, Inc. (the "**Registrant**") hereby incorporates by reference into this Registration Statement the following documents filed by it with the Commission:

(a)        the Registrant's prospectus filed on May 6, 2021 pursuant to Rule 424(b), dated May 4, 2021, under the Securities Act relating to the Registration Statement on Form S-1, as amended (File No. 333-255150), which contains audited financial statements for the Registrant's latest fiscal year, for which such statements have been filed; and

(b)        the description of the Common Stock contained in the Registrant's Registration Statement on Form 8-A (File No. 001-40378) filed with the Commission on May 3, 2021, under Section 12(b) of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), including any amendments or reports filed for the purpose of updating such description.

All documents filed by the Registrant pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act subsequent to the filing of this Registration Statement and prior to the filing of a post-effective amendment which indicates that all securities offered hereby have been sold or which deregisters all securities then remaining unsold, shall be deemed to be incorporated by reference into this Registration Statement and to be a part hereof from the date of filing such documents, except as to specific sections of such documents as set forth therein. Any statement contained in a document incorporated or deemed to be incorporated by reference herein shall be deemed to be modified or superseded for purposes of this Registration Statement to the extent that a statement herein or in any subsequently filed document which also is or is deemed to be incorporated by reference herein modifies or supersedes such statement. Any such statement so modified or superseded shall not constitute a part of this Registration Statement, except as so modified or superseded.

Item 4.        **Description of Securities.**

Not applicable.

Item 5.        **Interests of Named Experts and Counsel.**

Not applicable.

Item 6.        **Indemnification of Directors and Officers.**

Section 145 of the Delaware General Corporation Law authorizes a court to award, or a corporation's board of directors to grant, indemnity to directors and officers in terms sufficiently broad to permit such indemnification under certain circumstances for liabilities, including reimbursement for expenses incurred, arising under the Securities Act. The Registrant's amended and restated certificate of incorporation provides for indemnification of the Registrant's directors to the maximum extent permitted by the Delaware General Corporation Law, and the Registrant's amended and restated bylaws provide for indemnification of the Registrant's directors, officers, employees and other agents to the maximum extent permitted by law.

The Registrant has entered into indemnification agreements with the Registrant's directors and officers, whereby the Registrant has agreed to indemnify the Registrant's directors and officers to the fullest extent permitted by law, including advancement of expenses incurred in legal proceedings to

which the director or officer was, or is threatened to be made, a party by reason of the fact that such director or officer is or was a director, officer, employee or agent of the Registrant, provided that such director or officer acted in good faith and in a manner that the director or officer reasonably believed to be in, or not opposed to, the best interest of the Registrant. At present, there is no pending litigation or proceeding involving a director or officer of the Registrant regarding which indemnification is sought, nor is the Registrant aware of any threatened litigation that may result in claims for indemnification.

The Registrant maintains insurance policies that indemnify the Registrant's directors and officers against various liabilities arising under the Securities Act and the Exchange Act that might be incurred by any director or officer in his capacity as such.

**Item 7.        Exemption from Registration Claimed.**

Not applicable.

**Item  8. Exhibits.**

The exhibits to this Registration Statement are listed below:

| Exhibit Number | Exhibit Description |
|---|---|
| 4.1 | Amended and Restated Certificate of Incorporation, as currently in effect (incorporated herein by reference to Exhibit 3.1 to the Registrant's Registration Statement on Form S-1 (File No. 333-255150), filed with the Commission on April 26, 2021). |
| 4.2 | Amended and Restated Bylaws, as currently in effect (incorporated herein by reference to Exhibit 3.3 to the Registrant's Registration Statement on Form S-1 (File No. 333-255150), filed with the Commission on April 9, 2021). |
| 4.3 | Form of Amended and Restated Certificate of Incorporation, to be in effect immediately prior to the completion of the Registrant's initial public offering (incorporated herein by reference to Exhibit 3.2 to the Registrant's Registration Statement on Form S-1 (File No. 333-255150), filed with the Commission on April 19, 2021). |
| 4.4 | Form of Amended and Restated Bylaws, to be in effect immediately prior to the completion of the Registrant's initial public offering (incorporated herein by reference to Exhibit 3.4 to the Registrant's Registration Statement on Form S-1 (File No. 333-255150), filed with the Commission on April 19, 2021). |
| 4.5 | Form of Common Stock Certificate (incorporated herein by reference to Exhibit 4.1 to the Registrant's Registration Statement on Form S-1 (File No. 333-255150), filed with the Commission on April 26, 2021). |
| 5.1 | Opinion of Cooley LLP. |
| 23.1 | Consent of Independent Registered Public Accounting Firm. |
| 23.2 | Consent of Cooley LLP (included in Exhibit 5.1). |
| 24.1 | Power of Attorney (included on the signature page of this registration statement). |
| 99.1 | The Honest Company, Inc. Amended and Restated 2011 Stock Incentive Plan, as amended, and forms of agreements thereunder (incorporated herein by reference to Exhibit 10.2 to the Registrant's Registration Statement on Form S-1 (File No. 333-255150), filed with the Commission on April 9, 2021). |
| 99.2 | The Honest Company, Inc. 2021 Equity Incentive Plan and forms of agreements thereunder. |
| 99.3 | The Honest Company, Inc. 2021 Employee Stock Purchase Plan. |

**Item 9.**      **Undertakings.**

A.      The undersigned Registrant hereby undertakes:

1.      To file, during any period in which offers or sales are being made, a post-effective amendment to this Registration Statement:

(i)      To include any prospectus required by Section 10(a)(3) of the Securities Act;

(ii)      To reflect in the prospectus any facts or events arising after the effective date of the Registration Statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the Registration Statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than a 20% change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective Registration Statement; and

(iii)      To include any material information with respect to the plan of distribution not previously disclosed in the Registration Statement or any material change to such information in the Registration Statement.

*Provided, however*, that paragraphs (A)(1)(i) and (A)(1)(ii) do not apply if the information required to be included in a post-effective amendment by those paragraphs is contained in reports filed with or furnished to the Commission by the Registrant pursuant to Section 13 or Section 15(d) of the Exchange Act that are incorporated by reference in the Registration Statement.

2.      That, for the purpose of determining any liability under the Securities Act, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered herein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

3.      To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

B.      The undersigned Registrant hereby undertakes that, for purposes of determining any liability under the Securities Act, each filing of the Registrant's annual report pursuant to Section 13(a) or Section 15(d) of the Exchange Act (and, where applicable, each filing of an employee benefit plan's annual report pursuant to Section 15(d) of the Exchange Act) that is incorporated by reference in the Registration Statement shall be deemed to be a new registration statement relating to the securities offered herein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

C.      Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers and controlling persons of the Registrant pursuant to the foregoing provisions, or otherwise, the Registrant has been advised that in the opinion of the Commission such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the Registrant of expenses incurred or paid by a director, officer or controlling person of the Registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the Registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on Form S-8 and has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Los Angeles, State of California on May 6, 2021.

**The Honest Company, Inc.**

By:  /s/ Nikolaos Vlahos
     Nikolaos Vlahos
     Chief Executive Officer

## POWER OF ATTORNEY

**KNOW ALL PERSONS BY THESE PRESENTS,** that each person whose signature appears below constitutes and appoints Nikolaos Vlahos, Kelly Kennedy, and Brendan Sheehey and each or any one of them, his or her true and lawful attorney-in-fact and agent, with full power of substitution and resubstitution, for him or her and in his or her name, place and stead, in any and all capacities, to sign any and all amendments (including post-effective amendments) to this registration statement, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully to all intents and purposes as he or she might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, or their or his or her substitutes or substitute, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this registration statement on Form S-8 has been signed by the following persons in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Nikolaos Vlahos <br> Nikolaos Vlahos | Chief Executive Officer and Director <br> (Principal Executive Officer) | May 6, 2021 |
| /s/ Jessica Warren <br> Jessica Warren | Chief Creative Officer and Director | May 6, 2021 |
| /s/ Kelly Kennedy <br> Kelly Kennedy | Executive Vice President, <br> Chief Financial Officer <br> (Principal Financial and Accounting Officer) | May 6, 2021 |
| /s/ Katie Bayne <br> Katie Bayne | Director | May 6, 2021 |

| /s/ Scott Dahnke | Director | May 6, 2021 |
| Scott Dahnke | | |

| /s/ Eric Liaw | Director | May 6, 2021 |
| Eric Liaw | | |

| /s/ Jeremy Liew | Director | May 6, 2021 |
| Jeremy Liew | | |

| /s/ Avik Pramanik | Director | May 6, 2021 |
| Avik Pramanik | | |

| /s/ Susan Gentile | Director | May 6, 2021 |
| Susan Gentile | | |

| /s/ James White | Director | May 6, 2021 |
| James White | | |

# Exhibit E

**UNITED STATES**

**SECURITIES AND EXCHANGE COMMISSION**

**WASHINGTON, DC 20549**

**FORM 10-Q**

**(Mark One)**

☒    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the quarterly period ended June 30, 2021**

**OR**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from    to**

**Commission File Number: 001-40378**

❀ HONEST

**The Honest Company, Inc.**

(Exact Name of Registrant as Specified in its Charter)

| | |
|---|---|
| **Delaware** | **90-0750205** |
| (State or Other Jurisdiction of | (I.R.S. Employer |
| Incorporation or Organization) | Identification No.) |
| **12130 Millennium Drive, #500** | |
| **Los Angeles, CA** | **90094** |
| (Address of Principal Executive Offices) | (Zip Code) |

**(888) 862-8818**

(Registrant's Telephone Number, Including Area Code)

**N/A**

(Former Name, Former Address and Former Fiscal Year, if Changed Since Last Report)

Securities Registered Pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.0001 par value per share | HNST | The Nasdaq Stock Market LLC |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | | |
|---|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | | ☐ |
| Emerging growth company | ☒ | | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

As of August 9, 2021, the registrant had 90,272,332 shares of common stock, $0.0001 par value per outstanding.

**The Honest Company, Inc.**

**Table of Contents**

|  |  | **Page** |
|---|---|---|
| **PART I.** | FINANCIAL INFORMATION | 3 |
| Item 1. | Condensed Consolidated Financial Statements (unaudited) | 3 |
|  | Condensed Consolidated Balance Sheets | 3 |
|  | Condensed Consolidated Statements of Comprehensive Income (Loss) | 4 |
|  | Condensed Consolidated Statements of Redeemable Convertible Preferred Stock and Stockholders' Equity (Deficit) | 5 |
|  | Condensed Consolidated Statements of Cash Flows | 7 |
|  | Notes to Condensed Consolidated Financial Statements | 8 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 19 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 30 |
| Item 4. | Controls and Procedures | 31 |
| **PART II.** | OTHER INFORMATION | 33 |
| Item 1. | Legal Proceedings | 33 |
| Item 1A. | Risk Factors | 33 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 35 |
| Item 3. | Defaults Under Senior Securities | 35 |
| Item 4. | Mine Safety Disclosures | 35 |
| Item 5. | Other Information | 35 |
| Item 6. | Exhibits | 37 |
|  | Signatures | 39 |

1

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This Quarterly Report on Form 10-Q contains "forward-looking statements" (within the meaning of Section 27A of the Securities Act of 1933, as amended ("Securities Act"), and Section 21E of the Securities Exchange Act of 1934, as amended) about us and our industry that involve substantial risks and uncertainties. In some cases, you can identify forward-looking statements because they contain words such as "anticipate," "believe," "contemplate," "continue," "could," "estimate," "expect," "intend," "may," "plan," "potential," "predict," "project," "should," "target," "will" or "would" or the negative of these words or other similar terms or expressions. Actual results or events could differ materially from the plans, intentions and expectations disclosed in the forward-looking statements that we make. These forward-looking statements involve risks and uncertainties that could cause our actual results to differ materially from those in the forward-looking statements, including, without limitation, those set forth in Part II, Item 1A, "Risk Factors," if any, and other factors set forth in other parts of this Quarterly Report on Form 10-Q. Furthermore, such forward-looking statements speak only as of the date of this report. Except as required by law, we undertake no obligation to update any forward-looking statements to reflect events or circumstances after the date of such statements. These forward-looking statements include, but are not limited to, statements concerning the following:

- our expectations regarding our revenue, cost of revenue, operating expenses, gross margin, adjusted EBITDA and other operating results;
- the effect of COVID-19 or other public health crises on our business and the global economy;
- our ability to effectively manage our growth;
- our ability to acquire new consumers and successfully retain existing consumers, including their level of spend with us;
- anticipated trends, growth rates, and challenges in our business and in the markets in which we operate;
- our ability to achieve or sustain our profitability;
- future investments in our business, our anticipated capital expenditures and our estimates regarding our capital requirements;
- the costs and success of our marketing efforts, and our ability to grow brand awareness and maintain, protect and enhance our brand;
- our ability to effectively manage our inventory;
- our ability to gauge consumer trends and changing consumer preferences;
- our reliance on key personnel and our ability to identify, recruit and retain skilled personnel;
- our ability to obtain, maintain, protect and enforce our intellectual property rights and any costs associated therewith;
- our ability to compete effectively with existing competitors and new market entrants;
- our ability to successfully enter new markets and expand internationally;
- our ability to identify and complete acquisitions that complement and expand our reach and platform;
- seasonality;
- the financial condition of, and our relationships with, our suppliers, manufacturers, distributors and retailers;
- our ability to offset commodity prices, input cost and transportation cost inflation with productivity or pricing improvements;
- the ability of our suppliers and manufacturers to comply with safety, environmental or other laws or regulations;
- our ability to comply or remain in compliance with laws and regulations that currently apply or become applicable to our business in the United States, such as the U.S. Food and Drug Administration governmental regulation and state regulation; and other jurisdictions where we elect to do business;
- economic conditions and their impact on consumer spending;
- outcome of legal or administrative proceedings; and
- the growth rates of the markets in which we compete.

2

**PART I—FINANCIAL INFORMATION**

**Item 1. Condensed Consolidated Financial Statements.**

**The Honest Company, Inc.**
**Condensed Consolidated Balance Sheets**
*(Unaudited)*
*(in thousands, except share and per share amounts)*

| | June 30, 2021 | December 31, 2020 |
|---|---:|---:|
| **Assets** | | |
| Current assets | | |
| Cash and cash equivalents | $ 41,438 | $ 29,259 |
| Restricted cash | — | 1,752 |
| Short-term investments | 53,673 | 34,425 |
| Accounts receivable, net | 27,396 | 22,795 |
| Inventories, net | 82,413 | 76,669 |
| Prepaid expenses and other current assets | 10,698 | 8,657 |
| Total current assets | 215,618 | 173,557 |
| Restricted cash, net of current portion | — | 6,189 |
| Property and equipment, net | 54,774 | 56,703 |
| Goodwill | 2,230 | 2,230 |
| Intangible assets, net | 476 | 511 |
| Other assets | 4,010 | 1,542 |
| Total assets | $ 277,108 | $ 240,732 |
| **Liabilities, Redeemable Convertible Preferred Stock and Stockholders' Equity (Deficit)** | | |
| Current liabilities | | |
| Accounts payable | $ 32,709 | $ 31,132 |
| Accrued expenses | 17,612 | 22,222 |
| Deferred revenue | 775 | 716 |
| Total current liabilities | 51,096 | 54,070 |
| Long term liabilities | | |
| Lease financing obligation, net of current portion | 37,983 | 38,426 |
| Other long-term liabilities | 8,242 | 8,657 |
| Total liabilities | 97,321 | 101,153 |
| Commitments and contingencies (Note 8) | | |
| Redeemable convertible preferred stock, $0.0001 par value, 49,192,248 shares authorized at December 31, 2020; 49,100,928 shares issued and outstanding as of December 31, 2020; (liquidation preference of $396,726 as of December 31, 2020) | — | 376,404 |
| Stockholders' equity (deficit) | | |
| Preferred stock, $0.0001 par value, 20,000,000 shares authorized at June 30, 2021, none issued or outstanding as of June 30, 2021 | — | — |
| Common stock, $0.0001 par value, 1,000,000,000 and 150,000,000 shares authorized at June 30, 2021 and December 31, 2020, respectively; 90,288,407 and 34,089,186 shares issued and outstanding as of June 30, 2021 and December 31, 2020, respectively | 9 | 3 |
| Additional paid-in capital | 557,285 | 116,055 |
| Accumulated deficit | (377,495) | (352,977) |
| Accumulated other comprehensive income (loss) | (12) | 94 |
| Total stockholders' equity (deficit) | 179,787 | (236,825) |
| Total liabilities, redeemable convertible preferred stock and stockholders' equity (deficit) | $ 277,108 | $ 240,732 |

*The accompanying notes are an integral part of these Condensed Consolidated Financial Statements.*

**The Honest Company, Inc.**
**Condensed Consolidated Statements of Comprehensive Income (Loss)**
*(Unaudited)*
*(in thousands, except share and per share amounts)*

| | For the three months ended June 30, | | For the six months ended June 30, | |
| --- | --- | --- | --- | --- |
| | **2021** | **2020** | **2021** | **2020** |
| Revenue | $ 74,576 | $ 72,354 | $ 155,607 | $ 144,726 |
| Cost of revenue | 47,633 | 45,867 | 100,284 | 92,434 |
| Gross profit | 26,943 | 26,487 | 55,323 | 52,292 |
| Operating expenses | | | | |
| Selling, general and administrative | 30,091 | 14,940 | 46,788 | 29,646 |
| Marketing | 14,009 | 10,625 | 28,182 | 19,818 |
| Research and development | 2,345 | 1,100 | 3,991 | 2,266 |
| Total operating expenses | 46,445 | 26,665 | 78,961 | 51,730 |
| Operating income (loss) | (19,502) | (178) | (23,638) | 562 |
| Interest and other income (expense), net | (510) | (175) | (836) | (334) |
| Income (loss) before provision for income taxes | (20,012) | (353) | (24,474) | 228 |
| Income tax provision | 22 | 22 | 44 | 44 |
| Net income (loss) | $ (20,034) | $ (375) | $ (24,518) | $ 184 |
| Net income (loss) per share attributable to common stockholders: | | | | |
| Basic | $ (0.17) | $ (0.01) | $ (0.32) | $ 0.00 |
| Diluted | $ (0.17) | $ (0.01) | $ (0.32) | $ 0.00 |
| Weighted-average shares used in computing net income (loss) per share attributable to common stockholders: | | | | |
| Basic | 68,079,387 | 34,069,346 | 51,184,615 | 34,065,173 |
| Diluted | 68,079,387 | 34,069,346 | 51,184,615 | 35,064,356 |
| Other comprehensive income (loss) | | | | |
| Unrealized gain (loss) on short-term investments, net of taxes | (24) | 169 | (106) | 162 |
| Comprehensive income (loss) | $ (20,058) | $ (206) | $ (24,624) | $ 346 |

*The accompanying notes are an integral part of these Condensed Consolidated Financial Statements.*

4

**The Honest Company, Inc.**
**Condensed Consolidated Statements of Redeemable Convertible Preferred Stock and Stockholders' Equity (Deficit)**
*(Unaudited)*
*(in thousands, except share amounts)*

| | Redeemable Convertible Preferred Stock | | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Accumulated Other Comprehensive Income (Loss) | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| **Balances at December 31, 2019** | 49,100,928 | $ 376,404 | 34,033,074 | $ 3 | $ 108,109 | $ (338,511) | $ 122 | $ (230,277) |
| Net income | — | — | — | — | — | 559 | — | 559 |
| Other comprehensive loss | — | — | — | — | — | — | (7) | (7) |
| Stock options exercised | — | — | 29,420 | — | 13 | — | — | 13 |
| Stock-based compensation | — | — | — | — | 1,923 | — | — | 1,923 |
| **Balances at March 31, 2020** | 49,100,928 | $ 376,404 | 34,062,494 | $ 3 | $ 110,045 | $ (337,952) | $ 115 | $ (227,789) |
| Net loss | — | — | — | — | — | (375) | — | (375) |
| Other comprehensive loss | — | — | — | — | — | — | 169 | 169 |
| Stock options exercised | — | — | 21,500 | — | 6 | — | — | 6 |
| Stock-based compensation | — | — | — | — | 2,325 | — | — | 2,325 |
| **Balances at June 30, 2020** | 49,100,928 | $ 376,404 | 34,083,994 | $ 3 | $ 112,376 | $ (338,327) | $ 284 | $ (225,664) |

