# EXHIBIT 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

IN RE THE HONEST COMPANY,    ) Case No.

INC. SECURITIES LITIGATION.  ) 2:21-cv-7405-MCS-PLA

                                                  )

                                                  )

                                                  )

_____  )

VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED DEPOSITION OF

KATHIE NG

Sunday, February 26, 2023

Remotely Testifying from San Francisco, California

Stenographically Reported By:

Hanna Kim, CLR, CSR No. 13083

Job No. 5780519

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

IN RE THE HONEST COMPANY,    ) Case No.

INC. SECURITIES LITIGATION.  ) 2:21-cv-7405-MCS-PLA

                                                 )

                                                 )

                                                 )

                                                 )

                                                 )

                                                 )

                                                 )

                                                 )

                                                 )

_____  )

Virtual videoconference video-recorded deposition of KATHIE NG, remotely testifying from San Francisco, California, upon the stipulations of counsel thereof, on Sunday, February 26, 2023, beginning at 9:42 a.m., PST, and concluding at 2:06 p.m., before Hanna Kim, CLR, Certified Shorthand Reporter, No. 13083.

Page 2

REMOTE APPEARANCES OF COUNSEL:


FOR LEAD PLAINTIFF KATHIE NG AND THE PUTATIVE CLASS:

LABATON SUCHAROW LLP

BY:  JOSEPH COTILLETTA, ESQ.

140 Broadway

New York, New York 10005

212.907.0700

jcotilletta@labaton.com


-and-


THE SCHALL LAW FIRM

BY:  RINA RESTAINO, ESQ.

2049 Century Park East, Suite 2406

Los Angeles, California 90067

310.301.3335

rina@schallfirm.com

Page 3

REMOTE APPEARANCES OF COUNSEL:


FOR DEFENDANTS THE HONEST COMPANY, INC., KATIE BAYNE, SCOTT DAHNKE, KELLY KENNEDY, ERIC LIAW, JEREMY LIEW, AVIK PRAMANIK, NIKOLAOS VLAHOS, AND JESSICA WARREN:

       COOLEY LLP

       BY:  BENJAMIN B. SWEENEY, ESQ.

       355 South Grand Avenue, Suite 900

       Los Angeles, California 90071

       213.561.3250

       bsweeney@cooley.com

Veritext Legal Solutions
866 299-5127

REMOTE APPEARANCES OF COUNSEL:


FOR DEFENDANTS MORGAN STANLEY & CO. LLC, J.P.

MORGAN SECURITIES LLC, JEFFERIES LLC, BOFA

SECURITIES, INC., CITIGROUP GLOBAL MARKETS, INC.,

WILLIAM BLAIR & COMPANY, L.L.C., GUGGENHEIM

SECURITIES, LLC, TELSEY ADVISORY GROUP LLC, C.L.

KING & ASSOCIATES, INC., LOOP CAPITAL MARKETS LLC,

PENSERRA SECURITIES LLC, AND SAMUEL A. RAMIREZ &

COMPANY, INC.:

             SHEARMAN & STERLING LLP

             BY:  ELIZABETH J. STEWART, ESQ.

             535 Mission Street, 25th Floor

             San Francisco, California 94105

             415.616.1100

             elizabeth.stewart@shearman.com



Also Present:

             JINAH CHOI, Concierge

             SOSEH KEVORKIAN, Video Operator

Page 5

INDEX OF EXAMINATION

WITNESS:  KATHIE NG

EXAMINATION                                              PAGE

          BY MR. SWEENEY:                                  10

Veritext Legal Solutions
866 299-5127

electronically.)

THE WITNESS:  I have it in front of me.

BY MR. SWEENEY:

Q.   Have you ever seen this document before?

A.   I have.                                              09:48:53

Q.   Do you understand what this document is?

A.   Yes.

Q.   What do you understand it to be?

A.   This is a motion to -- oh, I'm so sorry.

I was moving to -- move this as a class      09:49:22
action case.

Q.   Okay.  I'll represent to you, Ms. Ng, that
this is a document to take your deposition today.

A.   Okay.

Q.   When did you learn that you would need to   09:49:35
testify at a deposition in this -- in connection
with this litigation?

A.   I believe the beginning of this week.

Q.   And who told you?

A.   Rina.                                               09:49:47

Q.   Prior to this week, did you have any
understanding as to whether or not you would need to
testify at a deposition in this case?

