UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | | |
|---|---|---|
| CODY DIXON, | ) | CASE NO: 2:21-cv-07405-MCS-PLA |
| | ) | |
| Plaintiff, | ) | CIVIL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| THE HONEST COMPANY, INC, ET AL, | ) | Monday, April 17, 2023 |
| | ) | |
| | ) | (9:46 a.m. to 10:24 a.m.) |
| Defendants. | ) | |

HEARING RE:

MOTION TO CERTIFY CLASS [ECF.NO.113]

BEFORE THE HONORABLE MARK C. SCARSI,
UNITED STATES DISTRICT JUDGE

APPEARANCES:                SEE PAGE 2

Court Reporter:             Recorded; CourtSmart

Courtroom Deputy:           Stephen Montes Kerr

Transcribed by:             Exceptional Reporting Services, Inc.
                            P.O. Box 8365
                            Corpus Christi, TX 78468
                            361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

EXCEPTIONAL REPORTING SERVICES, INC

**APPEARANCES:**

For Plaintiff:              ALFRED L. FATALE, III, ESQ.
                           Labaton Sucharow
                           140 Broadway, 34th Floor
                           New York, NY 10005

                           BRIAN J. SCHALL, ESQ.
                           2049 Century Park East
                           Suite 2460
                           Los Angeles, CA 90067

For Defendants:            MICHAEL C. TU, ESQ.
                           Cooley
                           355 S. Grand Avenue
                           Suite 900
                           Los Angeles, CA 90071

                           DANIEL H.R. LAGUARDIA, ESQ.
                           Shearman & Sterling
                           535 Mission Street, 25th Floor
                           San Francisco, CA 94105

3

**Los Angeles, California; Monday, April 17, 2023; 9:46 a.m.**

--oOo--

THE CLERK:  Item number three, CV-21-7405, *In Re The Honest Company, Inc.* securities litigation.  Counsel, state your appearances, please.

MR. FATALE:  Your Honor, Alfred Fatale from Labaton Sucharow, lead counsel on behalf of Plaintiff.

THE COURT:  Good morning.

MR. SCHALL:  Brian Schall of the Schall Law Firm on behalf of -- local counsel, excuse me, on behalf of the Plaintiff.

THE COURT:  Good morning.

MR. TU:  Good morning.  Michael Tu on behalf of The Honest Company --

THE COURT:  Good morning.

MR. TU:  -- and The Honest Company defendants.

THE COURT:  Morning.

MR. LAGUARDIA:  Morning, Your Honor, Daniel Laguardia, Shearman and Sterling, on behalf of the underwriter defendants.

THE COURT:  Good morning.  To start off, Mr. Tu, do we know each other?  Are -- do you have -- you look familiar to me and so I just want to make sure if we do know each other, it's disclosed.  Do you live in La Canada?

MR. TU:  I do.  Your Honor, our children played on

4

the same baseball team.

THE COURT:  They did, okay.  What's your son's name?

MR. TU:  Christopher.

THE COURT:  Christopher, that's right, yeah.

MR. TU:  Right.

THE COURT:  Yeah.  Did I coach?

MR. TU:  I coached.

THE COURT:  You coached, okay.  And what's -- was it Andrew or John was on your team?

MR. TU:  It was your son who was the catcher.

THE COURT:  Oh, so that was Matthew.  So that was a while ago, yeah.

MR. TU:  It might have been Jeremy actually, my son Jeremy --

THE COURT:  Oh, yes, --

MR. TU:  -- now that I think about it.

THE COURT:  -- yeah, okay, so, yeah, so our kids --

MR. TU:  Who's now in college as I -- yeah.

THE COURT:  Okay, yeah.  That -- yeah, that -- yeah, so that makes sense.  Okay.  I thought I recognized you, just want to make sure.

I haven't spoken with Mr. Tu since baseball years so probably six or seven years ago maybe.

MR. TU:  At a -- yes, at a minimum.

THE COURT:  At a minimum.  Any problem with that?

5

MR. FATALE:  No issue, Your Honor.

