**LABATON SUCHAROW LLP**
Jonathan Gardner*
David J. Schwartz*
Alfred L. Fatale III*
Joseph N. Cotilletta*
Charles Wood*
Robert S. Rowley*
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: jgardner@labaton.com
dschwartz@labaton.com
afatale@labaton.com
jcotilletta@labaton.com
cwood@labaton.com
rrowley@labaton.com

*admitted *pro hac vice*

*Lead Counsel for Lead Plaintiff
Kathie Ng and the Class*

**THE SCHALL LAW FIRM**
Brian Schall
Rina Restaino
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (310) 301-3335
Facsimile: (213) 519-5876
Email: brian@schallfirm.com
rina@schallfirm.com

*Liaison Counsel for Lead Plaintiff
Kathie Ng and the Class*

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE THE HONEST COMPANY, INC. SECURITIES LITIGATION | 2:21-CV-07405-MCS-PLA |
| | ECF CASE |
| | **AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| | **DEMAND FOR JURY TRIAL** |
| | Courtroom: 7C<br>Judge: Hon. Mark C. Scarsi |

**TABLE OF CONTENTS**

**Page**

I. NATURE OF THE ACTION..................................................................... 1

II. JURISDICTION AND VENUE............................................................... 3

III. PARTIES .............................................................................................. 4

    A. Lead Plaintiff ............................................................................. 4

    B. Defendants................................................................................. 4

        1. The Corporate Defendant.................................................. 4

        2. The Individual Defendants................................................ 4

        3. The Underwriter Defendants............................................. 6

        4. The Catterton Defendants .................................................10

IV. SUBSTANTIVE ALLEGATIONS ........................................................13

    A. Honest's Business and Omnichannel Approach ...................................13

    B. Honest's Clean Conscious Diaper ........................................................15

    C. Honest's "Growth" .................................................................................31

    D. Honest's IPO .........................................................................................33

    E. The Offering Documents Contained Materially False and Misleading Statements of Fact and Omitted Material Information ........34

        1. The Offering Documents Contained Misstatements and Omissions About Honest's Product Innovation and its Clean Conscious Diaper..........................................................35

        2. The Offering Documents Contained Misstatements and Omissions About Honest's COVID-19 Inventory Stock Up........38

        3. The Offering Documents Failed to Disclose and Misrepresented Significant Risks That Made the Offering More Speculative and Risky ................................................40

i

F.      Post-IPO Events Demonstrate that the Offering Documents Were Materially False and Misleading at the Time of the Offering ................51

V.   CLASS ALLEGATIONS ................................................................53

VI.  CAUSES OF ACTION ..................................................................55

     COUNT I FOR VIOLATION OF SECTION 11 OF THE SECURITIES ACT..............................................................................................55

     COUNT II FOR VIOLATION OF SECTION 15 OF THE SECURITIES ACT..............................................................................................58

VII.  PRAYER FOR RELIEF................................................................59

VIII. JURY TRIAL DEMANDED ........................................................60

Lead Plaintiff Kathie Ng ("Lead Plaintiff"), individually and on behalf of a class of similarly situated persons and entities, alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief is based upon, among other things, the investigation undertaken by Court-appointed Lead Counsel, Labaton Sucharow LLP, which included a review and analysis of: (i) regulatory filings made by The Honest Company, Inc. ("The Honest Company," "Honest," or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (ii) Company press releases, transcripts of earnings calls, and other public statements issued and disseminated by the Company; (iii) Company website and marketing materials; (iv) price and volume data for Honest common stock; (v) research reports from securities and financial analysts; (vi) news and media reports concerning the Company and other facts related to this action; (vii) interviews with former Honest employees; (viii) other publicly available materials and data; and (ix) and documents produced by Defendants in this Action (as defined herein). Lead Counsel's investigation into the factual matters alleged herein continues and many of the relevant facts are known only by the Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.  NATURE OF THE ACTION

1.  The claims asserted herein are strict liability claims for violations of Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") relating to the Honest Company's initial public offering (the "IPO" or "Offering"), commenced on or about May 4, 2021, of 29,678,050 shares of common stock at a price of $16.00 per share. This federal securities class action is brought on behalf of a Class (defined herein) of all persons or entities who purchased or otherwise acquired Honest common stock pursuant and/or traceable to the Offering Documents (as defined herein) issued in connection with the IPO, and who were damaged thereby.

2. Congress passed the Securities Act in the hopes of restoring investor confidence after corporate scandals and the stock market crash of 1929. The Securities Act requires that those who sell securities to the investing public do so on the basis of accurate and fulsome disclosure. The Securities Act creates liability for false, misleading, and incomplete statements made in connection with public securities offerings in order to protect investors and maintain confidence in our public markets.

3. In one of her first communications to investors, Honest Founder Jessica Alba shared an important sentiment: "[Trust] is hard to earn and it's easy to lose." Honest's customers and investors would agree.

4. Defendant Honest develops, markets and sells clean and sustainable household and personal care products. The Company describes itself as focused on "leading the clean lifestyle movement" and "creating a community for conscious consumers." Of Honest's three business segments—Diapers and Wipes, Skin and Personal Care, and Household and Wellness—its Diapers and Wipes category accounts for the majority of Honest's revenue.

5. At the time of Honest's May 2021 IPO, as further alleged below, Honest was experiencing a deceleration in sales—following both the January 2021 introduction of a newly formulated Clean Conscious Diaper, which customers have claimed is subject to leaks, blowouts, and causing rashes, and a decline in demand following an undisclosed year-long COVID-19 consumer stock-up.

6. Despite these then-existing facts, the Offering Documents told investors that Honest's diapers were an important "strategic customer acquisition tool" to introduce consumers to the brand and increase the likelihood that they will purchase products from Honest's remaining segments. The Offering Documents also emphasized Honest's Clean Conscious Diaper as a key example of the Company's product innovation and continuous improvement in existing products' safety, sustainability, efficacy, and design and touted Honest's omnichannel strategy as central

2

to its growth by having Honest products available wherever customers want to shop—whether in-store at major retailers, online, or at Honest.com.

7.    On the other hand though, the Offering Documents failed to disclose that customers did not view its new Clean Conscious Diaper as either safe or effective—as evidenced by a flood of online consumer reviews on Honest's major retailer sites and social media platforms describing chemical irritation and rashes, leaking and blowouts amongst users. As early as February 2021, many customers promised to stop buying Honest diapers and cancel their subscriptions because of the new and problematic Clean Conscious Diaper formula.

8.    The Offering Documents also incorrectly touted the boon the COVID-19 pandemic had been for the Company while describing the potential negative impact of COVID-19 in generalized terms and as unascertainable. In reality, retailers were destocking COVID-19 products and demand for these products were decreasing as consumers had stocked up on these products during 2020. Although Honest was tracking inventory daily and monitoring trends monthly such that the deceleration in sales would be readily apparent at the time of the IPO, it was not until months later that Defendant Vlahos acknowledged that the Company experienced a COVID-19 stock-up over the past year—at least *nine months* before the IPO.

9.    As a result of these undisclosed, adverse facts, Honest's stock plummeted, falling from its offering price of $16.00 per share to close at $10.55 on September 15, 2021, the day this action was filed.

## II.    JURISDICTION AND VENUE

10.    The claims asserted herein arise under and pursuant to Section 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o.

11.    This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331.

12.    Venue is properly laid in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. § 1391(b), (c), and (d). Many of the acts and transactions

3

that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

13. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of national securities exchanges.

## III. PARTIES

### A. Lead Plaintiff

14. As set forth in the Certification filed in this Action on November 15, 2021 (ECF Nos. 22-3 to -4), Lead Plaintiff Kathie Ng purchased Honest's common stock pursuant and/or traceable to the Offering Documents. Lead Plaintiff purchased Honest's common stock at a time when only shares offered in the IPO were in the market. Lead Plaintiff suffered damages as a result of the violations of the federal securities laws alleged herein. On January 26, 2022, the Court appointed Kathie Ng as Lead Plaintiff in this Action (ECF No. 47).

### B. Defendants

#### 1. The Corporate Defendant

15. Defendant Honest is a Delaware corporation headquartered at 12130 Millennium Drive, #500, Los Angeles, California. Honest claims to be a digitally-native,[1] mission-driven brand focused on leading the clean lifestyle movement, creating a community for conscious consumers and seeking to disrupt multiple consumer product categories. The Company's stock is listed under the ticker symbol "HNST" on Nasdaq Global Market ("NASDAQ").

#### 2. The Individual Defendants

16. Defendant Nikolaos Vlahos ("Vlahos") served at all relevant times as Chief Executive Officer ("CEO") and as a member of Honest's Board of Directors.

---

[1] Honest refers to itself as "digitally-native," meaning that it launched the Company as a digital platform.

Defendant Vlahos reviewed, contributed to, and signed the Company's Registration Statement filed with the SEC.

17.     Defendant Kelly Kennedy ("Kennedy") served at all relevant times as Executive Vice President and Chief Financial Officer ("CFO"). Defendant Kennedy reviewed, contributed to, and signed the Company's Registration Statement filed with the SEC.

18.     Defendant Jessica Warren ("Warren" or "Alba")[2] served at all relevant times as the Chief Creative Officer and a member of Honest's Board of Directors. Defendant Warren served as the Chair of Honest's Board of Directors from May 2018 to May 2021. Defendant Warren reviewed, contributed to, and signed the Company's Registration Statement filed with the SEC.

19.     Defendant Katie Bayne ("Bayne") served at all relevant times as a member of Honest's Board of Directors. Defendant Bayne reviewed, contributed to, and signed the Company's Registration Statement filed with the SEC.

20.     Defendant Scott Dahnke ("Dahnke") served at all relevant times as a member of Honest's Board of Directors. Defendant Dahnke reviewed, contributed to, and signed the Company's Registration Statement filed with the SEC.

21.     Defendant Eric Liaw ("E. Liaw") served at all relevant times as a member of Honest's Board of Directors. Defendant E. Liaw reviewed, contributed to, and signed the Company's Registration Statement filed with the SEC.

22.     Defendant Jeremy Liew ("J. Liew") served at all relevant times as a member of Honest's Board of Directors. Defendant J. Liew reviewed, contributed to, and signed the Company's Registration Statement filed with the SEC.

23.     Defendant Avik Pramanik ("Pramanik") served at all relevant times as a member of Honest's Board of Directors. Defendant Pramanik reviewed, contributed to, and signed the Company's Registration Statement filed with the SEC.

---

[2] The Offering Documents refer to founder, Chief Creative Officer, and former Chair of Honest's board of directors Jessica Warren as Jessica Alba throughout the Prospectus (as defined herein).

5

24. Defendants Vlahos, Kennedy, Warren, Bayne, Dahnke, E. Liaw, J. Liew, and Pramanik are collectively referred to hereinafter as the "Individual Defendants."

