**LABATON KELLER SUCHAROW LLP**
Jonathan Gardner*
Alfred L. Fatale III*
David J. Schwartz*
Robert S. Rowley*
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: jgardner@labaton.com
afatale@labaton.com
dschwartz@labaton.com
rrowley@labaton.com

*admitted *pro hac vice*

*Lead Counsel for Lead Plaintiff
and the Class*

**THE SCHALL LAW FIRM**
Brian Schall
Rina Restaino
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (310) 301-3335
Facsimile: (213) 519-5876
Email: brian@schallfirm.com
rina@schallfirm.com

*Liaison Counsel for Lead Plaintiff*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE THE HONEST COMPANY, INC. SECURITIES LITIGATION | 2:21-CV-07405-MCS-BFMx |
| | ECF CASE |
| | **LEAD PLAINITFF'S OPPOSTION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT** |
| | Hearing Date: April 15, 2024<br>Hearing Time: 9:00 a.m.<br>Courtroom: 7C<br>Judge: Hon. Mark C. Scarsi |

# CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

I.      INTRODUCTION ...................................................................................................... 1

II.     FACTUAL BACKGROUND ...................................................................................... 3

III.    ARGUMENT .............................................................................................................. 4

        A.     Legal Standard ................................................................................................. 4

        B.     Catterton Mischaracterizes and Ignores Critical Context in the
               Exhibits ............................................................................................................ 5

               1.     The Pre-IPO Exhibits Establish That Catterton Sought to
                      Urgently Exit its Investment in Honest While the
                      Company's Financials Surged Due to the COVID-19
                      Pandemic ................................................................................................. 5

               2.     Catterton Controlled the Mechanics of the Offering and the
                      Contents of the Offering Documents .......................................................... 8

               3.     The Documents Are Clear That Catterton Chose Morgan
                      Stanley as the Lead Underwriter ...........................................................12

        C.     The Statute of Limitations Has Not Passed Because the
               Allegations Derived from the Exhibits Could Not Have Been
               Known When Lead Plaintiff Filed the Initial Complaint .......................14

        D.     The Complaint's Allegations Establish Catterton's Control ...................16

IV.     CONCLUSION ........................................................................................................20

LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS
2:21-CV-07405-MCS-BFMx

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re AFC Enterprises, Inc. Sec. Litig.*,
  348 F. Supp. 2d 1363 (N.D. Ga. 2004)................................................................16

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...............................................................................................5

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...............................................................................................5

*In re BofI Holding, Inc. Sec. Litig.*,
  2017 WL 2257980 (S.D. Cal. May 23, 2017)......................................................16

*Chen v. Urb. Commons 6 Ave Seattle, LLC*,
  2023 WL 4291439 (C.D. Cal. Apr. 18, 2023) .....................................................17

*In re China Intelligent Lighting & Elecs., Inc. Sec. Litig.*,
  2012 WL 3834815 (C.D. Cal. Sept. 5, 2012) ......................................................16

*In re Cobalt Int'l Energy Inc. Sec. Litig.*,
  2016 WL 215476 (S.D. Tex. Jan. 19, 2016)........................................................16

*City of Pittsburgh Comp. Mun. Pension Trust Fund v. Benefitfoucs, Inc.*,
  2021 WL 4441904 (N.Y. Sup. Ct. Sep. 28, 2021) ..............................................18

*In re DDi Corp. Sec. Litig.*,
  2005 WL 3090882 (C.D. Cal. July 21, 2005).......................................................17

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008)...............................................................17

*In re Downey Sec. Litig.*,
  2009 U.S. Dist. LEXIS 25007 (C.D. Cal. Mar. 18, 2019)..................................19

*Fed. Hous. Fin. Agency v. UBS Americas, Inc.*,
  858 F. Supp. 2d 306 (S.D.N.Y. 2012) ......................................................... 17-18

*F.D.I.C. v. Countrywide Fin. Corp.*,
  2012 WL 5900973 (C.D. Cal. Nov. 21, 2012).....................................................14

*Glynn Env't Coal., Inc. v. Sea Island Acquisition, LLC*,
    26 F. 4th 1235 (11th Cir. 2022)......................................................................................4

*Griffin v. Painwebber, Inc.*,
    2001 WL 740764 (S.D.N.Y. June 29, 2001) ...................................................................18

*In re Homestore.com, Inc. Sec. Litig.*,
    347 F. Supp. 2d 790 (C.D. Cal. 2004)..............................................................................18

*In re Honest Co. Sec. Litig*,
    615 F. Supp. 3d 1149 (C.D. Cal. 2022)......................................................................6, 17

*Johnson v. Riverside Healthcare Sys., LP*,
    534 F.3d 1116 (9th Cir. 2008)............................................................................................5

*Lester v. Preco Indus., Inc.*,
    282 F. Supp. 459 (S.D.N.Y. 1965) ...................................................................................16

*Merck & Co. v. Reynolds*,
    559 U.S. 633 (2010)...............................................................................................14, 15

*Moement, Inc. v. Groomore, Inc.*,
    2022 WL 18284405 (C.D. Cal. Nov. 29, 2022).................................................................4

*Navarro v. Block*,
    250 F.3d 729 (9th Cir. 2001)..............................................................................................4