5

**The Honest Company, Inc.**
**Condensed Consolidated Statements of Redeemable Convertible Preferred Stock and Stockholders' Equity (Deficit)**
*(Unaudited)*
*(in thousands, except share amounts)*

| | Redeemable Convertible Preferred Stock | | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Accumulated Other Comprehensive Income (Loss) | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| **Balances at December 31, 2020** | 49,100,928 | $ 376,404 | 34,089,186 | $ 3 | $ 116,055 | $ (352,977) | $ 94 | $ (236,825) |
| Net loss | — | — | — | — | — | (4,484) | — | (4,484) |
| Other comprehensive loss | — | — | — | — | — | — | (82) | (82) |
| Stock options exercised | — | — | 38,188 | — | 33 | — | — | 33 |
| Stock-based compensation | — | — | — | — | 1,838 | — | — | 1,838 |
| **Balances at March 31, 2021** | 49,100,928 | $ 376,404 | 34,127,374 | $ 3 | $ 117,926 | $ (357,461) | $ 12 | $ (239,520) |
| Net loss | — | — | — | — | — | (20,034) | — | (20,034) |
| Other comprehensive loss | — | — | — | — | — | — | (24) | (24) |
| Stock options exercised | — | — | 53,694 | — | 295 | — | — | 295 |
| Dividends paid ($0.42 per share) | — | — | — | — | (35,000) | — | — | (35,000) |
| Issuance of common stock pursuant to initial public offering, net of underwriting commissions and discounts and offering costs of $12.2 million | — | — | 6,451,613 | 1 | 91,038 | — | — | 91,039 |
| Conversion of redeemable convertible preferred stock to common stock upon initial public offering | (49,100,928) | (376,404) | 49,649,023 | 5 | 376,400 | — | — | 376,405 |
| Vested restricted stock units | — | — | 6,703 | — | — | — | — | — |
| Stock-based compensation | — | — | — | — | 6,626 | — | — | 6,626 |
| **Balances at June 30, 2021** | — | $ — | 90,288,407 | $ 9 | $ 557,285 | $ (377,495) | $ (12) | $ 179,787 |

*The accompanying notes are an integral part of these Condensed Consolidated Financial Statements.*

6

**The Honest Company, Inc.**
**Condensed Consolidated Statements of Cash Flows**
*(Unaudited)*
*(in thousands)*

|  | For the six months ended June 30, | |
|---|---|---|
|  | 2021 | 2020 |
| **Cash flows from operating activities** | | |
| Net income (loss) | $ (24,518) | $ 184 |
| Adjustments to reconcile net income (loss) to net cash (used in) provided by operating activities: | | |
| Depreciation and amortization | 2,117 | 2,557 |
| Stock-based compensation | 8,464 | 4,248 |
| Other | 93 | 39 |
| Changes in assets and liabilities: | | |
| Accounts receivable, net | (4,601) | 3,083 |
| Inventories | (5,744) | 667 |
| Prepaid expenses and other assets | (4,507) | (1,896) |
| Accounts payable, accrued expenses and other long-term liabilities | (3,969) | 4,721 |
| Deferred revenue | 58 | (117) |
| Net cash (used in) provided by operating activities | (32,607) | 13,486 |
| **Cash flows from investing activities** | | |
| Purchases of short-term investments | (54,009) | (4,459) |
| Proceeds from sales of short-term investments | 25,362 | 5,830 |
| Proceeds from maturities of short-term investments | 9,207 | 31,932 |
| Purchases of property and equipment | (100) | (56) |
| Net cash (used in) provided by investing activities | (19,540) | 33,247 |
| **Cash flows from financing activities** | | |
| Proceeds from initial public offering, net of underwriting commissions and discounts | 96,517 | — |
| Dividends paid | (35,000) | — |
| Proceeds from exercise of stock options | 328 | 19 |
| Payment of initial public offering costs | (4,892) | — |
| Payments on lease obligations | (568) | (496) |
| Net cash provided by (used in) financing activities | 56,385 | (477) |
| Net increase in cash, cash equivalents and restricted cash | 4,238 | 46,256 |
| **Cash, cash equivalents and restricted cash** | | |
| Beginning of the period | 37,200 | 13,543 |
| End of the period | $ 41,438 | $ 59,799 |
| | | |
| **Reconciliation of cash, cash equivalents and restricted cash to the consolidated balance sheets** | | |
| Cash and cash equivalents | $ 41,438 | $ 51,858 |
| Restricted cash, current | — | 1,313 |
| Restricted cash, non-current | — | 6,628 |
| Total cash, cash equivalents and restricted cash | $ 41,438 | $ 59,799 |
| | | |
| **Supplemental disclosures of noncash activities** | | |
| Equipment acquired under capital lease obligations | $ 95 | $ 46 |
| Deferred IPO costs included in accounts payable and accrued expenses | $ 585 | $ — |
| Capital expenditures included in accounts payable and accrued expenses | $ 9 | $ 18 |

*The accompanying notes are an integral part of these Condensed Consolidated Financial Statements.*

7

**The Honest Company, Inc.**
**Notes to Condensed Consolidated Financial Statements**
**As of June 30, 2021**
*(in thousands, except share and per share amounts, percentages and as otherwise indicated)*

*(Unaudited)*

**1.   Nature of Business**

The Honest Company, Inc. (the "Company") was incorporated in the State of California on July 19, 2011 and on May 23, 2012 was re-incorporated in the State of Delaware under the same name. The Company is a mission-driven lifestyle brand that formulates, designs and sells clean products with a focus on sustainability and thoughtful design. The Company sells its products through digital and retail sales channels in the following product categories: Diapers and Wipes, Skin and Personal Care, and Household and Wellness.

**Initial Public Offering**

The Company's registration statement on Form S-1 ("IPO Registration Statement") related to its initial public offering ("IPO") was declared effective on May 4, 2021, and the Company's common stock began trading on the Nasdaq Global Select Market on May 5, 2021. On May 7, 2021, the Company completed its IPO of 25,807,000 shares of the Company's common stock, $0.0001 par value per share at an offering price of $16.00 per share. The Company sold 6,451,613 shares and certain existing stockholders sold an aggregate of 19,355,387 shares. The Company received aggregate net proceeds of approximately $91.0 million after deducting underwriting discounts and commissions of $6.7 million and other offering expenses of $5.5 million, $0.6 million of which was unpaid at June 30, 2021. The Company granted the underwriters an option for a period of 30 days to purchase up to an additional 3,871,050 shares of common stock from the selling stockholders at $16.00 per share less the underwriting discounts and commissions. In May 2021, the underwriters fully exercised the option to purchase these additional shares from the selling stockholders. The Company did not receive any proceeds from the sale of shares of its common stock by the selling stockholders.

Upon completion of the IPO, the Company paid $9.5 million in cash bonuses to certain employees including members of management, as well as $0.2 million in related payroll taxes and expenses. Cash bonuses of $9.1 million were recorded in sales, general and administrative expenses and $0.4 million were recorded in research and development expenses in the accompanying condensed consolidated statement of operations and comprehensive income (loss) for the three and six months ended June 30, 2021.

Immediately prior to the completion of the IPO, the Company filed an Amended and Restated Certificate of Incorporation, which authorized a total of 1,000,000,000 shares of common stock and 20,000,000 shares of preferred stock. Upon the filing of the Amended and Restated Certificate of Incorporation, 49,100,928 shares of the Company's redeemable convertible preferred stock then outstanding with a carrying value of $376.4 million were automatically converted into 49,649,023 shares of the Company's common stock. Upon completion of the IPO, the Company recognized a gain for earnings per share purposes of $29.0 million from the conversion of redeemable convertible preferred stock to common stock. Following the completion of the IPO, the Company has one class of authorized and outstanding common stock.

**2.   Summary of Significant Accounting Policies**

**Basis of Presentation**

The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States ("GAAP") and applicable rules and regulations of the Securities and Exchange Commission ("SEC") regarding interim financial information. Certain information and disclosures normally included in consolidated financial statements prepared in accordance with GAAP have been condensed or omitted. Accordingly, these condensed consolidated financial statements should be read in conjunction with the audited consolidated financial statements and related notes for the year ended December 31, 2020. The condensed consolidated financial statements are unaudited. The unaudited interim condensed consolidated financial statements have been prepared on a basis consistent with that used to prepare the audited annual consolidated financial statements and include, in the opinion of management, all adjustments, consisting of normal recurring items, necessary for the fair statement of the condensed consolidated financial statements. The consolidated balance sheet as of December 31, 2020 has been derived from the audited financial statements at that date but does not include all of the disclosures required by GAAP.

The condensed consolidated financial statements include the accounts of the Company, and its wholly owned subsidiaries after elimination of intercompany transactions and balances. There have been no changes in the accounting policies from those disclosed in the audited consolidated financial statements and related notes for the year ended December 31, 2020.

8

**Stock Split**

In April 2021, the Company effected a 1-for-2 forward stock split of its common and redeemable convertible preferred stock. In connection with the forward stock split, each issued and outstanding share of common stock, automatically and without action on the part of the holders, became two shares of common stock and each issued and outstanding share of redeemable convertible preferred stock, automatically and without action on the part of the holders, became two shares of redeemable convertible preferred stock. The par value per share of common and redeemable convertible preferred stock was not adjusted. All share, per share and related information presented in the condensed consolidated financial statements and accompanying notes have been retroactively adjusted, where applicable, to reflect the impact of the stock split.

**Segment Reporting and Geographic Information**

The Company's Chief Executive Officer, as the chief operating decision maker, organizes the Company, manages resource allocations, and measures performance on the basis of one operating segment. All of the Company's long-lived assets are located in the United States and substantially all of the Company's revenue is from customers located in the United States.

**Use of Estimates**

The preparation of the condensed consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and contingent liabilities at the date of the condensed consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. The Company's estimates, which are subject to varying degrees of judgment, include the valuation of inventories, sales returns and allowances, allowances for doubtful accounts, valuation of short-term investments, valuation of build-to-suit lease, capitalized software, useful lives associated with long-lived assets, valuation allowances with respect to deferred tax assets, accruals and contingencies, recoverability of goodwill and long-lived assets, and the valuation and assumptions underlying stock-based compensation and common stock. On an ongoing basis, the Company evaluates its estimates compared to historical experience and trends, which form the basis for making judgments about the carrying value of assets and liabilities.

In March 2020, the World Health Organization declared the outbreak of the novel coronavirus disease ("COVID-19") a pandemic. The full extent to which the outbreak of the COVID-19 pandemic will impact the Company's business, results of operations and financial condition is still unknown and will depend on future developments, which are uncertain and cannot be predicted, including, but not limited to, the duration and spread of the outbreak, its severity, the actions to contain the virus or treat its impact, and how quickly and to what extent normal economic and operating conditions can resume.

In light of the currently unknown ultimate duration and severity of COVID-19, the Company faces a greater degree of uncertainty than normal in making certain judgments and estimates needed to apply significant accounting policies. The Company assessed certain accounting matters and estimates that generally require consideration of forecasted information in context with the information reasonably available to the Company as of the respective balance sheet dates and through the date these condensed consolidated financial statements were issued. Management is not aware of any specific event or circumstance that would require an update to estimates or judgments or a revision to the carrying value of assets or liabilities. However, these estimates and judgments may change as new events occur and additional information is obtained, which may result in changes being recognized in the Company's consolidated financial statements in future periods. For example, based on macro-Household & Wellness trends, consumer demand for sanitizing and disinfecting products has decelerated at a more rapid than expected rate as more consumers have become vaccinated and retailers continue to manage heavy inventories of sanitization and disinfecting products in stores. The Company will continue to monitor and evaluate the uncertainty and volatility of these conditions and the ultimate impact on the Company's inventory valuations in the future.

**Cash, Cash Equivalents, and Restricted Cash**

Cash equivalents consist of short-term, highly liquid investments with stated maturities of three months or less from the date of purchase. Cash equivalents comprise amounts invested in money market funds. Restricted cash consisted of deposits in a bank account used to collateralize the letters of credit for certain lease arrangements. The Company is no longer required to post collateral in a restricted cash account. Refer to Note 6 included in these condensed consolidated financial statements for additional information on the restricted cash account.

**Accounts Receivable**

Accounts receivable is presented net of allowances. The Company does not accrue interest on its trade receivables. On a periodic basis, the Company evaluates accounts receivable estimated to be uncollectible, and provides allowances as necessary for doubtful accounts. The allowance for doubtful accounts was $1.4 million as of June 30, 2021 and December 31, 2020.

9

**Deferred IPO Costs**

Deferred offering costs consist of costs incurred in connection with the sale of the Company's common stock in its IPO, including certain legal, accounting, and other IPO-related costs. As of June 30, 2021, the deferred offering costs of $5.5 million were recorded in stockholders' equity (deficit) as a reduction from the proceeds of the offering. As of December 31, 2020, deferred offering costs of $0.5 million had been recorded in other assets on the Company's condensed consolidated balance sheets.

**Fair Value Measurements**

Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. The Company uses the following hierarchy in measuring the fair value of the Company's assets and liabilities, focusing on the most observable inputs when available:

Level 1    - Quoted prices in active markets for identical assets or liabilities.

Level 2 - Observable inputs other than Level 1 quoted prices, such as quoted prices for similar assets and liabilities in active markets, quoted prices in markets that are not active for identical or similar assets and liabilities, or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.

Level 3 - Valuations are based on inputs that are unobservable and significant to the overall fair value measurement of the assets or liabilities. Inputs reflect management's best estimate of what market participants would use in pricing the asset or liability at the measurement date. Consideration is given to the risk inherent in the valuation technique and the risk inherent in the inputs to the model.

Fair value is based on quoted market prices, if available. If listed prices or quotes are not available, fair value is based on internally developed models that primarily use market-based or independently sourced market parameters as inputs. Cash equivalents, consisting primarily of money market funds, represent highly liquid investments with maturities of three months or less at purchase. Market prices, which are Level 1 in the fair value hierarchy, are used to determine the fair value of the money market funds. Investments in debt securities are measured using broker provided indicative prices developed using observable market data, which are considered Level 2 in the fair value hierarchy. Certain assets, including long-lived assets, goodwill and intangible assets are also subject to measurement at fair value on a non-recurring basis if they are deemed to be impaired as a result of an impairment review. The fair value is measured using Level 3 inputs in the fair value hierarchy.

**Recent Accounting Pronouncements**

As an "emerging growth company", the Jumpstart Our Business Startups Act, allows the Company to delay adoption of new or revised accounting pronouncements applicable to public companies until such pronouncements are made applicable to private companies. The Company has elected to use the adoption dates applicable to private companies. As a result, the Company's financial statements may not be comparable to the financial statements of issuers who are required to comply with the effective date for new or revised accounting standards that are applicable to public companies.

*Recently Issued Accounting Pronouncements – Not Yet Adopted*

In February 2016, the Financial Accounting Standards Board (the "FASB") issued ASU No 2016-02, *Leases (Topic 842)*, as subsequently amended, collectively codified under Topic 842. Topic 842 requires lessees to recognize on the balance sheet assets and liabilities for leases with lease terms of more than twelve months. Consistent with current GAAP, the recognition, measurement, and presentation of expenses and cash flows arising from a lease by a lessee primarily will depend on its classification as a finance or operating lease. However, unlike current GAAP which requires only capital leases to be recognized on the balance sheet, the new ASU will require both types of leases to be recognized on the balance sheet. ASU 2016-02 was effective for public business entities for fiscal years beginning after December 15, 2018. In June 2020, FASB issued ASU No. 2020-05, *Revenue from Contracts with Customers (Topic 606) and Leases (Topic 842) – Effective Dates for Certain Entities*, which extended the effective date of this guidance for certain non-public entities for fiscal years beginning after December 15, 2021, and interim periods within fiscal years beginning after December 15, 2022, with early adoption permitted. The Company is evaluating the adoption of this guidance and the potential effects on its consolidated financial statements. The Company anticipates the adoption of this guidance may result in a material impact to the Company's consolidated financial statements as it relates to its build-to-suit lease and recording other operating leases on the consolidated balance sheets.

In June 2016, the FASB issued ASU No. 2016-13, *Financial Instruments Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments*, to amend the accounting for credit losses for certain financial instruments. This guidance replaces the incurred loss impairment methodology with a methodology that reflects expected credit losses. In November 2019, FASB issued ASU No. 2019-10 which delayed the effective dates of the guidance. This guidance is effective for public business entities that meet the definition of an SEC filer, excluding entities eligible to be smaller reporting companies ("SRC") for fiscal

10

years beginning after December 15, 2019 and all other entities for fiscal years beginning after December 15, 2022, including interim periods within those fiscal years. Early adoption is permitted for fiscal years beginning after December 15, 2018, including interim periods within those fiscal years. The Company is evaluating the adoption of this guidance and the potential effects on the consolidated financial statements.

In January 2017, the FASB issued ASU No. 2017-04, *Intangibles Goodwill and Other (Topic 350): Simplifying the Test for Goodwill Impairment.* The amendments in this guidance eliminate Step 2 from the goodwill impairment test, whereby an entity had to perform procedures to determine the fair value at the impairment testing date of its assets and liabilities (including unrecognized assets and liabilities) following the procedure that would be required in determining the fair value of assets acquired and liabilities assumed in a business combination. Instead, under this amendment, an entity should perform its goodwill impairment test by comparing the value of a reporting unit with its carrying amount. An entity should recognize an impairment charge for the amount by which the carrying amount exceeds the reporting unit's fair value; however, the loss recognized should not exceed the total amount of goodwill allocated to that reporting unit. In November 2019, the FASB issued ASU No. 2019-10 which delayed the effective dates of this guidance. This guidance is effective for public business entities excluding entities eligible to be SRCs for annual and any interim impairment test performed for periods beginning after December 15, 2019. For all other entities the guidance is effective for fiscal years beginning after December 15, 2022. Early adoption is permitted for interim or annual goodwill impairment tests performed on testing dates after January 1, 2017. The Company is evaluating the adoption of this guidance and the potential effects on the consolidated financial statements.

In December 2019, the FASB issued ASU No. 2019-12, *Income Taxes (Topic 740): Simplifying the Accounting for Income Taxes.* This standard simplifies the accounting for income taxes by removing certain exceptions to the general principles in ASC 740 as well as by improving consistent application of the topic by clarifying and amending existing guidance. For public business entities, the ASU is effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2020. For all other entities, the ASU is effective for fiscal years beginning after December 15, 2021, and interim periods within fiscal years beginning after December 15, 2022. Early adoption of the amendments is permitted, including adoption in any interim period for (1) public business entities for periods for which financial statements have not yet been issued and (2) all other entities for periods for which financial statements have not yet been made available for issuance. An entity that elects to early adopt the amendments in an interim period should reflect any adjustments as of the beginning of the annual period that includes that interim period. Additionally, an entity that elects early adoption must adopt all the amendments in the same period. The Company does not expect ASC 740 to have a material impact on the Company's consolidated financial statements.

3. **Revenue**

*Disaggregation of Revenue*

Revenue by sales channel:

| | For the three months ended June 30, | | For the six months ended June 30, | |
|---|---|---|---|---|
| | **2021** | **2020** | **2021** | **2020** |
| *(In thousands)* | | | | |
| Digital | $ 34,820 | $ 46,065 | $ 77,281 | $ 87,561 |
| Retail | 39,756 | 26,289 | 78,326 | 57,165 |
| Total revenue | $ 74,576 | $ 72,354 | $ 155,607 | $ 144,726 |

Revenue by product category:

| | For the three months ended June 30, | | For the six months ended June 30, | |
|---|---|---|---|---|
| | **2021** | **2020** | **2021** | **2020** |
| *(In thousands)* | | | | |
| Diapers and wipes | $ 47,831 | $ 48,744 | $ 97,404 | $ 99,227 |
| Skin and personal care | 23,866 | 20,558 | 50,111 | 39,040 |
| Household and wellness | 2,879 | 3,052 | 8,092 | 6,459 |
| Total revenue | $ 74,576 | $ 72,354 | $ 155,607 | $ 144,726 |

*Non-Monetary Transaction*

In March 2021, the Company entered into $4.0 million in trade agreements with a vendor for the exchange of legacy beauty inventory for future marketing and transportation credits. The fair value of the marketing and transportation credits are recognized as revenue, with the corresponding asset included in prepaid expenses and other current assets and other assets in the accompanying condensed consolidated balance sheets. The Company may use the marketing and transportation credits over four years, with an option to extend for another two years if agreed upon by both parties. For the three and six months ended June 30, 2021, the Company recognized $0.5 million and $3.9 million, respectively, of revenue and $0.3 million and $2.2 million, respectively, of associated cost of revenue based on timing of delivery of goods. The Company assesses the recoverability of the

11

marketing and transportation credits periodically. Factors considered in evaluating the recoverability include management's plans with respect to advertising, freight and other services for which these credits can be used. Any impairment losses are charged to operations as they are determinable. During the three and six months ended June 30, 2021, the Company recorded no impairment losses related to these credits and an immaterial amount of credits have been used.

**4.   Investments**

As of June 30, 2021 and December 31, 2020, all investments in debt securities are classified as available-for-sale investments. All investments are reported within current assets because the securities represent investments of cash available for current operations. As of June 30, 2021 and December 31, 2020, the Company held $36.9 million and $27.5 million, respectively, of investments with contractual maturities of less than one year. As of June 30, 2021 and December 31, 2020, the Company held $16.8 million and $6.9 million, respectively, of investments with contractual maturities between one and two years. Available-for-sale investments are recorded at fair value, and unrealized holding gains and losses are recorded as a component of other comprehensive income (loss). The following table summarizes the Company's available-for-sale investments:

| | As of June 30, 2021 | | | |
| | Cost or Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Total Estimated Fair Value |
|---|---|---|---|---|
| *(In thousands)* | | | | |
| Corporate bonds | $ 22,787 | $ 1 | $ (12) | $ 22,776 |
| Certificates of deposit | 24,904 | — | (3) | 24,901 |
| U.S. government and agency securities | 5,995 | 1 | — | 5,996 |
| Total investments | $ 53,686 | $ 2 | $ (15) | $ 53,673 |

| | As of December 31, 2020 | | | |
| | Cost or Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Total Estimated Fair Value |
|---|---|---|---|---|
| *(In thousands)* | | | | |
| Corporate bonds | $ 22,894 | $ 58 | $ (3) | $ 22,949 |
| Commercial paper | 538 | — | — | 538 |
| Certificates of deposit | 4,447 | 1 | — | 4,448 |
| U.S. government and agency securities | 6,452 | 38 | — | 6,490 |
| Total investments | $ 34,331 | $ 97 | $ (3) | $ 34,425 |

Realized gains and losses on investments in debt securities were immaterial for the three and six months ended June 30, 2021 and 2020.