A.   No.

Q.   So you didn't have any understanding one    09:50:02

Page 15

BY MR. SWEENEY:

Q.   Had you seen either of those documents prior to preparing for your deposition?

A.   Yes.

Q.   Do you recall when you first saw the    09:52:27 Consolidated and Amended Complaint?

A.   I don't remember the exact date, but it was, I would say, sometime I think towards the end of 2021.

Q.   Do you recall whether you reviewed that    09:52:41 Complaint before it was filed?

A.   I did.

Q.   Did you have any edits to that Complaint?

A.   I don't recall.

Q.   To your knowledge, are all the allegations    09:53:00 in the Complaint accurate?

A.   Yes.

MR. COTILLETTA:  Objection to form.

BY MR. SWEENEY:

Q.   And just really quickly, before we go on,    09:53:17 I think this is something I usually cover in the ground rules, but I may have neglected to today.

So at various points throughout the deposition, one or more of your attorneys may interpose an objection to a question that I've    09:53:30

Page 18

MR. COTILLETTA:  Objection.  Form.

BY MR. SWEENEY:

Q.    You can answer.

A.    Correct.

Q.    And I asked you earlier whether you'd    10:22:29
reviewed the consolidated and amended complaint
prior to filing, and I think you said that you
believed you had.

Is that right?

A.    Correct.    10:22:46

Q.    Did you take any steps personally to
investigate or otherwise verify the information in
the consolidated and amended complaint?

A.    I did not.

Q.    Do you have an understanding regarding the    10:23:04
nature of the allegations against the defendants in
this case?

A.    I do.

Q.    Can you please tell me what your
understanding is?    10:23:21

A.    My understanding is that The Honest
Company potentially violated the Securities Act.

Q.    And do you contend that the The Honest
Company violated the Securities Act in connection
with particular SEC filings or other documents?    10:23:42

Page 37

day.

MR. COTILLETTA:  We can also talk on break, too.  That might help me understand better kind of what you're look- -- looking for, and I'm not trying to try to block any of that.          10:33:41

MR. SWEENEY:  Yeah.  Okay.  Well, let's circle back to that.

BY MR. SWEENEY:

Q.   And sort of -- sort of picking up where we just left off, Ms. Ng, you understand that you've          10:33:49 applied to be class representative in this litigation; right?

A.   I do.

Q.   Why did you decide to apply for the class representative position?          10:34:02

A.   Well, based on the monetary loss that I suffered, I thought that I would be the best suited person.

And I'm super motivated to participate in the case from beginning to end, and I just want to          10:34:17 work alongside the attorneys and just oversee the whole general process.

Q.   Is there anything in particular that is motivating you to participate in this litigation?

A.   Well, I wanted to be involved every step          10:34:31

Page 45

of the way and be able to make a decision with the settlement.

Q.   Did you speak with anyone other than your attorneys regarding a decision to apply to serve as class rep?                                              10:34:50

A.   No.

Q.   Do you have any sort of understanding regarding what a class action is?

A.   Yes.

Q.   Can you tell me what your understanding    10:35:07 is?

A.   There's a group of us who suffered the same loss.

Q.   And do you have any understanding regarding the -- the -- excuse me.                  10:35:20

Do you have any understanding regarding the responsibilities of a class representative?

A.   Yes.

Q.   And what is your understanding?

A.   Well, I have to look out -- I have a        10:35:30 fiduciary responsibility to the class members, and I have to look out for the -- their best interest.

Q.   Anything else that you can think of?

A.   Just to work closely with the attorneys and just to oversee and supervise and monitor the    10:35:49

Page 46

Q.    They also told us you were unable to travel to Los Angeles because of your work schedule.

Is -- is that true?

A.    That's true.

Q.    If there were ever another reason why you    10:41:14 needed to -- to travel to Los Angeles, for instance to attend trial, would you be able to do that?

A.    If I had ample notice, I can try to make arrangement to do so.  But with this deposition, it was so such short notice, I wasn't able to.    10:41:47

Q.    Do you anticipate that your work schedule will interfere with your participation in this litigation going forward?

A.    No.

Q.    Are you taking any steps to ensure that it    10:42:07 does not interfere?

A.    Well, again, if I just have ample notice, I'll be able to participate no problem and be -- make myself available.

Q.    And just to confirm and make sure I'm    10:42:24 remembering correctly, you mentioned that the first time you learned that you might need to testify at a deposition in this case was earlier this week; is that right?

MR. COTILLETTA:  Ob- -- ob- -- objection    10:42:44

Page 50

to form.

THE WITNESS:  That's correct.

BY MR. SWEENEY:

Q.   Do you have any understanding regarding how much time you might need to devote to this litigation?                                          10:42:59

A.   I do have.

Q.   I'm sorry, can you please repeat --

A.   I said I do.

Q.   And what is your understanding?         10:43:12

A.   My understanding is time-wise I just need to make myself available in terms of, as you mentioned, if I had to attend for the trial, I understand I need to make myself avail- -- available for however long it takes.  And I'm prepared to do    10:43:32 that.