THE COURT:  Okay.  Thanks.  Okay.  So we're here on the motion for class certification.  And, you know, there's just this issue of trying to figure out what the appropriate definition of the class is with the tracing issue.

And I'm trying to figure out, you know, what's the -- how we can define a class and make sure that we're getting the appropriate people and not the people subject to the lockup agreement.

Let me start with the Plaintiff.  You're saying the class definition specifically excludes members who are unable to trace their shares to the IPO.  How can we make that happen? I mean, without this cutoff date of August 19th, 2021, how is that possible?

MR. FATALE:  Sure, Your Honor.  In the claims process that will happen after trial or a judgment through settlement, shareholders will have to substantiate when they purchased their shares.  For a large member of the -- for a lot of the class it'll be I purchased my shares at a time when non-IPO shares were in.

Now, there are maybe a few cases where shares can be traced otherwise.  Let's say I had an account and I had a beneficiary on it and I died, title doesn't change to the shares but title of the account changes.  So they would be able to put in the supporting document for that to show, you know,

6

well the -- I acquired the shares later on but the shares were purchased during that period.

And this is a typical definition for a Section 11 case. I just went through the first couple pages of my table of contents in our opening brief. There's the *Uber* case from the Northern District of California. That doesn't have a time period. There was the *China Intelligent Lighting* case in this district that had another case without, you know, class definition, without this timeframe.

This is the typical Section 11 definition that I've always put forward in every court. And this is the first time I've had this issue. Lockups are not foreign. That's always the issue. But courts have found that the language that we use addresses that, including courts in this district in the Nath Quest (phonetic) case came out the same way that we're advocating, that having the language traceable shares in the definition addresses defendant's concern.

And if there was a concern, if issues did arise with traceability, I don't think it's inappropriate to be raised now at class certification or on this record. Classes are always modified. And really it is a question that would come up in the claims process and not really go to manageability of the case.

And the Ninth Circuit doesn't say that ascertainability, to the extent this goes into that, is

appropriate, is an element that courts in this district or this circuit should look at a class certification.

THE COURT:  So, I mean, but aren't we just kicking the can down the road, though?  I mean, it would seem like if we're got a bunch of mini proceedings during the claims process, we -- it -- isn't that unworkable from like a commonality standpoint?

MR. FATALE:  It's very theoretical, Your Honor.  I haven't run acrossed (sic) it.  I specialize in this area. This is the definition I always put in.  Courts recognize it. It's very theoretical to me so it's difficult to contemplate what this big adversarial quagmire is going to be in the claims process.

And when there are disputes in the claims process, usually if it resolved through a settlement, that's resolved through the claims process and not involve the work or time of the Court.

THE COURT:  Okay.  Let me hear from the Defendants on this point.

MR. TU:  Thank you, Your Honor.  I'll go to the podium, --

THE COURT:  Great, thanks.

MR. TU:  -- if that's all right.  Okay.  Think that last counsel was a bit taller than me so --

THE COURT:  Yeah.

8

**MR. TU:**  All right.  Your Honor, I would say that one thing that my esteemed colleague, the Plaintiffs' counsel, has not done is actually give you a reason why we should not call the question now.

And, in fact, waiting I think is the wrong way to go here.  I was going to use the phrase kicking the can down the road that Your Honor just used.  And that's essentially what Plaintiffs' counsel is advocating for.

And I think the reasons not to do that are several.  First of all, it's important I think to recognize that there's no actual dispute here that by August 19th, 2021 nonregistered shares have become comingled with registered shares.  They haven't objected to that in their reply so they've waived any argument against that.

And because there's no dispute in terms of a factual matter, I think the Court can actually take judicial notice.  You know, frankly, we haven't made that motion but the Court could certainly even take judicial notice that the funds are now held in electronic -- held electronically in fungible bulk, as has been described in many of the various cases that explain how the process works with the depository trust company and brokers like E*TRADE and the great majority of how shares are bought and sold out in the aftermarket.  So, first of all, there's no dispute on this.

Second of all, if they -- if you actually look at the

**EXCEPTIONAL REPORTING SERVICES, INC**

definition that's been proposed in the Plaintiffs' motion for class certification, it is not seeking only shares that are directly traceable to the IPO offering documents. They actually use the words pursuant to or traceable to the IPO offering. And I think, you know, that amount of ambiguity right there should be a red flag for the Court.