25. Each of the Individual Defendants participated in the preparation of and signed the Registration Statement and in the making of the materially inaccurate, misleading, and incomplete statements alleged herein. The Individual Defendants reviewed, edited and approved the Offering Documents, participated in the IPO, and solicited the purchase of Honest's common stock in the IPO.

### 3.    The Underwriter Defendants

26. Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") was an underwriter for the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant Morgan Stanley acted as a representative of all of the underwriters. In the IPO, Defendant Morgan Stanley was allocated 9,627,997 shares of the Company's common stock, exclusive of the over-allotment option, to sell to the investing public.

27. Defendant J.P. Morgan Securities LLC ("J.P. Morgan") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant J.P. Morgan acted as a representative of all of the underwriters. In the IPO, Defendant J.P. Morgan was allocated 7,166,405 shares of the Company's common stock, exclusive of the over-allotment option, to sell to the investing public.

28. Defendant Jefferies LLC ("Jefferies") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant Jeffries acted as a representative of all of the underwriters. In the IPO, Defendant Jefferies was allocated 3,771,792 shares of the Company's common stock, exclusive of the over-allotment option, to sell to the investing public.

6

29. Defendant BofA Securities, Inc. ("BofA") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. In the IPO, Defendant BofA was allocated 1,191,092 shares of the Company's common stock, exclusive of the over-allotment option, to sell to the investing public.

30. Defendant Citigroup Global Markets, Inc. ("Citigroup") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. In the IPO, Defendant Citigroup was allocated 1,191,092 shares of the Company's common stock, exclusive of the over-allotment option, to sell to the investing public.

31. Defendant William Blair & Company, L.L.C. ("William Blair") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. In the IPO, Defendant William Blair was allocated 952,874 shares of the Company's common stock, exclusive of the over-allotment option, to sell to the investing public.

32. Defendant Guggenheim Securities, LLC ("Guggenheim") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. In the IPO, Defendant Guggenheim was allocated 774,210 shares of the Company's common stock, exclusive of the over-allotment option, to sell to the investing public.

33. Defendant Telsey Advisory Group LLC ("Telsey") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. In the IPO, Defendant Telsey was allocated 416,882 shares of the

7

Company's common stock, exclusive of the over-allotment option, to sell to the investing public.

34. Defendant C.L. King & Associates, Inc. ("C.L. King") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. In the IPO, Defendant C.L. King was allocated 178,664 shares of the Company's common stock, exclusive of the over-allotment option, to sell to the investing public.

35. Defendant Loop Capital Markets LLC ("Loop") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. In the IPO, Defendant Loop was allocated 178,664 shares of the Company's common stock, exclusive of the over-allotment option, to sell to the investing public.

36. Defendant Penserra Securities LLC ("Penserra") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. In the IPO, Defendant Penserra was allocated 178,664 shares of the Company's common stock, exclusive of the over-allotment option, to sell to the investing public.

37. Defendant Samuel A. Ramirez & Company, Inc. ("Samuel A. Ramirez") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. In the IPO, Defendant Samuel A. Ramirez was allocated 178,664 shares of the Company's common stock, exclusive of the over-allotment option, to sell to the investing public.

38. Defendants Morgan Stanley, J.P. Morgan, Jefferies, BofA, Citigroup, William Blair, Guggenheim, Telsey, C.L. King, Loop, Penserra, and Samuel A. Ramirez are collectively referred to hereinafter as the "Underwriter Defendants."

39. The Underwriter Defendants are investment banking houses which specialize, among other things, in underwriting public offerings of securities. The Underwriter Defendants' participation in and their solicitation of purchases of Honest's common stock in the IPO was motivated by their financial interests. Collectively, the Underwriter Defendants received over $30 million in fees and commissions in connection with their sale of Honest common stock in the IPO.

40. The Underwriter Defendants determined that in return for their share of the IPO's proceeds, they were willing to merchandise Honest's common stock in the IPO. The Underwriter Defendants arranged for the roadshow prior to the IPO during which they, and the Individual Defendants, met with investors and presented highly favorable information about the Company, its operations, and its financial prospects.

41. The Underwriter Defendants also demanded and obtained an agreement from Honest that Honest would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that Honest had purchased millions of dollars of directors' and officers' liability insurance.

42. The Underwriter Defendants assisted Honest and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Honest, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Honest's operations and financial prospects.

43. In addition to availing themselves of virtually unbridled access to internal corporate documents, the Underwriter Defendants had access to the Company's

9

lawyers, management, and directors and top executives (including the Individual Defendants) to determine: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which the Company's common stock would be sold; (iii) the language to be used in the Offering Documents; (iv) what disclosures about the Company would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents. As a result of those constant contacts and communications between the Underwriter Defendants and the Company's lawyers, management, directors, and top executives (including the Individual Defendants), at a minimum, the Underwriter Defendants were negligent in not knowing of the materially untrue statements and omissions contained in the Offering Documents as detailed herein.

44. The Underwriter Defendants caused the Offering Documents to be filed with the SEC and to be declared effective in connection with offers and sales of the Company's common stock pursuant and/or traceable to the IPO and the Offering Documents, including to Lead Plaintiff and other members of the Class.

**4.    The Catterton Defendants**

45. Defendant Catterton Management Company, L.L.C. ("Catterton"), by and through the other named Catterton Defendants, beneficially owned 31,187,748 Honest shares on an as converted basis prior to the Offering, representing 37.1% of total shares. In the Offering, Catterton sold 19,017,945 shares to the investing public. At all relevant times, Defendant Dahnke was the co-CEO of Catterton and Defendant Pramanik was a Partner at Catterton.

46. Defendant L Catterton VIII, L.P. ("Catterton VIII") and Defendant L Catterton VIII Offshore, L.P. ("Catterton VIII Offshore") are the two Catterton funds that invested in Honest through Defendant THC Shared Abacus, LP ("Shared Abacus"). Defendant Catterton Managing Partner VIII, L.L.C. ("Catterton Managing Partner VII") was at all relevant times the general partner of Defendants Catterton VIII and Catterton VIII Offshore. Defendant C8 Management, L.L.C. ("C8 Management")

10

was at all relevant times the general partner of Defendant Shared Abacus and the managing partner of Defendant Catterton Managing Partner VIII. Defendant Dahnke was at all relevant times a managing member of Defendant C8 Management.



47.     Defendants Catterton, C8 Management, Catterton Managing Partner VIII, Catterton VIII, Catterton VIII Offshore, Shared Abacus, Dahnke, and Pramanik, are collectively referred to hereinafter as the "Catterton Defendants."

48.     The Offering was primarily for the benefit of the Catterton Defendants, and as such, the Catterton Defendants orchestrated the IPO and insisted that the other members of Honest's board of directors agree to the Offering.

49.     The Catterton Defendants exercised substantial dominion over the Offering. For instance, the Catterton Defendants directly participated in the preparation of the Offering Documents, including the prospectus summary, business summaries, management's discussion and analysis, applicable risk factors, F-pages, and the audit of the Company's financials.

11

50. Relatedly, the Catterton Defendants played a substantial role in the review of Honest's financials which were included in the Offering Documents and/or factored into the Company's forecasts. This included Public Company Accounting Oversight Board (PCAOB) audits for 2019 and 2020, 2018 historical financials, the three-year analyst model, both quarterly and annual, Honest's guidance strategy, and the Company's tax structure and related net operating loss (NOL).

51. The Catterton Defendants significantly participated in the purported due diligence process, including the review of the Company's business and financials, as well as issues pertaining to legal, intellectual property, regulatory and cybersecurity risks, vendors, auditors, and analysts.

52. As to the marketing strategy for the Offering, the Catterton Defendants again directly participated. For example, the Catterton Defendants were involved in testing-the-waters, roadshow presentations and videos, public filings, determining and messaging the Offering size and structure, investor targeting, Honest's valuation, and the directed share program and insider participation.

53. Finally, the Catterton Defendants directly managed Honest's business and other affairs leading up to the IPO. This included a CFO search and evaluating hiring needs, selecting bookrunners and co-managers for the Offering, quarterly dry-runs of disclosing and validating metrics and guidance, corporate governance matters and board composition, compensation plans, internal and external communications, FINRA approvals, exchange listing and listing approval, share class structure, and selecting a transfer agent.

54. In addition to the above, the Catterton Defendants selected Morgan Stanley as the lead underwriter for the Offering. Afterwards, Morgan Stanley provided the Catterton Defendants with briefings, sometimes daily. The Catterton Defendants also participated in IPO meetings with Morgan Stanley without any non-Catterton Honest personnel present. Finally, the Catterton Defendants were responsible for Morgan Stanley's incentive fee upon closing of the Offering.

55.    Honest employees routinely reported to and took direction from the Catterton Defendants, including with respect to the Company's financials and business strategy in addition to IPO-related matters.

56.    At bottom, each of the Catterton Defendants participated in the preparation of the Registration Statement and in the making of the materially inaccurate, misleading, and incomplete statements alleged herein. The Catterton Defendants reviewed, edited, approved, and controlled the Offering Documents, participated in the IPO, and solicited the purchase of Honest's common stock in the IPO.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.    Honest's Business and Omnichannel Approach

57.    Honest describes itself as a digitally-native, mission-driven brand focused on leading the "clean lifestyle movement," creating a community for conscious consumers and seeking to disrupt multiple consumer product categories. According to Honest, since its launch in 2012, Honest has been dedicated to developing clean, sustainable, effective and thoughtfully designed products with transparency. Honest's products contain primarily "better-for-you" products, including clean and natural categories of diapers, personal care, and household wellness products. According to the Company, Honest had developed its products with transparency and as a result had "cultivated deep trust around what matters most to [its] consumers: their health, their families and their homes."

58.    Honest's three main categories are: (i) Diapers and Wipes; (ii) Skin and Personal Care—which includes shampoo, conditioner, body wash, lotions and the Company's Clean Beauty category; and (iii) Household and Wellness, which includes cleaning supplies, sanitizers and disinfectants, feminine care products, and vitamins. These categories represented 63%, 26% and 11% of the Company's 2020 revenue, respectively.

13

59. Its largest segment, Diapers and Wipes, is described in the Offering Documents as the center of Honest's product ecosystem, serving as an entry point for new parents to become customers for everyday family needs. According to Honest, its multi-category product architecture is designed to drive loyalty, increase its consumer wallet share and generate attractive consumer lifetime value.

60. According to the Company, Honest's diapers serve as a strategic customer acquisition tool, as new parents then often purchase wipes and other Honest products from the Company's Skin and Personal Care and Household and Wellness categories. In 2020, the Company commissioned a third-party study that showed nearly 90% of its diaper buyers expanded their purchases beyond diapers and nearly half of diaper buyers have purchased two or more of Honest's non-diaper products.

61. Honest describes itself as an omnichannel brand, meaning its products are available regardless of where customers shop, whether through Honest's own ecommerce site, another online retailer, or in the traditional retail space. In other words, as stated in the Offering Documents, Honest's "omnichannel approach seeks to meet consumers however they want to shop." According to its Offering Documents, Honest's "differentiated platform positions [it] for continued growth through [its] trusted brand, award-winning multi-category product offering, deep digital-first connection with consumers and omnichannel accessibility."