*In re Musicmaker.com Sec. Litig.*,
    2001 WL 34062431 (C.D. Cal. June 4, 2001) ................................................................16

*Pace v. Quintanilla*,
    2015 WL 652719 (C.D. Cal. Feb. 13, 2015) ...................................................................15

*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*,
    96 F.3d 1151 (9th Cir. 1996)....................................................................................18, 19

*In re Peregrine Sys. Sec. Litig.*,
    2005 U.S. Dist. LEXIS 59408 (S.D. Cal. Mar. 30, 2005).................................................19

*Tellabs, Inc. v. Makor Issues & Rts, Ltd.*,
    551 U.S. 308 (2007).............................................................................................................4

*Welgus v. TriNet Grp.*,
    2017 U.S. Dist. LEXIS 6347 (N.D. Cal. Jan. 17, 2017)...................................................19

iii

*In re Worlds of Wonder Sec. Litig.*,
 694 F. Supp. 1427 (N.D. Cal. 1988)................................................................19

*In re YogaWorks, Inc. Sec. Litig.*,
 2020 WL 2549290 (C.D. Cal. Apr. 23, 2020) ................................................14

**Statutes**

Section 11 of the Securities Act of 1933 (15 U.S.C. §77k) ........................ 3, 14, 17

Section 15 of the Securities Act of 1933 (15 U.S.C. §77o).............................*passim*

**Other Authorities**

Fed. R. Civ. P. 8.................................................................................................1, 15

Fed. R. Civ. P. 9....................................................................................................19

Fed. R. Civ. P. 11............................................................................................11, 15

Fed. R. Civ. P. 12.........................................................................................1, 4, 14

iv

Lead Plaintiff, Kathie Ng ("Lead Plaintiff"), respectfully submits this memorandum in opposition to Defendants' Motion to Dismiss Second Amended Complaint (the "Motion" or "MTD") submitted by Defendants Catterton Management Company L.L.C., L Catterton VIII, L.P., L. Catterton VIII Offshore, L.P., Catterton Managing Partner VIII, L.L.C., C8 Management, L.L.C., and THC Shared Abacus, LP (collectively, "Catterton"). ECF No. 195.

## I.    INTRODUCTION

Lead Plaintiff's claims arise out of material misrepresentations and omissions contained in The Honest Company's ("Honest" or the "Company") Registration Statement and Prospectus (together the "Offering Documents") filed in connection with its May 4, 2021 initial public offering (the "IPO" or the "Offering"). Lead Plaintiff now asserts claims against Catterton pursuant to Section 15 of the Securities Act of 1933 (the "Securities Act") as a result of newly uncovered evidence discovered in documents produced by the Honest Defendants and the Underwriter Defendants evincing Catterton's control of Honest. Catterton opposes their addition as Defendants in this Action. Faced with no law in support of their argument, Catterton spends most of the Motion providing their preferred interpretation of the Complaint's allegations and the documents attached as exhibits to it (the "Exhibits") in an attempt to factually refute Catterton's control of Honest.

However, Catterton's decision to forego legal argument for rhetoric ignores that the Motion is a motion to dismiss under FRCP 8 and 12(b)(6) and the inferences it seeks to have drawn in Catterton's favor cannot be credited by the Court. Rather than actually engaging with the allegations as pled and recognizing the inference owed to Lead Plaintiff, the Motion devolves into a series of accusations that Lead Plaintiff misrepresented the Exhibits used in support of her allegations. This is a projection. For each document Catterton either: (1) cherry picks irrelevant portions of an Exhibit in an attempt to establish that the entire document is irrelevant; (2) ignores context necessary to understanding the import of the Exhibit; or (3) blatantly misrepresents documents.

1

Moreover, Catterton's approach to dealing with the Exhibits one by one and in a vacuum fails to acknowledge that it is the combined weight of the documents and the inferences drawn therefrom that establishes Catterton's liability in this Action and what Lead Plaintiff could not have known when this Action was first brought. Indeed, before May 2023, when the first documents were produced in this Action after the automatic discovery stay had been lifted, all the information available to Lead Plaintiff concerning Catterton's relationship with Honest was contained in the Registration Statement, which provided shockingly little. Indeed, based on the Offering Documents, the only information available to Lead Plaintiff concerning Catterton's relationship with Honest consisted of three facts: (1) two members of Honest's six member Board of Directors (the "Board") were employed by Catterton; (2) Catterton held a minority share (approximately 37%) of Honest's stock prior to the IPO; and (3) Catterton would be selling between approximately 48% to 60% of its Honest stock in the Offering. Based on this, it appeared that Catterton was simply one of several minority shareholders that sold shares in the Offering.

In contrast, the documents produced by the Honest Defendants and the Underwriter Defendants paint an entirely different picture.[1] According to the documents and the Complaint's allegations, Catterton was highly motivated to exit its investment in Honest during the COVID-19 pandemic when retailers were stockpiling Honest's products, which caused Honest's revenues to experience a temporary though significant spike. █████████████

███████████████████████████

[1] Importantly, none of Lead Plaintiff's document requests were designed to capture information related to Catterton, rather, Catterton's role in the Offering was so pervasive, its conduct was captured in requests designed to reveal information related to the Honest Defendants and the Underwriter Defendants' conduct in connection with the Offering. Moreover, Lead Plaintiff served Catterton with a document subpoena in May 2023, but Catterton evaded compliance with that subpoena for over three months until the most recent discovery stay was entered in this case.

LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS
2:21-CV-07405-MCS-BFMx

During the IPO process, Catterton involved itself in almost every facet of its execution, including drafting parts of the Offering Documents, which contained misstatements at issue in this case; reviewing Honest's financials (and finding ways to make them appear even higher); and selecting the lead underwriter for the Offering. Indeed, documents produced by the Underwriter Defendants suggest that for the purposes of making decisions about the Offering, Honest and Catterton were essentially treated as one in the same. Moreover, Catterton did not act solely through Defendants Dahnke and Pramanik, who were the only Catterton employees formally affiliated with Honest, rather multiple other Catterton employees—with no independent affiliation with Honest—were also involved in the IPO process. Most notably, Adam Hasiba, a former principal at Catterton, provided directions to Honest employees at various times throughout the IPO process and was included on almost every email sent to Defendants Dahnke and Pramanik.

Catterton spends the vast majority of its Motion attempting to improperly rewrite the Complaint and Exhibits to absolve itself of liability. However, not only do the documents speak for themselves and taken together and in context they paint a clear picture of Catterton's control over Honest that was unknown prior to May 2023.

## II.    FACTUAL BACKGROUND

Lead Plaintiff filed the Consolidated Complaint for Violations of the Federal Securities Laws (the "Consolidated Complaint") on February 21, 2022, asserting claims pursuant to Sections 11 and 15 of the Securities Act. ECF No. 59. On July 18, 2022, the Court upheld the legal sufficiency of the Consolidated Complaint. ECF No. 71. The Consolidated Complaint did not name Catterton as defendants.

Thereafter, discovery began, and the named parties engaged in extensive negotiations over the scope of relevancy in connection with what documents would be produced by the Honest Defendants and the Underwriter Defendants. As a result of the

3

negotiations, on May 23, 2023, Honest produced the first set of documents relevant to Lead Plaintiff's claims. The Underwriter Defendants followed soon after, making their first production on June 13, 2023. Based on Lead Plaintiff's review of these documents, it became clear that Catterton was more than a passive shareholder of Honest stock, but rather leveraged its minority ownership of Honest to have an outsized influence on the Offering, thereby constituting control under Section 15 of the Securities Act.

On August 14, 2023, Lead Plaintiff filed the Amended Consolidated Complaint for Violations of the Federal Securities Laws. ECF No. 141. Catterton filed its Motion to Dismiss the Amended Complaint on October 16, 2023 (ECF No. 169) and on January 31, 2024, the Court granted Catterton's motion but allowed Lead Plaintiff leave to amend the complaint (ECF No. 183). Lead Plaintiff filed the Second Amended Consolidated Complaint for Violations of the Federal Securities Laws (the "Complaint"), on February 14, 2024. ECF No. 185. On February 28, 2024, Catterton filed the instant Motion seeking to dismiss the Complaint. ECF No. 195.

## III.    ARGUMENT

### A.    Legal Standard

In assessing a Rule 12(b)(6) motion, the Court must consider the Complaint in its entirety, "accept all factual allegations . . . as true," and construe them in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007); *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001) ("all material allegations of the complaint are accepted as true, as well as all reasonable inferences to be drawn from them"). The court must draw all inferences in plaintiff's favor whether they are derived from the complaint itself or documents attached thereto. *See Moement, Inc. v. Groomore, Inc.,* 2022 WL 18284405, at *1 (C.D. Cal. Nov. 29, 2022) (drawing reasonable inference in plaintiff's favor based on exhibit attached to complaint ) (*citing Glynn Env't Coal., Inc. v. Sea Island Acquisition, LLC*, 26 F.4th 1235, 1240 (11th Cir. 2022) ("We accept as true the allegations in the complaint and attached exhibits and draw all reasonable inferences in favor of the plaintiffs.")).

4

A complaint "does not need detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007), but rather must simply "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 n.12 (2009). FRCP 8 does not impose "an onerous burden" as "[s]pecific facts are not necessary; the statement need only give the defendant[s] fair notice of what . . . the claim is and the grounds upon which it rests." *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1122 (9th Cir. 2008).

**B.      Catterton Mischaracterizes and Ignores Critical Context in the Exhibits**

**1.      The Pre-IPO Exhibits Establish That Catterton Sought to Urgently Exit its Investment in Honest While the Company's Financials Surged Due to the COVID-19 Pandemic**

Catterton first takes issue with the Complaint's allegation that Catterton exerted pressure on Honest to ensure the IPO would happen as quickly as possible. *See* MTD at 4-7; *see also* ¶¶80-89.[2] Catterton points to Exhibit F in an attempt to show that the IPO was "enthusiastically pursued by Honest" (MTD at 5), quoting certain (largely irrelevant) portions of the email, while conspicuously failing to address the portions of the document that were referenced and quoted in the Complaint. *Compare* MTD at 5 *with* ¶88. ███████████████████████████████████████████

---

[2] Citations to paragraphs ("¶") are to paragraphs in the Complaint. Unless otherwise noted, emphasis is added and internal citations and quotation marks are omitted throughout.