**5.   Fair Value Measurements**

Financial assets measured and recorded at fair value on a recurring basis consist of the following as of:

12

| | June 30, 2021 | | | |
|---|---|---|---|---|
| *(In thousands)* | Level 1 | Level 2 | Level 3 | Total |
| **Cash equivalents** | | | | |
| Money market funds | $ 17,300 | $ — | $ — | $ 17,300 |
| Corporate bonds[1] | — | 433 | — | 433 |
| Certificates of deposit[1] | — | 3,500 | — | 3,500 |
| Total cash equivalents | 17,300 | 3,933 | — | 21,233 |
| **Short-term investments** | | | | |
| Corporate bonds | — | 22,776 | — | 22,776 |
| Certificates of deposit | — | 24,901 | — | 24,901 |
| U.S. government and agency securities | — | 5,996 | — | 5,996 |
| Total short-term investments | — | 53,673 | — | 53,673 |
| Total | $ 17,300 | $ 57,606 | $ — | $ 74,906 |

(1) Consists of short-term corporate bonds and certificates of deposit with stated maturities of three months or less.

| | December 31, 2020 | | | |
|---|---|---|---|---|
| *(In thousands)* | Level 1 | Level 2 | Level 3 | Total |
| **Cash equivalents** | | | | |
| Money market funds | $ 12,696 | $ — | $ — | $ 12,696 |
| Total cash equivalents | 12,696 | — | — | 12,696 |
| **Short-term investments** | | | | |
| Corporate bonds | — | 22,949 | — | 22,949 |
| Commercial paper | — | 538 | — | 538 |
| Certificates of deposit | — | 4,448 | — | 4,448 |
| U.S. government and agency securities | — | 6,490 | — | 6,490 |
| Total short-term investments | — | 34,425 | — | 34,425 |
| Total | $ 12,696 | $ 34,425 | $ — | $ 47,121 |

The carrying amounts for the Company's accounts receivable, accounts payable, and accrued expenses approximate fair value due to their short maturities.

**6. Credit Facilities**

On June 4, 2020, the Company terminated its Asset Backed Loan facility ("ABL Revolver"). The Company had no outstanding borrowings under the ABL Revolver immediately prior to termination. Upon termination of the ABL Revolver, the Company was required to post collateral of $7.9 million in a restricted cash account to collateralize the letters of credit related to certain facility leases. As of December 31, 2020, the letters of credit issued related to facility leases of $7.7 million were collateralized by the Company's restricted cash of $7.9 million. Upon entering into the 2021 Credit Facility (defined below), the Company is no longer required to maintain collateral in a restricted cash account.

**2021 Credit Facility**

In April 2021, the Company entered into a first lien credit agreement ("2021 Credit Facility"), with JPMorgan Chase Bank, N.A., as administrative agent and lender, and the other lenders party thereto, which provides for a $35.0 million revolving credit facility that matures April 2026. The 2021 Credit Facility includes a subfacility that provides for the issuance of letters of credit in an amount of up to $10.0 million at any time outstanding, which reduces the amount available under the 2021 Credit Facility. The 2021 Credit Facility is subject to customary fees for loan facilities of this type, including a commitment fee based on the average daily undrawn portion of the revolving credit facility. The Company expensed the commitment fee and included it in interest and other expense, net in the consolidated statement of operations and comprehensive income (loss). For the three and six months ended June 30, 2021, the commitment fee incurred was immaterial. The interest rate applicable to the 2021 Credit Facility is, at the Company's option, either (a) the LIBOR (or a replacement rate established in accordance with the terms of the 2021 Credit Facility) (subject to a 0.00% LIBOR floor), plus a margin of 1.50% or (b) the CB floating rate minus a margin of 0.50%. The CB floating rate is the higher of (a) the Wall Street Journal prime rate and (b)(i) 2.50% plus (ii) the adjusted LIBOR rate for a one-month interest period. As of June 30, 2021, there was no outstanding balance under the 2021 Credit Facility.

The Company is subject to certain affirmative and negative covenants including the requirement that it maintains a total net leverage ratio of not more than 3.50:1.00 during the periods set forth in the 2021 Credit Facility. Failure to do so, unless waived by the lenders under the 2021 Credit Facility pursuant to its terms, as amended, would result in an event of default under the 2021 Credit Facility. As of June 30, 2021, the Company was in compliance with the net leverage ratio covenant.

## 7.    Accrued Expenses

Accrued expenses consisted of the following as of:

| (In thousands) | June 30, 2021 | | December 31, 2020 | |
|---|---|---|---|---|
| Payroll and payroll related expenses | $ | 1,750 | $ | 6,115 |
| Accrued inventory purchases | | 4,330 | | 4,588 |
| Accrued returns | | 1,983 | | 2,585 |
| Other accrued expenses | | 9,549 | | 8,934 |
| Total accrued expenses | $ | 17,612 | $ | 22,222 |

## 8.    Commitments and Contingencies

**Litigation**

From time to time, the Company is subject to various claims and contingencies which are in the scope of ordinary and routine litigation incidental to its business, including those related to regulation, litigation, business transactions, employee-related matters and taxes, among others. When the Company becomes aware of a claim or potential claim, the likelihood of any loss or exposure is assessed. If it is probable that a loss will result and the amount or range of the loss can be reasonably estimated, the Company records a liability for the loss and discloses the possible loss in the consolidated financial statements. Legal costs are expensed as incurred.

On September 17, 2019, the Nevada Department of Taxation (the "Department") issued a Deficiency Notice against the Company to initiate administrative legal proceedings before the Department for the alleged non-compliance with employee retention requirements provided in exchange for tax benefits in establishing the Company's Las Vegas distribution center in a December 2016 Abatement Agreement the Company had executed with the State of Nevada via its Governor's Office of Economic Development. The Company has denied the allegations. An administrative hearing was held in the matter on January 15, 2021. On June 9, 2021 the court upheld the Department's Deficiency Notice against the Company in its entirety. The loss resulting from this matter is $0.7 million including penalties and interest, for which the Company has recorded an accrual of $0.6 million in accrued expenses on the consolidated balance sheets as of June 30, 2021 and December 31, 2020. During the three and six months ended June 30, 2021, the Company recorded interest expense of $0.1 million in interest and other expense, net on the consolidated statement of operations and comprehensive income (loss). The Company filed its Notice of Appeal on July 1, 2021.

On September 23, 2020, the Center for Advanced Public Awareness served a 60-Day Notice of Violation on the Company, alleging that the Company violated California's Health and Safety Code ("Prop 65") because of the amount of lead in the Company's Diaper Rash Cream and seeking statutory penalties and product warnings available under Prop 65. The Company intends to vigorously defend itself in this matter. The matter's outcome and materiality are uncertain at this time. Therefore, the Company cannot estimate the probability of loss or make an estimate of the loss or range of loss in this matter.

On January 28, 2021, Rosaura Navar filed a putative class action complaint (Rosaura Navar, et al. v. The Honest Company, Inc.—Los Angeles County Superior Court, Case No. 21STCV03381) alleging that the Company violated California's Unfair Competition Law by failing to comply with California's Automatic Renewal Law. The complaint demands restitution, injunctive and declaratory relief. This matter was settled in April 2021 for an immaterial amount. The loss on settlement was recorded in accrued expenses in the accompanying condensed consolidated balance sheets as of June 30, 2021.

As of June 30, 2021 and December 31, 2020, the Company is not subject to any other currently pending legal matters or claims that could have a material adverse effect on its financial position, results of operations, or cash flows should such litigation be resolved unfavorably.

**Indemnifications**

In the ordinary course of business, the Company may provide indemnifications of varying scope and terms to investors, directors and officers with respect to certain matters, including, but not limited to, losses arising out of the Company's breach of such agreements, services to be provided by the Company, or from intellectual property infringement claims made by third

14

parties. These indemnifications may survive termination of the underlying agreement and the maximum potential amount of future payments the Company could be required to make under these indemnification provisions may not be subject to maximum loss clauses. The maximum potential amount of future payments the Company could be required to make under these indemnification provisions is indeterminable. The Company has never paid a material claim, nor has the Company been involved in litigation in connection with these indemnification arrangements. As of June 30, 2021 and December 31, 2020, the Company has not accrued a liability for these guarantees as the likelihood of incurring a payment obligation, if any, in connection with these guarantees is not probable or reasonably estimable due to the unique facts and circumstances involved.

**9.    Stock-Based Compensation**

**Stock Options**

The following table summarizes the stock option activity for the three months ended June 30, 2021:

|  | Number of Options | Weighted Average Exercise Price |
|---|---|---|
| **Outstanding at March 31, 2021** | 17,829,264 | $ 5.24 |
| Granted | — | $ — |
| Exercised | (53,694) | $ 5.49 |
| Forfeited | (99,007) | $ 5.34 |
| **Outstanding at June 30, 2021** | 17,676,563 | $ 5.24 |

From 2018 to 2020, the Company granted stock options that vest based upon achieving a qualifying liquidity event, provided the employee remains employed on the date the vesting condition is satisfied. In conjunction with the IPO, 2,442,918 stock option awards with a weighted average exercise price of $5.54 vested based on the achievement of the IPO qualifying liquidity event, which resulted in the recognition of stock-based compensation expense of $3.1 million during the three and six months ended June 30, 2021.

**2021 Equity Incentive Plan**

In April 2021, the Company's board of directors adopted the Company's 2021 Equity Incentive Plan (the "2021 Plan"), which became effective in connection with the IPO. All equity-based awards granted on or after the effectiveness of the 2021 Plan will be granted under the 2021 Plan. The 2021 Plan provides for grants of incentive stock options ("ISOs") within the meaning of Section 422 of the Internal Revenue Code of 1986, as amended (the "Code"), to the Company's employees and its parent and subsidiary corporations' employees, and for the grant of nonstatutory stock options ("NSOs"), stock appreciation rights, restricted stock awards, restricted stock units ("RSUs") awards, performance awards and other forms of awards to the Company's employees, directors and consultants and any of its affiliates' employees and consultants. Initially, the maximum number of shares of the Company's common stock that may be issued under its 2021 Plan will not exceed 25,025,580 shares of the Company's common stock. In addition, the number of shares of the Company's common stock reserved for issuance under its 2021 Plan will automatically increase on January 1 of each year for a period of ten years, beginning on January 1, 2022 and continuing through January 1, 2031, in an amount equal to (1) 4% of the total number of shares of the Company's common stock outstanding on December 31 of the immediately preceding year, or (2) a lesser number of shares determined by the Company's board of directors prior to the date of the increase. The maximum number of shares of the Company's common stock that may be issued on the exercise of ISOs under its 2021 Plan is 75,100,000 shares.

15

*RSU Awards*

The following table summarizes the RSU activity for the six months ended June 30, 2021:

| | Number of Shares | | Weighted Average Grant Date Fair Value Per Share | |
| --- | --- | --- | --- | --- |
| | Non-Employee Directors | Directors, Officers and Employees | Non-Employee Directors | Directors, Officers and Employees |
| **Unvested RSUs at December 31, 2020** | — | — | $ — | $ — |
| Granted[1] | 110,267 | 2,605,555 | $ 16.00 | $ 14.31 |
| Vested | 6,703 | — | $ 16.00 | $ — |
| Forfeited | — | — | $ — | $ — |
| **Unvested RSUs at June 30, 2021** | 116,970 | 2,605,555 | $ 16.00 | $ 14.31 |

(1) Includes 200,000 RSUs granted to an officer of the Company in February 2021 under the 2011 Stock Incentive Plan.

As of June 30, 2021, there was $36.2 million of unrecognized stock-based compensation expense related to unvested RSUs, which is expected to be recognized over a weighted-average period of 2.12 years.

**2021 Employee Stock Purchase Plan**

In April 2021, the Company's board of directors adopted the Company's 2021 Employee Stock Purchase Plan (the "2021 ESPP"). The Company authorized the issuance of 1,175,000 shares of common stock under the 2021 ESPP. In addition, the number of shares available for issuance under the 2021 ESPP will be annually increased on January 1 of each year for a period of ten years, beginning on January 1, 2022 and continuing through January 1, 2031 by the lesser of (i) 1% of the total number of shares of common stock outstanding on December 31 of the immediately preceding year; and (ii) 3,525,000 shares, except before the date of any such increase, the Company's board of directors may determine that such increase will be less than the amount set forth in clauses (i) and (ii). Subject to any limitations contained therein, the 2021 ESPP allows eligible employees to contribute (in the form of payroll deductions or otherwise to the extent permitted by the administrator) an amount established by the administrator from time to time in its discretion to purchase common stock at a discounted price per share.

Under the 2021 ESPP, eligible employees are granted the right to purchase shares of common stock at the lower of 85% of the fair value at the time of grant or 85% of the fair value at the time of exercise. The right to purchase shares of common stock is granted in May and November of each year for an offering period of approximately six months. The first offering period under the 2021 ESPP commenced in May 2021. For the three and six months ended June 30, 2021, no shares were purchased under the 2021 ESPP.

The following table summarizes the key input assumptions used in the Black-Scholes option-pricing model to estimate the grant-date fair value of the 2021 ESPP:

| | For the three months ended June 30, 2021 |
| --- | --- |
| Expected life of options (in years) | 0.50 |
| Expected stock price volatility | 54.83% |
| Risk free interest rate | 0.04% |
| Expected dividend yield | —% |
| Weighted average grant-date fair value per share | $4.86 |

16

**Stock-based Compensation Expense**

Stock-based compensation expense related to RSU awards, ESPP purchases and stock options, as applicable, are as follows:

| | For the three months ended June 30, | | | | For the six months ended June 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2021 | | 2020 | | 2021 | | 2020 | |
| *(In thousands)* | | | | | | | | |
| Selling, general and administrative | $ | 6,194 | $ | 2,242 | $ | 7,942 | $ | 4,087 |
| Research and development | | 432 | | 83 | | 522 | | 161 |
| Total stock-based compensation expense | $ | 6,626 | $ | 2,325 | $ | 8,464 | $ | 4,248 |

**10.    Net Income (Loss) per Share Attributable to Common Stockholders**

The Company computes net income (loss) per share using the two-class method required for participating securities. The two-class method requires net income be allocated between common stock and participating securities based upon their respective rights to receive dividends as if all income for the period had been distributed. In periods where the Company has net losses, losses are not allocated to participating securities as they are not required to fund the losses. The Company considers its redeemable convertible preferred stock to be participating securities as preferred stockholders have rights to participate in dividends with the common stockholders.

Basic net income (loss) attributable to common stockholders per share is calculated by dividing net income (loss) attributable to common stockholders by the weighted-average number of shares of common stock outstanding. The Company computes diluted net income per share under a two-class method where income is reallocated between common stock, potential common stock and participating securities. Diluted net income (loss) per share attributable to common stockholders adjusts the basic net income (loss) per share attributable to common stockholders and the weighted-average number of shares of common stock outstanding for the potentially dilutive impact of stock options using the treasury stock method.

The following table sets forth the computation of the Company's basic and diluted net income (loss) per share attributable to common stockholders:

| | For the three months ended June 30, | | | | For the six months ended June 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| *(In thousands, except for share and per share values)* | 2021 | | 2020 | | 2021 | | 2020 | |
| **Numerator:** | | | | | | | | |
| Net income (loss) | $ | (20,034) | $ | (375) | $ | (24,518) | $ | 184 |
| Less: undistributed earnings allocated to redeemable convertible preferred stock | | — | | — | | — | | (109) |
| Add: gain on conversion of preferred stock[1] | | 28,994 | | — | | 28,994 | | — |
| Less: dividends paid to preferred stockholders[2] | | (20,637) | | — | | (20,637) | | — |
| Net income (loss) attributable to common stockholders - basic | $ | (11,677) | $ | (375) | $ | (16,161) | $ | 75 |
| Add: undistributed earnings reallocated to common stockholders | | — | | — | | — | | 2 |
| Net income (loss) attributable to common stockholders - diluted | $ | (11,677) | $ | (375) | $ | (16,161) | $ | 77 |
| **Denominator:** | | | | | | | | |
| Weighted average shares of common stock outstanding - basic | | 68,079,387 | | 34,069,346 | | 51,184,615 | | 34,065,173 |
| Add: effect of dilutive stock options | | — | | — | | — | | 999,183 |
| Weighted average shares of common stock outstanding - diluted | | 68,079,387 | | 34,069,346 | | 51,184,615 | | 35,064,356 |
| Net income (loss) per share, attributable to common shareholders: | | | | | | | | |
| Basic | $ | (0.17) | $ | (0.01) | $ | (0.32) | $ | 0.00 |
| Diluted | $ | (0.17) | $ | (0.01) | $ | (0.32) | $ | 0.00 |

17

17

Case 2:21-cv-07405-MCS-AS   Document 115-2   Filed 03/06/23   Page 110 of 164
Page ID #:2515

(1) The conversion price of the Company's Series C and Series D redeemable convertible preferred stock was adjusted as the offering price in the initial public offering was below a certain threshold resulting in the preferred stockholders receiving a fixed dollar amount on conversion settled into a variable number of shares, or a stock-settled redemption feature. Upon the settlement of this redemption feature, the Company recorded a gain on extinguishment of the redeemable convertible preferred stock of $29.0 million as an adjustment to net loss to arrive at net loss attributable to common stockholders to calculate earnings per share. The extinguishment gain was measured as the difference between the carrying amount of the redeemable convertible preferred stock and the fair value of common stock upon the IPO date that the preferred stock converted into.
(2) In April 2021, the Company's board of directors declared a cash dividend of $35.0 million to the holders of record of our common stock as of May 3, 2021, that was contingent upon the closing of the Company's IPO. On June 29, 2021, the Company paid the dividend, of which $20.6 million was paid to the holders of the Company's redeemable convertible preferred stock.

The following potentially dilutive shares were excluded from the computation of diluted net income (loss) per share because including them would have been antidilutive:

| | For the three months ended June 30, | | For the six months ended June 30, | |
|---|---|---|---|---|
| | **2021** | **2020** | **2021** | **2020** |
| Redeemable convertible preferred stock[1] | — | 49,100,928 | — | 49,100,928 |
| Stock options to purchase common stock | 17,676,563 | 17,414,024 | 17,676,563 | 11,963,528 |
| Unvested restricted stock units | 2,709,119 | — | 2,709,119 | — |
| Employee stock purchase plan | 30,789 | — | 30,789 | — |
| Total | 20,416,471 | 66,514,952 | 20,416,471 | 61,064,456 |

(1) Immediately prior to the completion of the IPO, 49,100,928 outstanding shares of redeemable convertible preferred stock with a carrying value of $376.4 million converted into 49,649,023 shares. of common stock.

## 11.    Income Taxes

In determining quarterly provisions for income taxes, the Company uses the annual estimated effective tax rate applied to the actual year-to-date loss, adjusted for discrete items arising in that quarter. The Company's annual estimated effective tax rate differs from the U.S. federal statutory rate of 21% primarily as a result of a valuation allowance against net deferred tax assets, stock-based compensation, state taxes, and other permanent differences.

The Company has evaluated the available positive and negative evidence supporting the realization of its gross deferred tax assets, including cumulative losses, and the amount and timing of future taxable income, and has determined it is more likely than not that the assets will not be realized. Accordingly, the Company has recorded a full valuation allowance against the U.S. federal and state deferred tax assets as of each balance sheet date presented.

During the three and six months ended June 30, 2021 and 2020, the Company has not recorded any uncertain tax positions and has not recognized interest or penalties in the consolidated statement of operations and comprehensive income (loss).

## 12.    Related Party Transactions

In April 2020, the Company engaged Summit House Studios LLC, a third-party consultant, to provide digital ad production services. Summit House Studios LLC is owned by a major shareholder of the Company. Based on services provided, the Company incurred $0.2 million and $0.3 million, respectively, of advertising costs for the three and six months ended June 30, 2021, and $0.1 million and $0.1 million, respectively, for the three and six months ended June 30, 2020 which is reported as marketing expense in the Company's consolidated statements of comprehensive income (loss).

## 13.    Subsequent Events

None.

18

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

You should read the following discussion and analysis of our financial condition and results of operations together with our condensed consolidated financial statements and related notes included elsewhere in this Quarterly Report on Form 10-Q, as well as our audited consolidated financial statements and related notes as disclosed in our prospectus, dated May 4, 2021, filed with the Securities and Exchange Commission ("SEC") in accordance with Rule 424(b) of the Securities Act on May 6, 2021 (the "Prospectus") in connection with our initial public offering ("IPO").