Q.   And do you think you can do that even given the demanding nature of your job?

A.   Yes, with ample notice.

THE COURT REPORTER:  Counsel, this is the    10:44:04 court reporter.  Whenever you get to a good breaking point, I'm going request a break, please.

MR. SWEENEY:  Yeah, just a -- a couple more -- I think, you know, just another two minutes and we can be at a good breaking point.         10:44:19

Page 51

regarding the attorney-client privilege.

So I'm going to do my best to ask similar questions while steering clear of privilege issues. And, again, I want to be very clear, I -- I'm not asking for you to give me the substance of any of   11:06:20 the communications between you and your attorneys.

Did you review the Motion for Appointment as Lead Plaintiff filed in the fall of last year? Or, excuse me, back up.  Excuse me.

Did you review, prior to filing, the   11:06:40 Motion for Appointment as Lead Plaintiff filed in fall of 2021?

A.   I did.

Q.   Did you review the Motion for Appointment as Class Representative and Certification of the   11:06:53 Class filed in February of this year?

A.   I did.

Q.   And did you review the Consolidated and Amended Complaint filed in February of 2022?

A.   I did.                                          11:07:14

Q.   Can you think of any other court filings in this case that you have reviewed?

A.   The Complaint.  There were several other documents that I did review and --

Q.   And were -- I'm sorry.                          11:07:34

Page 53

A.   No, that's fine.

Q.   And were those --

A.   There were some other documents I reviewed.

Q.   Were those other documents to your                    11:07:41 knowledge filed in connection with either the Lead Plaintiff motion or the class certification motion?

A.   I believe so.

Q.   Do you also recall responding to questions from Defendants called interrogatories in this case?   11:08:09

A.   I do.

Q.   Okay.  So I'm going to introduce another exhibit now.  I think this will be Exhibit 3.

         (Kathie Ng Deposition Exhibit 3 was marked

         electronically.)                                  11:08:22

         MR. SWEENEY:  You should all have it shortly.

         So for purposes of the record, I'm marking as Exhibit 3 "LEAD PLAINTIFF'S RESPONSES AND OBJECTIONS TO THE HONEST COMPANY, INCORPORATED'S    11:08:35 FIRST SET OF INTERROGATORIES TO LEAD PLAINTIFF AND PROPOSED CLASS REPRESENTATIVE KATHIE NG." [As read]

BY MR. SWEENEY:

Q.   Can you let me know when you that up, Ms. Ng?                                                     11:08:47

Page 54

Q.   Sure.

And who are the parties --

A.   The case -- I don't understand the case.

Diaz and Partners was our property manager for a property that we had in Idaho.          11:16:06

Q.   You and Mr. Dong?

A.   That's correct.

Q.   Was Diaz and Partners Property Management your property manager?

A.   They were a -- they -- they were the       11:16:35 initial property manager.

Q.   Is Diaz and Partners the property manager that you had understood the claim to be against?

A.   No.

Q.   Is that a different property manager?       11:16:55

A.   It is.  It was the one after Diaz and --

Q.   And do you recall --

A.   -- Partners.

Q.   Sorry.

Do you recall the name of that other       11:17:05 property manager?

A.   Offhand, I -- I don't.  It's been a while.

Q.   Did you ever pay the hundred and $16 referenced in this document to Diaz and Partners Property Management?          11:17:36

Page 59

A.    I don't recall.

Q.    Do you recall whether Mr. Dong did?

A.    I don't think he did.

Q.    Is there a reason this case was not included in your response to Interrogatory Number 11?                                                                11:18:03

A.    Quite honestly, I don't even recall this at all.

Q.    Do you presently have any liens against your assets that you're aware of?                                11:18:30

A.    No.

Q.    Do you recall having ever been named as a defendant in a lawsuit filed by Toorak Capital Partners?

A.    No, I do not.                                                                11:18:59

MR. SWEENEY:  I'm going to introduce another exhibit.  This will be Exhibit Number 5, I think.