Pursuant to could mean anything. I mean, that's such a broad term. Someone on August 20th, 2019 who goes on their Schwab website and decides to buy shares of Honest stock reads the IPO prospectus, arguably has now purchased pursuant to the IPO offering documents, but clearly has done so after, you know, the group of shares out in the aftermarket have been comingled. So in that case that would technically be within the class certification definition that's being sought.

We cited a number of cases I think where courts have elected not to kick the can down the road. Century Aluminum, the Ninth Circuit case that is cited here, is very I think relevant and instructive here, you know.

And in that case there was both an initial offering and a secondary public offering. And the issue there was whether a Section 11 claim could be brought with -- that could be traceable to the secondary offering shares because the initial offering had already been out there.

And the court affirmed, the district court, and said, no, that can't happen. And when it did, it said experience and

10

common sense tell us that when a company is offered shares under more than one registration statement, aftermarket purchasers usually will not be able to trace their shares back to a particular offering.

I think this is particularly important here.  And one thing to keep -- that the Court should bear in mind is that this is not your typical securities fraud case.  This is not brought under Rule 10(b)(5), Section 10(b).

Those types of cases typically require, as Your Honor's well aware from the motion to dismiss briefing we've had in this case, those cases typically require a much higher showing at the pleading stage.

Congress specifically allowed a very relaxed pleading standard for Section 11 Securities Act types of cases.  And as the *Century Aluminum* panel held in 2013, though difficult to meet in some circumstances, this tracing requirement is the condition Congress has imposed for granting access to the relaxed liability requirements Section 11 affords.

I think there are other reasons as well why it doesn't make sense to kick the can down the road, the most obvious of which is just case management going forward, discovery, potential damages in this case, who might be potential class members.

The courts -- these issues will likely come up.  The case is now being litigated in discovery, and the courts are

11

going back -- I'm sorry, the parties are going back and forth meeting and conferring on discovery issues.  There are likely going to be negotiations over who should be deposed and for how long and the scope of document production, all of those things.

I think having the Court make very clear what the actual permitted class definition should be here would just be immensely helpful to the efficient coordination and running of this case, not only for the parties but for the Court.

And, you know, the last thing I would just say is just to reemphasize here that it is the Plaintiffs' affirmative burden in a Section 11 class action to show that they have met all of these requirements, not only tracing but also the Rule 23, you know, requirements that include standing.

And, you know, it's -- I do understand that class actions -- class certification motions often get certified, and in many cases it makes sense.  In many cases I have actually stipulated, you know, to certification where it was very clear that there was a proposed class that made sense, was supportable under the law, and was not in dispute.

I don't think this is one of those cases.  And I think it's -- in my view it's a very straightforward issue that we've raised.  There's not really a lot of black and white here.  Either the shares are traceable or they're not.

And I believe if your court -- I believe if Your Honor applies *Century Aluminum*, applies the many other -- the

12

holdings and -- of the many other cases we've cited, including the Fifth Circuit decision in *Krim versus pcOrder*, which I believe is the only Federal appellate court that's spoken on this and which dealt with early release, lockup shares just like this, the conclusion here should be pretty clear.

THE COURT:  Have you looked at this snap -- *In Re Snap* security litigation case?  It's a district court case from this district where essentially the court, you know, decided to -- decided that statistical tracing was okay.  Have you had an opportunity to look at that case yet?

MR. TU:  I was not involved in that particular case. But I can tell you that statistical tracing is an argument that is made quite often in opposition to these types of cases or these types of oppositions.  It was not made in this particular case.

But with respect to statistical -- the so-called stratistical (sic) argument for tracing, you know, that essentially is arguing that, well, you should not really apply the actual language, right, of the tracing requirement; instead, you should allow us to go by because there is a very high likelihood that we purchased shares.