62. Honest's products are sold on its flagship digital platform and in retail channels that include Costco, Target, and Amazon. In 2020, Honest generated 55% of its revenue from its Digital channel and 45% of its revenue from its Retail channels. Honest's products can be found in approximately 32,000 retail locations across the United States, Canada, and Europe.

63. According to the Company "[t]his distinctive business model has allowed us to efficiently scale our business while *remaining agnostic as to the channel where consumers purchase our products*."

14

64. Nevertheless, Honest told investors that there is "a fundamental channel shift [] underway across the Diapers and Wipes, Skin and Personal Care and Household and Wellness markets." According to Honest, these products had historically been sold through traditional, wholesale, store-based channels, which accounted for approximately 80% of U.S. retail sales in these markets in 2019. According to Honest, however, from 2014 to 2019, total ecommerce sales grew at seven times the rate of brick and mortar store-based sales. To this point, Honest touted to investors that it expected these trends would not only continue but would accelerate globally.

**B.     Honest's Clean Conscious Diaper**

65. According to Honest, diapers are at the "center of [Honest's] product ecosystem," serving as a strategic customer acquisition tool that acts as an entry point for Honest's product portfolio and leads to the purchase products from other categories. Put differently, the diapers category serves as an integral entry point for Honest which materially impacts customer purchasing and retention of the Company's other products. As explained in the Prospectus, Honest commissioned a third-party study in 2020 that found nearly 90% of Honest's surveyed diaper buyers expanded their purchases. Nearly half of diaper buyers surveyed purchased two or more of Honest's non-diaper products.

66. To the point of purported customer synergies, Honest's self-proclaimed mantra is "costovation," which, as defined, refers to Honest's touted goal of continuously improving the safety, sustainability, efficacy, and design profile of its existing suite of products.

67. Relevant here, a key example of Honest's "costovation" strategy was the introduction of the Clean Conscious Diapers line of products in January 2021. According to Honest, these diapers are made with plant-based materials, packaged in 100% recyclable boxes, and premised on new technology which improves absorption while at the same time reducing the material used for each diaper.

68.     The Clean Conscious Diapers design includes a quilted bubble liner, toxicologist-verified wetness indicator, and a quick absorb channel to better help control leaks and keep the baby dry. The Clean Conscious Diapers also offer customized enhancements for each age, including a belly button cutout for additional comfort (Newborns), double poo pockets to prevent blowouts (Sizes 1–2), and stretch comfort for more active babies (Sizes 3–6).

69.     In reality, however, shortly after its introduction—and months prior to the IPO—Honest's Clean Conscious Diaper caused leaks, blowouts and rashes on its child users.

70.     CW-1 started working for Honest in early 2020 and was a Manager of Social Marketing for all of Honest's products from the start of 2021 through her departure a month after the IPO.[3]

71.     CW-1 stated that in January 2021, Honest changed their diaper technology.[4] According to CW-1, customers were very unhappy about the change because, although the newer diapers were more eco-conscious, they did not work as well as the previous versions. CW-1 added that once the new diapers "crashed and burned," she got a sense that things were not great at the Company. Many consumers shared their negative experiences with the new formula and its failure to guard against leaking and blowouts online.

72.     Several customers explained that, despite having been loyal Honest customers, the new Clean Conscious Diaper came with unexpected and frightening side effects, including "permanent rash[es]," "chemical irritation," "big" and "constant leaks," as well as issues with the "poorly made" diaper lining and wetness indicator. In

---

[3] For ease of comprehension and readability, the Complaint uses the pronoun "she" and possessive "her" in connection with former Honest employees. This convention, however, is not meant to identify the actual gender of any of the former employees.

[4] On January 22, 2021, Honest issued a press release announcing the launch of a new line of Clean Conscious Diapers that, according to Honest, were designed to be conscious of both baby and the environment. The press release details new technology designed to be better absorbing and allow for a more efficient design.

16

an understandable uproar, many customers stated they would no longer purchase Honest diapers. For example:

### Caused "a permanent rash for a few months"



Heather Trapier Rolfe 🌟 doesn't recommend **The Honest Company.**
May 9, 2021 · 🌐

I used to love Honest diapers. My baby has sensitive skin so these were a great option. BUT my son has had a permanent rash for a few months and, I had no idea what was causing it until I went on vacation and bought a different brand of diapers. It's been ONE DAY, his rash gone and he's not trying to scratch at his bottom anymore. I am positive that since they changed to the clean conscious diapers my son can no longer wear these diapers. Sadly I will be cancelling our subscription and going with another company.

👍❤️ 2

### Constant leaks lead to canceled subscription



Andrea L Akins 🌟 doesn't recommend **The Honest Company.**
May 15, 2021 · 🌐

Please go back to the old Diapers. We have been using you for over a year with no issues and then all of a sudden you change to your new design and the leaks or constant. We switch to Huggies and canceled our subscription.

👍 3

17

**<u>Cannot trust Honest after chemical irritation, leaks and blowouts</u>**



Liz Phillips Myrick ⭐ doesn't recommend **The Honest Company**.
April 29, 2021 · 🌐

Dear Honest,
You've been my go to, my ride or die, my forever thing for the past 2.5 years. You were perfect just the way you were. But then you decided to change. I was worried when you said you were adding a chemical strip .... after all the no strip was the reason we got together in the first place. But I decided to give you a chance. I wanted to still believe in you. Here we are less than a week later. You never let me down before. But chemical irritation, 3 big leaks and 2 blow outs in 5 days of your new "improved" design tell me we're over. I just can't trust you anymore.

 2

**<u>"Hands down the worst diapers I have ever used"</u>**



Ana De Weerd ⭐ doesn't recommend **The Honest Company**.
October 7, 2021 · 🌐

Honest diapers used to be the absolute best, but ever since they switched to "clean conscious", they have been garbage. Every single diaper leaks within an hour of putting it on my baby. These are hands down the worst diapers I have ever used in my life. It blows my mind that they cost so much when they are so horrible. Since they got rid of the diapers that actually work, I have had to do so much laundry and scrubbing messes that I might as well have been cloth diapering the whole time. It would have been less mess.

**<u>Buy other clean brands before "these poorly made diapers"</u>**



**<u>Diapers soaked through and blown-out</u>**



## Leaks every day and rash

### Awful new diaper

  Would not recommend

Satha - 1 year ago

Awful, awful awful! What happened to the old ones? These new ones are terrible! All of a sudden there's leaks everyday and a white gel like substance that's all over my baby's diaper area. It's also given him a rash where ever the diaper touches.

> **1 reply from Honest Product Expert team - 1 year ago**
>
> Hi Satha, We are sorry to hear that you did not have a positive experience with our Clean Conscious Diapers. We're committed to your satisfaction and would love to be able to speak with you to gather some more information. Please send us an email to support@thehonestcompany.com with the best time and phone number to reach you with a mention of the Target review. We look forward to hearing from you!

## Diapers leak through and smell "really bad"

### Poorly made

  Would not recommend

mamamichelle - 11 months ago

I've been using the original honest diapers with my daughter since she was a newborn and never had a problem until the new ones she leaks through every single diaper. They also smell really bad when she has a pee diaper.

> **1 reply from Honest Product Expert team - 11 months ago**
>
> Hi Mamamichelle, We are sorry to hear that you did not have a positive experience with our diapers. We're always listening, and we will make sure our team hears your feedback. Please give us a call at 1.888.862.8818 so we can gather some additional information!

**Changed for "the WORSE" and "will never buy them again"**

**Changed design and now quality is AWFUL**

★☆☆☆☆  ⊗ Would not recommend

Krushton - 10 months ago

These were our go-to diapers until this last box. They rebranded/changed the quality and now leak ALL THE TIME. My son could wear it for 30min and leak. Every diaper he wears...leaks so matter how often we change him. There was one time I even had just changed him, and somehow, while holding him I felt his pee come right through. I'm so upset they changed it for the WORSE and I will never buy them again.

… **1 reply from Honest Product Expert team - 10 months ago**

We're sorry to hear you had this experience with our diapers, Krushton. We take product complaints very seriously and would like to gather additional details. Please give us a call at 1.888.862.8818 so our team can best assist.

**"Bring back the old version"**

**Please bring the old version back!**

★☆☆☆☆  ⊗ Would not recommend

Jessmr27 - 10 months ago

I have use honest for both of my girls since they were born., this new version sucks it leaks everytime. Can you please bring back the old version.

… **1 reply from Honest Product Expert team - 10 months ago**

We're sorry to hear you had this experience with our diapers, Jessmr27. We take product complaints very seriously and would like to gather additional details. Please give us a call at 1.888.862.8818 so our team can best assist.

**Leaks lead to return for a refund**

**New design is causing daily leaks**

★☆☆☆☆  ⊗ Would not recommend

HWGrey - 1 year ago, Verified purchaser

I only use honest company diapers for my toddler. The new design with the wetness indicator is terrible. My daughter has leaked every single day this week (yes daily!). On the couch, in her car seat, playing outside... the list goes on and on. This never happened with the old design. I'll have to return my unopened box for a refund.

… **1 reply from Honest Product Expert team - 1 year ago**

Hi HWGrey, We are sorry to hear that you did not have a positive experience with our Clean Conscious Diapers. We're always listening, and we will make sure our team hears your feedback. Please give us a call at (888) 862-8818 so we can gather some additional information!

21

### "Awful" and "have to find something different now"



**New design is awful - leaks**

⭐☆☆☆☆ | ⊗ Would not recommend

Mommyto3 - 1 year ago, Verified purchaser

We have loved Honest diapers. Used them exclusively for 2 years. Now they've changed the design/formula and it's awful!! They leak! Have to find something different now. So sad! :(

> 💬 **1 reply from Honest Product Expert team - 1 year ago**
>
> Hi Mommyto3, We are sorry to hear that you did not have a positive experience with our Clean Conscious Diapers. We're always listening, and we will make sure our team hears your feedback. Please give us a call at (888)862-8818 so we can gather some additional information!

### Leaks and "no longer buying"



**Leak through and cheap**

⭐☆☆☆☆ | ⊗ Would not recommend

Elirad244 - 1 year ago

I use to LOVE honest. Their new and " improved" diaper is such a disappointment. My child has leaked through the diaper the past week every single time. They are cheap material and the pee indicator isn't necessary really. I think they say " environmentally better" because they wanted to decrease material and wanted to increase profit. I am no longer buying honest. I am so sad to say that, especially since I am expecting a little one in less than 2 months. I hope they go back to their old diaper.

> 💬 **1 reply from Honest Product Expert team - 11 months ago**
>
> Hi Elirad244, We are sorry to hear that you did not have a positive experience with our Clean Conscious Diapers. We're always listening, and we will make sure our team hears your feedback. Please give us a call at 1.888.862.8818 so we can gather some additional information!