5

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████ ignores the Complaint's allegations (which have already been sustained by the Court) explaining that leading up to the IPO customers were stocking up on Honest's products, which boosted revenues but inevitably led to a drastic decrease in demand at the time of the IPO. *See In re Honest Co. Sec. Litig.*, 615 F. Supp. 3d 1149, 1156 (C.D. Cal. 2022); ECF No. 71 at 8-10.

Similarly, Catterton's discussion of Exhibit H ignores important context helpful to understanding how Catterton was exerting pressure on Honest to move forward with the IPO. *See* MTD at 5-6. "[W]hat's missing" (MTD at 6), is what Catterton conveniently chooses to exclude. Specifically, when relaying the content of a call between Morgan Stanley, Defendant Vlahos, Kim Sung (an Honest VP of Finance), and Catterton (which was represented by Adam Hasiba in addition to Defendants Dahnke and Pramanik), a Morgan Stanley employee stated that "Scott [Dahnke] [was] very focused" and it was he who "seem[ed] confident that the IPO [was] an attractive path." See Ex. H, at MS_HONEST_00000000-00068730. It was on this same call that Morgan Stanley learned that any IPO would need to be conducted "ASAP." *Id.* The inference to be taken here in Lead Plaintiff's favor is that the one who pushed for the IPO—Defendant Dahnke—was the one who wanted it to happen as soon as possible for Catterton's benefit.

Catterton's characterizations of discussions concerning the timing of its exit from Honest are similarly designed to obfuscate the meaning of the documents. *See* MTD at 6-7. ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS
2:21-CV-07405-MCS-BFMx

In making this argument Catterton chooses to bury its head in the sand. It is beyond dispute that Honest received a significant boost to its revenues as a result of the COVID-19 pandemic, which was at its height in July 2020. ¶¶8, 72, 78.

Based on the above, it is clear that Catterton sought to exit its investment from Honest when the Company's financials were artificially inflated by the pandemic.

7

LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS
2:21-CV-07405-MCS-BFMx

Again, the only inference to be drawn from these documents is that Catterton knew that Honest's financials would falter once pandemic buying ceased and thus pushed to exit its investment in Honest before demand cratered. While Catterton argues that this pre-IPO conduct is irrelevant (MTD at 7), it provides important context as to why it sought to leverage its minority ownership position in Honest to push the IPO along as quickly as possible. Had Catterton not taken the reins and the IPO was delayed, Catterton would not have gotten the valuation of Honest that it desired.

### 2. Catterton Controlled the Mechanics of the Offering and the Contents of the Offering Documents

Catterton next shifts to arguing that the documents do not establish that it actually controlled the Offering or the contents of the Offering Documents. MTD at 7-11. Once again, in making this argument Catterton ignores critical portions of the documents and implores the Court to draw not only improper but implausible inferences in its favor. For example, Catterton takes issue with Exhibit I, which it describes as "innocuous." However, in a December 4, 2020, email between Morgan Stanley employees, one employee states that L Catterton will be included in all drafting sessions for the Company's S-1 Registration Statement. *See* Ex. I, at MS_HONEST_00000000_00040296. Notably, the only other parties mentioned are Honest, its lawyers, and a public relations firm hired to help with the Company's messaging during the IPO process. *Id.* Despite the fact that at least four other private equity funds were using the IPO to sell parts of their investment,[5] two of which had board representation like Catterton,[6] Catterton was the only investor mentioned as being invited to these drafting sessions.

---

[5] Institutional Venture Partners XIII, L.P., which owned 13.8% of Honest's stock prior to the IPO, Lightspeed Venture Partners, which owned 12.2% of Honest's stock prior to the IPO, General Catalyst, which owned 5% of Honest's stock prior to the IPO, and Glade Brook Private Investors VII LLC, which owned 2% of Honest's stock prior to the IPO, all sold shares in the IPO. *See* ECF No. 169-2 at 20-40.

[6] Defendant Liaw was at the time of the IPO a General Partner of Institutional Venture Partners and Defendant Liew was at the time of the IPO a Partner at Lightspeed

Footnote continued on next page

8

Similarly, Exhibit J, a PowerPoint slide for a December 14, 2020 "Project Horizon Organizational Meeting"[7] groups Honest, L Catterton, and ICR together in the "Horizon" group, meaning that each had responsibility over essentially the same tasks. *See* Ex. J, at 7. Catterton attempts to undercut the importance of this as it relates to Catterton by noting ICR's inclusion in this group and stating that "most reasonable people would regard a control person claim brought against ICR as being absurd." MTD at 8. This argument is nonsensical and borders on incoherent. ICR as a public relations firm has a logical well-defined reason for being included in this group—it was hired by Honest as part of the IPO process to help with the Company's messaging and marketing. The same is not true of Catterton, who was a shareholder, and as other documents establish, contributed significantly to the content of the Offering Documents. This difference in position and function is exactly why ICR is not alleged to be a control person in this case. Catterton takes Lead Plaintiff to task for next describing a "litany of essentially everything that happens in a public offering" without tying it directly to Catterton. MTD at 8; *see also* ¶91 (explaining that the responsibilities Catterton shared with Honest included "drafting the Registration Statement's management discussion and analysis (MD&A) section (among others), conducting third-party due diligence calls and analyst/roadshow presentations, and working out terms of the underwriting and lock up agreements). However, that is exactly the import of Exhibits I and J, by attending all drafting sessions and being included as a responsible party for every function for which Honest was also responsible, Catterton was involved in almost every aspect of the IPO.