**Overview**

The Honest Company, Inc. ("Honest" and, together with its consolidated subsidiaries, the "Company," "we," "us" and "our") is a digitally-native, mission-driven brand focused on leading the clean lifestyle movement, creating a community for conscious consumers and seeking to disrupt multiple consumer product categories. Our commitment to our core values, passionate innovation and engaging our community has differentiated and elevated our brand and our products. Since our launch in 2012, we have been dedicated to developing clean, sustainable, effective and thoughtfully-designed products. By doing so with transparency, we have cultivated deep trust around what matters most to our consumers: their health, their families and their homes. We are an omnichannel brand, ensuring our products are available however our consumers shop. Our differentiated platform positions us for continued growth through our trusted brand, award-winning multi-category product offering, deep digital-first connection with consumers and omnichannel accessibility.

Our integrated multi-category product architecture is intentionally designed to serve our consumers every day, at every age and through every life stage, no matter where they are on their journey. Our three categories are Diapers and Wipes, Skin and Personal Care, and Household and Wellness, which represented 64%, 32%, and 4%, respectively, of our revenue for the three months ended June 30, 2021, compared to 67%, 28%, and 5%, respectively, of our revenue for the three months ended June 30, 2020, and 63%, 32%, and 5%, respectively, of our revenue for the six months ended June 30, 2021, compared to 69%, 27%, and 4%, respectively, of our revenue for the six months ended June 30, 2020. At the center of our product ecosystem are our diapers, which are a strategic consumer acquisition tool that acts as an entry point for our portfolio, as new parents often go on to purchase products from our other categories for their everyday family needs. Our integrated multi-category product architecture is designed to drive loyalty, increase our consumer wallet share and generate attractive consumer lifetime value.

We believe that our consumers are modern, aspirational, conscious and style-forward and that they seek out high quality, effective and thoughtfully-designed products. We believe that they are passionate about living a conscious life and are enthusiastic ambassadors for brands they trust. As purpose-driven consumers, they transcend any one demographic, spanning gender, age, geography, ethnicity and household income. Honest consumers are often young, mobile-centric and digitally-inclined. We build relationships with these consumers through a disruptive digital marketing strategy that engages them with "snackable" digital content (short-form, easily digestible content), immerses them in our brand values, and inspires them to join the Honest community. Our direct connection with our community enables us to understand what consumers' needs are and inspires our product innovation pipeline, generating a significant competitive advantage over more traditional consumer packaged goods, or CPG, peers.

Our omnichannel approach seeks to meet consumers however they want to shop, balancing deep consumer connection with broad convenience and accessibility. Since our launch, we have built a well-integrated omnichannel presence by expanding our retail accessibility across both Digital and Retail channels, including the launch of strategic partnerships with Costco, Target and Amazon in 2013, 2014 and 2017, respectively. For the three months ended June 30, 2021, we generated 47% and 53% of our revenue from our Digital and Retail channels, respectively, compared to 64% and 36%, respectively, for the three months ended June 30, 2020. For the six months ended June 30, 2021, we generated 50% and 50% of our revenue from our Digital and Retail channels, respectively, compared to 61% and 39%, respectively, for the six months ended June 30, 2020. We maintain direct relationships with our consumers via our flagship digital platform, Honest.com, which allows us to influence brand experience and better understand consumer preferences and behavior. We increase accessibility of our products to more consumers through both the third-party pureplay ecommerce sites that, with Honest.com, comprise the rest of our Digital channel, and our Retail channel, which includes leading retailers and their websites. Our products can be found in approximately 32,000 retail locations across the United States, Canada and Europe. This distinctive business model has allowed us to efficiently scale our business while remaining agnostic as to the channel where consumers purchase our products. Our integrated omnichannel presence provides meaningful benefits to our consumers which we believe is not easily replicated by our competitors.

**Innovation Strategy**

Our Innovation Strategy was implemented in 2017, in order to reposition us for long-term success. In the first two years of implementing the Innovation Strategy, we underwent a period of transition during which we executed on portfolio simplification, product innovation and accelerated our shift from digital to omnichannel.

19

**Initial Public Offering**

On May 7, 2021, we completed our IPO of 25,807,000 shares of our common stock at a stock price of $16.00 per share, resulting in aggregate net proceeds to us of approximately $91.0 million, after deducting the underwriting discount and commissions of $6.7 million and offering expenses of $5.5 million, $0.6 million of which was unpaid at June 30, 2021. We sold 6,451,613 shares and certain existing stockholders sold an aggregate of 19,355,387 shares. We granted the underwriters an option for a period of 30 days to purchase up to an additional 3,871,050 shares of common stock from the selling stockholders at $16.00 per share less the underwriting discounts and commissions. In May 2021, the underwriters fully exercised the option to purchase these additional shares from the selling stockholders. We did not receive any proceeds from the sale of shares of our common stock by the selling stockholders.

**Key Factors Affecting Our Performance**

We believe that the growth of our business and our future success are dependent on many factors. While each of these factors presents significant opportunities for us, they also pose important challenges that we must successfully address to enable us to sustain the growth of our business and improve our operations while staying true to our mission, including those discussed below and in the section of this Quarterly Report on Form 10-Q titled "Risk Factors."

*Ability to Grow Our Brand Awareness*

Our brand is integral to the growth of our business and is essential to our ability to engage and stay connected with the growing clean lifestyle consumer. Honest is still unknown to many consumers, with unaided brand awareness of 25% among diaper buyers according to our consumer research as of January 2021. In order to increase the wallet share of existing conscious consumers and attract new ones, our brand has to maintain its trustworthiness and authenticity. Our ability to attract new consumers will depend, among other things, on our ability to successfully communicate the value of our products as clean, sustainable and effective, the efficacy of our marketing efforts and the offerings of our competitors. Beyond preserving the integrity of our brand, our performance will depend on our ability to augment our reach and increase the number of consumers aware of Honest and our product portfolio. We believe our brand strength will enable us to continue to expand across categories and channels, allowing us to deepen relationships with consumers and expand our access to global markets. Our performance depends significantly on factors that may affect the level and pattern of consumer spending in the product categories in which we operate.

*Continued Innovation*

Research, development and innovation are core elements underpinning our growth strategy. Through our in-house research and development laboratories, we are able to access the latest advancements in clean ingredients and continue to innovate in the clean conscious lifestyle space. Based in Los Angeles, California, our research and development team, including chemists and an in-house toxicologist, develops innovative clean products based on the latest green technology. At Honest, product innovation never stops. The improvement of existing products and the introduction of new products have been, and continue to be, integral to our growth. We have made significant investments in our product development capabilities and plan to do so in the future. We believe our rigorous approach to product innovation has helped redefine and grow the clean and natural segments of the categories in which we operate. Our continued focus on research and development will be central to attracting and retaining consumers in the future. Our ability to successfully develop, market and sell new products will depend on a variety of factors, including our continued investment in innovation, integrated business planning processes and capabilities.

*Continued Product Category Growth*

Our product mix is a driver of our financial performance given our focus on accretive product launches and innovation to increase product margins. Even though our growth strategy aims to boost sales across all categories, we intend to prioritize growth in Skin and Personal Care given its attractive margin characteristics and leverage our brand equity and consumer insights to extend into new adjacent product categories. Since we launched our Innovation Strategy, we have enhanced our product portfolio by strategically discontinuing certain products and making calculated extensions within our three product categories. These product changes have contributed to our revenue and margin growth.

*Continued Execution of Omnichannel Strategy*

The continued execution of our omnichannel strategy impacts our financial performance. We intend to continue leveraging our marketing strategy to drive increased consumer traffic to our flagship digital platform, Honest.com, as it is a valuable tool for creating direct connections with our consumers, influencing brand experience and understanding consumer preference and behavior. Our partnerships with leading third-party retail platforms and national retailers have broadened our consumer reach, raised our brand awareness and enhanced our margins through operating leverage. We will continue to pursue partnerships with a wide variety of retailers, including online retailers, big-box retailers, grocery stores, drugstores and specialty

retailers. Our ability to execute this strategy will depend on a number of factors, such as retailers' satisfaction with the sales and profitability of our products, channel shifts of their customers, and their own supply chain, order timing, and inventory needs, which may fluctuate from period to period. For example, in the second quarter of fiscal 2021, we experienced volatility in orders from a key digital partner that reduced its inventory on-hand in consumables to free up space for other products ahead of a major promotional event, which caused revenue from that partner to decline by $6.4 million for the three months ended June 30, 2021 compared to the three months ended June 30, 2020. We are working with this digital partner on a new arrangement, including whether to allow them to set up a fulfillment operation inside one of our warehouses. Even if we execute a new arrangement with this digital partner, inventory levels at this partner may remain lower than historical levels.

*Operational and Marketing Efficiency*

To grow our business, we intend to continue to improve our operational and marketing efficiency, which includes attracting new consumers, increasing community engagement and improving fulfillment and distribution operations. We invest significant resources in marketing and content generation, use a variety of brand and performance marketing channels and work continuously to improve brand exposure at our retail partners to acquire new consumers. It is important to maintain reasonable costs for these marketing efforts relative to the revenue we expect to derive from our consumers. We leverage our proprietary Honest Omni-Analytics to generate valuable consumer insights that guide our omnichannel strategy and inform our marketing spend optimization. Our future success depends in part on our ability to effectively attract consumers on a cost-efficient basis and achieve efficiencies in our operations.

*Overall Macro Trends*

We have strategically positioned ourselves to benefit from several macro trends related to changes in consumer behavior. We believe consumers' increasing interest in a conscious lifestyle has contributed to significant demand for our products. Further, the rise in digital shopping has complemented our flagship digital platform, Honest.com, our presence with third-party ecommerce players and our Retail partners' websites. In 2021, we have seen a significant shift from Digital to Retail as more consumers have become vaccinated and have chosen to return to in-store shopping. Changes in macro-level consumer spending trends, including as a result of the COVID-19 pandemic, could result in fluctuations in our operating results.

**Impact of COVID-19**

The COVID-19 pandemic caused general business disruption worldwide beginning in January 2020. The full extent to which the COVID-19 pandemic will directly or indirectly impact our cash flow, business, financial condition, results of operations and prospects will depend on future developments that are uncertain.

As a result of the COVID-19 pandemic, our headquarters has been temporarily closed but we are beginning to reopen in a limited capacity. We have also implemented travel restrictions. These actions represent a significant change in how we operate our business, but we believe that we successfully navigated this transition. In an effort to provide a safe work environment for our employees, we have implemented various social distancing measures, including replacing many in-person meetings with virtual interactions. We will continue to take actions as may be required or recommended by government or health authorities or as we determine are in the best interests of our employees and other business partners in light of the pandemic.

We have experienced relatively minor impacts on our inventory availability and delivery capacity since the outbreak, none of which has materially impacted our ability to service our consumers and retail and third-party ecommerce customers. We have taken measures to bolster key aspects of our supply chain, such as ensuring sufficient inventory to support our continued growth in the face of the pandemic. We continue to work with our existing manufacturing, logistics and other supply chain partners to ensure our ability to service our consumers and retail and third-party ecommerce customers.

We believe COVID-19 has been one of the drivers of demand in our Digital channel as consumers shifted to online shopping amid the pandemic. Additionally, in 2020 our Household and Wellness product category benefited from increasing demand for sanitization products. In response, we accelerated our development timeline for certain product launches, launching our disinfecting spray and alcohol wipes in 2020. In 2021, we have seen a decrease in consumer demand as more consumers have become vaccinated and retailers continue to manage heavy inventories of sanitization and disinfecting products in stores. We have also seen increased consumer willingness to return to in-store shopping as the economy opens and more of the population is vaccinated. This has driven a channel shift and demand acceleration driving revenue growth within our Retail channel in 2021.

The operations of our retail partners, manufacturers and suppliers have also been impacted by the COVID-19 pandemic. While the duration and extent of the COVID-19 pandemic depends on future developments that cannot be accurately predicted at this time, it has already had an adverse effect on the global economy and the ultimate societal and economic impact of the COVID-19 pandemic remains unknown. In particular, the conditions caused by this pandemic may negatively impact collections of accounts receivable and reduce expected spending from new consumers, all of which could adversely affect our business, financial condition, results of operations and prospects during fiscal 2021 and potentially future periods.

21

**Components of Results of Operations**

*Revenue*

We generate revenue through the sale of our products through Digital and Retail channels in the following product categories: Diapers and Wipes, Skin and Personal Care, and Household and Wellness. The Digital channel includes direct sales to the consumer through our website and sales to third-party ecommerce customers, who resell our products through their own online platforms. The Retail channel includes sales to traditional brick and mortar retailers, who may also resell our products through their own online platforms. Our revenue is recognized net of allowances for returns, discounts, credits and any taxes collected from consumers.

In 2019 we entered into a license agreement with Butterblu, LLC, or Butterblu, pursuant to which we license certain of our trademarks to Butterblu for the manufacture and distribution of certain baby apparel products in exchange for royalties. Butterblu operates and maintains our baby apparel offerings independently through the honestbabyclothing.com website. Our baby apparel offerings and our agreement with Butterblu are not currently material to our business and not expected to be material in the future. For the three and six months ended June 30, 2021, we collected $0.2 million and $0.5 million, respectively, in royalty revenue. For the three and six months ended June 30, 2020, we did not collect any royalty revenue under this agreement due in part because we granted Butterblu temporary payment relief.

*Cost of Revenue*

Cost of revenue includes the purchase price of merchandise sold to customers, inbound and outbound shipping and handling costs, freight and duties, shipping and packaging supplies, credit card processing fees and warehouse fulfillment costs incurred in operating and staffing warehouses, including rent. Cost of revenue also includes depreciation and amortization for warehouse fulfillment facilities and equipment, allocated overhead and direct and indirect labor for warehouse personnel.

*Gross Profit and Gross Margin*

Gross profit represents revenue less cost of revenue. Gross margin is gross profit expressed as a percentage of revenue. Our gross margin may in the future fluctuate from period to period based on a number of factors, including the mix of products we sell, the channel through which we sell our products, the innovation initiatives we undertake in each product category, the promotional environment in the marketplace, manufacturing costs, commodity prices and transportation rates, among other factors.

*Operating Expenses*

Our operating expenses consist of selling, general and administrative, marketing and research and development expenses.

*Selling, General and Administrative*

Selling, general and administrative expenses consist primarily of personnel costs, principally for our selling and administrative functions. These include personnel-related expenses, including salaries, bonuses, benefits and stock-based compensation expense. Selling, general and administrative expenses also include technology expenses, professional fees, facility costs, including insurance, utilities and rent relating to our headquarters, depreciation and amortization and overhead costs. We expect our general and administrative expenses to increase in absolute dollars as we continue to grow our business and organizational capabilities. We will also incur additional costs for employees and third-party professional fees related to operating as a public company and costs to comply with the rules and regulations applicable to companies listed on a national securities exchange, costs related to compliance and reporting obligations, and increased expenses for insurance, investor relations and professional services.

*Marketing*

Marketing expenses include costs related to our branding initiatives, retail customer marketing activities, point of purchase displays, targeted online advertising through sponsored search, display advertising, email marketing campaigns, market research, content production and other public relations and promotional initiatives. We expect marketing expenses to continue to increase in absolute dollars as we continue to expand brand awareness, introduce new product innovation across multiple product categories and implement new marketing strategies.

*Research and Development*

Research and development expenses consist primarily of personnel-related expenses for our research and development team. Research and development expenses also include costs incurred for the development of new products, improvement in the quality of existing products and the development and implementation of new technologies to enhance the quality and value of products. Research and development expenses also include allocated depreciation and amortization and overhead costs. We expect

research and development expenses to increase in absolute dollars as we invest in the enhancement of our product offerings through innovation and the introduction of new adjacent product categories.

### *IPO-Related Expenses*

In December 2020, we paid bonuses totaling $9.5 million to certain employees, including members of management, relating to preparation of our IPO, and after the closing of the IPO, we paid an additional $9.5 million in bonuses to certain employees, including members of management, which we collectively refer to as the IPO Bonuses, excluding in each case payroll taxes and expenses. The IPO Bonuses were recognized in selling, general and administrative and research and development expense. In addition, upon the effective date of the registration statement for our IPO in May 2021, we recognized stock-based compensation expense in selling, general and administrative and research and development expenses of $3.1 million related to certain performance and market-based stock options that vested upon this liquidity event and $0.2 million related to certain restricted stock units.

### *Interest and Other Income (Expense), Net*

Interest income consists primarily of interest income earned on our short-term investments and our cash and cash equivalents balances. Interest expense consists primarily of the portion of rent payments recognized as imputed interest expense under build-to-suit accounting associated with our leasing arrangements.

Other income (expense), net consists primarily of our foreign currency exchange gains and losses relating to transactions denominated in currencies other than the U.S. dollar. We expect our foreign currency gains and losses to continue to fluctuate in the future due to changes in both the volume of foreign currency transactions and foreign currency exchange rates.

### *Income Tax Provision*

We are subject to federal and state income taxes in the United States. Our annual estimated tax rate differed from the U.S. federal statutory rate of 21% primarily as a result of a valuation allowance against deferred tax assets, stock-based compensation, state taxes, and other permanent differences. We maintain a full valuation allowance for our federal and state deferred tax assets, including net operating loss carryforwards, as we have concluded that it is not more likely than not that the deferred tax assets will be realized.

## Results of Operations

The following table sets forth our condensed consolidated statements of operations data for each of the periods indicated:

| | For the three months ended June 30, | | For the six months ended June 30, | |
| --- | --- | --- | --- | --- |
| | **2021** | **2020** | **2021** | **2020** |
| *(In thousands)* | | | | |
| Revenue | $ 74,576 | $ 72,354 | $ 155,607 | $ 144,726 |
| Cost of revenue | 47,633 | 45,867 | 100,284 | 92,434 |
| Gross profit | 26,943 | 26,487 | 55,323 | 52,292 |
| Operating expenses | | | | |
| Selling, general and administrative[1] | 30,091 | 14,940 | 46,788 | 29,646 |
| Marketing | 14,009 | 10,625 | 28,182 | 19,818 |
| Research and development[1] | 2,345 | 1,100 | 3,991 | 2,266 |
| Total operating expenses | 46,445 | 26,665 | 78,961 | 51,730 |
| Operating income (loss) | (19,502) | (178) | (23,638) | 562 |
| Interest and other income (expense), net | (510) | (175) | (836) | (334) |
| Income (loss) before provision for income taxes | (20,012) | (353) | (24,474) | 228 |
| Income tax provision | 22 | 22 | 44 | 44 |
| Net income (loss) | $ (20,034) | $ (375) | $ (24,518) | $ 184 |

[1] Includes stock-based compensation expense as follows:

23

|  | For the three months ended June 30, | | For the six months ended June 30, | |
| --- | --- | --- | --- | --- |
|  | 2021 | 2020 | 2021 | 2020 |
| *(In thousands)* | | | | |
| Selling, general and administrative | $        6,194 | $        2,242 | $        7,942 | $        4,087 |
| Research and development | 432 | 83 | 522 | 161 |
| Total | $        6,626 | $        2,325 | $        8,464 | $        4,248 |

The following table sets forth our condensed consolidated statements of operations data expressed as a percentage of revenue*:

|  | For the three months ended June 30, | | For the six months ended June 30, | |
| --- | --- | --- | --- | --- |
|  | 2021 | 2020 | 2021 | 2020 |
|  | (as a percentage of revenue) | | | |
| Revenue | 100.0 % | 100.0 % | 100.0 % | 100.0 % |
| Cost of revenue | 63.9 | 63.4 | 64.4 | 63.9 |
| Gross profit | 36.1 | 36.6 | 35.6 | 36.1 |
| Operating expenses | | | | |
| Selling, general and administrative | 40.3 | 20.6 | 30.1 | 20.5 |
| Marketing | 18.8 | 14.7 | 18.1 | 13.7 |
| Research and development | 3.1 | 1.5 | 2.6 | 1.6 |
| Total operating expenses | 62.3 | 36.9 | 50.7 | 35.7 |
| Operating income (loss) | (26.2) | (0.1) | (15.2) | 0.4 |
| Interest and other income (expense), net | (0.7) | (0.2) | (0.5) | (0.2) |
| Income (loss) before provision for income taxes | (26.8) | (0.4) | (15.7) | 0.2 |
| Income tax provision | — | — | — | — |
| Net income (loss) | (26.9) % | (0.4) % | (15.8) % | 0.1 % |

\* Amounts may not sum due to rounding.