(Kathie Ng Deposition Exhibit 5 was marked electronically.)                                                        11:19:33

BY MR. SWEENEY:

Q.    If you could let me know when you have this up, Ms. Ng.

A.    I have it up.

Q.    And if you could scroll down to the third    11:19:52

Page 60

A.   Mm-hmm.  I can see that.

Q.   Do you have an understanding of what an instrument number is?

A.   Yeah, I do.

Q.   What is an instrument number?                    11:21:50

A.   It's a recording number.

Q.   Is that a number that could be used to look up a deed?

A.   Yes.

Q.   But sitting here today, you don't recall     11:21:56 having been named as a defendant in this action?

A.   No.  I've never seen this document.

Q.   Have you ever heard of Toorak Capital Partners?

A.   Never.                                          11:22:41

Q.   Do you recall having ever been a -- a party to a court case against someone named Carissa Loretto?

A.   No.

Q.   All right.                                      11:23:09

     MR. SWEENEY:  I'm introducing another exhibit.  This will be Exhibit Number 6.

     (Kathie Ng Deposition Exhibit 6 was marked

     electronically.)

BY MR. SWEENEY:                                       11:23:42

Page 62

Q.   Can you let me know when you have it up, Ms. Ng.

A.   Okay.

Q.   I apologize if it's a little small, but I think there's a -- should be a zoom function in case   11:24:05 you need to blow it up a little bit to read the text.

THE COURT REPORTER:  Just so you know, it's at the bottom, if you hover.

THE WITNESS:  I see it.  Mm-hmm.  I see   11:24:21 it.  I have it enlarged.  I can see it now.

BY MR. SWEENEY:

Q.   I'll represent to you that this is a printout from the Stanislaus County Superior Court website in California.   11:24:37

A.   Okay.

Q.   Do you see the reference to a "KATHIE NG" listed next to "Plaintiff"?

A.   I do.

Q.   Sitting here, do you know, one way or   11:24:42 another, whether that is referring to you or a different Kathie Ng?

A.   It has to be a different Kathie Ng.

Q.   So you've never heard of someone named Carissa Loretto?   11:25:03

Page 63

Veritext Legal Solutions
866 299-5127

Q.   And if you could scroll to page number 5 of the document, Bates ending in '0017.  And just let me know when you're there.

A.   0- -- okay.  I'm sorry, repeat that again.

Q.   Sure.  Just the -- the -- the easiest way   12:00:18 is probably just the fifth page of the --

A.   Okay.  I'm there.

Q.   -- of the document.

A.   Okay.

Q.   And would you agree that this document   12:00:27 appears to reflect a number of purchases of Honest shares made by you between June 17 and June 18, 2021?

MR. COTILLETTA:  Objection to form.

THE WITNESS:  Yes.   12:00:51

BY MR. SWEENEY:

Q.   Are you sure that -- oh, I'm sorry.

Yes, you would agree that's what it appears to reflect?

A.   Yes.  Correct.   12:01:08

Q.   And if you scroll back one page to the fourth page of the document, you'll see -- about halfway up the page, do you see the line where it says "HONEST CO INC" [as read], and then the second cell in, it says 20,000"?   12:01:28

Page 84

they're claiming the product to be and what

customers are, you know, actually receiving it to

be.

Q.   Do you think it's unusual for a company of

Honest's size to be subject to customer complaints?   12:07:38

MR. COTILLETTA:  Objection to form.

THE WITNESS:  Rephrase that, please.

BY MR. SWEENEY:

Q.   Do you think it is unusual for a company

of Honest's size to be subject to one or more   12:07:59

customer complaints?

MR. COTILLETTA:  Objection to form.

THE WITNESS:  No, I don't.

BY MR. SWEENEY:

Q.   Do you have any understanding regarding   12:08:10

the quantity or number of customer complaints

received by The Honest Company?

MR. COTILLETTA:  Object to form.

THE WITNESS:  I don't know the actual

number, but on the Complaint there were snippets of   12:08:29

product reviews, and that -- there was quite a bit.

BY MR. SWEENEY:

Q.   Did you see any positive reviews included

in the Consolidated and Amended Complaint?

A.   I did not.   12:08:54

Page 88

A.    Well, specifically like the diapers.  That was supposed to be, you know, a diaper that had new technology, and -- and that wasn't the case.  So there was a lot of consumer dissatisfaction with that.                                                            01:01:15

And just the sales that they claimed to have just wasn't there, so...

Q.    Is it your understanding that Honest misrepresented its sales numbers?

A.    I believe so.                                           01:01:34

Q.    Do you have any understanding as to what -- as -- as to for what period -- well, strike the question.

Do you have any understanding as to the period for which Honest misrepresented its sale          01:01:54 numbers?

A.    The period I believe right before the IPO or around that time.

Q.    Is it your understanding that Honest reported sales numbers that were higher than what it     01:02:16 had, in fact, experienced?

A.    Well, I'm not too sure about that, but the claim of the sales for COVID-related products being really good, when it actually wasn't, was a factor.