And I think what I would direct the Court to, what I think would be very helpful, is if you look at the *Krim versus pcOrder* decision from the Fifth Circuit, --

THE COURT:  Right, the --

13

**MR. TU:**  Yeah.  There's a very good, you know, --

**THE COURT:**  The Wyoming --

**MR. TU:**  -- explanation there.

**THE COURT:**  Yeah.

**MR. TU:**  Exactly.  It cannot be the answer.  If Congress had wanted to say you have a very high probability of having shares traceable back to the offering, it could have said that.  It didn't do that.

And, you know, in the *Krim*, *pcOrder* case, there was a good quote here that in which Judge Higginbotham of the Fifth Circuit held that -- that I think is relevant on this point, Congress conferred standing on those who actually purchased the tainted stock, not on the whole class of those who possibly purchased tainted shares or, to put it another way, are at risk of having purchased tainted shares.

Unlike the standing conferred by Congress in The Clean Water Act, appellants here cannot meet the statutory standing requirement of Section 11 merely by showing that they jumped into a potentially polluted pool of stock.

**THE COURT:**  So if we require this kind of strict tracing, and statistical tracing isn't allowed, couldn't the company kind of jury-rig the system by comingling a handful of lockup shares prior to the -- at the same time as the IPO?  I mean, couldn't you inoculate yourself against a Section 11 lawsuit by doing that?

14

**MR. TU:** Well, I guess I would have two thoughts on that. First of all, that's not what happened here, okay, so that -- I mean, I understand Your Honor is throwing out a hypothetical here.

**THE COURT:** Right.

**MR. TU:** But just to be clear, that's not what happened here. The IPO happened in May, and it wasn't until August that this happened.

And just as a practical matter, the way these public offerings work is that the underwriters who are handling the public offerings almost always require that these lockup periods exist. So you always routinely have the -- it -- these types of issues.

The other thing I would say is that as we mentioned this in our brief, and Your Honor may be aware, there's actually currently a case before the U.S. Supreme Court. I believe it's actually being argued today, if I'm correct.

Pirani versus Slack (sic), which actually maybe is a little more relevant to your hypothetical because in that case it dealt with a direct listing, which is different of course than the kind of public offering we had here. But in that case the -- it was a direct listing which included both registered and nonregistered shares being sold at the same time.

So as Judge Breyer in the decision we -- the Sundharm (phonetic) decision we cited, noted, while that case isn't

really relevant to our, you know, case here, I would say that I think that's precisely the kind of hypothetical issue that the Supreme Court has now taken up and presumably will be, you know, issuing a decision that, you know, rules on that at some point.

But as Judge Breyer noted in that Sundharm case, that particular situation is different than the situation we have here, which is where you've got -- you've very clearly got a period where you have registered securities and then you had a period of mixed registered and nonregistered securities.

**THE COURT:** Okay, thanks. Let me go back to Plaintiffs' counsel.

So let's start with this August 19th, 2021 cutoff date. What would be -- what's the downside of including that cutoff date? Because it's pretty clear, right, that that's the -- that after that date there was comingling.

**MR. FATALE:** Again, Your Honor, I thought of at least one hypothetical, since we're dealing in hypotheticals here, where title to the shares could change without --

**THE COURT:** Right.

**MR. FATALE:** -- actual trading having occurred.

I'd like to also address that by pointing to the point that my colleague raised about waiver. This is -- traceability is a merits issue. We're talking about the legal issue of a class definition.

16

Defendants have produced 14 documents in this case to date. We got these trading information in connection with their opposition last month.

We haven't deposed these traders on why they decided to sell their lockup shares right after the first disclosure of bad news happened for this company. We'll be taking those depositions. There's a lot of merits issues here that still need to be addressed on that.

And, again, class definitions are modifiable when issues present themselves. But I don't think that an issue has actually presented itself.

I wanted to talk also, if Your Honor will permit me, about the term pursuant.

**THE COURT:** Yes. That was going to be my next question.

**MR. FATALE:** Oh, good. Your Honor, I am not -- I didn't craft this language myself. I'm not that intelligent. This is the language that is used in all these cases.

And what pursuant means, if you went through the caselaw, is the people who bought on the day of the -- like in the IPO on the day of the IPO, and then also those people that could trace who purchased in the aftermarket the day after.