### "Took a perfect item and ruined it with the new design"



**Awful new design**

⭐☆☆☆☆ | ⊗ Would not recommend

Yari - 10 months ago

New diaper design is AWFUL. They are no longer high quality, the bikini cut style makes it easy for them to leak and they are super thin. They took a perfect item and ruined it with the new design.

> 💬 **1 reply from Honest Product Expert team - 9 months ago**
>
> We are sorry to hear that you did not have a positive experience with our diapers, Yari. We're always listening, and we will make sure our team hears your feedback. Please give us a call at 1.888.862.8818 so we can gather some additional information!

### "Definitely not recommend"

**Leaks, leaks, leaks**

  Would not recommend

Dad - 9 months ago

I definitely not recommend this "new" design anymore. Leaks from the sides and even the diaper.

> 1 reply from Honest Product Expert team - 9 months ago
>
> Oh no! We're so sorry to hear this. We'd love to gather some additional information and learn more about your experience. So we can best assist, please give us a call at 1.888.862.8818. Thank you!

### New diapers are "awful!"

**Terrible**

  Would not recommend

Taylor - 1 year ago

The new honest diapers are awful! They are incredibly thin and leak within 30 minutes of wearing. I will be switching back to Pampers.

> 1 reply from Honest Product Expert team - 1 year ago
>
> Hi Taylor, We are sorry to hear that you did not have a positive experience with our Clean Conscious Diapers. We're always listening, and we will make sure our team hears your feedback. Please give us a call at (888) 862-8818 so we can gather some additional information!

### "Major leaking problems!"

**Leakage!!!!!!**

  Would not recommend

T - 11 months ago

Major leaking problems! I've used honest diapers for over a year without a problem but as soon as we switched to these new ones with the wetness indicator I was cleaning up a very wet baby every 1.5 hours. You can see straight through these to where the strip was laid for the indicator so I'm assuming that is where the leak is coming from.

> 1 reply from Honest Product Expert team - 11 months ago
>
> Hi T, We are sorry to hear that you did not have a positive experience with our Clean Conscious Diapers. We're always listening, and we will make sure our team hears your feedback. Please give us a call at 1.888.862.8818 so we can gather some additional information!

## "So mad we have to change diaper brands"

**leaks! bad re-design**

    Would not recommend

Sarah K - 10 months ago, Verified purchaser

new version of honest diapers leak! my son leaked through 4 in a row, meaning four outfit changes! ugh, so mad we have to change diaper brands.

> **1 reply from Honest Product Expert team - 10 months ago**
>
> We're sorry to hear you had this experience with our diapers, Sarah. We take product complaints very seriously and would like to gather additional details. Please give us a call at 1.888.862.8818 so our team can best assist!

## "I am never buying these again"

**New version leaks like crazy!**

    Would not recommend

Amber - 10 months ago

I've been using Honest diapers for a while and really liked them. Recently they changed to include a wetness indicator, and you can see there is less absorbing material (there are 3 distinct lines, instead of a big pad) and they leak like crazy!!! I just took my son to the doctor, was gone less than 2 hours and his pants are soaked. Forget about using them overnight. They used to hold great for us, but 4 nights in a row we have woken up with drenched pajamas (usually with lots of tears, in the middle of the night). I am never buying these again. They are terrible!!

> **1 reply from Honest Product Expert team - 10 months ago**
>
> We're sorry to hear you had this experience with our diapers, Amber. We take product complaints very seriously and would like to gather additional details. Please give us a call at 1.888.862.8818 so our team can best assist.

## "Please go back to old designs"

**New design is trash!**

    Would not recommend

Lou - 1 year ago

We've used honest for 2 years since my son was born and I rave about them to everyone until she switched 'technology' and added the indicator. Please go back to old designs. These new one leak so bad. We are changing clothes 2-4 times a day!!!! I'm using the rest of this box then fingers crossed I can find a new diaper company. May try hello bello because my son has very sensitive skin, I'm worried about switching him!!

> **1 reply from Honest Product Expert team - 1 year ago**
>
> Hi Lou, We are sorry to hear that you did not have a positive experience with our Clean Conscious Diapers. We're always listening, and we will make sure our team hears your feedback. Please give us a call at (888) 862-8818 so we can gather some additional information!

73.    In addition to expressing general outrage on social media, including the Company's Facebook page, Honest customers left targeted comments on the Company's announcement of the Clean Conscious Diaper. Many of these aggrieved consumers received responses from the Honest Company asking to learn more about their negative experiences. For example:





25



**Alexis Ann** My son has been using honest company diapers for 10 months the new CC diapers do not compare to the old version! So disappointed the diaper leaks, gives my lo diaper rash, definitely not as absorbing, and i have to use so many more diapers throughout the day! I will be searching for a new diaper brand if the old version isn't available to purchase... 😑

51w · Edited                                                           1

 **Erica Swan** These are not "your best diapers yet" they are terrible, did you even test them before releasing them? Leaks immediately as soon as my daughter pees and I shouldnt have to size her up when she isn't even in the next sizes weight I'm not going to get "less diapers for the same amount of money" because you built an inferior product. Another lost customer

50w                                                                   10

        ↳  1 Reply

 **Megan Frix** We loved this brand until their new diapers came out! Now our 6 month old wakes up soaking wet everyday ! This is so disappointing because we loved this brand of diapers but have to switch to something different 😭

50w

 **Gail Erin** Your new diaper design is horrendous. I literally have to change my daughter's diaper every 30-60 minutes now. I go through pants because of leaks several times a day. You lost a customer.

50w                                                                   6

 **Jillian Meloche** These are horrid!!We LOVED the old diapers they were dependable and amazing and one of the only brands that didn't make our sensitive skinned baby break out in a rash...These new ones are thin and garbage and even can't hold one small pee. Leaking everywhere and now rashes galore 😡Now we have to find a new diaper brand it's so so disappointing when you finally find something that works and you love and they change it 😩

41w · Edited

 ✏️ **Author**

**The Honest Company** ✔️ We apologize for the frustration you've experienced with our new Clean Conscious diapers, Jillian. We'd like to learn more about your experience and gather additional details. So we can best assist, please send us a Facebook direct message. Thank you!

41w

26



74.    Several users attributed leaking and skin irritation to the new materials used in the Clean Conscious Diaper. For example:

**"Run far from Honest"**



### **"I will no longer purchase these"**



### **"Diapers have exploded" and "will not be purchasing … again"**



### **"I will be returning the 2nd box"**

**Wetness indicator diapers are trash**

  Would not recommend

MalinLeiMom - 1 year ago

The wetness indicator diapers are horrible. They are super then. I bought 2 boxes for $50 each. Waste of money, I will be returning the 2nd box. My daughter pee right through the diaper. If honest no longer make the old diapers without the wetness indicator I will switch brands.

> **1 reply from Honest Product Expert team - 1 year ago**
>
> Hi MalinLeiMom, We are sorry to hear that you did not have a positive experience with our Clean Conscious Diapers. We're always listening, and we will make sure our team hears your feedback. Please give us a call at (888) 862-8818 so we can gather some additional information!

### **"HOR-RI-BLE!!!!"**

**Trash the New Design**

  Would not recommend

AsHuhLEe - 1 year ago, Verified purchaser

I think we all or almost all would agree that the new design is HOR-RI-BLE!!!! They leak, they sag, and they rip at the seams. I would be better off wrapping my mini human in a newspaper. It would definitely be cheaper! I have never had these kinds of problems up until now. And we have been using Honest since our little human was born 13 months ago. Now we have to figure out another brand just in case they discontinue the old design all together unless my daughter learns how to use the potty. Which I seriously doubt that would be happening anytime soon. Point of the story.... if you LOVE blowouts, and LOVE changing your little one clothes after every diaper change. Try the new design, because these are the diapers for you!!!!

> **1 reply from Honest Product Expert team - 1 year ago**
>
> Hi Ashuhlee, We are sorry to hear that you did not have a positive experience with our Clean Conscious Diapers. We're always listening, and we will make sure our team hears your feedback. Please give us a call at 1.888.862.8818 so we can gather some additional information!

## Rash and will no longer purchase




Becky K.

⭐☆☆☆☆ **New design terrible and caused a rash**
Reviewed in the United States on March 8, 2021
Color: Rose Blossom + Tutu Cute   |   Size: 76 Count (Pack of 1)   |   **Verified Purchase**

We've used honest diapers for a month and a half since my daughter was born. Had no problems with them except they didn't have a spot cut out for the umbilical cord. The new design doesn't fit the same and gave my daughter a rash. Nothing changed but the diapers so I'm almost positive that's what caused it. Also read other reviews once I was trying to figure it out that many ppl have had the rash problem. I no longer will purchase honest diapers.

11 people found this helpful

## "Horrible rash" and doctor needed

**Horrible**

   ⊗ Would not recommend

Adri - 1 year ago

I have been using this brand for the past two years with no issue, no leak or rash. The new designs cause horrible rash along the thighs of my baby and he has soaked through the diaper the past few nights. Highly disappointed:( I now have to take baby to the doctor because his skin is so chapped. I was able to find an old pack at one of the stores nearby (old diaper in photo) but don't know what else to use going forward.

> 💬 **1 reply from Honest Product Expert team - 1 year ago**
>
> Hi Adri, We are sorry to hear that you did not have a positive experience with our Clean Conscious Diapers. We're committed to your satisfaction and would love to be able to speak with you to gather some more information. Please send us an email to support@thehonestcompany.com with the best time and phone number to reach you with a mention of the Target review. We look forward to hearing from you!

## "Rash and they leak"

★☆☆☆☆

   **Sandra of Bradford, VT**   ✔ Verified Reviewer

Original review: May 29, 2021

I used to use Honest company diapers, but recently they changed them. They now have a line to show if they're wet and have weird ridges in the diapers. My daughter now gets a rash and they leak. I have never had any issues with their old diapers. I wish they hadn't changed them. Do not recommend.

30

**"Wouldn't buy these again"**





Jennifer S.
Bakersfield, CA

34 reviews

★★★★★    April 27th 2021, 1:34 pm

I had been using honest diapers for 6 months for my girl and during these six months they released their new "conscious clean" diapers. Since we've started using the "new and improved" diapers my girl broke out into the worst rash, so bad I can't even wipe her without her squirming and kicking. Didn't realize it was because of the diapers until I asked my sister if her baby is going through the same and she said YES!! Wouldn't buy these again until they switch back to the old diapers that didn't need improvement.

    ...

75.    Notwithstanding the then-present and disastrous reception of the Clean Conscious Diaper, Honest's Offering Documents touted product innovation as central to its growth and described its diapers as a "strategic customer acquisition tool."