Further, some of Catterton's specific contributions are outlined in Exhibit K, which are notes from a December 18, 2020 S-1 Registration Statement drafting session,

Venture Partners. ECF No. 169-2 at 12. In contrast to Defendants Dahnke and Pramanik, discovery to date shows that Defendants Liaw and Liew acted as would be expected for any Board member and did not insert Institutional Venture Partners or at Lightspeed Venture Partners into the IPO process.

[7] Project Horizon was the internal codename for the IPO.

9

wherein it is noted that Catterton was "to take first half of business section and rework it." Notably, the first half of the business section included several of the statements alleged to be false and misleading. Catterton somehow fails to mention this, mischaracterizing the document as merely "referenc[ing] . . . largely stylistic revisions." MTD at 8. Rewriting half of a section that included material information is not "trivial" and giving a 37% shareholder carte blanche to rewrite sections of the Offering Documents—which ultimately contained false and misleading statements— is the epitome of giving them control. Despite this, Catterton argues that "[n]othing alleged in the [Complaint], however, shows Catterton controlling . . . the preparation of the Offering Documents." *Id.* This reveals a startling lack of candor from Catterton.

Catterton continues its questionable narration of the documents in connection with Exhibit L, a December 8, 2020 email thread between Morgan Stanley, Adam Hasiba, and two other Catterton employees who had no affiliation to Honest. Ex. L, at MS_HONEST_00000000-00041384-85. In this email, Morgan Stanley asks Hasiba's permission to reach out to McKinsey & Company about data Morgan Stanley potentially wanted to include in the S-1 Registration Statement related to Honest's brand awareness. *Id.* Catterton attempts to downplay this document, characterizing Morgan Stanley's request for data to be so trivial that it would be beneath Honest's board. MTD at 9. However, this misses the point. Catterton fails to offer any explanation for why Adam Hasiba, an employee of Catterton, would be the one responsible for deciding whether Honest would have access to data on its own products. Indeed, in this context it appears Catterton was operating independently on matters concerning the Offering without any oversight from Honest or even the Catterton affiliated Honest Board members.

Catterton then attempts to argue that the allegations contained in paragraph 94 are solely based on this interaction between Adam Hasiba and Morgan Stanley. MTD at 9. In reality, paragraph 94 is the culmination of the preceding four paragraphs, which lay out each of Catterton's responsibilities in connection with the Offering Documents.

*See* ¶¶90-94. Once again, Catterton's "argument" is simply and improperly an attempt to rewrite the Complaint.

Catterton next turns to Exhibit M, a February 5, 2021 email thread wherein an Honest employee informed Defendant Kennedy that Honest provides Catterton with reports that have "additional detail into [Honest's] consumption data." *See* Ex. M, at HNST_0095658. Catterton attempts to explain this away, arguing without a shred of support that it is commonplace—and perhaps even a fiduciary duty—to provide minority shareholders with more information about a company than other shareholders. MTD at 10. Indeed, while Honest was owned in part by several other private equity funds, only Catterton is referenced as getting this additional detail. Moreover, Catterton's suggestion that Lead Plaintiff should have "always assumed" Catterton received these extra reports from Honest is completely at odds with Lead Plaintiff's actual duty to ensure the accuracy of information included in the Complaint. *See* Fed. R. Civ. P. 11(b)(3).

One of Catterton's most egregious mischaracterizations stems from its discussion of Exhibit N, a November 2020 email thread between Adam Hasiba and Sung Kim. In the Motion, Catterton characterizes the conversation as Honest merely asking for some "small bit of advice" from Catterton. MTD at 10. In reality, this has nothing to do with advice, rather Hasiba reached out to Kim and instructed him to get an estimate from Honest's auditor about when Honest's PCAOB audits will be ready. Kim responded two days later relaying what he was told by the auditor concerning the audits. Ex. N, at HNST_0108490-91. Ultimately, Hasiba explains to Kim that despite what he was told by the auditor, they will likely need additional audits. *Id.* at HNST_0108490. Far from advice, Hasiba is instructing Kim on how the audit process should go, representing Catterton's control of that part of the IPO process.

Finally, Catterton takes issue with Exhibits O and P, which Lead Plaintiff alleges establish that Catterton directly participated in the marketing strategy for the IPO, including in the testing-the-waters process and roadshow presentations and videos.

11

LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS
2:21-CV-07405-MCS-BFMx

MTD at 10-11; *see* ¶97. As to testing-the-waters, Catterton's assertion that "[w]ere Catterton really running the testing-the-waters process, it would not have needed an update" is belied by what the document actually says. MTD at 11. Indeed, Morgan Stanley is not offering to update them on how the process is going but rather wants to "share perspectives on next steps in the process." Ex. O, at MS_HONEST_00000000-00078407. If Catterton were not running, at least in part, the testing-the-waters process, Morgan Stanley would have no need to solicit Catterton's perspective on next steps. Similarly, with regards to Exhibit P, while it is true that Morgan Stanley expresses that the roadshow should have a professionally produced video, it shares this perspective with five Catterton employees, four of whom have no connection to Honest, indicating that Catterton had at least some say in the matter. Ex. P, at MS_HONEST_00000000-00041034.