**Comparison of the Three and Six Months Ended June 30, 2021 and 2020**

*Revenue*

|  | For the three months ended June 30, | | | | For the six months ended June 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
|  | 2021 | 2020 | $ change | % change | 2021 | 2020 | $ change | % change |
| *(In thousands, except percentages)* | | | | | | | | |
| By Product Category | | | | | | | | |
| Diapers and Wipes | $    47,831 | $    48,744 | $    (913) | (1.9) % | $    97,404 | $    99,227 | $    (1,823) | (1.8) % |
| Skin and Personal Care | 23,866 | 20,558 | 3,308 | 16.1 | 50,111 | 39,040 | 11,071 | 28.4 |
| Household and Wellness | 2,879 | 3,052 | (173) | (5.7) | 8,092 | 6,459 | 1,633 | 25.3 |
| Total Revenue | $    74,576 | $    72,354 | $    2,222 | 3.1 % | $    155,607 | $    144,726 | $    10,881 | 7.5 % |

|  | For the three months ended June 30, | | | | For the six months ended June 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
|  | 2021 | 2020 | $ change | % change | 2021 | 2020 | $ change | % change |
| *(In thousands, except percentages)* | | | | | | | | |
| By Channel | | | | | | | | |
| Digital | $    34,820 | $    46,065 | $    (11,245) | (24.4) % | $    77,281 | $    87,561 | $    (10,280) | (11.7) % |
| Retail | 39,756 | 26,289 | 13,467 | 51.2 | 78,326 | 57,165 | 21,161 | 37.0 |
| Total Revenue | $    74,576 | $    72,354 | $    2,222 | 3.1 % | $    155,607 | $    144,726 | $    10,881 | 7.5 % |

Revenue was $74.6 million for the three months ended June 30, 2021, as compared to $72.4 million for the three months ended June 30, 2020. The increase of $2.2 million, or 3.1%, was primarily due to a $3.3 million increase in revenue from Skin and Personal Care products, offset by a $0.9 million decrease in revenue from Diapers and Wipes and a $0.2 million decrease in revenue from Household and Wellness products. The revenue increase from Skin and Personal Care was primarily driven by increased sales volume in our products across the Retail channel as a result of continued investment in marketing innovation, our Content, Community, Commerce marketing strategy and incremental merchandising programs with our retail partners. Diapers and Wipes revenue decreased as we saw lower wipes consumption across channels during the three months ended June 30, 2021, as compared to the significant wipes stock-up behavior during the initial stages of the COVID-19 pandemic during the three months ended June 30, 2020. As we rolled out and invested in our Clean, Conscious Diaper innovation, diaper revenue increased mid-single digits in the three months ended June 30, 2021 as compared to the three months ended June 30, 2020. Household and Wellness revenue was down due to a decrease in overall consumer demand for sanitization and disinfecting products during the three months ended June 30, 2021, as compared to higher consumption during the initial stages of the COVID-19 pandemic during the three months ended June 30, 2020.

Revenue was $155.6 million for the six months ended June 30, 2021, as compared to $144.7 million for the six months ended June 30, 2020. The increase of $10.9 million, or 7.5%, was primarily due to a $11.1 million increase in revenue from Skin and Personal Care products and a $1.6 million increase in revenue from Household and Wellness products, offset by a $1.8 million decrease in revenue from Diapers and Wipes. The revenue increase from Skin and Personal Care was primarily driven by increased sales volume on our products across the Retail channel as a result of continued investment in marketing innovation, our Content, Community, Commerce marketing strategy, expanded distribution and merchandising programs with our retail partners and improved retail unit volume, including $3.9 million through the non-monetary sale of our legacy beauty inventory in exchange for future marketing and transportation credits. The revenue growth from Household and Wellness was primarily driven by our new product innovations in sanitization and disinfecting that were introduced in the second half of 2020, offset by a decrease in overall consumer demand for sanitization and disinfecting products as more consumers became vaccinated against COVID-19 during the six months ended June 30, 2021. Diapers and Wipes revenue decreased as we saw lower wipes consumption across channels in the six months ended June 30, 2021, as compared to the significant wipes stock-up behavior during the six months ended June 30, 2020. This decrease in wipes was offset by an increase in sales volume of our diaper business with our new Clean Conscious Diaper innovation.

Revenue growth increased in our Retail channel for the three and six months ended June 30, 2021, compared to the three and six months ended June 30, 2020, primarily due to the continued channel shift to Retail as sales across products saw higher volumes with our retail partners as compared to the higher digital penetration we saw during the initial stages of the COVID-19 pandemic during the three and six months ended June 30, 2020. In addition to this shift, we also saw continued retail distribution expansion, additional merchandising programs and overall increases in retail unit volume with our retail partners. The reduction in revenue in our Digital channel was primarily due to the Retail channel shift and a reduction in inventory on-hand by a key digital partner who cut inventory in consumables in the second quarter of 2021 to free up space for other products ahead of a major promotional event. Therefore, for this key digital partner, shipments were down for the three and six months ended June 30, 2021, compared to the three and six months ended June 30, 2020, whereas consumption to this customer's end consumer increased during that same period.

*Cost of Revenue and Gross Profit*

| | For the three months ended June 30, | | | | For the six months ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2021 | 2020 | $ change | % change | 2021 | 2020 | $ change | % change |
| *(In thousands, except percentages)* | | | | | | | | |
| Cost of revenue | $ 47,633 | $ 45,867 | $ 1,766 | 3.9 % | $ 100,284 | $ 92,434 | $ 7,850 | 8.5 % |
| Gross profit | $ 26,943 | $ 26,487 | $ 456 | 1.7 % | $ 55,323 | $ 52,292 | $ 3,031 | 5.8 % |

Cost of revenue was $47.6 million for the three months ended June 30, 2021, as compared to $45.9 million for the three months ended June 30, 2020. The increase of $1.8 million, or 3.9%, was primarily due to increased product costs, offset by a decrease in shipping and fulfillment expenses as we saw the shift in revenue from our Digital channel to our Retail channel. Cost of revenue as a percentage of revenue increased by 48 basis points primarily due to a more normalized level of trade spend and higher input costs as compared to the three months ended June 30, 2020.

Gross profit was $26.9 million for the three months ended June 30, 2021, as compared to $26.5 million for the three months ended June 30, 2020. The increase of $0.5 million, or 1.7%, was primarily due to the increased sales of our products primarily from Skin and Personal Care.

Cost of revenue was $100.3 million for the six months ended June 30, 2021, as compared to $92.4 million for the six months ended June 30, 2020. The increase of $7.9 million, or 8.5%, was primarily due to increased product costs and fulfillment expenses associated with the increased sales of our products. Cost of revenue as a percentage of revenue increased by 58 basis points primarily due to a more normalized level of trade spend and higher input costs as compared to the six months ended June 30, 2020.

Gross profit was $55.3 million for the six months ended June 30, 2021, as compared to $52.3 million for the six months ended June 30, 2020. The increase of $3.0 million, or 5.8%, was primarily due to the increased sales of our products primarily from Skin and Personal Care and Household and Wellness.

*Operating Expenses*

*Selling, General and Administrative Expenses*

| (In thousands, except percentages) | For the three months ended June 30, | | | | For the six months ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2021 | 2020 | $ change | % change | 2021 | 2020 | $ change | % change |
| Selling, general and administrative | $ 30,091 | $ 14,940 | $ 15,151 | 101.4 % | $ 46,788 | $ 29,646 | $ 17,142 | 57.8 % |

Selling, general and administrative expenses were $30.1 million for the three months ended June 30, 2021 as compared to $14.9 million for the three months ended June 30, 2020. The increase of $15.2 million, or 101.4%, was primarily due to a $9.1 million bonus payment to certain employees, including members of management, excluding in each case payroll taxes and expenses, as well as an increase of $3.7 million in stock-based compensation expense related to the IPO.

Selling, general and administrative expenses were $46.8 million for the six months ended June 30, 2021 as compared to $29.6 million for the six months ended June 30, 2020. The increase of $17.1 million, or 57.8%, was primarily due to a $9.1 million bonus payment to certain employees, including members of management, excluding in each case payroll taxes and expenses, as well as an increase of $3.6 million in stock-based compensation expense, $1.5 million in audit fees and $1.0 million in legal expenses all related to the preparation of becoming a public company.

*Marketing Expenses*

| (In thousands, except percentages) | For the three months ended June 30, | | | | For the six months ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2021 | 2020 | $ change | % change | 2021 | 2020 | $ change | % change |
| Marketing | $ 14,009 | $ 10,625 | $ 3,384 | 31.8 % | $ 28,182 | $ 19,818 | $ 8,364 | 42.2 % |

Marketing expenses were $14.0 million for the three months ended June 30, 2021, as compared to $10.6 million for the three months ended June 30, 2020. The increase of $3.4 million, or 31.8%, was primarily due to an increase of $1.2 million in retail marketing expenses and an increase of $1.1 million in digital advertising expenses. The increase in retail marketing expense was driven in part by the launch of our Clean Conscious Diaper, as well as by marketing for a key digital partner's promotional event. The increase in digital advertising expenses drove our Content, Community, Commerce marketing strategy within Skin and Personal Care and Diapers and Wipes.

Marketing expenses were $28.2 million for the six months ended June 30, 2021, as compared to $19.8 million for the six months ended June 30, 2020. The increase of $8.4 million, or 42.2%, was primarily due to an increase of $3.5 million in retail marketing expenses, $2.4 million in digital advertising expenses and $1.0 million in video and photo production costs. The increase in retail marketing expense was driven in part by the launch of our Clean Conscious Diaper in January 2021, as well as by marketing for a key digital partner's promotional event. The increase in digital advertising expenses drove our Content, Community, Commerce marketing strategy within Skin and Personal Care and Diapers and Wipes. The increase in video and production costs were primarily related to our new innovations and other promotional events, including the Clean Conscious Diaper, incurred during the second quarter of 2021.

*Research and Development Expenses*

| (In thousands, except percentages) | For the three months ended June 30, | | | | For the six months ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2021 | 2020 | $ change | % change | 2021 | 2020 | $ change | % change |
| Research and development | $ 2,345 | $ 1,100 | $ 1,245 | 113.2 % | $ 3,991 | $ 2,266 | $ 1,725 | 76.1 % |

Research and development expenses were $2.3 million for the three months ended June 30, 2021, as compared to $1.1 million for the three months ended June 30, 2020. The increase of $1.2 million, or 113.2%, was primarily due to an increase in employee expenses, product development expenses, as well as clinical and claims testing and pilot trial expenses. The increase in employee expenses was driven by a $0.4 million bonus payment to certain employees, including management, excluding in each case payroll taxes and expenses, in connection with the IPO, as well as an increase of $0.4 million in stock-based compensation related to the IPO.

Research and development expenses were $4.0 million for the six months ended June 30, 2021, as compared to $2.3 million for the six months ended June 30, 2020. The increase of $1.7 million, or 76.1%, was primarily due to an increase in employee expenses, product development expenses, as well as clinical and claims testing and pilot trial expenses. The increase in employee expenses was driven by a $0.4 million bonus payment to certain employees, including management, excluding in each case payroll taxes and expenses, in connection with the IPO, as well as an increase of $0.4 million in stock-based compensation related to the IPO.

### *Interest and Other Income (Expense), Net*

| | For the three months ended June 30, | | | | For the six months ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| *(In thousands, except percentages)* | **2021** | **2020** | **$ change** | **% change** | **2021** | **2020** | **$ change** | **% change** |
| Interest and other income (expense), net | $ (510) | $ (175) | $ (335) | 191.4 % | $ (836) | $ (334) | $ (502) | 150.3 % |

Interest and other income (expense), net was net expense of $0.5 million for the three months ended June 30, 2021, as compared to net expense of $0.2 million for the three months ended June 30, 2020. The increase of $0.3 million, or 191.4%, was primarily due to a decrease in interest income on our short-term investments due to a lower average investment balance and lower average interest rates, as well as interest expense on a litigation matter.

Interest and other income (expense), net was net expense of $0.8 million for the six months ended June 30, 2021, as compared to net expense of $0.3 million for the six months ended June 30, 2020. The increase of $0.5 million, or 150.3%, was primarily due to a decrease in interest income on our short-term investments due to a lower average investment balance and lower average interest rates, as well as interest expense on a litigation matter.

## Liquidity and Capital Resources

We have incurred net losses and net cash outflows from operating activities since our inception. To date, our available liquidity and operations have been financed primarily through the sale of redeemable convertible preferred stock, equity securities and to a lesser extent, debt financing. As of June 30, 2021, we had $41.4 million of cash and cash equivalents and $53.7 million of short-term investments. Although we are dependent on our ability to raise capital or generate sufficient cash flow from operations to achieve our business objectives, we believe our existing cash, cash equivalents, and short-term investments will be sufficient to meet our working capital and capital expenditure needs for at least the next twelve months. Future capital requirements will depend on many factors, including our rate of revenue growth, gross margin and the level of expenditures in all areas of the Company. To the extent that existing capital resources and sales growth are not sufficient to fund future activities, we will need to raise capital through additional equity or debt financing. Additional funds may not be available on terms favorable to us or at all. Failure to raise additional capital, if and when needed, could have a material adverse effect on our financial position, results of operations, and cash flows.

### *2021 Credit Facility*

In April 2021, we entered into a first lien credit agreement (the "2021 Credit Facility"), with JPMorgan Chase Bank, N.A., as administrative agent and lender, and the other lenders party thereto, which provides for a $35.0 million revolving credit facility maturing five years from the date of the 2021 Credit Facility. The 2021 Credit Facility includes a subfacility that provides for the issuance of letters of credit in an amount of up to $10.0 million at any time outstanding, which reduces the amount available under the 2021 Credit Facility.

The 2021 Credit Facility is subject to customary fees for loan facilities of this type, including a commitment fee based on the average daily undrawn potion of the revolving credit facility. The interest rate applicable to the 2021 Credit Facility is, at our option, either (a) the LIBOR (or a replacement rate established in accordance with the terms of the 2021 Credit Facility) (subject to a 0.00% LIBOR floor), plus a margin of 1.50% or (b) the CB floating rate minus a margin of 0.50%. The CB floating rate is the higher of (a) the Wall Street Journal prime rate and (b)(i) 2.50% plus (ii) the adjusted LIBOR rate for a one-month interest period.

The 2021 Credit Facility terminates and borrowings thereunder, if any, will be due in full five years from the date of the 2021 Credit Facility. As of June 30, 2021, there was no outstanding balance under the 2021 Credit Facility. We are required to follow certain covenants. As of August 9, 2021, we were in compliance with all covenants under the 2021 Credit Facility.

Refer to Note 6 included in these condensed consolidated financial statements for more information on the 2021 Credit Facility.

### Cash Flows

The following table summarizes our cash flows for the periods presented:

| | For the six months ended June 30, | |
| --- | --- | --- |
| (In thousands) | 2021 | 2020 |
| Net cash (used in) provided by operating activities | $ (32,607) | $ 13,486 |
| Net cash (used in) provided by investing activities | $ (19,540) | $ 33,247 |
| Net cash provided by (used in) financing activities | $ 56,385 | $ (477) |

### Operating Activities

Our largest source of operating cash is from the sales of our products through Digital and Retail channels to our consumers. Our primary uses of cash from operating activities are for cost of revenue expenses, selling, general and administrative expenses, marketing expenses and research and development expenses. We have generated negative cash flows from operating activities and have supplemented working capital requirements through net proceeds from the sale and maturity of short-term investments.

Net cash used in operating activities of $32.6 million for the six months ended June 30, 2021 was primarily due to net loss of $24.5 million, non-cash adjustments of $10.7 million and a net decrease in cash related to changes in operating assets and liabilities of $18.8 million. Non-cash adjustments primarily consisted of stock-based compensation of $8.5 million and depreciation and amortization of $2.1 million. Changes in cash flows related to operating assets and liabilities primarily consisted of a $5.7 million increase in inventory due to timing of inventory purchases, $4.6 million increase in accounts receivable due to increase in sales from retail customers, $4.5 million increase in prepaid expenses and other assets due to timing of payments, as well as the non-monetary sale of our legacy beauty inventory for future marketing and transportation credits and a $4.0 million use of cash due to the timing of payments associated with our accounts payable and operating leasing obligations.

Net cash provided by operating activities of $13.5 million for the six months ended June 30, 2020 was primarily due to net income of $0.2 million, non-cash adjustments of $6.8 million and a net decrease in cash related to changes in operating assets and liabilities of $6.5 million. Non-cash adjustments primarily consisted of stock-based compensation of $4.2 million and depreciation and amortization of $2.6 million. Changes in cash flows related to operating assets and liabilities primarily consisted of a $4.7 million increase in accounts payable and operating leasing obligations due to the timing of associated payments, a $3.1 million decrease in accounts receivable due to timing of cash collection from retail customers and a $0.7 million decrease in inventory due to the timing of inventory purchases. This use of cash was partially offset by a $1.9 million increase in prepaid expenses and other assets.

### Investing Activities

Our primary source of investing cash is the sale and maturity of short-term investments and our primary use of investing cash is the purchase of short-term investments and property and equipment.

Net cash used in investing activities of $19.5 million for the six months ended June 30, 2021 was due to purchases of short-term investments of $54.0 million, offset by proceeds from the sales and maturities of short-term investments of $25.4 million and $9.2 million, respectively.

Net cash provided by investing activities of $33.2 million for the six months ended June 30, 2020 was due to maturities and sales of short-term investments of $31.9 million and $5.8 million, respectively, net of purchases of short-term investments of $4.5 million.

28

*Financing Activities*

Our financing activities primarily consisted of payments of deferred offering cost, stock option awards exercises and principal payments of financing lease obligations.

Net cash provided by financing activities of $56.4 million for the six months ended June 30, 2021 primarily consisted of proceeds from our IPO of $96.5 million net of underwriting discounts and commissions, offset by dividend payments of $35.0 million and payments of offering cost in connection with our IPO of $4.9 million.

Net cash used in financing activities of $0.5 million for the six months ended June 30, 2020 primarily consisted of principal payments of financing lease obligations of $0.5 million.

**Dividends**

In April 2021, our board of directors declared a cash dividend of $35.0 million to the holders of record of our common stock and our redeemable convertible preferred stock as of May 3, 2021, which we paid on June 29, 2021 (the "2021 Dividend"). Other than the 2021 Dividend, we have not declared or paid cash dividends on our capital stock, and we do not anticipate declaring or paying any cash dividends other than the 2021 Dividend in the foreseeable future. Any future determination regarding the declaration and payment of dividends, if any, will be at the discretion of our board of directors and will depend on then-existing conditions, including our financial condition, operating results, contractual restrictions (including any restrictions in our then-existing debt arrangements), capital requirements, business prospects and other factors our board of directors may deem relevant. The 2021 Credit Facility contains restrictions on our ability to pay dividends.

**Non-GAAP Financial Measure**

We prepare and present our condensed consolidated financial statements in accordance with GAAP. However, management believes that adjusted EBITDA, a non-GAAP financial measure, provides investors with additional useful information in evaluating our performance.

We calculate adjusted EBITDA as net income (loss), adjusted to exclude: (1) interest and other (income) expense, net; (2) income tax provision; (3) depreciation and amortization; (4) stock-based compensation expense; (5) professional fees and expenses and executive termination expenses related to our Innovation Strategy; (6) litigation and settlement fees associated with certain non-ordinary course litigation; and (7) the IPO Bonuses, including associated payroll taxes and expenses, and third-party costs associated with our IPO.

Adjusted EBITDA is a financial measure that is not required by, or presented in accordance with GAAP. We believe that adjusted EBITDA, when taken together with our financial results presented in accordance with GAAP, provides meaningful supplemental information regarding our operating performance and facilitates internal comparisons of our historical operating performance on a more consistent basis by excluding certain items that may not be indicative of our business, results of operations or outlook. In particular, we believe that the use of adjusted EBITDA is helpful to our investors as it is a measure used by management in assessing the health of our business, determining incentive compensation and evaluating our operating performance, as well as for internal planning and forecasting purposes.

Adjusted EBITDA is presented for supplemental informational purposes only, has limitations as an analytical tool and should not be considered in isolation or as a substitute for financial information presented in accordance with GAAP. Some of the limitations of adjusted EBITDA include that (1) it does not reflect capital commitments to be paid in the future, (2) although depreciation and amortization are non-cash charges, the underlying assets may need to be replaced and adjusted EBITDA does not reflect these capital expenditures, (3) it does not consider the impact of stock-based compensation expense, (4) it does not reflect other non-operating expenses, including interest expense, (5) it does not include the IPO Bonuses, including associated payroll taxes and expenses, or third-party costs associated with the preparation of the IPO, (6) it does not reflect tax payments that may represent a reduction in cash available to us, and (7) does not include certain non-ordinary cash expenses that we do not believe are representative of our business on a steady-state basis. In addition, our use of adjusted EBITDA may not be comparable to similarly titled measures of other companies because they may not calculate adjusted EBITDA in the same manner, limiting its usefulness as a comparative measure. Because of these limitations, when evaluating our performance, you should consider adjusted EBITDA alongside other financial measures, including our net income (loss) and other results stated in accordance with GAAP.

The following table presents a reconciliation of net income (loss), the most directly comparable financial measure stated in accordance with GAAP, to adjusted EBITDA, for each of the periods presented:

29

| (In thousands) | For the three months ended June 30, | | For the six months ended June 30, | |
|---|---|---|---|---|
| | **2021** | **2020** | **2021** | **2020** |
| **Reconciliation of Net Income (Loss) to Adjusted EBITDA** | | | | |
| Net income (loss) | $ (20,034) | $ (375) | $ (24,518) | $ 184 |
| Interest and other (income) expense, net | 510 | 175 | 836 | 334 |
| Income tax provision | 22 | 22 | 44 | 44 |
| Depreciation and amortization | 1,027 | 1,328 | 2,117 | 2,557 |
| Stock-based compensation | 6,626 | 2,325 | 8,464 | 4,248 |
| Innovation Strategy expenses[1] | — | — | — | 571 |
| Related IPO costs and other transaction-related expenses[2] | 11,085 | — | 12,160 | — |
| Adjusted EBITDA | $ (764) | $ 3,475 | $ (897) | $ 7,938 |

[1] Includes professional fees and expenses and executive severance and termination expenses related to our Innovation Strategy.

[2] Includes IPO-related costs, including IPO Bonuses, and other transaction-related third-party expenses, which are generally incremental costs incurred associated with the preparation of the IPO.