Q.    And do you have any understanding as to       01:02:45

Page 111

A.   Yes.

Q.   Could you tell me which of the named defendants you can recall?

A.   The Honest Company, the -- the directors, the executives, and the underwriters.                    01:16:06

Q.   And do you have any understanding as to the names of any of the individual directors or executives named as defendants?

A.   Well, aside from Jessica Alba, not off the top of my head.                                          01:16:31

Q.   And do you recall any of the particular banks named as underwriter defendants?

A.   I believe it's Chase, but I'm going by memory.

Q.   Is it your contention in this litigation     01:16:55
that Honest misrepresented the effects of COVID-19 on its business?

A.   Yes.

Q.   How so?

A.   Well, they presented the products that        01:17:20
were COVID related to be selling -- there were high sales of those particular products.

      But come to find out, it turns out that the -- the -- those products, the sales were actually declining because, you know, we were    01:17:44

Page 120

getting the -- the COVID shots were available, things of that sort.  So people were less inclined to purchase the COVID-related products.

Q.   And do you contend that those alleged misrepresentation [verbatim] influenced your    01:18:11 decision to purchase Honest shares?

A.   Repeat that --

MR. COTILLETTA:  Object to form.

I'm sorry, can I get a read back of the question?    01:18:28

(Record read back by the reporter.)

MR. COTILLETTA:  Objection to form.

BY MR. SWEENEY:

Q.   You can answer the question, if you understand it.    01:18:52

A.   You know what, I'm sorry, something's buzzing on my end.  Can you repeat that one more time?

Q.   Sure.

So the question -- we were just discussing    01:19:07 your contention in this litigation regarding alleged misrepresentations connected to the effects of COVID on Honest business.

And my question was whether you contend that those alleged misrepresentations influenced    01:19:18

Page 121

A.   I think so.

Q.   And how do you think Honest misrepresented that?

A.   Well, they were touting the -- their Clean Conscious Diaper as being, you know, one -- one way,   01:23:16 when it wasn't.  It -- it was a faulty product and it just wasn't doing what it was supposed to do.

Q.   And on what do you base your understanding that it was a faulty product, not doing what it was supposed to do?   01:23:44

A.   Well, the fact that it caused rashes. There were leaks and blow-backs, so that was a problem among consumers.

Q.   When your kids were younger, do you recall ever dealing with diaper blow-outs?   01:24:15

A.   Not so much blow-outs, no.

Q.   Never?

A.   I'm sure there was on occasion.

Q.   Did you think the company had done something wrong that caused the blow-out?   01:24:35

A.   Do you mean Honest?

Q.   No.  I'm -- I'm sorry.

Go ahead.

A.   Well, which company are you referring to?

Q.   Sure.   01:24:48

Page 124

discussed, that you are alleging were made by The Honest Company?

MR. COTILLETTA:  Objection.  Form.

THE WITNESS:  No. No.

BY MR. SWEENEY:                                          01:29:45

Q.   And is it your contention that those misrepresentations that we just discussed influenced your decision to purchase Honest shares?

MR. COTILLETTA:  Objection to form.

THE WITNESS:  That, and the omission of      01:30:28 information.

BY MR. SWEENEY:

Q.   What information do you think should have been disclosed that was not?

A.   Oh, are you partic- -- pertaining to the      01:30:39 diapers or just information in general.

Q.   Sure.

Let's start with the diapers and then you can tell me anything else after.

A.   Okay.  Well, with the diapers, no.  But      01:30:50 with the destocking of the COVID products, yes.

Q.   So in your view, Honest should have disclosed additional information concerning the destocking of COVID products?

A.   Correct.  The actual -- yeah, sales and      01:31:08

Page 128

the inventory levels.

Q.   And you are not aware of any of the allegedly omitted or withheld information at the time you purchased the shares in June of 2021?

MR. COTILLETTA:  Objection to form.   01:31:40

THE WITNESS:  That's correct.

MR. COTILLETTA:  I'm sorry, can I get a readback on the question.  Sorry, Ben.

(Record read back by the reporter.)

MR. COTILLETTA:  Thank you.   01:32:10

BY MR. SWEENEY:

Q.   We talked earlier about Honest's registration statement and prospectus.  And I believe you testified that you might have reviewed them if they were linked to on Yahoo Finance; is   01:32:30 that right?

A.   That's correct.

Q.   But sitting here today, you can't recall, one way or another, whether you, in fact, reviewed those documents; correct?   01:32:44

A.   Correct.

Q.   How much time, in total, would you estimate that you've spent reviewing the consolidated and amended Complaint?

A.   I would say an hour or two.   01:33:13

Page 129