On standing, which was another point that's been raised and is really the issue in *Century Aluminum*, they're talking about lead plaintiff standing. In that *Krim* case, the

case is saying that they're not even addressing the denial class certification.  They're talking about plaintiff's standing.

There is no challenge in this case to my client's standing who purchased their -- her shares prior to these August dates.

When you look at the case law that has actually addressed this issue at class certification, the rulings are in our favor.

THE COURT:  But the class members all have to have standing.  But you're saying that that'll get worked out in the end.

MR. FATALE:  Correct, Your Honor.

THE COURT:  Class members that have standing will be able to benefit from the outcome of this case.  Class members that don't won't --

MR. FATALE:  Correct.

THE COURT:  -- essentially.  And the issue -- and at this point I guess what your argument at this point, I only need to be concerned about standing for the lead plaintiff.

MR. FATALE:  Correct.  And that's Defendants' cases.

And if Your Honor would permit me, I made one other note on my colleague's presentation, that was the impact this has on discovery.

Cutting off the class period at an August 18th, prior

18

to when we brought the suit, doesn't impact discovery because -- particularly on damages because the model is price at the time of the offering versus value at the date suit was brought. So that's the time period that you're going to have to do discovery on damages issues at least.

And because it's value and not price on the day, it could extend -- it extends past the date of suit.

So at least on the damages issues that was raised, discovery and expert work on that doesn't -- isn't impacted by having this date in or not.

**THE COURT:** Right. But wouldn't it be helpful for the parties to limit discovery if we sort of limited this group of people that we be looking at? I mean, the list of potential holders of this IPO stock would seem that -- it would seem like we could do the parties a favor by limiting the definition to limit the number of people we'd be looking at information for.

**MR. FATALE:** Well, class member discovery is rarely granted and disfavored. I don't know the exact ruling in this district on that. But I know it's universally disfavored and in some places unpermitted.

And the discovery in this case to date is -- that has been served is all defendant-facing because the case is about what they said in the registration statement and nothing about class members because there's no reliance in a Section 11 case. Damages are a formula. There is no independent damages

19

analysis.  It's not out-of-pocket, it's not reliance, it's not total loss or something like that.

It's just a simple formula of, you bought it at this price and the suit was brought on this date, or you sold on this date.  And that's why there's no predominance issues in a Section 11 case.

THE COURT:  Okay.  Let me go back to the Defendant.  Question about this issue that counsel brings up with is somebody who transfers the IPO shares out after the date but it's -- you know, it's they get it from a family member or they, you know, receive it as a -- in some way where they're -- they have standing, they're an appropriate plaintiff but they, you know, acquire after the August 19th date.  Why should they be excluded from the class?

MR. TU:  Well, okay.  So, first of all, if someone has purchased shares prior to August 19th, then from a class perspective you can say that okay they must have purchased shares that were registered under the IPO because those were the only shares that they could have purchased, right, that were out in the aftermarket.

Once those shares enter that comingled kind of fungible bulk, unless you've got an actual paper certificate, which no one has anymore, simply -- if you transfer -- if someone who purchased in that share -- I'm sorry, someone who purchased in -- before August 19th then attempts to transfer

that to someone else, whether it's a family member or otherwise, there's -- it -- there's no distinction there in terms of not being comingled at that time.

Because remember what you have here is just hypothetically let's say there's 10,000 shares that are out there -- there's way more than that obviously. But say you've got 10,000 shares and Mary Smith owns 50 of those shares, okay and purchased them on August 18th, all right. On August 22nd she decides she wants to transfer those shares to her sister, okay, Jane Smith. She would then go on E*TRADE and actually transfer those shares.

Well, when she does that, that actually becomes part of the comingled fungible bulk. So, I mean, you know, that's just the reality I think of how these shares are held and how they're electronically -- there's no differentiation that's made. And it's frankly just not possible to hold that, you know, chain of title.

And remember the person who would be handling, who would be receiving those shares on August 22nd is not receiving those, right, you know, pursuant to -- in this hypothetical pursuant to the IPO offering. They're getting it because of a gift from a family member, so on and so forth. So, you know, I suppose that's a slightly different issue. But, you know, that would be my response to that.