C.    **Honest's "Growth"**

76.    Honest told investors in the Offering Documents that the "clean and natural" segments of Diapers and Wipes, Skin and Personal Care and Household and Wellness markets were growing at outsized rates as a result of demand for "better-for-you" products. Honest pointed to several performance metrics in its Offering Documents to demonstrate to investors that the Company was part of this growth.

77.    According to Honest, the Company's trusted brand, innovative product offering, deep consumer connection and differentiated omnichannel presence had driven strong performance at Honest. For example, Honest grew revenue 27.6% from $235.6 million in 2019 to $300.5 million in 2020 with revenue in its Diapers and Wipes, Skin and Personal Care and Household and Wellness categories growing by 16.4%, 35.5% and 116.5% respectively, from 2019 to 2020.

78.    Regarding COVID-19, the Offering Documents disclosed that Honest's employees had transitioned to working from home and that Honest was subject to the general risk that the "COVID-19 pandemic could have an adverse effect on [its] business, financial condition, results of operations and prospects." In spite of these

31

boilerplate warnings, the COVID-19 pandemic was portrayed in the Offering Documents as a boon to Honest's business and growth.

79.    As Honest has explained, "[w]hen the COVID-19 pandemic hit and we went into lockdown, people became more aware of their health and what they bring into their homes," and in less than six months after the onset of COVID-19, Honest created and brought to market a new Stay Safe cleaning collection, a complete set of cleaning, sanitizing and disinfecting solutions.

80.    Moreover, Honest told investors that "COVID-19 has been one of the drivers of demand in [its] Digital channel as consumers shifted to online shopping amid the pandemic. Additionally, [its] Household and Wellness product category has benefitted from increased demand for sanitization products."

81.    Honest went on to say that it could offer no assurance that it would continue to experience such increases in demand or that there might be a decline in the use of online shopping or demand for sanitization products when the COVID-19 pandemic subsides. Nevertheless, the Offering Documents offered these statements as prognostications about the future and did not disclose that such declines in online shopping or demand for sanitization products had occurred or currently was occurring.

82.    The Offering Documents' portrayal of growth and the COVID-19 pandemic's impact on the Company's business are revealed to be misleading by Lead Counsel's investigation and as well as Defendant Vlahos's admission of a customer "stock up" prior to the IPO.

83.    CW-2 was an accountant at Honest in 2021.

84.    CW-2 was on a distribution list that received a daily report that detailed all of the Company's inventory. CW-2 explained that Honest also monitored trends on a monthly basis to compare how inventory was moving across time periods. According to CW-2, it was clear from the reports and meetings related to those reports that there was a significant decline in the sale of wipes and sanitizers, which she called "COVID products."

32

85.    CW-2 explained that Honest did not do well with sales for Q1'21 or Q2'21. She attributed this mostly to the decline in sale of the COVID products. CW-2 recalled chatter amongst her colleagues with concerns about the steep decline in sales. CW-2 explained it was clear that COVID products were "not moving" and it was clear from Honest's internal reporting that these products had been trending down for some time.

86.    According to CW-1, the bulk of Honest's business was in the Diaper and Wipes category. Although Honest had always offered sanitizers and wipes, there was a surge in sales of those products during the COVID-19 pandemic.

87.    When asked about the Company's deceleration in business during her tenure, CW-1 stated that it was apparent internally that there was a slow-down in business.

**D.    Honest's IPO**

88.    On or about May 4, 2021, Honest conducted its IPO, in which it sold 29,678,050 shares of common stock to the public, including an underwriter over-allotment option of 3,871,050 shares. Of the shares of common stock offered in the IPO, the Honest Company received the proceeds from 6,451,613 shares and the selling stockholders (as identified in the Prospectus) received the proceeds for the remainder.

89.    The IPO, which was priced at $16 per share, generated over $400 million in proceeds for Honest and the selling stockholders. The IPO was conducted pursuant to, and the sale of Honest stock was solicited by, several documents filed by Honest and the Underwriter Defendants with the SEC and disseminated to the investing public, including (i) an April 9, 2021 registration statement on Form S-1, which following amendment, was declared effective by the SEC on May 4, 2021 (the "Registration Statement"), and (ii) a May 4, 2021 final prospectus, which forms part of the Registration Statement, on Form 424(b)(4) (the "Prospectus" and, together with the Registration Statement, the "Offering Documents.").

90.    The Offering Documents state that "[n]either [Honest], the selling stockholders, nor any of the underwriters have authorized anyone to provide any information or to make any representations other than those contained in this prospectus or in any free writing prospectuses [Honest] ha[s] prepared."

91.    Lead Plaintiff and other members of the Class purchased or otherwise acquired Honest common stock pursuant and/or traceable to the IPO and the Offering Documents, and were damaged thereby.

**E.    The Offering Documents Contained Materially False and Misleading Statements of Fact and Omitted Material Information**

92.    The Offering Documents were negligently prepared, and as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing its preparation.

93.    Section 11 creates liability against each of the Defendants for each (1) misstatement, (2) omission in contravention of an affirmative legal disclosure obligation, and (3) omission of information that is necessary to prevent existing disclosures from being misleading, in the Offering Documents.

94.    Additionally, pursuant to SEC Regulation C, the Offering Documents were required to disclose material information necessary to ensure that representations in the Offering Documents were not misleading. Specifically, Rule 408, 17 C.F.R. § 230.408(a), states that "[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading."

95.    Further, Defendants were required to comply with Item 303 of Regulation S-K, 17 C.F.R. § 229.303. Specifically, Item 303 and the SEC's related interpretive releases thereto, requires issuers to disclose events and uncertainties, including any

known trends that have had or are reasonably likely to cause the issuer's financial information not to be indicative of future operating results.

96. Moreover, Defendants were also required to comply with Item 105 of Regulation S-K, 17 C.F.R. § 229.105. Specifically, Item 105 requires that the Offering Documents furnish, among other things, a discussion of the most significant factors that make the Offering speculative or risky.

### 1. The Offering Documents Contained Misstatements and Omissions About Honest's Product Innovation and its Clean Conscious Diaper

97. The Offering Documents failed to disclose that Honest's introduction of its "clean conscious diaper" was negatively received by customers at the time of the IPO. Although the Offering Documents touted Honest's product innovation and product efficacy as central to its growth and success, in reality, at the time of the IPO, Honest's new Clean Conscious Diaper was causing leaks and rashes among users, such that one of Honest's pivotal products was defective. As a result, the Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements contained therein not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

98. For example, the Offering Documents told investors that a key aspect of Honest's growth strategy was its ability to drive product innovation, stating:

> **Our Growth Strategy**
>
> *             *             *
>
> ***Drive Accretive Product Innovation***
> • *Improve Existing Products.* Since our inception, we have been guided by the idea that there is always room for innovation. ***We strive for continuous improvement in our existing products' safety, sustainability, efficacy and design profile, which we refer to as costovation, as exemplified by the introduction of our clean conscious diaper in January 2021.*** We believe continuous innovation is important to accelerating our growth, deepening consumer connections and improving the profitability of our product offering.

35

99.    Likewise, the Offering Documents stated that since its launch in 2012, Honest was "dedicated to developing **clean,** sustainable, **effective and thoughtfully designed products**."

100.    Specifically, with respect to Honest's diapers, the Offering Documents touted to investors that **"[a]t the center of our product ecosystem are our diapers, which are a strategic consumer acquisition tool** that acts as an entry point for our portfolio, as new parents often go on the purchase products from our other categories for their everyday family needs."

101.    The statements in ¶¶98-100 were false and misleading statements of material fact when made because they failed to disclose the following material adverse facts, material adverse trends, material uncertainties, or significant risks that existed at the time of the IPO:

(a)    According to customers experiencing chemical irritations and rashes, leaking and blowouts, Honest's Clean Conscious Diaper reformulation was neither safe nor effective;

(b)    Honest's Clean Conscious Diaper was not achieving the pillars of Honest's "costovation" strategy, which emphasizes safety, sustainability, efficacy and design profile;

(c)    Honest was not capturing the benefits of its Diapers as a "strategic customer acquisition tool"; and

(d)    As a result of the Clean Conscious Diaper's new technology and defective design, Honest would—and did—lose customers and revenue.

102.    The Offering Documents also described product innovation as "the heart of [Honest's] business," touting Honest's product development and "direct connection with [its] community" as a competitive advantage. The Offering Documents also acknowledged the importance of customer reviews and Honest's ability to reformulate products to improve performance. The Offering Documents state:

36

### *In-House Product Development Capabilities that Power Innovation*

Product innovation lies at the heart of our business. *We have built a high-performance product development team that sets new standards with a proven track record of bringing innovative, award-winning products to market. To maximize the impact of our product development capabilities, our direct connection with our community enables us to understand what consumers' needs are and inspires our product innovation pipeline, which we believe generates a significant competitive advantage over more traditional CPG peers.* Our product innovation is inspired by feedback from our consumers that we receive through multiple avenues, including through our internal customer service team, comments left by consumers on our social media platforms and product ratings on our website and retailer's websites. For example, we created and brought to market a new Stay Safe cleaning collection, a complete set of cleaning, sanitizing and disinfecting solutions, in less than six months after the onset of COVID-19. In 2020, 22% of our revenue was generated from stock keeping units, or SKUs, introduced in 2020. *In addition to using these capabilities to innovate new products to bring to market, we also regularly reformulate or update existing products, improving performance and expanding gross margin.* We have won over 100 awards, including the 2020 "Parents" Best for Baby Award and seven Allure Best of Beauty awards.

103. The statements in ¶102 were false and misleading statements of material fact when made because they failed to disclose the following material adverse facts, material adverse trends, material uncertainties, or significant risks that existed at the time of the IPO:

(a)    According to customers experiencing chemical irritations and rashes, leaking and blowouts, Honest's Clean Conscious Diaper reformulation was neither safe nor effective;

(b)    As a result, Honest's Clean Conscious Diaper was not "improving performance," as evidenced by a multitude of consumer reviews describing its defective features;

(c)    Honest was not capturing the benefits of its Diapers as a "strategic customer acquisition tool"; and

37

(d)    As a result of the Clean Conscious Diaper's new technology and defective design, Honest would—and did—lose customers and revenue.

### 2.    The Offering Documents Contained Misstatements and Omissions About Honest's COVID-19 Inventory Stock Up

104.    The Offering Documents failed to disclose the extent to which consumers' COVID-19 stockpiling of Honest products was negatively impacting the Company at the time of the IPO. Although the Offering Documents described the impact of COVID-19 on Honest's revenue and customer demand as unascertainable, in reality, at the time of the IPO, Honest was tracking inventory daily and monitoring trends monthly, such that the COVID-19 stock up later described by Defendant Vlahos as occurring "over the prior year period" was apparent at the time of the IPO. This is further confirmed by the CW-1 and CW-2. As a result, the Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements contained therein not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

105.    For example, the Offering Documents told investors that the Company benefitted from the increased demand for Honest's products amidst the COVID-19 pandemic while stating the impact of the COVID-19 pandemic on Honest's business could not be ascertained:

> **Impact of COVID-19**
>
> The COVID-19 pandemic has caused general business disruption worldwide beginning in January 2020. ***The full extent to which the COVID-19 pandemic will directly or indirectly impact our cash flow, business, financial condition, results of operations and prospects will depend on future developments that are uncertain.***
>
> \* \* \*
>
> We believe COVID-19 has been one of the drivers of demand in our Digital channel as consumers have shifted to online shopping amid the pandemic. Additionally, our Household and Wellness product category has benefitted from increasing demand for sanitization products. We accelerated our development timeline for certain product launches, launching our disinfecting spray and alcohol wipes in 2020.