### 3.    The Documents Are Clear That Catterton Chose Morgan Stanley as the Lead Underwriter

Catterton attempts to argue that it was not responsible for picking Morgan Stanley despite the weight of evidence to the contrary. MTD at 11-13. First, Catterton points to Exhibits Q and R, arguing that Exhibit R has nothing to do with underwriter selection. *Id.* at 11. Indeed, Exhibit R is an August 2020 internal Morgan Stanley email wherein Morgan Stanley stated that Catterton had an "outsize[d] influence" on advisor selection. Ex. R, at MS_HONEST_00000000-00091276. While it is true that this occurred before the Company was set on an IPO, there is nothing to suggest that Honest re-opened the advisor process once it chose to pivot to an IPO. Moreover, this is a red herring as in December 2020, after Honest chose to move forward with an IPO, Morgan Stanley reached out directly to Defendant Dahnke—specifically without any Honest employees included—and thanked him for the opportunity to lead the IPO. Ex. Q, at MS_HONEST_00000000-00041724. Catterton's criticisms do not change the fact that Exhibit Q unequivocally establishes that it chose Morgan Stanley. ██████████

████████████████████████████████████████████████████

12

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████

Similarly, Catterton paid Morgan Stanley's incentive fee giving it great incentive to cede to Catterton's wishes. Ex. T, at MS_HONEST_00000000-0006035. While Catterton attempts to undercut this allegation, asserting that the "[Complaint] does not allege that Morgan Stanley was not contractually entitled to the incentive fee" (MTD at 12), as if it would make a difference, the plain language of the document describes it as a "reward[]" which suggests that it was not contractually required (Ex. T, at MS_HONEST_00000000-0006035). Moreover, Catterton's suggestion that Lead Plaintiff should have anticipated that Morgan Stanley would abdicate its responsibility to Honest in favor of a private equity fund that could provide repeat business is at odds with Lead Plaintiff's duty to ensure the accuracy of the allegations in the Complaint. While Catterton engages in blind supposition for its own benefit, Lead Plaintiff does not. Further, while Catterton notes that Honest was not harmed by Catterton's selection of Morgan Stanley, it makes no mention of the investors who lost millions of dollars in the IPO thanks in no small part to Morgan Stanley's and the other Underwriter Defendants' negligence. ¶163.

Finally, with respect to Exhibit O, a March 31, 2021 email thread between Catterton and Honest, while Catterton quizzically chooses to quote a random, irrelevant portion of the email, it is cited for the simple proposition that Morgan Stanley met with Catterton independently of Honest. *See* ¶100.

Try as it might, Catterton cannot rewrite the Exhibits and as explained above, their characterizations cannot be given any weight. Throughout the Motion, Catterton mischaracterizes the documents and Lead Plaintiff's allegations and ignores critical context all the while baselessly claiming Lead Plaintiff has done the same. However,

13

the documents speak for themselves. What they say tells the story of Catterton attempting to exit its investment in Honest when it could receive the maximum return on its investment and using all of its influence over Honest and Morgan Stanley to make that happen. This is control under the securities laws.

### C. The Statute of Limitations Has Not Passed Because the Allegations Derived from the Exhibits Could Not Have Been Known When Lead Plaintiff Filed the Initial Complaint

Catterton argues that Lead Plaintiff should have had enough information when she filed the initial complaint to plead Catterton as a control defendant. MTD at 14.[8] However, in making this argument, Catterton conspicuously fails to directly cite the seminal Supreme Court case articulating the standard for when a plaintiff is on notice of a securities claim, instead choosing to write the law itself. Contrary to Catterton's argument, the Supreme Court has explained that the statute of limitations for securities claims only begins to run "when the litigant first knows or with due diligence should know facts that will form the basis for an action." *Merck & Co. v. Reynolds*, 559 U.S. 633, 646 (2010); *see also In re YogaWorks, Inc. Sec. Litig.*, 2020 WL 2549290, at \*2 (C.D. Cal. Apr. 23, 2020) (applying *Merck* to claims brought under Sections 11 and 15 of the Securities Act). Post-*Merck*, "[p]laintiffs are considered to have discovered a fact when a 'reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint . . . ***with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss***.'" *F.D.I.C. v. Countrywide Fin. Corp.*, 2012 WL 5900973, at \*3 (C.D. Cal. Nov. 21, 2012); *see also Merck,* 559 U.S. at 653 (holding limitations period only starts running when "a reasonably diligent plaintiff would have discovered 'the facts constituting the violation[]'").

Despite the Supreme Court's clear articulation of this standard, Catterton argues—without citing any authority, including *Merck*—that the statute of limitations

---

[8] Catterton does not argue that if Lead Plaintiff was in fact not on notice of its claims until May 2023 as alleged in the Complaint (¶175), the statute of limitations ran nonetheless This is because Lead Plaintiff quickly sought to amend her allegations within three months of the earliest possible notice.