**Contractual Obligations and Commitments**

There have been no material changes to our contractual obligations from those described in the Prospectus.

**Off-Balance Sheet Arrangements**

We did not have during the periods presented, and we do not currently have, any off-balance sheet financing arrangements or any relationships with unconsolidated entities or financial partnerships, including entities sometimes referred to as structured finance or special purpose entities, that were established for the purpose of facilitating off-balance sheet arrangements or other contractually narrow or limited purposes.

**Critical Accounting Policies and Estimates**

Our condensed consolidated financial statements and the related notes thereto included elsewhere in this Quarterly Report on Form 10-Q are prepared in accordance with GAAP. The preparation of consolidated financial statements requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue, costs and expenses and related disclosures. We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances. Actual results could differ significantly from our estimates. To the extent that there are differences between our estimates and actual results, our future financial statement presentation, financial condition, results of operations and cash flows will be affected.

Our critical accounting policies are described under the heading "Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Policies and Estimates" in the Prospectus and the notes to the audited consolidated financial statements appearing in the Prospectus. During the three and six months ended June 30, 2021, there were no material changes to our critical accounting policies from those discussed in our Prospectus.

**Recent Accounting Pronouncements**

Refer to Note 2 to our condensed consolidated financial statements included in this Quarterly Report on Form 10-Q for a discussion of recently issued accounting pronouncements not yet adopted.

**Item 3. Quantitative and Qualitative Disclosures about Market Risk**

We are exposed to market risks in the ordinary course of our business. Market risk represents the risk of loss that may impact our financial position due to adverse changes in financial market prices and rates. Our market risk exposure is primarily the result of fluctuations in interest rates and foreign currency exchange rates.

*Interest Rate Risk*

We had cash and cash equivalents of $41.4 million as of June 30, 2021, which consisted of bank accounts, money market funds, certificates of deposit and corporate bonds. We had short-term investments of $53.7 million as of June 30, 2021, which

consisted of commercial paper, certificates of deposit, corporate bonds and U.S. government and agency securities. Interest-earning instruments carry a degree of interest rate risk. We do not enter into investments for trading or speculative purposes and have not used any derivative financial instruments to manage our interest rate risk exposure. Due to the short-term nature of our investments, we have not been exposed to, nor do we anticipate being exposed to, material risks due to changes in interest rates. A hypothetical 10% change in interest rates would not result in a material impact on our condensed consolidated financial statements.

We are also subject to interest rate risk in connection with our 2021 Credit Facility. See the section titled "—Liquidity and Capital Resources— 2021 Credit Facility" above. Based on the average interest rate on the instruments under the 2021 Credit Facility during the three and six months ended June 30, 2021, and to the extent that borrowings were outstanding, we do not believe that a hypothetical 10% change in the interest rate would have a material effect on our results of operations or financial condition for the three and six months ended June 30, 2021.

### *Foreign Currency Exchange Risk*

Our reporting currency is the U.S. dollar. Gains or losses due to transactions in foreign currencies are reflected in the condensed consolidated statements of comprehensive income (loss) under the line item interest and other income (expense), net. We have not engaged in the hedging of foreign currency transactions to date, although we may choose to do so in the future. We do not believe that an immediate 10% increase or decrease in the relative value of the U.S. dollar to other currencies would have a material effect on our condensed consolidated financial statements.

### *Inflation Risk*

We do not believe that inflation has had a material effect on our business, results of operations or financial condition. If we are unable to offset changing commodity prices through price increases or cost reductions, our inability or failure to do so could harm our business, results of operations and financial condition.

### Emerging Growth Company Status

In April 2012, the JOBS Act was enacted. Section 107(b) of the JOBS Act provides that an emerging growth company can take advantage of an extended transition period for complying with new or revised accounting standards. Thus, an emerging growth company can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We have elected to take advantage of the extended transition period to comply with new or revised accounting standards and to adopt certain of the reduced disclosure requirements available to emerging growth companies. As a result of the accounting standards election, we will not be subject to the same implementation timing for new or revised accounting standards as other public companies that are not emerging growth companies which may make comparison of our financials to those of other public companies more difficult.

### Item 4. Controls and Procedures.

### Evaluation of Disclosure Controls and Procedures

We maintain "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, or the Exchange Act, that are designed to ensure that information required to be disclosed in the reports that we file or submit under the Exchange Act is (1) recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms and (2) accumulated and communicated to our management, including our principal executive officer and principal financial officer, to allow timely decisions regarding required disclosure. Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated, as of the period ended June 30, 2021, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act). Based on that evaluation, our principal executive officer and principal financial officer concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level.

### Changes in Internal Control over Financial Reporting

There was no change in the Company's internal control over financial reporting that occurred during the Company's second quarter of 2021 that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

### Limitations on Effectiveness of Controls and Procedures

31

In designing and evaluating our disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply judgment in evaluating the benefits of possible controls and procedures relative to their costs.

32

**PART II—OTHER INFORMATION**

**Item 1. Legal Proceedings.**

The information contained under the heading "Litigation" in Note 8 to our condensed consolidated financial statements included in this Quarterly Report on Form 10-Q is incorporated by reference into this Item.

**Item 1A. Risk Factors.**

*Other than the risk factors set forth below, there have been no material changes to the risk factors set forth in the section titled "Risk Factors" included in our prospectus, dated May 4, 2021, filed with the Securities and Exchange Commission ("SEC") in accordance with Rule 424(b) of the Securities Act on May 6, 2021 (the "Prospectus") in connection with our initial public offering ("IPO"). Our business involves significant risks. You should carefully consider the risks and uncertainties described in our Prospectus, together with all of the other information in this Quarterly Report on Form 10-Q, as well as our audited consolidated financial statements and related notes as disclosed in our Prospectus. The risks and uncertainties described in our Prospectus are not the only ones we face. Additional risk and uncertainties that we are unaware of or that we deem immaterial may also become important factors that adversely affect our business. The realization of any of these risks and uncertainties could have a material adverse effect on our reputation, business, financial condition, results of operations, growth and future prospects as well as our ability to accomplish our strategic objectives. In that event, the market price of our common stock could decline and you could lose part or all of your investment.*

***Our business, including our costs and supply chain, is subject to risks associated with sourcing, manufacturing, warehousing, distribution and logistics, and the loss of any of our key suppliers or logistical service providers could negatively impact our business.***

All of the products we offer are manufactured by a limited number of third-party manufacturers, and as a result we may be subject to price fluctuations or demand disruptions. Our operating results would be negatively impacted by increases in the costs of our products, and we have no guarantees that costs will not rise. In addition, as we expand into new categories and product types, we expect that we may not have strong purchasing power in these new areas, which could lead to higher costs than we have historically seen in our current categories. We may not be able to pass increased costs on to consumers, which could adversely affect our operating results. Moreover, in the event of a significant disruption in the supply of the materials used in the manufacture of the products we offer, we and the vendors that we work with might not be able to locate alternative suppliers of materials of comparable quality at an acceptable price.

In addition, products and merchandise we receive from manufacturers and suppliers may not be of sufficient quality or free from damage, or such products may be damaged during shipping, while stored in our warehouse fulfillment centers or with third-party ecommerce or retail customers or when returned by consumers. We may incur additional expenses and our reputation could be harmed if customers or consumers and potential consumers believe that our products do not meet their expectations, are not properly labeled or are damaged. For example, as disinfecting and sanitization products have faced supply chain challenges, decelerating market demand and slower turning inventory, the Company has received some product quality complaints from customers and consumers that have resulted or may result in refunds, returns, write-offs and remediation costs.

We purchase significant amounts of product supply from a limited number of suppliers with limited supply capabilities. There can be no assurance that our current suppliers will be able to accommodate our anticipated growth or continue to supply current quantities at preferential prices. An inability of our existing suppliers to provide materials in a timely or cost-effective manner could impair our growth and have an adverse effect on our business, financial condition, results of operations and prospects. We generally do not maintain long-term supply contracts with any of our suppliers and any of our suppliers could discontinue selling to us at any time. However, we have a long-term supply agreement with Valor Brands LLC (dba Ontex North America), or Ontex, for the manufacture and supply of certain diaper products. The current term of the supply agreement with Ontex ends on December 31, 2023. In addition, our agreement with Ontex provides that Ontex will be our exclusive supplier of diaper and training pant products so long as Ontex is able to provide us such products. Either party may terminate the agreement if the other party materially breaches the agreement and does not cure the breach within a specified notice period, or upon the other party's insolvency. If the agreement with Ontex is terminated, is not renewed, or if Ontex becomes insolvent, ceases or significantly reduces its operations or experiences financial distress, as a result of the COVID-19 pandemic or otherwise, or if any environmental, economic or other outside factors impact their operations, our ability to procure diaper manufacturing services may be impaired, and we may not be able to obtain, or may face increased costs related to, such services. The loss of Ontex, or of any of our other significant suppliers, or the discontinuance of any preferential pricing or exclusive incentives they currently offer to us could have an adverse effect on our business, financial condition, results of operations and prospects.

We continually seek to expand our base of suppliers, especially as we identify new products that necessitate new or additional materials. We also require our new and existing suppliers to meet our ethical and business partner standards. Suppliers may also have to meet governmental and industry standards and any relevant standards required by our consumers, which may require additional investment and time on behalf of suppliers and us. If any of our key suppliers becomes insolvent, ceases or significantly reduces its operations or experiences financial distress, as a result of the COVID-19 pandemic or otherwise, or if any

environmental, economic or other outside factors impact their operations. If we are unable to identify or enter into distribution relationships with new suppliers or to replace the loss of any of our existing suppliers, we may experience a competitive disadvantage, our business may be disrupted and our business, financial condition, results of operations and prospects could be adversely affected.

Our principal suppliers currently provide us with certain incentives such as volume purchasing, trade discounts, cooperative advertising and market development funds. A reduction or discontinuance of these incentives would increase our costs and could reduce our ability to achieve or maintain profitability. Similarly, if one or more of our suppliers were to offer these incentives, including preferential pricing, to our competitors, our competitive advantage would be reduced, which could have an adverse effect on our business, financial condition, results of operations and prospects.

In addition, we have warehouse fulfillment centers located in Las Vegas, Nevada, Fontana, California, Breinigsville, Pennsylvania and the Netherlands, all of which are managed by a single distribution partner, GEODIS Logistics LLC, or GEODIS. We have an agreement with GEODIS pursuant to which GEODIS provides warehousing, distribution and fulfillment services to us. Our agreement with GEODIS may be terminated for any reason by us or by GEODIS on delivery of prior written notice, and is renewable on an annual basis. If the agreement with GEODIS is terminated, is not renewed, or if GEODIS becomes insolvent, ceases or significantly reduces its operations or experiences financial distress, as a result of the COVID-19 pandemic or otherwise, or if any environmental, economic or other outside factors impact their operations, our ability to procure warehousing, distribution and fulfillment services may be impaired, and we may not be able to obtain, or may face increased costs related to, such services and our business, financial condition, results of operations and prospects could be adversely affected.

***We rely on third-party suppliers, manufacturers, retail and ecommerce partners and other vendors, and they may not continue to produce products or provide services that are consistent with our standards or applicable regulatory requirements, which could harm our brand, cause consumer dissatisfaction, and require us to find alternative suppliers of our products or services.***

We do not own or operate any manufacturing facilities. We use multiple third-party suppliers and manufacturers based primarily in the United States, China and Mexico and other countries to a lesser extent, to source and manufacture all of our products, including product components, under our owned brand. We engage many of our third-party suppliers and manufacturers on a purchase order basis and in some cases are not party to long-term contracts with them. The ability and willingness of these third parties to supply and manufacture our products may be affected by competing orders placed by other companies and the demands of those companies. If we experience significant increases in demand, or need to replace a significant number of existing suppliers or manufacturers, there can be no assurance that additional supply and manufacturing capacity will be available when required on terms that are acceptable to us, or at all, or that any supplier or manufacturer will allocate sufficient capacity to us in order to meet our requirements. Furthermore, our reliance on suppliers and manufacturers outside of the United States, the number of third parties with whom we transact and the number of jurisdictions to which we sell complicates our efforts to comply with customs duties and excise taxes; any failure to comply could adversely affect our business.

In addition, quality control problems, such as the use of materials and delivery of products that do not meet our quality control standards and specifications or comply with applicable laws or regulations, could harm our business. For example, as disinfecting and sanitization products have faced supply chain challenges, decelerating market demand and slower turning inventory, the Company has received some product quality complaints from customers and consumers that have resulted or may result in refunds, returns, write-offs and remediation costs. Quality control problems could result in regulatory action, such as restrictions on importation, products of inferior quality or product stock outages or shortages, harming our sales and creating inventory write-downs for unusable products.

We have also outsourced portions of our fulfillment process, as well as certain technology-related functions, to third-party service providers. Specifically, we rely on third parties in a number of foreign countries and territories, we are dependent on third-party vendors for credit card processing, and we use third-party hosting and networking providers to host our sites. The failure of one or more of these entities to provide the expected services on a timely basis, or at all, or at the prices we expect, or the costs and disruption incurred in changing these outsourced functions to being performed under our management and direct control or that of a third party, could have an adverse effect on our business, financial condition, results of operations and prospects. We are not party to long-term contracts with some of our retail and ecommerce partners, and upon expiration of these existing agreements, we may not be able to renegotiate the terms on a commercially reasonable basis, or at all.

Further, our third-party manufacturers, suppliers and retail and ecommerce partners may:

- have economic or business interests or goals that are inconsistent with ours;
- take actions contrary to our instructions, requests, policies or objectives;
- be unable or unwilling to fulfill their obligations under relevant purchase orders or manufacturing or supply agreements, including obligations to meet our production deadlines, quality standards, pricing guidelines and product specifications, and to comply with applicable regulations, including those regarding the safety and quality of products;
- have financial difficulties;
- encounter raw material or labor shortages;
- encounter increases in raw material or labor costs which may affect our procurement costs;
- encounter difficulties with proper payment of custom duties or excise taxes;

- disclose our confidential information or intellectual property to competitors or third parties;
- engage in activities or employ practices that may harm our reputation; and
- work with, be acquired by, or come under control of, our competitors.

**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds.**

**(a) Recent Sales of Unregistered Equity Securities**

*Restricted Stock Unit Awards*

On May 7, 2021, we granted an aggregate of 23,124 RSUs with an aggregate value of $370,000 to two of our non-employee directors in connection with our IPO, which will vest in three equal annual installments on the one-, two- and three-year anniversaries of the grant date, subject to the non-employee director's continued service on each vesting date. We also granted an aggregate of 87,143 RSUs with an aggregate value of $1.4 million to our seven non-employee directors, which vested as to 1/13th of each such grant on June 1, 2021, and as to 12/13th of each such grant on the earlier of (i) the date immediately prior to the annual meeting of our stockholders next following the grant date of each such grant and (ii) June 1, 2022, subject to the non-employee director's continued service through each vesting date. Each non-employee director may elect to defer the delivery of shares in settlement of any restricted stock unit award granted under the terms of our Non-Employee Director Compensation Policy (the "Policy") that would otherwise be delivered to such non-employee director on or following the date such award vests pursuant to the terms of a deferral election such non-employee director makes in accordance with the Policy.

The offers, sales and issuances of the securities described above were deemed to be exempt under Section 4(a)(2) of the Securities Act or Rule 506 of Regulation D under the Securities Act as a transaction by an issuer not involving a public offering. The recipients of securities in each of these transactions acquired the securities for investment only and not with a view to or for sale in connection with any distribution thereof and appropriate legends were affixed to the securities issued in these transactions. Each of the recipients of securities in these transactions was an accredited investor within the meaning of Rule 501 of Regulation D under the Securities Act and served as a director of the Company. No underwriters were involved in these transactions.

*Common Stock Issued Upon Conversion of Preferred Stock*

Immediately prior to the completion of the IPO, 49,100,928 outstanding shares of redeemable convertible preferred stock with a carrying value of $376.4 million converted into 49,649,023 shares of common stock. Immediately prior to the completion of the IPO, we filed an Amended and Restated Certificate of Incorporation, which authorized a total of 1,000,000,000 shares of common stock and 20,000,000 shares of preferred stock. Upon the filing of the Amended and Restated Certificate of Incorporation, 49,100,928 shares of our redeemable convertible preferred stock then outstanding were automatically converted into 49,649,023 shares of our common stock. The issuance of such shares of our common stock was exempt from registration under Section 3(a)(9) of the Securities Act.

**(b) Use of Proceeds**

On May 4, 2021, our Registration Statement on Form S-1, as amended (File No. 333-255150) was declared effective in connection with our IPO, pursuant to which we issued and sold an aggregate of 6,451,613 shares of our common stock, and certain existing stockholders sold an aggregate of 23,226,437 shares of our common stock, including the full exercise of the underwriters' option to purchase additional shares, at a price to the public of $16.00 per share. Morgan Stanley & Co. LLC, J.P. Morgan Securities LLC and Jefferies LLC acted as representatives of the underwriters for the offering.

The IPO closed May 7, 2021. We received net proceeds of approximately $91.0 million, after deducting underwriting discounts and commissions of $6.7 million and offering expenses of $5.5 million. No payments for such expenses were made directly or indirectly to (i) any of our officers or directors or their associates, (ii) any persons owning 10% or more of any class of our equity securities or (iii) any of our affiliates.

The net proceeds from our IPO have been invested in investment grade, interest-bearing instruments. There has been no material change in the expected use of the net proceeds from our IPO as described in our Prospectus.

**Item 3. Defaults Upon Senior Securities.**

None.

**Item 4. Mine Safety Disclosures.**

Not applicable.

**Item 5. Other Information.**

35

None.

36

**Item 6. Exhibits.**

**EXHIBIT INDEX**

| Exhibit Number | Exhibit Description |
|---|---|
| 3.1 | Amended and Restated Articles of Incorporation, as currently in effect (incorporated herein by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K (File No. 001-40378), filed with the SEC on May 11, 2021). |
| 3.2 | Amended and Restated Bylaws, as currently in effect (incorporated herein by reference to Exhibit 3.2 to the Company's Current Report on Form 8-K (File No. 001-40378), filed with the SEC on May 11, 2021). |
| 10.1+ | 2021 Equity Incentive Plan and forms of agreements thereunder (incorporated herein by reference to Exhibit 10.3 to Amendment No. 1 to the Company's Registration Statement on Form S-1 (File No. 333-255150), filed with the SEC on April 20, 2021). |
| 10.2+ | Employee Stock Purchase Plan and forms of agreements thereunder (incorporated herein by reference to Exhibit 10.4 to Amendment No. 1 to the Company's Registration Statement on Form S-1 (File No. 333-255150), filed with the SEC on April 20, 2021). |
| 10.3+ | Non-Employee Director Compensation Policy (incorporated herein by reference to Exhibit 10.5 to Amendment No. 1 to the Company's Registration Statement on Form S-1 (File No. 333-255150), filed with the SEC on April 20, 2021). |
| 10.4+ | Form of Indemnity Agreement entered into by and between the Company and each director and executive officer (incorporated herein by reference to Exhibit 10.6 to Amendment No. 1 to the Company's Registration Statement on Form S-1 (File No. 333-255150), filed with the SEC on April 20, 2021). |
| 10.5+ | Amended and Restated Employment Agreement, dated April 24, 2021, by and between the Company and Nikolaos Vlahos (incorporated herein by reference to Exhibit 10.7 to Amendment No. 2 to the Company's Registration Statement on Form S-1 (File No. 333-255150), filed with the SEC on April 26, 2021). |
| 10.6+ | Amended and Restated Employment Agreement, dated April 26, 2021, by and between the Company and Jessica Warren (incorporated herein by reference to Exhibit 10.8 to Amendment No. 2 to the Company's Registration Statement on Form S-1 (File No. 333-255150), filed with the SEC on April 26, 2021). |
| 10.7+ | Amended and Restated Employment Agreement, dated April 25, 2021, by and between the Company and Donald Frey (incorporated herein by reference to Exhibit 10.9 to Amendment No. 2 to the Company's Registration Statement on Form S-1 (File No. 333-255150), filed with the SEC on April 26, 2021). |
| 10.8+ | Amended and Restated Employment Agreement, dated April 24, 2021, by and between the Company and Janis Hoyt (incorporated herein by reference to Exhibit 10.10 to Amendment No. 2 to the Company's Registration Statement on Form S-1 (File No. 333-255150), filed with the SEC on April 26, 2021). |
| 10.9+ | Amended and Restated Employment Agreement, dated April 24, 2021, by and between the Company and Kelly Kennedy (incorporated herein by reference to Exhibit 10.11 to Amendment No. 2 to the Company's Registration Statement on Form S-1 (File No. 333-255150), filed with the Commission on April 26, 2021). |
| 10.10+ | Amended and Restated Employment Agreement, dated April 25, 2021, by and between the Company and Glenn Klages (incorporated herein by reference to Exhibit 10.12 to Amendment No. 2 to the Company's Registration Statement on Form S-1 (File No. 333-255150), filed with the SEC on April 26, 2021). |
| 10.11+ | Amended and Restated Employment Agreement, dated April 24, 2021, by and between the Company and Jasmin Manner (incorporated herein by reference to Exhibit 10.13 to Amendment No. 2 to the Company's Registration Statement on Form S-1 (File No. 333-255150), filed with the SEC on April 26, 2021). |
| 10.12+ | Amended and Restated Employment Agreement, dated April 24, 2021, by and between the Company and Sharareh Parvaneh (incorporated herein by reference to Exhibit 10.14 to Amendment No. 2 to the Company's Registration Statement on Form S-1 (File No. 333-255150), filed with the SEC on April 26, 2021). |
| 10.13+ | Amended and Restated Employment Agreement, dated April 24, 2021, by and between the Company and Rick Rexing (incorporated herein by reference to Exhibit 10.15 to Amendment No. 2 to the Company's Registration Statement on Form S-1 (File No. 333-255150), filed with the SEC on April 26, 2021). |

37

| 10.14+ | Amended and Restated Employment Agreement, dated April 24, 2021, by and between the Registrant and Brendan Sheehey (incorporated herein by reference to Exhibit 10.16 to Amendment No 2. to the Company's Registration Statement on Form S-1 (File No. 333-255150), filed with the SEC on April 26, 2021). |
| 10.15 | Credit Agreement dated as of April 30, 2021, among the Company, as a Borrower, JPMorgan Chase Bank, N.A., as the Administrative Agent, and the other parties thereto (incorporated herein by reference to Exhibit 10.15 to the Company's Quarterly Report on Form 10-Q (file No. 001-40378), filed with the SEC on June 17, 2021). |
| 10.16† | Amendment Sixteen to the Logistics Services Agreement, dated as of July 12, 2021, by and between the Registrant and Geodis Logistics, LLC. |
| 31.1 | Certification of Principal Executive Officer pursuant to Rule 13a-14(a) and Rule 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2 | Certification of Principal Financial Officer pursuant to Rule 13a-14(a) and Rule 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1* | Certification of Principal Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2* | Certification of Principal Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document |
| 104 | Cover Page Interactive Data File (formatted as inline XBRL and contained in Exhibit 101) |

+Indicates a management contract or compensatory plan

\* Furnished herewith and not deemed to be "filed" for purposes of Section 18 of the Exchange Act, and shall not be deemed to be incorporated by reference into any filing under the Securities Act of 1933, as amended, or the Exchange Act (whether made before or after the date of the Form 10-Q), irrespective of any general incorporation language contained in such filing.