THE COURT: Okay.

21

**MR. TU:** And but do you mind if I just very quickly address some of the other points --

**THE COURT:** Sure.

**MR. TU:** -- he made? Just -- there were just three points that I'll just very quickly address.

So on the discovery, you know, issue, I think the very example that my esteemed colleague here has given of, well, we haven't even deposed these people who, you know, as to why they sold their shares, you know, in an early lockup, that's exactly what -- you know, that's exactly what would be not relevant in this case. This is not a Section 10(b) case.

Their knowledge, their scienter here has nothing to do with this. This is a Section 11 case where it's being alleged that there was a material misstatement or omission made in the IPO registration statement and prospectus.

You know, when some -- when an insider, for whatever reason, sold their shares in a lockup, their reason for doing that is entirely irrelevant to any claim in this case. Now, it might not be if this were a securities fraud case, right, under 10(b). But it's not. And so that's just one example.

You know, another example I can easily think of is that in these securities class actions, experts are always going to be a big part of this. They're helpful for the parties, for the courts, not only in settlement discussions but, you know, for summary judgment and for trial.

22

And, you know, I think for experts, and in particular expert discovery and the scope of expert opinions, which can be very expensive when you start adding on the experts, you know, to do this and to do that, not having the certainty of having a very bright, clear line class definition that excludes anyone who purchased the -- at a time when it was impossible for them to be able to trace back I think would be very counterproductive to having efficient discovery in that manner.

**THE COURT:** I --

**MR. TU:** Go -- yes, go ahead.

**THE COURT:** I think I'm -- I think I've got enough on the traceability point.

**MR. TU:** Okay.

**THE COURT:** But let me ask, I just want to briefly touch on this issue with the lead plaintiff.

And so, you know, the bar's pretty low for how much the lead plaintiff needs to know about the case and how involved the lead plaintiff has to be in the case. You know, what's -- you know, and I've seen these attacks on lead plaintiff before. What's so horrible here that rises to the level with respect to lead plaintiff's lack of knowledge or involvement considering the bar is so low?

**MR. TU:** So I agree with Your Honor that, you know, I recognize here that there is a very high level of discretion that's typically employed by courts in determining whether a

proposed class representative is suitable for this case.  We do not commonly object to proposed class representatives.

In this particular situation we did include, as you are aware, a section at the end of our opposition brief.  It wasn't the focus of our brief, which was the tracing argument.

But given the inconsistencies, I have had cases with other judges where this was very important to them.  When you do appoint a proposed class representative, they are undertaking obviously a very serious and important role.  It's a fiduciary role.

And I think one of the things that in my experience courts are often times very keenly keyed in on is whether there was actual supervision engagement that is happening here, and it's not completely a lawyer-driven case.  And I don't mean this with any disrespect to this particular counsel.  But just as a general matter, right, that's the way that my experience has been.

So with some courts it's more important; with others, it hasn't.

We've laid out in our briefing where we thought, you know, this was not a particularly engaged plaintiff.  She would only make herself available to be deposed via Zoom on a Sunday, you know, despite knowing from the time she applied as a lead plaintiff that she would need -- and, you know, the schedule in this case being what it is for some time, that's just -- you

24

know, if she can't even make herself available during the week to come to the district to be deposed for what is one of the very few things that she would actually probably need to have in-person engagement on, you know, I think the Court can draw its own concludes as to perhaps how much attention, you know, she might be giving to the day-to-day of the case.

There were also inconsistencies clearly in her deposition testimony, with her interrogatories. You know, with some judges that's important, with some judges it's less important. We've just put it out there so that you're aware of it. And, --

THE COURT: Thank you.

MR. TU: -- you know, but I would say, you know, for -- just to be clear, I think the real focus of our opposition has been on the tracing argument. We think that's the important real part that we would ask you to focus on.

THE COURT: Thank you. Okay. Let me give the Plaintiff the last word here on -- so, you know, you gave me an example of how shares you thought might be -- might have standing but would be I guess transferred after the August 19th date.