There is no assurance that we will continue to experience such increases in demand. *We may see a decline in use of online shopping and demand for sanitization products when the COVID-19 pandemic subsides.*

106. Nevertheless, the Offering Documents also told investors that the Company's omnichannel approach was "*agnostic* as to the channel where consumers purchase [its] products." The Offering Documents stated, in pertinent part, as follows:

> *Our omnichannel approach seeks to meet consumers however they want to shop, balancing deep consumer connection with broad convenience and accessibility.* Since our launch, we have built a well-integrated omnichannel presence by expanding our retail accessibility across both Digital and Retail channels, including the launch of strategic partnerships with Costco, Target and Amazon in 2013, 2014 and 2017, respectively. In 2020, we generated 55% and 45% of our revenue from our Digital and Retail channels, respectively. We maintain direct relationships with our consumers via our flagship digital platform, Honest.com, which allows us to influence brand experience and better understand consumer preferences and behavior. We increase accessibility of our products to more consumers through both the third-party pureplay ecommerce sites that, with Honest.com, comprise the rest of our Digital channel, and our Retail channel, which includes leading retailers and their websites. Our products can be found in approximately 32,000 retail locations across the United States, Canada and Europe. *This distinctive business model has allowed us to efficiently scale our business while remaining agnostic as to the channel where consumers purchase our products. Our integrated omnichannel presence provides meaningful benefits to our consumer which we believe is not easily replicated by our competitors.*

107. The statements in ¶¶105-06 were false and misleading statements of material fact when made because they failed to disclose the following material adverse facts, material adverse trends, material uncertainties, or significant risks that existed at the time of the IPO:

(a) Contrary to the Offering Document's claim that the COVID-19 pandemic was good for Honest's business, retailers were destocking COVID-19 products and Honest's sales for those products were decreasing;

39

(b)     Honest produced daily reports detailing the Company's inventory and monitored inventory on a monthly basis;

(c)     Despite Honest's products being available "wherever customers shop," Honest's omnichannel strategy failed to account for changing customer needs as the pandemic lessened;

(d)     As Defendant Vlahos would later admit, Honest's COVID-19 stock up began as early as August 2020—nine months before the IPO; and

(e)     As a result, Honest was *already* seeing a decline in demand for COVID-19 related products at the time of the IPO.

**3.      The Offering Documents Failed to Disclose and Misrepresented Significant Risks That Made the Offering More Speculative and Risky**

108.    The Offering Documents falsely represented the negative impact of consumers' COVID-19 stock-up, decreasing demand, and Honest's omnichannel strategy which purportedly positioned the Company for continued growth. As a result, the Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements contained in the Offering Documents not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

109.    The Offering Documents inaccurately described as *potential*, certain future risks associated with consumer perception of the health and safety of Honest's product and demand for those products which "could" have an adverse effect on its business, financial condition, and results of operations, rather than disclosing the actual events and trends or uncertainties that had already manifested. The Offering Documents stated, in pertinent part, that:

> *Economic downturns or a change in consumer preferences, perception and spending habits in the clean products categories, in particular, could limit consumer demand for our products and negatively affect our business.*

We have positioned our brand to capitalize on growing consumer interest in clean conscious products. The clean conscious consumer product industry is sensitive to national and regional economic conditions and the demand for the products that we distribute may be adversely affected from time to time by economic downturns that impact consumer spending, including discretionary spending. Future economic conditions such as employment levels, business conditions, housing starts, interest rates, inflation rates, energy and fuel costs and tax rates could reduce consumer spending or change consumer purchasing habits. Among these changes could be a reduction in the number of clean conscious consumer products that consumers purchase where there are alternatives, given that many products in this category often have higher retail prices than do their conventional counterparts.

***Further, the Diapers and Wipes, Skin and Personal Care and Household and Wellness markets in which we operate are subject to changes in consumer preference, perception and spending habits. Our performance depends significantly on factors that may affect the level and pattern of consumer spending in the markets in which we operate. Such factors include consumer preference, consumer confidence, consumer income, consumer perception of the safety and quality of our products and shifts in the perceived value for our products relative to alternatives.*** The Diapers and Wipes market is also subject to changes in birthrates, which have been declining in developed countries like the United States. In addition, media coverage regarding the safety or quality of, our products or the raw materials, ingredients or processes involved in their manufacturing may damage consumer confidence in our products. A general decline in the consumption of our products could occur at any time as a result of change in consumer preference, perception, confidence and spending habits, including an unwillingness to pay a premium or an inability to purchase our products due to financial hardship or increased price sensitivity, which may be exacerbated by the effects of the COVID-19 pandemic. If consumer preferences shift away from clean products, our business, financial condition and results of operations could be adversely affected.

110. The statements in ¶109 were each inaccurate statements of material fact when made while noting only the ***potential*** negative impacts on its business, financial condition, and results of operations, the Offering Documents failed to disclose the following significant, ***then-existing*** material events and adverse trends or uncertainties that Honest ***had already been*** facing at the time of the IPO:

(a)    According to customers experiencing chemical irritations and rashes, leaking and blowouts, Honest's Clean Conscious Diaper reformulation was neither safe nor effective;

(b)    Honest's Clean Conscious Diaper was not achieving the pillars of Honest's "costovation" strategy, which emphasizes safety, sustainability, efficacy and design profile;

(c)    Honest was not capturing the benefits of its Diapers as a "strategic customer acquisition tool"; and

(d)    As a result of the Clean Conscious Diaper's new technology and defective design, Honest would lose customers and revenue.

111.    Further, the Offering Documents inaccurately described as *potential*, certain risks associated with perceived quality, safety and efficacy issues with Honest's products and social media scrutiny, which *may* have an adverse effect on its business, financial condition, and results of operations, rather than disclosing the actual events and trends or uncertainties that had already manifested. The Offering Documents stated, in pertinent part, that:

> *Our brand and reputation may be diminished due to real or perceived quality, safety, efficacy or environmental impact issues with our products, which could have an adverse effect on our business, financial condition, results of operations and prospects.*
>
> We believe our consumers rely on us to provide them with clean, sustainable, well-designed, and effective products. *Any loss of confidence on the part of consumers in our products or the ingredients used in our products, whether related to product contamination or product safety or quality failures, actual or perceived, environmental impacts, or inclusion of prohibited ingredients, or ingredients that are perceived to be "toxic", could tarnish the image of our brand and could cause consumers to choose other products. Allegations of contamination or other adverse effects on product safety or efficacy or suitability for use by a particular consumer or on the environment, even if untrue, may require us to expend significant time and resources responding to such allegations and could, from time to time, result in a recall of a product from any or all of the markets in which the affected product was distributed. Any such issues or recalls*

42

***could negatively affect our ability to achieve or maintain profitability and brand image.***

For example, in 2015, multiple class action lawsuits were filed against us claiming that certain of our products, including our sunscreen, were ineffective and were not "natural." In 2017, we settled these class action lawsuits by agreeing to labeling changes and a $7.4 million settlement fund. In 2016, multiple class action lawsuits were filed against us claiming that we misled buyers about ingredients in our laundry detergent, dish soap and multisurface cleaner. In 2017, we settled these class action lawsuits by agreeing to marketing or reformulating changes and a settlement fund of $1.6 million. We have also been the subject of litigation claiming our labels contain inaccurate or misleading information. In response, we are in the process of updating the language on certain of our labels. In addition, we voluntarily recalled certain of our baby wipes and baby powder products in 2017 and one of our bubble bath products in January 2021 due to concerns about potential contamination. These incidents negatively affected our brand image and required significant time and resources to address.

We also have no control over our products once purchased by consumers. For example, consumers may store or use our products under conditions and for periods of time inconsistent with approved directions for use or the listed "Period After Opening," or required warnings or other governmental guidelines on our labels, which may adversely affect the quality and safety of our products.

***If our products are found to be, or perceived to be, defective or unsafe, or if they otherwise fail to meet our consumers' expectations, our relationships with consumers could suffer, the appeal of our brand could be diminished, we may need to recall some of our products and/or become subject to regulatory action, and we could lose sales or market share or become subject to boycotts or liability claims.*** In addition, safety or other defects in our competitors' products or products using the Honest name in other consumer categories, like beverages and pet food in which we do not own the Honest brand, could reduce consumer demand for our own products if consumers view them to be similar. Any such adverse effect could be exacerbated by our market positioning as a purveyor of clean, sustainable, well-designed, and effective products and may significantly reduce our brand value. ***Issues regarding the safety, efficacy, quality or environmental impact of any of our products, regardless of the cause, may have an adverse effect on our brand, reputation and operating results. Further, the growing use of social and digital media by us, our consumers and third parties increases the speed and extent that information or misinformation and opinions can be shared. Negative publicity about us, our brand or our products on social or digital media could seriously***

43

*damage our brand and reputation. Any loss of confidence on the part of consumers in the quality, safety, efficacy or environmental suitability of our products would be difficult and costly to overcome, even if such concerns were based on inaccurate or misleading information. If we do not maintain the favorable perception of our brand, our business, financial condition, results of operations and prospects could be adversely affected.*

112. The statements in ¶111 were each inaccurate statements of material fact when made while noting only the *potential* negative impacts on its business, financial condition, and results of operations, the Offering Documents failed to disclose the following significant, *then-existing* material events and adverse trends or uncertainties that Honest *had already been* facing at the time of the IPO:

(a) According to customers experiencing chemical irritations and rashes, leaking and blowouts, Honest's Clean Conscious Diaper reformulation was neither safe nor effective;

(b) Honest's Clean Conscious Diaper was not achieving the pillars of Honest's "costovation" strategy, which emphasizes safety, sustainability, efficacy and design profile;

(c) Honest was not capturing the benefits of its Diapers as a "strategic customer acquisition tool"; and

(d) As a result of the Clean Conscious Diaper's new technology and defective design, Honest would lose customers and revenue.