14

began to run when Lead Plaintiff had enough information to comply with FRCP 11(b). MTD at 14. This is incorrect. *See Pace v. Quintanilla*, 2015 WL 652719, at *6 n.2 (C.D. Cal. Feb. 13, 2015) (rejecting argument that information sufficient to "allow [p]laintiffs to bring a non-frivolous suit (under Rule 11)" begins the running of the statute of limitations in a securities class action post-*Merck* and recognizing that "[m]eeting the Rule 11 standard  . . . is merely the bare minimum that a plaintiff's attorney must do"). Rather, consistent with *Merck*, for a plaintiff bringing a claim under Sections 11 or 15, "to adequately plead" a fact requires meeting the FRCP 8 standard articulated above.

As already discussed at length, the information contained in the Exhibits, which forms the basis for the Complaint's new allegations, was not available to Lead Plaintiff until after the Honest Defendants and the Underwriter Defendants began producing documents in May and June 2023, respectively. Based on the public information available at the time Lead Plaintiff filed the initial complaint, all that was known of Catterton's relationship to Honest was that it was a minority shareholder, which was represented on the board, and which sold approximately half of its holdings in the IPO. ¶174. In contrast, the documents show that Catterton was involved in all facets of Honest's operations, was a key decision maker in connection with the IPO, and even independently drafted portions of the Registration Statement. Because Lead Plaintiff would not have been able to plead these facts in a complaint until May 2023—at the absolute earliest—the statute of limitations did not begin to run until that time.

Catterton also argues that Lead Plaintiff should have guessed that Catterton was controlling Honest and thus should have included them in the initial complaint. MTD at 14. Catterton asserts, without any support, that Catterton's actions are the same of any minority shareholder. This is non-sensical and at odds with Lead Plaintiff's duties under FRCP 11(b)(3), which requires that "factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."

15

Catterton additionally cites a number of cases to support the faulty proposition that Catterton's minority ownership and two board seats are sufficient to establish control. MTD at 14. In fact, the cases cited by Catterton belie this contention. *See In re Musicmaker.com Sec. Litig.*, 2001 WL 34062431, at *17 (C.D. Cal. June 4, 2001) (MTD at 14) (finding control where investor held a "majority interest"); *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2016 WL 215476, at *11 (S.D. Tex. Jan. 19, 2016) (MTD at 14) (finding control where investor had "significant stock ownership *and* ability to elect a majority of Cobalt's Board of Directors. . . .[*and*] the right to select a majority of the members of every Board Committee except the Audit Committee"); *In re AFC Enterprises, Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1382 (N.D. Ga. 2004) (MTD at 14) (finding control where investor controlled six of eleven board seats). In each of these cases, the court required significantly more evidence of control than was available to Lead Plaintiff at the time the initial complaint was filed.

Accordingly, the statute of limitations did not begin to run until May 2023, less than one year ago.

### D. The Complaint's Allegations Establish Catterton's Control

Pursuant to Section 15, a defendant is liable if: (1) there is a primary violation of the Securities Act; and (2) the defendant directly or indirectly controlled the person or entity liable for the primary violation. *In re China Intelligent Lighting & Elecs., Inc. Sec. Litig.*, 2012 WL 3834815, at *5 (C.D. Cal. Sept. 5, 2012). The inquiry into a defendant's control "is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *In re BofI Holding, Inc. Sec. Litig.*, 2017 WL 2257980, at *21 (S.D. Cal. May 23, 2017); *see Id.*, at *23 ("The control inquiry, as defined by the Ninth Circuit . . . requires [c]ourts to inquire into the 'realities of business relationships.'"); *see also Lester v. Preco Indus., Inc.*, 282 F. Supp. 459, 461 (S.D.N.Y. 1965) ("What constitutes control is one of the most difficult questions in securities law."). Accordingly, "[w]hether a defendant is a control person is a fact

16

question rarely appropriate for motion practice." *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1183 (C.D. Cal. 2008).

The Court has already found that Lead Plaintiff sufficiently alleged that Honest committed a primary violation of Section 11 (*see generally In re Honest Co. Sec. Litig.*, 615 F. Supp. 3d 1149 (C.D. Cal. 2022) (ECF No. 71)), thus, the sole inquiry relevant to Catterton's liability at this stage is whether the Complaint sufficiently alleges Catterton directly or indirectly controlled Honest and the contents of the Offering Documents, which contained the material misrepresentations and omissions at issue in this Action. It does.

As alleged in the Complaint, Catterton controlled the timing of the IPO (¶¶80-89), participated in all drafting sessions for the Registration Statement and wrote parts of it independently of Honest (¶¶90-92), controlled access to data related to Honest's brand awareness (¶93), was involved in PCAOB audits and received additional financial reports other investors did not have access to (¶¶95-96), participated in the marketing strategy for the Offering (¶97), selected Morgan Stanley as the lead underwriter for the IPO (¶¶98-100), and directed Honest employees in connection with tasks related to the IPO (*see, e.g.*, Ex. N). Together, Catterton's direct management of Honest employees, participation in and direction of the IPO, role in preparing the Offering Documents, and relationship with Defendant Morgan Stanley establish Catterton's control over Honest, the IPO, and the content of the Offering Documents. *See Chen v. Urb. Commons 6 Ave Seattle, LLC*, 2023 WL 4291439, at *7 (C.D. Cal. Apr. 18, 2023) (finding claims under Section 15 adequately pled where defendants were "owners" of company that committed primary violation, participated and were aware of the company's operations, and "had the power and control, and did influence and control, directly or indirectly, the decision making relating to the . . . [o]ffering."); *In re DDi Corp. Sec. Litig.*, 2005 WL 3090882, at *21 (C.D. Cal. July 21, 2005) (finding Bain Capital a "controlling person" under Section 15 because it "control [led] the contents of the … Prospectus") (alteration in original); *Fed. Hous. Fin. Agency v.*