† Portions of this exhibit (indicated by asterisks) have been omitted because the registrant has determined that the information is both not material and is the type that the registrant treats as private or confidential.

38

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

The Honest Company, Inc.

Date: August 13, 2021                                    By: /s/ Nikolaos Vlahos

**Nikolaos Vlahos**
**Chief Executive Officer and Director**
*(Principal Executive Officer)*

Date: August 13, 2021                                    By: /s/ Kelly J. Kennedy

**Kelly J. Kennedy**
**Executive Vice President, Chief Financial Officer**
*(Principal Financial Officer and*
*Accounting Officer)*

39

**AMENDMENT SIXTEEN TO THE**
**LOGISTICS SERVICES AGREEMENT**

This Amendment Sixteen ("**Overflow Amendment**") is entered into as of July 12, 2021 (the "**Effective Date**") and amends the Logistics Services Agreement (defined below) by and between Geodis Logistics LLC ("**GEODIS**") and The Honest Company ("**Client**", and together with GEODIS, the "**Parties**").

WHEREAS, GEODIS and Client entered into that certain Logistics Services Agreement dated January 27, 2014 ("**Agreement**");

WHEREAS, pursuant to the Agreement, GEODIS provides logistics and warehousing services for Client in a warehouse space located at 651 Boulder Drive, Breinigsville, PA 18031
(the "**Main Facility**"); and

WHEREAS, Client requires additional overflow warehouse space and GEODIS has agreed to provide additional warehouse space and services within the facility located at is 951 Willowbrook Road, Northampton, PA 18067 (the "**Overflow Warehouse**"), as further described herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in the Agreement and this Overflow Amendment, and subject to the terms and conditions of the Agreement, with the exceptions defined below, the Parties agree as follows:

| **1. Description of Services** |
| --- |

GEODIS will provide Client warehouse handling and storage services, specifically including the unloading of inbound containers, inbound put-away, storage, and outbound loading of trailers (the "**Overflow Services**") at the Overflow Warehouse.

The terms and conditions set forth in the Agreement shall apply only to the Overflow Services contemplated hereunder; provided that, Section 1 (TERM), Section 6 (TERMINATION), and the Agreement exhibits (and language referencing such exhibits) shall not apply to the Overflow Services set forth herein and such terms shall be governed by this Overflow Amendment exclusively. The term "Warehouse" in the Agreement shall be understood to mean the Overflow Warehouse specified herein as it relates to this Overflow Amendment. Should the Agreement be terminated or expire during the Term of this Overflow Agreement, the terms and conditions therein shall continue to govern these Overflow Services until the Parties execute a new master agreement that expressly governs these Overflow Services.

Should there be any other conflicts or inconsistencies between this Overflow Amendment and the Agreement, the provisions of this Overflow Amendment will control.

| **2. Term of Agreement** |
| --- |

The term for the Overflow Services is to begin July 12, 2021 and expire on October 4, 2021. After such time, upon written agreement by both Parties, the Overflow Services may renew each month in successive one (1) month periods upon the mutual written agreement of the parties. Following October 4, 2021, either Party may terminate the Overflow Services under this

Overflow Amendment for any reason whatsoever, in whole or in part, upon sixty (60) days' written notice to the other Party.

| 3. Assumptions, Facts and Operating Parameters |
| --- |

- GEODIS to receive containers for Client at the Overflow Warehouse
- GEODIS' standard operating hours are 7:00 AM - 3:30 PM EST Monday - Friday
- GEODIS will provide unloading of containers, inbound putaway, storage, outbound pallet pick, and outbound loading to Breinigsville Bldg.
- Product: Personal care wipes + Diapers
- Product that can be safely double stacked will be double stacked
- Bulk storage: Floor storage
- Minimum square footage allocation: 20,000 square feet (19,000 square feet operational space; 1,000 square feet common space)
- Maximum square footage allocation: 40,000 square feet
- Temperature controlled space: Ambient
- Hazmat or OTC SKUs in scope: Alcohol Wipes (limited quantity)

| 4. Rates and Invoicing |
| --- |

In consideration for the Overflow Services, Client shall pay GEODIS the fees and charges ("**Rates**") set forth below.

The Rates were determined in reliance on the operational parameters set forth in Section 3 above, as well as other data, projections or information provided to GEODIS by or on behalf of Client. Any variances or changes to (i) the operational parameters or forecasts in Section 3, (ii) any other data, projections or information provided to GEODIS by or on behalf of Client, or (iii) the scope of Overflow Services from the Year One baseline values may result in additional costs or impact timelines and project plans.

**Open Book Pricing**. Client and GEODIS agree to an open book pricing structure, wherein Client agrees to pay the expenses (both fixed and variable) for the Overflow Services, plus an applicable mark-up, discussed herein. The fixed costs include rent, CAM, and insurance related to the Overflow Warehouse. The variable costs include, but are not limited to, direct hourly labor, indirect hourly labor, supplies, miscellaneous costs, salary labor, utilities, building repairs, maintenance, equipment, and systems cost. Fixed costs will be based on a square foot allocation percent calculated as follows: space used by Honest divided by total space in the building. For facility improvements, such as roof replacement and parking lot resurfacing, Honest will only be charged for the depreciation expense incurred during the time they occupy the space based on the square foot allocation. Hourly labor costs will be billed based on actual labor hours used supporting the Honest account. Salaried labor costs will be billed based on percent of time spent supporting the Honest account. The names and percent of salaried staff will be agreed upon between Geodis and Honest in advance and changes to the personnel or percent must be discussed before making the changes. Supply costs will be billed as used by Honest. Any supplies or expenses for external services that are based on square foot allocation must be itemized and agreed upon in advance. Additions or changes must be discussed in advance. Pursuant to the open book structure, a fee that consists of a "Management Margin" of [***] and "G&A Margin" of

[***], shall be applied to each of the actual fixed and variable charges throughout the Term (the "**Margin**").

The labor benefits expense (the "**Benefit Rate**") is: [Wages + PTO+ Holiday] x[***]%.

| Space | Space rate [***] per square foot, minimum [***] SF per month. |
|-------|-------------------------------------------------------------|
| Labor | Hourly variable rate + Benefit Rate + Margin |
| Equipment | Forklift, variable rate + Margin |
| Supplies | As needed at GEODIS' actual cost with a [***] markup |

[***]

---

**5. Separate Agreement**

---

Any termination, expiration, or breach of this Overflow Amendment shall have no bearing or effect on any other contractual relationships between the Parties.

IN WITNESS WHEREOF, the Parties hereto have caused this Overflow Amendment to be executed by their duly authorized representatives.

**THE HONEST COMPANY    GEODIS LOGISTICS LLC**

| | | | |
|---|---|---|---|
| By: | /s/ Glenn Klages | By: | /s/ Anthony Jordan |
| Printed Name: | Glenn Klages | Printed Name: | Anthony Jordan |
| Title: | EVP Supply Chain | Title: | Chief Operating Officer |

Page **3** of **3**

**Exhibit 31.1**

**CERTIFICATION**

I, Nikolaos Vlahos, certify that:

1.    I have reviewed this Quarterly Report on Form 10-Q of The Honest Company, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)    [Omitted];

    (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 13, 2021                                    By:      /s/ Nikolaos Vlahos

                                                                         Nikolaos Vlahos
                                                          Chief Executive Officer and Director
                                                              *(Principal Executive Officer)*

**Exhibit 31.2**

**CERTIFICATION**

I, Kelly J. Kennedy, certify that:

1.      I have reviewed this Quarterly Report on Form 10-Q of The Honest Company, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)      [Omitted];

(c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 13, 2021                          By:          /s/ Kelly J. Kennedy

Kelly J. Kennedy
Executive Vice President, Chief Financial Officer
*(Principal Financial Officer and Accounting Officer)*

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO**

**18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO**

**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report on Form 10-Q of The Honest Company, Inc. (the "Company") for the period ended June 30, 2021 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Nikolaos Vlahos, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that, to the best of my knowledge:

(1)     The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"); and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: August 13, 2021                         By:      /s/ Nikolaos Vlahos

                                                        Nikolaos Vlahos
                                              Chief Executive Officer and Director
                                                 *(Principal Executive Officer)*

This certification shall not be deemed "filed" for purposes of Section 18 of the Exchange Act or otherwise subject to the liability of Section 18 of the Exchange Act. Such certification shall not be deemed to be incorporated by reference into any filing under the Securities Act of 1933, as amended, or the Exchange Act, except to the extent that the Company specifically incorporates it by reference.

**Exhibit 32.2**

**CERTIFICATION PURSUANT TO**

**18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO**

**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report on Form 10-Q of The Honest Company, Inc. (the "Company") for the period ended June 30, 2021 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Kelly J. Kennedy, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that, to the best of my knowledge:

(1)   The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"); and

(2)   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: August 13, 2021                                        By:    /s/ Kelly J. Kennedy

                                                                    Kelly J. Kennedy
                                                    Executive Vice President, Chief Financial Officer
                                                    *(Principal Financial Officer and Accounting Officer)*

This certification shall not be deemed "filed" for purposes of Section 18 of the Exchange Act or otherwise subject to the liability of Section 18 of the Exchange Act. Such certification shall not be deemed to be incorporated by reference into any filing under the Securities Act of 1933, as amended, or the Exchange Act, except to the extent that the Company specifically incorporates it by reference.

**Exhibit F**

The Honest Company Inc. Shareholder List 5-7-21

| Common (Unrestricted) | Lock-up/'33Act | Lock-up/'33 Act/Affiliate | 33 Act | 33 Act/Lock-up 3/Affiliate | REG_ADDRESS_LINE_1 |
|---|---|---|---|---|---|
| - | 65,028 | - | - | - | |
| - | 1,080,088 | - | - | - | |
| - | 2,035,190 | - | - | - | |
| - | 171,314 | - | - | - | |
| - | 86,146 | - | - | - | |
| - | 7,607 | - | - | - | |
| - | 841,111 | - | - | - | |
| - | 56,976 | - | - | - | |
| - | 46,008 | - | - | - | |
| - | 9,804 | - | - | - | |
| - | 156,433 | - | - | - | |
| - | 85,750 | - | - | - | |
| - | 647,301 | - | - | - | |
| - | 29,437 | - | - | - | |
| - | 100,384 | - | - | - | |
| - | 575,034 | - | - | - | |
| - | 43,898 | - | - | - | |
| - | 9,125 | - | - | - | |
| - | 215,697 | - | - | - | |
| - | 206,383 | - | - | - | |
| - | 327,275 | - | - | - | |
| - | 6,872 | - | - | - | |
| - | 159,724 | - | - | - | |
| - | 12,000 | - | - | - | |
| - | 1,407,865 | - | - | - | |
| - | - | 12,169,803 | - | - | |
| - | 2,456,110 | - | - | - | |
| - | 35,022 | - | - | - | |
| - | - | - | 18,700 | - | |
| - | - | - | 13,000 | - | |
| - | - | - | 14,330 | - | |
| - | - | - | 10,690 | - | |
| - | - | - | 46,282 | - | |

| Common (Unrestricted) | Lock-up/'33Act | Lock-up/'33 Act/Affiliate | 33 Act | 33 Act/Lock-up 3/Affiliate | REG_ADDRESS_LINE_1 |
|---|---|---|---|---|---|
| - | - | - | 16,802 | - | |
| - | - | - | 21,600 | - | |
| - | - | - | 33,100 | - | |
| - | 100,722 | - | - | - | |
| - | 2,307,344 | - | - | - | |
| - | 388,828 | - | - | - | |
| - | 32,106 | - | - | - | |
| - | 42,334 | - | - | - | |
| - | 44,075 | - | - | - | |
| - | 106,127 | - | - | - | |
| - | 2,591 | - | - | - | |
| - | 424,470 | - | - | - | |
| - | 23,004 | - | - | - | |
| - | 11,502 | - | - | - | |
| - | 14,920 | - | - | - | |
| - | 22,322 | - | - | - | |
| - | 23,971 | - | - | - | |
| - | 62,652 | - | - | - | |
| - | 8,465 | - | - | - | |
| - | 67,820 | - | - | - | |
| - | 3,242 | - | - | - | |
| - | 13,488 | - | - | - | |
| - | 90,176 | - | - | - | |
| - | 1,750 | - | - | - | |
| - | 1,084 | - | - | - | |
| - | - | - | 834 | - | |
| - | 422,775 | - | - | - | |
| - | 500 | - | - | - | |
| - | 32,234 | - | - | - | |
| - | 18,000 | - | - | - | |
| - | 100 | - | - | - | |
| - | 75,624 | - | - | - | |
| - | 312 | - | - | - | |

| Common (Unrestricted) | Lock-up/'33Act | Lock-up/'33 Act/Affiliate | 33 Act | 33 Act/Lock-up 3/Affiliate | REG_ADDRESS_LINE_1 |
|---|---|---|---|---|---|
| - | 290 | - | - | - | |
| - | - | - | 2,500 | - | |
| - | 1,894 | - | - | - | |
| - | 5,000 | - | - | - | |
| - | 13,332 | - | - | - | |
| - | 2,300 | - | - | - | |
| - | 23,604 | - | - | - | |
| - | 564 | - | - | - | |
| - | 159,105 | - | - | - | |
| - | 11,502 | - | - | - | |
| - | 10,500 | - | - | - | |
| - | 3,750 | - | - | - | |
| - | 70,000 | - | - | - | |
| - | 13,334 | - | - | - | |
| - | - | - | 30,000 | - | |
| - | 29,050 | - | - | - | |
| - | 22,900 | - | - | - | |
| - | 26,944 | - | - | - | |
| - | 23,790 | - | - | - | |
| - | 85,414 | - | - | - | |
| - | 2,000 | - | - | - | |
| - | 2,800 | - | - | - | |
| - | 874 | - | - | - | |
| - | - | - | 18,420 | 41,600 | |
| - | 168 | - | - | - | |
| - | 394 | - | - | - | |
| - | 12,660 | - | - | - | |
| - | - | - | 5,000 | - | |
| - | 7,540 | - | - | - | |
| - | - | - | 1,000 | - | |
| - | 5,000 | - | - | - | |
| - | 3,332 | - | - | - | |
| - | 4,000 | - | - | - | |

| Common (Unrestricted) | Lock-up/'33Act | Lock-up/'33 Act/Affiliate | 33 Act | 33 Act/Lock-up 3/Affiliate | REG_ADDRESS_LINE_1 |
|---|---|---|---|---|---|
| - | 354 | - | - | - | ■ |
| - | 396 | - | - | - | ■ |
| - | - | - | 3,480 | - | ■ |
| - | 270 | - | - | - | ■ |
| - | 1,124 | - | - | - | ■ |
| - | 1,200 | - | - | - | SUNG ■ |
| - | 454 | - | - | - | ■ |
| - | 6,874 | - | - | - | ■ |
| - | - | - | 5,416 | - | ■ |
| - | 1,500 | - | - | - | ■ |
| - | 5,416 | - | - | - | ■ |
| - | - | - | 1,000 | - | ■ |
| - | 270 | - | - | - | ■ |
| - | 1,750 | - | - | - | ■ |
| - | 9,866 | - | - | - | ■ |
| - | 478 | - | - | - | ■ |
| - | 100,000 | - | - | - | ■ |
| - | 1,208 | - | - | - | ■ |
| - | 290 | - | - | - | ■ |
| - | 38,750 | - | - | - | ■ |
| - | 2,000 | - | - | - | ■ |
| - | - | - | 10,000 | - | ■ |
| - | 610,000 | - | - | - | ■ |
| - | 1,874 | - | - | - | ■ |
| - | 15,832 | - | - | - | ■ |
| - | 7,000 | - | - | - | ■ |
| - | 1,582 | - | - | - | ■ |
| - | 332 | - | - | - | ■ |
| - | 3,316 | - | - | - | ■ |
| - | 2,708 | - | - | - | ■ |
| - | 562 | - | - | - | ■ |
| - | 160,000 | - | - | - | ■ |
| - | 344,732 | - | - | - | ■ |

The Honest Company Inc - Shareholder List 5-7-21

| Common (Unrestricted) | Lock-up/'33Act | Lock-up/'33 Act/Affiliate | 33 Act | 33 Act/Lock-up 3/Affiliate | REG_ADDRESS_LINE_1 |
|---|---|---|---|---|---|
| - | 51,325 | - | - | - | ████ |
| - | 4,500 | - | - | - | ████ |
| - | 30,800 | - | - | - | ████ |
| - | 260,000 | - | - | - | ████ |
| - | - | - | 832 | - | ████ |
| - | - | 2,012,842 | - | - | ████ |
| - | - | 4,253,036 | - | - | ████ |
| - | 956 | - | - | - | ████ |
| - | 40,000 | - | - | - | ████ |
| - | 45,000 | - | - | - | ████ |
| - | 2,500 | - | - | - | ████ |
| - | 5,000 | - | - | - | ████ |
| - | 4,666 | - | - | - | ████ |
| - | - | - | 50,832 | - | ████ |
| - | 2,100 | - | - | - | ████ |
| - | 2,042 | - | - | - | ████ |
| - | 15,416 | - | - | - | ████ |
| - | 1,000 | - | - | - | ████ |
| - | 11,000 | - | - | - | ████ |
| - | 4,524 | - | - | - | ████ |
| - | 330 | - | - | - | ████ |
| - | 708 | - | - | - | ████ |
| - | 5,958 | - | - | - | ████ |
| - | 3,000 | - | - | - | ████ |
| - | 37,900 | - | - | - | ████ |
| - | 70,000 | - | - | - | ████ |
| - | 36,000 | - | - | - | ████ |
| - | 2,290 | - | - | - | ████ |
| - | - | - | 270 | - | ████ |
| - | 5,500 | - | - | - | ████ |
| - | 80 | - | - | - | ████ |
| - | 11,250 | - | - | - | ████ |
| - | 36,000 | - | - | - | ████ |

| Common (Unrestricted) | Lock-up/'33Act | Lock-up/'33 Act/Affiliate | 33 Act | 33 Act/Lock-up 3/Affiliate | REG_ADDRESS_LINE_1 |
|---|---|---|---|---|---|
| - | 1,292 | - | - | - | ███ |
| - | - | - | 500 | - | ███ |
| - | - | - | 3,062 | - | ███ |
| - | 17,708 | - | - | - | ███ |
| - | 5,000 | - | - | - | ███ |
| - | - | - | 520 | - | ███ |
| - | 20,000 | - | - | - | ███ |
| - | 354 | - | - | - | ███ |
| - | 1,728 | - | - | - | ███ |
| - | 20,000 | - | - | - | ███ |
| - | 9,166 | - | - | - | ███ |
| - | 5,000 | - | - | - | ███ |
| - | 868 | - | - | - | ███ |
| - | - | 88,278 | - | - | ███ |
| - | 250 | - | - | - | ███ |
| - | 5,572 | - | - | - | ███ |
| - | 24,500 | - | - | - | ███ |
| - | 250 | - | - | - | ███ |
| - | 974 | - | - | - | ███ |
| - | 5,540 | - | - | - | CATHERINE ███ |
| - | 1,666 | - | - | - | ███ |
| - | 6,000 | - | - | - | ███ |
| - | - | - | 1,562 | - | ███ |
| - | 10,000 | - | - | - | ███ |
| - | 2,000 | - | - | - | ███ |
| - | 5,000 | - | - | - | ███ |
| - | - | - | 8,000 | - | ███ |
| - | 34,374 | - | - | - | ███ |
| - | 812 | - | - | - | ███ |
| - | 290 | - | - | - | ███ |
| - | 540 | - | - | - | ███ |
| - | 270 | - | - | - | ███ |
| - | 1,094 | - | - | - | ███ |