Counsel's argument is that those shares wouldn't -- shouldn't rightfully be part of the class. What's your response to that?

MR. FATALE: That will -- their re-articulation was

25

not my hypothetical.  My hypothetical was if title of an account changed, my grandmother died two years ago and I received a custodial IRA, nothing in the account changed.  The title to the account changed.

THE COURT:  Got you.

MR. FATALE:  I would just like one moment to respond to the adequacy points in --

THE COURT:  Sure.

MR. FATALE:  -- defense of my client.

THE COURT:  Sure.

MR. FATALE:  Look, the question is, did they have a -- did she have a general understanding of the litigation.  She knew this case was against Honest.  She knew some of the individual defendants.  She knew that underwriting banks were involved.  She knew this case was brought pursuant to the Securities Act.

She knew that the issue was with nondisclosure of the efficacy of the new reformulated diapers.  She knew this case involved destocking of cleaning products post-COVID.  She met the bar and then some in this case.

As to the deposition point, the original 26(f) agreement in this case called for discovery to be commenced prior to us even filing our motion.  I sent them a letter in November of 2022 saying this is who our class rep is going to be to facilitate that.

26

It wasn't until they received our actual brief that they served a notice of deposition.  So when she signs a declaration, she says, I might be deposed.  Then we negotiated.  If you look at Exhibit 1, we do come to an agreement on when that deposition will be.  We only have this three-week period to figure it out.

She's going to make herself available on a Sunday so we don't have to change the schedule so they could have enough time to put in their opposition.  I think it shows great dedication to this case for a woman, for a person who lost a hundred thousand dollars.  She is very motivated to see this case forward.

And so a deposition, when there's an inartful question, when did you know you would need to be deposed in this case, the answer is correct, this week, because the agreement on the date was reached that Tuesday.  Before that, it was always might.

As to the lawsuits that were raised, look, one was her.  It was a hundred and sixty-three dollar matter in small claims court from two years -- from 20 years prior involving a property manager that she did not recall when she answered her interrogatories.  And once her memory was refreshed to that, we updated the interrogatories.  And she testified truthfully to it at the deposition when her memory was refreshed.

One of the other cases they point to, if you look at

the address, if you look at the age of the party with the same name, it's not her.  It's several decades older than her.

And the other case, she was named in a lawsuit in connection with her job.  But she was never served with it, she was never told about it.  To this day, the only reason she knows about that litigation is through the deposition.  And, again, she updated her interrogatories saying this was brought to my attention and I know about it now.

There's no hiding things that are in the public domain anyway.

**THE COURT:**  Thank you.

**MR. TU:**  Thank you.

**THE COURT:**  Thank you on that.  And just want to get an answer to the question that counsel brings up that, you know, here's an example of 401(k) account, it's got the shares in it, title of the account gets transferred.  How does the class -- how does the -- if we limit the class to August 19, 2021, aren't we excluding people that have standing in this case.

**MR. TU:**  I suppose that if the definition in this case were all purchasers, you know, who acquired stock directly traceable, right, you know, prior to August 19th, that if all that happened was just sort of an administrative name change on it, that, you know, I mean, I'm sort of willing for purposes of this argument to say that that -- I don't think that that

28

necessarily would be comingled, right, if the actual account stays exactly the same but it's like an IRA transferring to another name or something like that.  I think that was --

THE COURT:  Okay, thanks.

MR. TU:  -- the question.

THE COURT:  Any response to that?

MR. FATALE:  No, Your Honor.

THE COURT:  Okay.  Thank you very much for the argument.  Appreciate it.  I really -- it's helpful in this case is to have such good counsel on both sides.

And, you know, feel free to help me along if you think I'm, you know, going astray on my questions as we get into further motions and things.  I definitely appreciate argument of good counsel.  Thank you.

MR. FATALE:  Well thank you, Your Honor.

MR. TU:  Thank you.

THE CLERK:  All rise.  This Court's in recess.

(This proceeding was adjourned at 10:23 a.m.)

EXCEPTIONAL REPORTING SERVICES, INC

29

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____          April 21, 2023

         Signed                               Dated


*TONI HUDSON, TRANSCRIBER*