113. Further, the Offering Documents inaccurately described as *potential*, certain risks associated with social media scrutiny, which *may* have an adverse effect on its business, financial condition, and results of operations, rather than disclosing the actual events and trends or uncertainties that had already manifested. The Offering Documents stated, in pertinent part, that:

*Use of social media and influencers may adversely affect our reputation or subject us to fines or other penalties.*

\*    \*    \*

44

*Negative commentary regarding us, our products or influencers and other third parties who are affiliated with us may also be posted on social media platforms and may be adverse to our reputation or business.* Influencers with whom we maintain relationships could engage in behavior or use their platforms to communicate directly with our consumers in a manner that reflects poorly on our brand and may be attributed to us or otherwise adversely affect us. It is not possible to prevent such behavior, and the precautions we take to detect this activity may not be effective in all cases. Our target consumers often value readily available information and often act on such information without further investigation and without regard to its accuracy. The harm may be immediate, without affording us an opportunity for redress or correction.

114.    The statements in ¶113 were each inaccurate statements of material fact when made while noting only the *potential* negative impacts on its business, financial condition, and results of operations, the Offering Documents failed to disclose the following significant, *then-existing* material events and adverse trends or uncertainties that Honest *had already been* facing at the time of the IPO:

(a)    According to customers experiencing chemical irritations and rashes, leaking and blowouts, Honest's Clean Conscious Diaper reformulation was neither safe nor effective;

(b)    Honest's Clean Conscious Diaper was not achieving the pillars of Honest's "costovation" strategy, which emphasizes safety, sustainability, efficacy and design profile;

(c)    Honest was not capturing the benefits of its Diapers as a "strategic customer acquisition tool"; and

(d)    As a result of the Clean Conscious Diaper's new technology and defective design, Honest would lose customers and revenue.

115.    Further, the Offering Documents inaccurately described as *potential*, certain risks associated with the impact of COVID-19, fluctuation in sales through the Company's retail and digital channels, and timing and success of Honest's product launches, which *may* have an adverse effect on its business, financial condition, and

45

results of operations, rather than disclosing the actual events and trends or uncertainties that had already manifested. The Offering Documents stated, in pertinent part, that:

> ***Our quarterly operating results may fluctuate, which could cause our stock price to decline.***
>
> ***Our quarterly operating results may fluctuate for a variety of reasons, many of which are beyond our control, including:***
> • ***fluctuations in revenue, including as a result of adverse market conditions due to the COVID-19 pandemic and the opening of retail and travel opportunities as the pandemic abates, the seasonality of market transactions and fluctuations in sales through our Retail and Digital channels;***
> • the amount and timing of our operating expenses;
> • our success in attracting new and maintaining relationships with existing retail and ecommerce partners;
> • ***our success in executing on our strategy and the impact of any changes in our strategy;***
> • ***the timing and success of product launches, including new products that we may introduce, such as our launch of clean conscious diapers in January 2021;***
> • the success of our marketing efforts;
> • ***adverse economic and market conditions, such as those related to the current COVID-19 pandemic, currency fluctuations and other adverse global events;***
> • disruptions or defects in our technology platform, such as privacy or data security breaches, errors in our software or other incidents that impact the availability, reliability, or performance of our platform;
> • disruptions in our supply chain, the ability of our third-party manufacturers to produce our products, ability of our distributors to distribute our products, or in our shipping arrangements;
> • ***the impact of competitive developments and our response to those developments;***
> • fluctuations in inventory and working capital;
> • our ability to manage our business and future growth; and
> • our ability to recruit and retain employees.

116.    The statements in ¶115, particularly those concerning the launch of Honest's Clean Conscious Diapers, were each inaccurate statements of material fact when made while noting only the ***potential*** negative impacts on its business, financial condition, and results of operations, the Offering Documents failed to disclose the following significant, ***then-existing*** material events and adverse trends or uncertainties that Honest ***had already been*** facing at the time of the IPO:

46

(a)    According to customers experiencing chemical irritations and rashes, leaking and blowouts, Honest's Clean Conscious Diaper reformulation was neither safe nor effective;

(b)    Honest's Clean Conscious Diaper was not achieving the pillars of Honest's "costovation" strategy, which emphasizes safety, sustainability, efficacy and design profile;

(c)    Honest was not capturing the benefits of its Diapers as a "strategic customer acquisition tool"; and

(d)    As a result of the Clean Conscious Diaper's new technology and defective design, Honest would lose customers and revenue.

117.    The statements in ¶115, particularly those concerning COVID-19, were each inaccurate statements of material fact when made while noting only the *potential* negative impacts on its business, financial condition, and results of operations, the Offering Documents failed to disclose the following significant, *then-existing* material events and adverse trends or uncertainties that Honest *had already been* facing at the time of the IPO:

(a)    Despite products being available "wherever customers shop," Honest's omnichannel strategy was not overcoming changing customer needs as the pandemic lessened;

(b)    Honest produced daily reports detailing the Company's inventory and monitored inventory trends on a monthly basis;

(c)    At least as early as April 2021, it was clear that COVID-19 products were "not moving" and Honest's internal reporting showed that these products had been trending down for some time; and

(d)    As Defendant Vlahos would later admit, Honest's COVID-19 stock up began as early as August 2020—nine months before the IPO.

118.    The Offering Documents also inaccurately described as *potential*, certain risks associated with Honest's ability to acquire new customers and retain existing

47

customers, which **may** have an adverse effect on its business, financial condition, and results of operations, rather than disclosing the actual events and trends or uncertainties that had already manifested. The Offering Documents stated, in pertinent part, that:

> **If we fail to cost-effectively acquire new consumers or retain our existing consumers, our business could be adversely affected. Our sales and profit are dependent upon our ability to expand our existing consumer relationships and acquire new consumers.**
>
> Our success, and our ability to increase revenue and achieve profitability, depend in part on our ability to cost-effectively acquire new consumers, retain existing consumers and keep existing consumers engaged so that they continue to purchase our products. Our diaper business is also a strategic consumer acquisition tool that fuels growth for baby wipes, personal care, and other products. While we intend to continue to invest significantly in sales and marketing to educate consumers about our brand, our values and our products, there is no assurance that these efforts will generate further demand for our products or expand our consumer base. Our ability to attract new consumers and retain our existing consumers will depend on, among other items, the perceived value and quality of our products, consumer demand for clean, sustainable, thoughtfully designed and effective products at a premium, competitive offerings, our ability to offer new and relevant products and the effectiveness of our marketing efforts. We may also lose loyal consumers to our competitors if we are unable to meet consumer demand in a timely manner. **If we are unable to cost-effectively acquire new consumers, retain existing consumers and keep existing consumers engaged, our business, financial condition, results of operations and prospects could be adversely affected.**

119. The statements in ¶118 were each inaccurate statements of material fact when made while noting only the **potential** negative impacts on its business, financial condition, and results of operations, the Offering Documents failed to disclose the following significant, **then-existing** material events and adverse trends or uncertainties that Honest **had already been** facing at the time of the IPO:

(a) According to customers experiencing chemical irritations and rashes, leaking and blowouts, Honest's Clean Conscious Diaper reformulation was neither safe nor effective;

48

(b)     Honest's Clean Conscious Diaper was not achieving the pillars of Honest's "costovation" strategy, which emphasizes safety, sustainability, efficacy and design profile;

(c)     Honest was not capturing the benefits of its Diapers as a "strategic customer acquisition tool"; and

(d)     As a result of the Clean Conscious Diaper's new technology and defective design, Honest would lose customers and revenue.

120.   The statements in ¶118 were also each inaccurate statements of material fact when made while noting only the *potential* negative impacts on its business, financial condition, and results of operations, the Offering Documents failed to disclose the following significant, ***then-existing*** material events and adverse trends or uncertainties that Honest ***had already been*** facing at the time of the IPO:

(a)     Despite products being available "wherever customers shop," Honest's omnichannel strategy was not overcoming changing customer needs as the pandemic lessened;

(b)     Honest produced daily reports detailing the Company's inventory and monitored inventory trends on a monthly basis;

(c)     At least as early as April 2021, it was clear that COVID-19 products were "not moving" and Honest's internal reporting showed that these products had been trending down for some time; and

(d)     As Defendant Vlahos would later admit, Honest's COVID-19 stock up began as early as August 2020—nine months before the IPO.

121.   The Offering Documents also inaccurately described as *potential*, certain risks associated with the impact of COVID-19, which *may* have an adverse effect on its business, financial condition, and results of operations, rather than disclosing the actual events and trends or uncertainties that had already manifested. The Offering Documents stated, in pertinent part, that:

49

> ***The COVID-19 pandemic could have an adverse effect on our business, financial condition, results of operations and prospects.***
>
>     \*       \*       \*
>
> ***The extent of the COVID-19 pandemic's effect on our operational and financial performance will depend on future developments, including the duration and intensity of the pandemic, all of which are uncertain and difficult to predict considering the rapidly evolving landscape. As a result, it is not currently possible to ascertain the overall impact of the COVID-19 pandemic on our business.*** However, if the pandemic continues to persist as a severe worldwide health crisis, the disease could have an adverse effect on our business, financial condition, results of operations and prospects, and may also have the effect of heightening many of the other risks described in this "Risk Factors" section.

122. The statements in ¶121 were each inaccurate statements of material fact when made while noting only the ***potential*** negative impacts on its business, financial condition, and results of operations, the Offering Documents failed to disclose the following significant, ***then-existing*** material events and adverse trends or uncertainties that Honest ***had already been*** facing at the time of the IPO:

    (a)    Despite products being available "wherever customers shop," Honest's omnichannel strategy was not overcoming changing customer needs as the pandemic lessened;

    (b)    Honest produced daily reports detailing the Company's inventory and monitored inventory trends on a monthly basis;

    (c)    At least as early as April 2021, it was clear that COVID-19 products were "not moving" and Honest's internal reporting showed that these products had been trending down for some time; and

    (d)    As Defendant Vlahos would later admit, Honest's COVID-19 stock up began as early as August 2020—nine months before the IPO.

50

**F.      Post-IPO Events Demonstrate that the Offering Documents Were Materially False and Misleading at the Time of the Offering**

123.    In its first press release just weeks after the IPO, on June 16, 2021, Honest reported the Company's first quarter 2021 financial results. Honest's revenue in its Company's Diapers and Wipes category was down, and the Company recorded a $4.5 million net loss in the first quarter of 2021 as compared to net income of $0.6 million in the first quarter of 2020.

124.    On the same day, during the earnings call to discuss the quarterly results, Defendant Kennedy explained that the decrease in Diapers and Wipes was attributable to COVID-19 pantry loading back in 2020 and the Company's transition to Clean Conscious Diapers, stating:

> ***Starting with Diapers and Wipes, the category decreased 2% as we transitioned to our Clean Conscious Diaper and lapped the acceleration in Diapers and Wipes related to COVID-19 pantry loading in the first quarter of 2020.*** Of note, diaper growth was positive in Q1 behind our new diaper launch but was offset by a decrease in wipes as we lapped consumer stock-up behavior from Q1 2020. Based on consumption data for the last 12 weeks ending May 16, our diaper business was up 13% while the overall market declined 1%.