17

*UBS Americas, Inc.*, 858 F. Supp. 2d 306, 333 (S.D.N.Y. 2012), *aff'd,* 712 F.3d 136 (2d Cir. 2013) (finding claims under Section 15 adequately pled where defendant "controlled the[] [issuer's] actions in issuing and selling [securities]."); *Griffin v. Painewebber, Inc.*, 2001 WL 740764, at \*3 (S.D.N.Y. June 29, 2001) (allegation that defendant "had the ability to control the contents of the Registration Statement and Prospectus" along with other allegations such as significant stock owners and right to appoint board members were "sufficient at the pleading stage to make out a primary facie case under § 15"); *City of Pittsburgh Comp. Mun. Pension Trust Fund v. Benefitfocus, Inc.*, 2021 WL 4441904, at \*3 (N.Y. Sup. Ct. Sep. 28, 2021) (sustaining allegations that Mercer controlled Benefitfocus when Complaint was "replete with allegations about the importance and influential nature of Mercer's relationship with Benefitfocus").

The case law cited by Catterton with respect to the question of control is inapposite at best and disingenuously asserted at worst.  The primary case Catterton relies on is *In re Homestore.com Inc. Sec. Litig.*, 347 F. Supp. 2d 790 (C.D. Cal. 2004) (MTD at 15), which examined at **summary judgment** whether an **auditor** controlled the company that hired it.  *Id.* at 810-11.  Just as strangely, Catterton cites to *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151 (9th Cir. 1996) (MTD at 16 n.7), which also examined control at the **summary judgment** stage but in a case where the plaintiff uniquely sought to hold a company's lender liable as a control person.  *Id.* at 1162-63 (noting that "the Ninth Circuit has not faced the lender-borrower situation before" and that other circuits had rejected the theory). Despite the complete incongruity between *Paracor* and this case, the Ninth Circuit's holding that "at least some indicia of … control is a necessary element of 'controlling person' liability" makes clear that is not Lead Plaintiffs burden to prove that Catterton stood in Honest's

LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS
2:21-CV-07405-MCS-BFMx

shoes at all times, on all matters.[9] *Id.* at 1163. *In re Peregrine Sys. Sec. Litig.*, 2005 U.S. Dist. LEXIS 59408 (S.D. Cal. Mar. 30, 2005) (MTD at 15-16 n.7), again applies a standard inapplicable to the Complaint in this case, i.e., FRCP 9(b)'s particularity standard because that case was a fraud action. *Id.* at *239 (requiring allegations be made with "particularity"). Moreover, the allegations that were deemed insufficient to allege control at Catterton's point of citation were nothing more than keeping contact with board members, appointing certain board members, and owning a "substantial" number of shares in the company (*id.* at *242), which surprisingly is what Catterton claims elsewhere in the Motion Lead Plaintiff should have alleged in her initial complaint. MTD at 14. The same is true for the rulings under FRCP 9(b) in *In re Downey Sec. Litig.*, 2009 U.S. Dist. LEXIS 25007, at *45 (C.D. Cal. Mar. 18, 2009) (dismissing "boilerplate" control allegations based solely on defendants position in the company and stock ownership), and *Welgus v. TriNet Grp.*, 2017 U.S. Dist. LEXIS 6347, at *13 (N.D. Cal. Jan. 17, 2017) (MTD at 16) (rejecting under FRCP 9(b) allegations premised on stock ownership, board membership, and boilerplate language suggesting the defendant participated in making misstatements and omissions).

Accordingly, Catterton is liable as a control person under Section 15 of the Securities Act.

---

[9] Indeed, courts generally require only some showing of control to establish a Section 15 violation. *See In re Worlds of Wonder Sec. Litig.*, 694 F. Supp. 1427, 1435 (N.D. Cal. 1988) ("there must be *some showing* of actual participation in the corporation's operation or *some influence* before the consequences of control may be imposed") (emphasis added).

19

## IV.    CONCLUSION

Lead Plaintiff respectfully requests the Motion be denied in its entirety.

Dated:  March 13, 2024                              Respectfully submitted,

**LABATON KELLER SUCHAROW LLP**

By:  */s/ Alfred L. Fatale III*                                        

Jonathan Gardner*
Alfred L. Fatale III*
David J. Schwartz*
Robert S. Rowley*
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: jgardner@labaton.com
afatale@labaton.com
dschwartz@labaton.com
rrowley@labaton.com

*admitted *pro hac vice*

*Lead Counsel for Lead Plaintiff
and the Class*

**THE SCHALL LAW FIRM**
Brian Schall
Rina Restaino
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (310) 301-3335
Facsimile: (213) 519-5876
Email: brian@schallfirm.com
rina@schallfirm.com

*Liaison Counsel for Lead Plaintiff*

20

LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS
2:21-CV-07405-MCS-BFMx