The Honest Company Inc - Shareholder List 5-7-21

| Common (Unrestricted) | Lock-up/'33Act | Lock-up/'33 Act/Affiliate | 33 Act | 33 Act/Lock-up 3/Affiliate | REG_ADDRESS_LINE_1 |
|---|---|---|---|---|---|
| - | - | 10,396,904 | - | - | |
| - | - | 529,108 | - | - | |
| - | - | 8,272,192 | - | - | |
| - | - | - | 19,166 | - | |
| - | 14,476 | - | - | - | |
| - | 191,404 | - | - | - | |
| - | 2,031,782 | - | - | - | |
| - | 509,929 | - | - | - | |
| - | 16,000 | - | - | - | |
| - | 2,874 | - | - | - | |
| - | - | - | 5,000 | - | |
| - | 384,313 | - | - | - | |
| - | 624 | - | - | - | |
| - | 450 | - | - | - | |
| - | 250 | - | - | - | |
| - | - | - | 542 | - | |
| - | 332 | - | - | - | |
| - | 2 | - | - | - | |
| - | 342,440 | - | - | - | |
| - | 14,000 | - | - | - | |
| - | 25,000 | - | - | - | |
| - | 819,284 | - | - | - | |
| - | 30,058 | - | - | - | |
| - | 8,513 | - | - | - | |
| - | 111,526 | - | - | - | |
| - | 36,430 | - | - | - | |
| 29,678,050 | - | - | - | - | |

**Exhibit G**

| 33 Act Legend | THE SHARES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF.  NO SUCH TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. |
|---|---|
| Lock-up Legend | THE SHARES REPRESENTED BY THIS CERTIFICATE OR BOOK ENTRY POSITION ARE SUBJECT TO A LOCK-UP AGREEMENT THAT RESTRICTS THE TRANSFER OF THESE SHARES BEFORE NOVEMBER 1, 2021; PROVIDED THAT A CERTAIN NUMBER OF SHARES REPRESENTED BY THIS CERTIFICATE OR BOOK ENTRY POSITION MAY BE RELEASED FROM SUCH RESTRICTIONS PRIOR TO NOVEMBER 1, 2021, AS SET FORTH IN THE AGREEMENT.  COPIES OF SUCH AGREEMENT MAY BE OBTAINED UPON WRITTEN REQUEST OF THE SECRETARY OF THE COMPANY. |
| Affiliate Legend | THE SECURITIES REPRESENTED BY THIS CERTIFICATE OR BOOK ENTRY POSITION ARE HELD BY A PERSON WHO MAY BE DEEMED TO BE AN AFFILIATE OF THE COMPANY FOR PURPOSES OF RULE 144 PROMULGATED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY ONLY BE SOLD OR OTHERWISE TRANSFERRED IN COMPLIANCE WITH THE REQUIREMENTS OF RULE 144 OR PURSUANT TO A REGISTRATION STATEMENT UNDER SAID ACT OR AN EXEMPTION FROM SUCH REGISTRATION. |
| Lock-up Legend 2 | THE SHARES REPRESENTED BY THIS CERTIFICATE OR BOOK ENTRY POSITION ARE SUBJECT TO THE HONEST COMPANY, INC. AMENDED AND RESTATED 2011 STOCK INCENTIVE PLAN THAT RESTRICTS THE TRANSFER OF THESE SHARES BEFORE NOVEMBER 1, 2021. COPIES OF SUCH PLAN  MAY BE OBTAINED UPON WRITTEN REQUEST OF THE SECRETARY OF THE COMPANY. |
| Lock-up Legend 3 | THE SHARES REPRESENTED BY THIS CERTIFICATE OR BOOK ENTRY POSITION ARE SUBJECT TO RESTRICTIONS ON TRANSFER PURSUANT TO AN AGREEMENT EXECUTED BY THE HOLDER OF THE SHARES THAT RESTRICTS THE TRANSFER OF THESE SHARES BEFORE NOVEMBER 1, 2021.  COPIES OF SUCH AGREEMENT MAY BE OBTAINED UPON WRITTEN REQUEST OF THE SECRETARY OF THE COMPANY. |

# Exhibit H

**The Honest Company**
12130 Millennium Drive, Suite 500
Los Angeles CA 90094

T: 888.862.8818 | HONEST.COM

| Re: Stock Option Issuance or Repurchase | Today's Date: 8/16/2021 |
|---|---|
| To: Kerri Altig/Jenny Messer | From: Brendan Sheehey |
| Fax #: | Phone #: 424-603-2060 |

## I.  TRANSACTION TYPE: Check one box only.

☒ DWAC – Deposit (Delivery to Broker)          ☐ Certificate Issuance

☐ DWAC – Withdrawal (Delivery to Computershare)          ☐ Book Issuance

## II. CLIENT INFORMATION:

| Issuer: The Honest Company Inc | Control #: 002 |
|---|---|
| COY ID: HNST | # of Shares: 6740 |

| TREASURY OR RESERVE ACCOUNT # | TREASURY OR RESERVE NAME | # OF SHARES | DEBIT | CREDIT |
|---|---|---|---|---|
| █████ | SUNG █████ | 1200 | 1200 | |
| | CATHERINE █████ | 5540 | 5540 | |
| | | | | |
| | | | | |
| | | | | |

## III. DISTRIBUTION INSTRUCTIONS

### DWAC transaction information

| Broker Name: E*TRADE | Broker Phone: 800-838-0908 |
|---|---|
| DTC Participant #: ███ | # of Shares :  6740 |

### If issuance into shareholder name

| Shareholder Name/Shareholder Address: | Date of Issuance: |
|---|---|
| | |

**The Honest Company**
12130 Millennium Drive, Suite 500
Los Angeles CA 90094

T: 888.862.8818 | HONEST.COM

| | SSN/Tax ID: |
|---|---|
| | |

| Legends: | Mailing/Special Instructions: |
|---|---|
| | |

| Authorized Signature(s): | Brendan Sheehey | DATE: |
|---|---|---|
| Title:  General Counsel | | 08/16/2021 |

**Exhibit I**

The Honest Company, Inc.
12130 Millennium Drive, #500
Los Angeles, CA 90094

August 17, 2021

Computershare Inc.
Computershare Trust Company, N.A.
150 Royall Street
Canton, MA 02021

**Re:  Removal of IPO Lock-Up Legends**

Ladies and Gentlemen:

As you are aware, certain stock certificates or book-entry positions representing shares of common stock, par value $0.0001 per share, listed on **Exhibit A** hereto (collectively, the "**Shares**"), of The Honest Company, Inc., a Delaware corporation (the "**Company**"), currently include the legend set forth on **Exhibit B** hereto pertaining to a a lock-up agreement that restricts the transfer of these shares before November 1, 2021 (the "**IPO Lock-Up**"), provided that a certain number of shares may be released from such restrictions on August 17, 2021 (the "**Early Release**"), as set forth in the agreement (collectively, the "**IPO Lock-Up Legends**")**.** Certain of the Shares listed on Exhibit A hereto are eligible for the Early Release.  The Company will monitor that the Shares are in compliance with the IPO Lock-Up as applicable.

Accordingly, at any time on or after August 17, 2021, we instruct Computershare Trust Company, N.A., (i) with respect to the Shares that are represented by stock certificates or book-entry, to reissue such Shares in the names of the respective holders thereof, without the IPO Lock-Up Legends, upon presentation of any stock certificate representing such Shares duly endorsed for reissuance, and (ii) with respect to the Shares that are evidenced in book-entry position, to remove the IPO Lock-Up Legends. The Shares shall continue to bear all other applicable legends, if any, appearing on the cancelled certificates or book-entry positions, subject to further legend removal instructions from the Company or the Company's counsel.

255107073 v2

Sincerely,

*Brendan Sheehey*

Brendan Sheehey

General Counsel

255107073 v2

**Exhibit A**

| HOLDER ID | REGISTRATION NAME | SHARE AMT |
|---|---|---|
| ██████████ | SUNG████████ | 1,200 |
| ██████████ | CATHERINE████ | 5,540 |

255107073 v2

**Exhibit B**

THE SHARES REPRESENTED BY THIS CERTIFICATE OR BOOK ENTRY POSITION ARE SUBJECT TO A LOCK-UP AGREEMENT THAT RESTRICTS THE TRANSFER OF THESE SHARES BEFORE NOVEMBER 1, 2021; PROVIDED THAT A CERTAIN NUMBER OF SHARES REPRESENTED BY THIS CERTIFICATE OR BOOK ENTRY POSITION MAY BE RELEASED FROM SUCH RESTRICTIONS PRIOR TO NOVEMBER 1, 2021, AS SET FORTH IN THE AGREEMENT. COPIES OF SUCH AGREEMENT MAY BE OBTAINED UPON WRITTEN REQUEST OF THE SECRETARY OF THE COMPANY.

255107073 v2

**Exhibit J**

Records Updated 08/19/2021 - 12:17:56
Logged on as: ██████████


Page: 1 <Previous   Next>
Approval/Cancellation Form
Item #1
A/C Participant Participant Name Last Pend Date Type CUSIP Quantity Fee / Type
A████  E*TRADE 08/19/2021 DEPOSIT ████████  6740 125.00/S

Reference ID: ████████████████     Billing Fee:    'S' -Standard Fee, 'L' -Alternate Fee, 'N' -No Fee
Participant Contact Name: Karen Robinson Dept  Phone: (866) 488-5646 Ext:
Comment: 002
Custodian Contact Name:  Phone: - - Ext:
Cancel Comment:

**Exhibit K**

**THE HONEST COMPANY, INC.**

**STOCK OPTIONS EXERCISED**
**FROM 05/04/2021 TO 09/15/2021**

| Name | ID | Option Number | Exercise Date | Type | Plan | Shares | Value Basis |
|---|---|---|---|---|---|---|---|
| ███ | ██ | ████ | 08/26/2021 | Cash | 2011 | 332 | $9.7700 |
| ████ | ██ | ████ | 09/10/2021 | Same-Day Sale | 2011 | 1,125 | $10.3622 |
| ████ | ██ | ████ | 09/02/2021 | Cash | 2011 | 3,895 | $10.5900 |
| ████ | ██ | ████ | 09/02/2021 | Cash | 2011 | 1,083 | $10.5900 |
| ██ | ██ | ████ | 08/10/2021 | Cash | 2011 | 1,458 | $13.9100 |
| ████ | ██ | ████ | 09/02/2021 | Cash | 2011 | 600 | $10.5900 |
| ████ | ██ | ████ | 09/02/2021 | Cash | 2011 | 1,708 | $10.5900 |
| ████ | ██ | ████ | 08/26/2021 | Cash | 2011 | 1,708 | $9.7700 |
| ██ | ██ | ████ | 08/26/2021 | Cash | 2011 | 2,395 | $9.7700 |
| ████ | ██ | ████ | 08/09/2021 | Cash | 2011 | 1,041 | $13.7700 |
| ██ | ██ | ████ | 08/31/2021 | Cash | 2011 | 1,000 | $10.1800 |
| ██ | ██ | ████ | 08/05/2021 | Cash | 2011 | 1,083 | $13.4000 |
| ████ | █ | ████ | 07/19/2021 | Cash | 2011 | 7,500 | $14.1500 |
| ████ | █ | ████ | 07/19/2021 | Cash | 2011 | 20,000 | $14.1500 |
| ████ | █ | ████ | 07/19/2021 | Cash | 2011 | 10,000 | $14.1500 |
| ████ | █ | ████ | 07/19/2021 | Cash | 2011 | 1,510 | $14.1500 |
| ███ | █ | ████ | 09/08/2021 | Cash | 2011 | 1,675 | $10.3800 |
| ███ | █ | ████ | 08/26/2021 | Cash | 2011 | 4,575 | $9.7700 |
| ███ | █ | ███ | 09/14/2021 | Cash | 2011 | 135 | $10.5900 |
| ███ | █ | ███ | 09/08/2021 | Cash | 2011 | 1,850 | $10.3800 |
| ███ | ██ | ███ | 08/26/2021 | Cash | 2011 | 3,750 | $9.7700 |
| ███ | ██ | ███ | 05/20/2021 | Cash | 2011 | 708 | $5.6600 |
| ███ | ██ | ███ | 06/03/2021 | Cash | 2011 | 1,250 | $5.6600 |
| ██ | ██ | ███ | 06/07/2021 | Cash | 2011 | 290 | $5.6600 |
| ██ | ██ | ███ | 06/07/2021 | Cash | 2011 | 750 | $5.6600 |
| ██ | ██ | ███ | 06/07/2021 | Cash | 2011 | 874 | $5.6600 |
| ███ | █ | ███ | 05/14/2021 | Cash | 2011 | 5,000 | $5.6600 |
| ██ | █ | ███ | 05/27/2021 | Cash | 2011 | 500 | $5.6600 |

| Name | ID | Option Number | Exercise Date | Type | Plan | Shares | Value Basis |
|---|---|---|---|---|---|---|---|
| ███ | █ | ███ | 08/20/2021 | Same-Day Sale | 2011 | 7,500 | $9.5148 |
| ███ | ███ | ███ | 09/10/2021 | Same-Day Sale | 2011 | 1,125 | $10.3622 |
| ███ | ███ | ███ | 09/03/2021 | Same-Day Sale | 2011 | 416 | $10.3748 |
| ███ | ███ | ███ | 09/03/2021 | Same-Day Sale | 2011 | 230 | $10.3748 |
| ███ | ███ | ███ | 09/03/2021 | Same-Day Sale | 2011 | 42 | $10.3748 |
| ███ | ███ | ███ | 09/01/2021 | Same-Day Sale | 2011 | 450 | $10.6253 |
| ███ | ███ | ███ | 08/18/2021 | Same-Day Sale | 2011 | 1,050 | $9.4569 |
| ███ | ███ | ███ | 08/30/2021 | Same-Day Sale | 2011 | 3,600 | $9.9806 |
| ███ | ███ | ███ | 08/31/2021 | Same-Day Sale | 2011 | 150 | $10.1500 |
| ███ | █ | ███ | 08/17/2021 | Same-Day Sale | 2011 | 1,800 | $9.8284 |
| ███ | ███ | ███ | 09/13/2021 | Same-Day Sale | 2011 | 5,700 | $10.9906 |
| ███ | ███ | ███ | 08/18/2021 | Same-Day Sale | 2011 | 1,950 | $9.8400 |
| ███ | ███ | ███ | 09/13/2021 | Same-Day Sale | 2011 | 812 | $11.1300 |
| ███ | ███ | ███ | 09/13/2021 | Same-Day Sale | 2011 | 762 | $11.1300 |
| ███ | ███ | ███ | 09/13/2021 | Same-Day Sale | 2011 | 1,125 | $11.1300 |
| ███ | ███ | ███ | 09/13/2021 | Same-Day Sale | 2011 | 2,500 | $11.0064 |
| ███ | ███ | ███ | 08/31/2021 | Same-Day Sale | 2011 | 5,000 | $10.0900 |
| ███ | ███ | ███ | 09/13/2021 | Same-Day Sale | 2011 | 7,500 | $10.5832 |
| ███ | █ | ███ | 08/20/2021 | Same-Day Sale | 2011 | 6,000 | $9.4301 |
| ███ | █ | ███ | 08/27/2021 | Same-Day Sale | 2011 | 6,000 | $10.0800 |
| ███ | █ | ███ | 09/15/2021 | Same-Day Sale | 2011 | 6,000 | $10.5301 |
| ███ | ███ | ███ | 08/19/2021 | Same-Day Sale | 2011 | 300 | $9.2017 |
| ███ | ███ | ███ | 08/27/2021 | Same-Day Sale | 2011 | 354 | $10.1100 |
| ███ | ███ | ███ | 08/27/2021 | Same-Day Sale | 2011 | 396 | $10.1100 |
| ███ | ███ | ███ | 09/02/2021 | Cash | 2011 | 5,000 | $10.5900 |

TOTALS

|  | 143,557 |  |
|---|---|---|
| Hi | | $14.1500 |
| Avg | | $11.0660 |
| Lo | | $5.6600 |

| | | |
|---|---|---|
| **Page:** | **1** | |
| **File:** | **Exrcised** | |
| **Date:** | **03/01/2023** | |
| **Time:** | **01:59:45AM** | |

| Total Value | Price | Total Price | Tax Deduction |
|---|---|---|---|
| $3,243.64 | $5.2250 | $1,734.70 | $1,508.94 |
| $11,657.48 | $5.7500 | $6,468.75 | $5,188.73 |
| $41,248.05 | $5.2250 | $20,351 38 | $20,896.67 |
| $11,468.97 | $5.7500 | $6,227.25 | $5,241.72 |
| $20,280.78 | $5.2250 | $7,618.05 | $12,662.73 |
| $6,354.00 | $5.1250 | $3,075.00 | $3,279.00 |
| $18,087.72 | $5.1250 | $8,753.50 | $9,334.22 |
| $16,687.16 | $5.1250 | $8,753.50 | $7,933.66 |
| $23,399.15 | $5.9700 | $14,298.15 | $9,101.00 |
| $14,334.57 | $5.7500 | $5,985.75 | $8,348.82 |
| $10,180.00 | $5.2250 | $5,225.00 | $4,955.00 |
| $14,512.20 | $5.2250 | $5,658.68 | $8,853.52 |
| $106,125.00 | $5.1250 | $38,437.50 | $67,687.50 |
| $283,000.00 | $5.1250 | $102,500.00 | $180,500.00 |
| $141,500.00 | $3.5700 | $35,700.00 | $105,800.00 |
| $21,366.50 | $5.1250 | $7,738.75 | $13,627.75 |
| $17,386.50 | $5.2250 | $8,751.88 | $8,634.62 |
| $44,697.75 | $5.2250 | $23,904.38 | $20,793.37 |
| $1,429.65 | $5.7500 | $776.25 | $653.40 |
| $19,203.00 | $5.7500 | $10,637.50 | $8,565.50 |
| $36,637.50 | $5.1250 | $19,218.75 | $17,418.75 |
| $4,007.28 | $5.1250 | $3,628.50 | $378.78 |
| $7,075.00 | $5.2250 | $6,531.25 | $543.75 |
| $1,641.40 | $5.6600 | $1,641.40 | $0.00 |
| $4,245.00 | $5.2250 | $3,918.75 | $326.25 |
| $4,946.84 | $5.7500 | $5,025.50 | $0.00 |
| $28,300.00 | $5.7500 | $28,750.00 | $0.00 |
| $2,830.00 | $5.2250 | $2,612.50 | $217.50 |

| Total Value | Price | Total Price | Tax Deduction |
|---|---|---|---|
| $71,361.10 | $5.1250 | $38,437 50 | $32,923.60 |
| $11,657.48 | $5.2250 | $5,878.13 | $5,779.35 |
| $4,315.90 | $5.6600 | $2,354 56 | $1,961.34 |
| $2,386.19 | $5.2250 | $1,201.75 | $1,184.44 |
| $435.74 | $5.7500 | $241 50 | $194.24 |
| $4,781.39 | $5.6600 | $2,547 00 | $2,234.39 |
| $9,929.75 | $5.1250 | $5,381 25 | $4,548.50 |
| $35,930.22 | $5.1250 | $18,450 00 | $17,480.22 |
| $1,522.50 | $5.2250 | $783.75 | $738.75 |
| $17,691.12 | $5.1250 | $9,225 00 | $8,466.12 |
| $62,646.42 | $1.6950 | $9,661 50 | $52,984.92 |
| $19,188.00 | $5.1250 | $9,993.75 | $9,194.25 |
| $9,037.56 | $5.6600 | $4,595 92 | $4,441.64 |
| $8,481.06 | $5.2250 | $3,981.45 | $4,499.61 |
| $12,521.25 | $5.7500 | $6,468.75 | $6,052.50 |
| $27,515.92 | $5.1250 | $12,812 50 | $14,703.42 |
| $50,450.00 | $5.1250 | $25,625 00 | $24,825.00 |
| $79,374.00 | $5.9700 | $44,775 00 | $34,599.00 |
| $56,580.60 | $0.4250 | $2,550 00 | $54,030.60 |
| $60,480.00 | $0.4250 | $2,550 00 | $57,930.00 |
| $63,180.60 | $0.4250 | $2,550 00 | $60,630.60 |
| $2,760.51 | $5.1250 | $1,537 50 | $1,223.01 |
| $3,578.94 | $5.2250 | $1,849.65 | $1,729.29 |
| $4,003.56 | $5.7500 | $2,277 00 | $1,726.56 |
| $52,950.00 | $5.6600 | $28,300 00 | $24,650.00 |
| _____ | | _____ | _____ |
| $1,588,604.95 | | $637,951.08 | $951,182.53 |
| Hi | $5.9700 | | |
| Avg | $4.4439 | | |
| Lo | $0.4250 | | |