125.    Defendant Kennedy also explained that Honest was starting to see some retailers destock sanitization and disinfecting products, stating in relevant part:

> Household and Wellness grew 53%, fueled by our standardization and disinfecting products that we introduced in the second half of 2020. ***While we were still able to see significant growth in Household and Wellness, we are starting to see household and retailers destock sanitization and disinfecting products as more consumers become vaccinated and return to their pre-COVID routine.***

126.    In response to an analyst question regarding Honest's Clean Conscious Diaper initiative going forward, Defendant Vlahos acknowledged some dissatisfaction but claimed Honest had the ability to "address [ ] key consumer dissatisfiers":

> Yes, I'll take the first one, Dana, thank you for the question. ***And I would say on the [Clean] Conscious Diaper is we've kind of built out that innovation. We do this type of work when it comes to the performance and being able to address these key consumer dissatisfiers. And we've done this in a***

51

*way now where we're also increasing the margin structure against that business. So it's got the right proposition for us because we talk about good growth always, which is this consistency around not just driving top line but also the margin expansion components that we want on the business. So that's rooted in the current proposition.*

127. On this news, the Company's stock price fell $1.30 per share, or 7% to close at $16.35 on June 17, 2021.

128. The next quarter, on August 13, 2021, Honest issued a press release reporting the Company's second quarter 2021 financial results and a net loss of $20 million for the second quarter 2021 as compared to a net loss of only $0.4 million for the second quarter of 2020. The Company noted its revenue grew only 3% as compared to the second quarter of 2020 because it was negatively impacted by "an estimated $3.7 million COVID-19 stock-up impact primarily in Diapers and Wipes in the prior year period."

129. Honest further reported that revenue for its top category, Diapers and Wipes, declined 2% compared to the second quarter of 2020 and revenue for Household and Wellness declined 6% from the second quarter of 2020 as "sales have been softer than expected as consumer demand has decreased as more consumers have become vaccinated and retailers continue to manage heavy inventories of sanitization and disinfecting products in stores." Gross margin decreased by 50 basis points from the second quarter of 2020.

130. Honest's digital channel revenue also decreased 24% to $34.8 million in the second quarter of 2021 as compared to the second quarter of 2020, due largely to the reduction in inventory on-hand by one of Honest's "key digital partner[s]" who "cut inventory in consumables in the second quarter to free up space for other products." During the quarter, revenue from that customer declined by $6.4 million.

131. On the related earnings call held the same day to discuss these results, Defendant Vlahos acknowledged the true extent of Honest's COVID-19 stock up,

52

noting Honest's "mid-single-digit growth for the quarter on [its] Diaper business despite COVID-19 stock-up impact *in the year ago period*."

132.  Defendant Kennedy noted that "[t]rends for the back half of the year remain volatile as we navigate an environment that is dynamic with significant input cost pressure and continuing uncertainty around the COVID-19 pandemic and its impact on consumer behavior."

133.  On this news, the Company's stock price fell $3.98 per share, or 28%, to close at $10.07 per share on August 13, 2021.

134.  In an August 13, 2021 report from Morgan Stanley, analysts noted "[c]learly the quarter is disappointing, particularly so soon after the IPO" recognizing that Honest's Diapers and Wipes segment was down -2% year-over-year "as the [C]ompany cycles through elevated comparisons due to pandemic pantry loading." The report recognized "slowing e-commerce momentum, a drop in demand following COVID stock up" as among the downside risks.

135.  On August 19, 2021, the Company's stock closed at a low of $9.16 per share, a nearly 43% decline from the IPO price. Since its IPO, the value of Honest's common stock has collapsed from its $16 per share offering price to as low as $5.54 per share.

## V.    CLASS ALLEGATIONS

136.  Lead Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following certified "Class":

> All persons and entities that purchased or otherwise acquired Honest publicly traded common stock pursuant and traceable to the Offering Documents for the IPO prior to August 19, 2021, as well as all persons and entities that acquired ownership of a trading account, retirement account, or any other similar investment account or portfolio containing Honest's publicly traded common stock that was purchased or otherwise acquired pursuant and traceable to the Offering Documents for Honest's IPO prior to August 19, 2021, and were damaged thereby. Excluded from the Class are: (i) Defendants and the Individual Defendants' immediate

53

family members;[2] (ii) the officers, directors, affiliates, and subsidiaries of Honest and the Underwriter Defendants, at all relevant times; (iii) Honest's affiliates and employee retirement and/or benefit plan(s) and their participants and/or beneficiaries to the extent they purchased or acquired Honest's common stock pursuant or traceable to the Offering Documents through any such plan(s); (iv) any person who had or has a controlling interest in Honest, at all relevant times; (v) any entity in which any of the Defendants have or had a controlling interest, provided, however, that any "Investment Vehicle" shall not be excluded from the Class; and (vi) the legal representatives, heirs, successors, or assigns of any such excluded person or entity, in their capacity as such.

137. The members of the Class are so numerous that joinder of all members is impracticable. The exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery. Lead Plaintiff believes there are at least thousands of members in the proposed Class as the Company offered over 25 million shares of common stock in the IPO. Record owners and other members of the Class may be identified from records maintained by Honest or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

138. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the Securities Act as set forth herein.

139. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

140. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the Securities Act;

(b)    whether the Offering Documents contained inaccurate statements of material fact and/or omitted material information required to be stated therein; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

141.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VI.    CAUSES OF ACTION

**COUNT I**
**FOR VIOLATION OF SECTION 11 OF THE SECURITIES ACT**
<u>**Against All Defendants**</u>

142.    Lead Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

143.    This cause of action is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against Defendant Honest, each of the Individual Defendants, and each of the Underwriter Defendants.

144.    This cause of action does not sound in fraud. Lead Plaintiff does not claim that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent. This Count is based solely on strict liability as to Honest and negligence as to the remaining Defendants. Lead Plaintiff expressly disclaims any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statements of opinion or belief made in connection with the IPO are alleged to have been materially misstated statements of opinion or belief when made.

145.    The Registration Statement, which includes the Prospectus, issued in connection with the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted material facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein.

55

146.   Honest is the registrant and issuer of the common stock sold pursuant to the Registration Statement. As such, Honest is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate. By virtue of the Registration Statement containing material misrepresentations and omissions of material fact necessary to make the statements therein not false and misleading, Honest is liable under Section 11 of the Securities Act to Lead Plaintiff and the Class.

147.   None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

148.   The Individual Defendants each signed the Registration Statement and caused its issuance. The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. They each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading. By virtue of each of the Individual Defendants' failure to exercise reasonable care, the Registration Statement contained misrepresentations of material facts and omissions of material facts necessary to make the statements therein not misleading. As such, each of the Individual Defendants is liable under Section 11 of the Securities Act to Lead Plaintiff and the Class.

149.   Each of the Underwriter Defendants served as the underwriters for the IPO and qualify as such according to the definition contained in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11). As such, they participated in the solicitation, offering, and sale of the securities to the investing public pursuant to the Offering Documents. Each of the Underwriter Defendants, as an underwriter of the securities offered in the IPO pursuant to the Registration Statement, had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements

contained in the Registration Statement. They each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading. By virtue of each of the Underwriter Defendants' failure to exercise reasonable care, the Registration Statement contained misrepresentations of material facts and omissions of material facts necessary to make the statements therein not misleading. As such, each of the Underwriter Defendants is liable under Section 11 of the Securities Act to Lead Plaintiff and the Class.

150. None of the untrue statements or omissions of material fact in the Registration Statement alleged herein was a forward-looking statement. Rather, each such statement concerned existing facts. Moreover, the Registration Statement did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

151. Each of the Defendants named in this Count issued, caused to be issued, and participated in the issuance of materially untrue and misleading written statements to the investing public that were contained in the Registration Statement, which misrepresented and failed to disclose, *inter alia*, the facts set forth above. By reasons of the conduct herein alleged, each such Defendant violated Section 11 of the Securities Act.

152. Lead Plaintiff and the Class have sustained damages. The value of Honest common stock has declined substantially subsequent to and due to violations by Defendants named in this Count.

153. At the time of their purchases of Honest common stock, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures alleged herein. Less than one year has elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based and the time that this action was commenced. Less than three years have elapsed between the time that the securities upon which this cause of

57

action is brought were offered to the public and the time that this action was commenced.

**COUNT II**
**FOR VIOLATION OF SECTION 15 OF THE SECURITIES ACT**
**Against the Individual Defendants and the Catterton Defendants**

154. Lead Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

155. This cause of action is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the Class, against each of the Individual Defendants.

156. This cause of action does not sound in fraud. Lead Plaintiff does not allege that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim. This Count is based solely on negligence and/or strict liability. Lead Plaintiff expressly disclaims any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statements of opinion or belief made in connection with the IPO are alleged to have been materially misstated statements of opinion or belief when made.

157. Each of the Individual Defendants and the Catterton Defendants were control persons of Honest by virtue of their positions as directors and/or senior officers and/or major shareholders of Honest. The Individual Defendants and the Catterton Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Honest.

158. Each of the Individual Defendants and the Catterton Defendants participated in the preparation and dissemination of the Offering Documents, and otherwise participated in the process necessary to conduct the IPO. Because of their positions of control and authority as senior officers and/or directors and/or major shareholders of the Company, each of the Individual Defendants and the Catterton Defendants were able to, and did, control the contents of the Offering Documents,

58

which contained materially untrue information and/or omitted material information required to be disclosed to prevent the statements made therein from being misleading.

159.   As control persons of Honest, each of the Individual Defendants and the Catterton Defendants are liable jointly and severally with and to the same extent as Honest for its violation of Section 11 of the Securities Act.

## VII.   PRAYER FOR RELIEF

160.   WHEREFORE, Lead Plaintiff on behalf of itself and the other members of the Class, prays for relief and judgment as follows:

(a)   Determining that this action is a proper class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)   Awarding all damages and other remedies set forth in the Securities Act in favor of Lead Plaintiff and other Class members against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

(c)   Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees, accountants' fees, and expert fees, and other costs and disbursements; and

(d)   Awarding Lead Plaintiff and the Class such other relief as may be deemed just and proper by the Court.

*        *        *

59

## VIII.  JURY TRIAL DEMANDED

161.  Lead Plaintiff demands a trial by jury.

Dated:  August 14, 2023                              Respectfully Submitted,

**LABATON SUCHAROW LLP**

By:  */s/ Alfred L. Fatale III* _____

Jonathan Gardner
Alfred L. Fatale III
David J. Schwartz
Joseph N. Cotilletta
Charles Wood
Robert S. Rowley
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: jgardner@labaton.com
afatale@labaton.com
dschwartz@labaton.com
jcotilletta@labaton.com
cwood@labaton.com
rrowley@labaton.com

*Lead Counsel for Lead Plaintiff Kathie Ng
and the Class*

**THE SCHALL LAW FIRM**
Brian Schall
Rina Restaino
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (310) 301-3335
Facsimile: (213) 519-5876
Email: brian@schallfirm.com
rina@schallfirm.com

*Liaison Counsel for Lead Plaintiff
Kathie Ng and the Class*

60